# THE 9/11 COMMISSION REPORT

# CONTENTS

*List of Illustrations and Tables*   ix

*Member List*   xi

*Staff List*   xiii–xiv

*Preface*   xv

1. "WE HAVE SOME PLANES"   1
    1.1   Inside the Four Flights   1
    1.2   Improvising a Homeland Defense   14
    1.3   National Crisis Management   35

2. THE FOUNDATION OF THE NEW TERRORISM   47
    2.1   A Declaration of War   47
    2.2   Bin Ladin's Appeal in the Islamic World   48
    2.3   The Rise of Bin Ladin and al Qaeda (1988–1992)   55
    2.4   Building an Organization, Declaring
           War on the United States (1992–1996)   59
    2.5   Al Qaeda's Renewal in Afghanistan (1996–1998)   63

3. COUNTERTERRORISM EVOLVES   71
    3.1   From the Old Terrorism to the New:
           The First World Trade Center Bombing   71
    3.2   Adaptation—and Nonadaptation—
           in the Law Enforcement Community   73
    3.3   . . . and in the Federal Aviation Administration   82
    3.4   . . . and in the Intelligence Community   86

3.5   . . . and in the State Department and the Defense Department   93
3.6   . . . and in the White House   98
3.7   . . . and in the Congress   102

4.   RESPONSES TO AL QAEDA'S INITIAL ASSAULTS   108
    4.1   Before the Bombings in Kenya and Tanzania   108
    4.2   Crisis: August 1998   115
    4.3   Diplomacy   121
    4.4   Covert Action   126
    4.5   Searching for Fresh Options   134

5.   AL QAEDA AIMS AT THE AMERICAN HOMELAND   145
    5.1   Terrorist Entrepreneurs   145
    5.2   The "Planes Operation"   153
    5.3   The Hamburg Contingent   160
    5.4   A Money Trail?   169

6.   FROM THREAT TO THREAT   174
    6.1   The Millennium Crisis   174
    6.2   Post-Crisis Reflection: Agenda for 2000   182
    6.3   The Attack on the USS *Cole*   190
    6.4   Change and Continuity   198
    6.5   The New Administration's Approach   203

7.   THE ATTACK LOOMS   215
    7.1   First Arrivals in California   215
    7.2   The 9/11 Pilots in the United States   223
    7.3   Assembling the Teams   231
    7.4   Final Strategies and Tactics   241

8.   "THE SYSTEM WAS BLINKING RED"   254
    8.1   The Summer of Threat   254
    8.2   Late Leads—Mihdhar, Moussaoui, and KSM   266

9.   HEROISM AND HORROR   278
    9.1   Preparedness as of September 11   278
    9.2   September 11, 2001   285
    9.3   Emergency Response at the Pentagon   311
    9.4   Analysis   315

vi

10. WARTIME    325
    10.1  Immediate Responses at Home    326
    10.2  Planning for War    330
    10.3  "Phase Two" and the Question of Iraq    334

11. FORESIGHT—AND HINDSIGHT    339
    11.1  Imagination    339
    11.2  Policy    348
    11.3  Capabilities    350
    11.4  Management    353

12. WHAT TO DO? A GLOBAL STRATEGY    361
    12.1  Reflecting on a Generational Challenge    361
    12.2  Attack Terrorists and Their Organizations    365
    12.3  Prevent the Continued Growth of Islamist Terrorism    374
    12.4  Protect against and Prepare for Terrorist Attacks    383

13. HOW TO DO IT? A DIFFERENT WAY OF
    ORGANIZING THE GOVERNMENT    399
    13.1  Unity of Effort across the Foreign-Domestic Divide    400
    13.2  Unity of Effort in the Intelligence Community    407
    13.3  Unity of Effort in Sharing Information    416
    13.4  Unity of Effort in the Congress    419
    13.5  Organizing America's Defenses in the United States    423

*Appendix A: Common Abbreviations*    429
*Appendix B: Table of Names*    431
*Appendix C: Commission Hearings*    439
*Notes*    449

LIST OF ILLUSTRATIONS
AND TABLES

p. 15        FAA Air Traffic Control Centers
p. 15        Reporting structure, Northeast Air Defense Sector
p. 32–33     Flight paths and timelines
p. 49        Usama Bin Ladin
p. 64        Map of Afghanistan
p. 148       Khalid Sheikh Mohammed
p. 238–239   The 9/11 hijackers
p. 279       The World Trade Center Complex as of 9/11
p. 284       The World Trade Center radio repeater system
p. 288       The World Trade Center North Tower stairwell with deviations
p. 312       The Twin Towers following the impact of American Airlines
             Flight 11 and United Airlines Flight 175
p. 313       The Pentagon after being struck by American Airlines Flight 77
p. 313       American Airlines Flight 93 crash site, Shanksville, Pennsylvania
p. 413       Unity of effort in managing intelligence



# COMMISSION
# MEMBERS

Thomas H. Kean
CHAIR

Lee H. Hamilton
VICE CHAIR

Richard Ben-Veniste

Bob Kerrey

Fred F. Fielding

John F. Lehman

Jamie S. Gorelick

Timothy J. Roemer

Slade Gorton

James R. Thompson

# COMMISSION
# STAFF

Philip Zelikow, *Executive Director*
Christopher A. Kojm, *Deputy Executive Director*
Daniel Marcus, *General Counsel*

Joanne M. Accolla
*Staff Assistant*

Alexis Albion
*Professional Staff Member*

Scott H. Allan, Jr.
*Counsel*

John A. Azzarello
*Counsel*

Caroline Barnes
*Professional Staff Member*

Warren Bass
*Professional Staff Member*

Ann M. Bennett
*Information Control Officer*

Mark S. Bittinger
*Professional Staff Member*

Madeleine Blot
*Counsel*

Antwion M. Blount
*Systems Engineer*

Sam Brinkley
*Professional Staff Member*

Geoffrey Scott Brown
*Research Assistant*

Daniel Byman
*Professional Staff Member*

Dianna Campagna
*Manager of Operations*

Samuel M.W. Caspersen
*Counsel*

Melissa A. Coffey
*Staff Assistant*

Lance Cole
*Consultant*

Marquittia L. Coleman
*Staff Assistant*

Marco A. Cordero
*Professional Staff Member*

Rajesh De
*Counsel*

George W. Delgrosso
*Investigator*

Gerald L. Dillingham
*Professional Staff Member*

Thomas E. Dowling
*Professional Staff Member*

Steven M. Dunne
*Deputy General Counsel*

Thomas R. Eldridge
*Counsel*

Alice Falk
*Editor*

John J. Farmer, Jr.
*Senior Counsel & Team Leader*

Alvin S. Felzenberg
*Deputy for Communications*

xiv                    COMMISSION STAFF

Lorry M. Fenner
*Professional Staff Member*

Susan Ginsburg
*Senior Counsel & Team Leader*

T. Graham Giusti
*Security Officer*

Nicole Marie Grandrimo
*Professional Staff Member*

Douglas N. Greenburg
*Counsel*

Barbara A. Grewe
*Senior Counsel, Special Projects*

Elinore Flynn Hartz
*Family Liaison*

Leonard R. Hawley
*Professional Staff Member*

L. Christine Healey
*Senior Counsel & Team Leader*

Karen Heitkotter
*Executive Secretary*

Walter T. Hempel II
*Professional Staff Member*

C. Michael Hurley
*Senior Counsel & Team Leader*

Dana J. Hyde
*Counsel*

John W. Ivicic
*Security Officer*

Michael N. Jacobson
*Counsel*

Hunter W. Jamerson
*Intern*

Bonnie D. Jenkins
*Counsel*

Reginald F. Johnson
*Staff Assistant*

R. William Johnstone
*Professional Staff Member*

Stephanie L. Kaplan
*Special Assistant & Managing Editor*

Miles L. Kara, Sr.
*Professional Staff Member*

Janice L. Kephart
*Counsel*

Hyon Kim
*Counsel*

Katarzyna Kozaczuk
*Financial Assistant*

Gordon Nathaniel Lederman
*Counsel*

Daniel J. Leopold
*Staff Assistant*

Sarah Webb Linden
*Professional Staff Member*

Douglas J. MacEachin
*Professional Staff Member & Team Leader*

Ernest R. May
*Senior Adviser*

Joseph McBride
*Intern*

James Miller
*Professional Staff Member*

Kelly Moore
*Professional Staff Member*

Charles M. Pereira
*Professional Staff Member*

John Raidt
*Professional Staff Member*

John Roth
*Senior Counsel & Team Leader*

Peter Rundlet
*Counsel*

Lloyd D. Salvetti
*Professional Staff Member*

Kevin J. Scheid
*Professional Staff Member & Team Leader*

Kevin Shaeffer
*Professional Staff Member*

Tracy J. Shycoff
*Deputy for Administration & Finance*

Dietrich L. Snell
*Senior Counsel & Team Leader*

Jonathan DeWees Stull
*Communications Assistant*

Lisa Marie Sullivan
*Staff Assistant*

Quinn John Tamm, Jr.
*Professional Staff Member*

Catharine S. Taylor
*Staff Assistant*

Yoel Tobin
*Counsel*

Emily Landis Walker
*Professional Staff Member & Family Liaison*

Garth Wermter
*Senior IT Consultant*

Serena B. Wille
*Counsel*

Peter Yerkes
*Public Affairs Assistant*

xiv

At 9:37:46, American Airlines Flight 77 crashed into the Pentagon, traveling at approximately 530 miles per hour.[61] All on board, as well as many civilian and military personnel in the building, were killed.

### The Battle for United 93

At 8:42, United Airlines Flight 93 took off from Newark (New Jersey) Liberty International Airport bound for San Francisco. The aircraft was piloted by Captain Jason Dahl and First Officer Leroy Homer, and there were five flight attendants. Thirty-seven passengers, including the hijackers, boarded the plane. Scheduled to depart the gate at 8:00, the Boeing 757's takeoff was delayed because of the airport's typically heavy morning traffic.[62]

The hijackers had planned to take flights scheduled to depart at 7:45 (American 11), 8:00 (United 175 and United 93), and 8:10 (American 77). Three of the flights had actually taken off within 10 to 15 minutes of their planned departure times. United 93 would ordinarily have taken off about 15 minutes after pulling away from the gate. When it left the ground at 8:42, the flight was running more than 25 minutes late.[63]

As United 93 left Newark, the flight's crew members were unaware of the hijacking of American 11. Around 9:00, the FAA, American, and United were facing the staggering realization of apparent multiple hijackings. At 9:03, they would see another aircraft strike the World Trade Center. Crisis managers at the FAA and the airlines did not yet act to warn other aircraft.[64] At the same time, Boston Center realized that a message transmitted just before 8:25 by the hijacker pilot of American 11 included the phrase, "We have some planes."[65]

No one at the FAA or the airlines that day had ever dealt with multiple hijackings. Such a plot had not been carried out anywhere in the world in more than 30 years, and never in the United States. As news of the hijackings filtered through the FAA and the airlines, it does not seem to have occurred to their leadership that they needed to alert other aircraft in the air that they too might be at risk.[66]

United 175 was hijacked between 8:42 and 8:46, and awareness of that hijacking began to spread after 8:51. American 77 was hijacked between 8:51 and 8:54. By 9:00, FAA and airline officials began to comprehend that attackers were going after multiple aircraft. American Airlines' nationwide ground stop between 9:05 and 9:10 was followed by a United Airlines ground stop. FAA controllers at Boston Center, which had tracked the first two hijackings, requested at 9:07 that Herndon Command Center "get messages to airborne aircraft to increase security for the cockpit." There is no evidence that Herndon took such action. Boston Center immediately began speculating about other aircraft that might be in danger, leading them to worry about a transcontinental flight—Delta 1989—that in fact was not hijacked. At 9:19, the FAA's New England regional office called Herndon and asked that Cleveland Center advise Delta 1989 to use extra cockpit security.[67]

Several FAA air traffic control officials told us it was the air carriers' responsibility to notify their planes of security problems. One senior FAA air traffic control manager said that it was simply not the FAA's place to order the airlines what to tell their pilots.[68] We believe such statements do not reflect an adequate appreciation of the FAA's responsibility for the safety and security of civil aviation.

The airlines bore responsibility, too. They were facing an escalating number of conflicting and, for the most part, erroneous reports about other flights, as well as a continuing lack of vital information from the FAA about the hijacked flights. We found no evidence, however, that American Airlines sent any cockpit warnings to its aircraft on 9/11. United's first decisive action to notify its airborne aircraft to take defensive action did not come until 9:19, when a United flight dispatcher, Ed Ballinger, took the initiative to begin transmitting warnings to his 16 transcontinental flights: "Beware any cockpit intrusion—Two a/c [aircraft] hit World Trade Center." One of the flights that received the warning was United 93. Because Ballinger was still responsible for his other flights as well as Flight 175, his warning message was not transmitted to Flight 93 until 9:23.[69]

By all accounts, the first 46 minutes of Flight 93's cross-country trip proceeded routinely. Radio communications from the plane were normal. Heading, speed, and altitude ran according to plan. At 9:24, Ballinger's warning to United 93 was received in the cockpit. Within two minutes, at 9:26, the pilot, Jason Dahl, responded with a note of puzzlement: "Ed, confirm latest mssg plz—Jason."[70]

The hijackers attacked at 9:28. While traveling 35,000 feet above eastern Ohio, United 93 suddenly dropped 700 feet. Eleven seconds into the descent, the FAA's air traffic control center in Cleveland received the first of two radio transmissions from the aircraft. During the first broadcast, the captain or first officer could be heard declaring "Mayday" amid the sounds of a physical struggle in the cockpit. The second radio transmission, 35 seconds later, indicated that the fight was continuing. The captain or first officer could be heard shouting: "Hey get out of here—get out of here—get out of here."[71]

On the morning of 9/11, there were only 37 passengers on United 93—33 in addition to the 4 hijackers. This was below the norm for Tuesday mornings during the summer of 2001. But there is no evidence that the hijackers manipulated passenger levels or purchased additional seats to facilitate their operation.[72]

The terrorists who hijacked three other commercial flights on 9/11 operated in five-man teams. They initiated their cockpit takeover within 30 minutes of takeoff. On Flight 93, however, the takeover took place 46 minutes after takeoff and there were only four hijackers. The operative likely intended to round out the team for this flight, Mohamed al Kahtani, had been refused entry by a suspicious immigration inspector at Florida's Orlando International Airport in August.[73]

Because several passengers on United 93 described three hijackers on the plane, not four, some have wondered whether one of the hijackers had been able to use the cockpit jump seat from the outset of the flight. FAA rules allow use of this seat by documented and approved individuals, usually air carrier or FAA personnel. We have found no evidence indicating that one of the hijackers, or anyone else, sat there on this flight. All the hijackers had assigned seats in first class, and they seem to have used them. We believe it is more likely that Jarrah, the crucial pilot-trained member of their team, remained seated and inconspicuous until after the cockpit was seized; and once inside, he would not have been visible to the passengers.[74]

At 9:32, a hijacker, probably Jarrah, made or attempted to make the following announcement to the passengers of Flight 93: "Ladies and Gentlemen: Here the captain, please sit down keep remaining sitting. We have a bomb on board. So, sit." The flight data recorder (also recovered) indicates that Jarrah then instructed the plane's autopilot to turn the aircraft around and head east.[75]

The cockpit voice recorder data indicate that a woman, most likely a flight attendant, was being held captive in the cockpit. She struggled with one of the hijackers who killed or otherwise silenced her.[76]

Shortly thereafter, the passengers and flight crew began a series of calls from GTE airphones and cellular phones. These calls between family, friends, and colleagues took place until the end of the flight and provided those on the ground with firsthand accounts. They enabled the passengers to gain critical information, including the news that two aircraft had slammed into the World Trade Center.[77]

At 9:39, the FAA's Cleveland Air Route Traffic Control Center overheard a second announcement indicating that there was a bomb on board, that the plane was returning to the airport, and that they should remain seated.[78] While it apparently was not heard by the passengers, this announcement, like those on Flight 11 and Flight 77, was intended to deceive them. Jarrah, like Atta earlier, may have inadvertently broadcast the message because he did not know how to operate the radio and the intercom. To our knowledge none of them had ever flown an actual airliner before.

At least two callers from the flight reported that the hijackers knew that passengers were making calls but did not seem to care. It is quite possible Jarrah knew of the success of the assault on the World Trade Center. He could have learned of this from messages being sent by United Airlines to the cockpits of its transcontinental flights, including Flight 93, warning of cockpit intrusion and telling of the New York attacks. But even without them, he would certainly have understood that the attacks on the World Trade Center would already have unfolded, given Flight 93's tardy departure from Newark. If Jarrah did know that the passengers were making calls, it might not have occurred to him that they were certain to learn what had happened in New York, thereby defeating his attempts at deception.[79]

At least ten passengers and two crew members shared vital information with family, friends, colleagues, or others on the ground. All understood the plane had been hijacked. They said the hijackers wielded knives and claimed to have a bomb. The hijackers were wearing red bandanas, and they forced the passengers to the back of the aircraft.[80]

Callers reported that a passenger had been stabbed and that two people were lying on the floor of the cabin, injured or dead—possibly the captain and first officer. One caller reported that a flight attendant had been killed.[81]

One of the callers from United 93 also reported that he thought the hijackers might possess a gun. But none of the other callers reported the presence of a firearm. One recipient of a call from the aircraft recounted specifically asking her caller whether the hijackers had guns. The passenger replied that he did not see one. No evidence of firearms or of their identifiable remains was found at the aircraft's crash site, and the cockpit voice recorder gives no indication of a gun being fired or mentioned at any time. We believe that if the hijackers had possessed a gun, they would have used it in the flight's last minutes as the passengers fought back.[82]

Passengers on three flights reported the hijackers' claim of having a bomb. The FBI told us they found no trace of explosives at the crash sites. One of the passengers who mentioned a bomb expressed his belief that it was not real. Lacking any evidence that the hijackers attempted to smuggle such illegal items past the security screening checkpoints, we believe the bombs were probably fake.[83]

During at least five of the passengers' phone calls, information was shared about the attacks that had occurred earlier that morning at the World Trade Center. Five calls described the intent of passengers and surviving crew members to revolt against the hijackers. According to one call, they voted on whether to rush the terrorists in an attempt to retake the plane. They decided, and acted.[84]

At 9:57, the passenger assault began. Several passengers had terminated phone calls with loved ones in order to join the revolt. One of the callers ended her message as follows: "Everyone's running up to first class. I've got to go. Bye."[85]

The cockpit voice recorder captured the sounds of the passenger assault muffled by the intervening cockpit door. Some family members who listened to the recording report that they can hear the voice of a loved one among the din. We cannot identify whose voices can be heard. But the assault was sustained.[86]

In response, Jarrah immediately began to roll the airplane to the left and right, attempting to knock the passengers off balance. At 9:58:57, Jarrah told another hijacker in the cockpit to block the door. Jarrah continued to roll the airplane sharply left and right, but the assault continued. At 9:59:52, Jarrah changed tactics and pitched the nose of the airplane up and down to disrupt

the assault. The recorder captured the sounds of loud thumps, crashes, shouts, and breaking glasses and plates. At 10:00:03, Jarrah stabilized the airplane.[87]

Five seconds later, Jarrah asked, "Is that it? Shall we finish it off?" A hijacker responded, "No. Not yet. When they all come, we finish it off." The sounds of fighting continued outside the cockpit. Again, Jarrah pitched the nose of the aircraft up and down. At 10:00:26, a passenger in the background said, "In the cockpit. If we don't we'll die!" Sixteen seconds later, a passenger yelled, "Roll it!" Jarrah stopped the violent maneuvers at about 10:01:00 and said, "Allah is the greatest! Allah is the greatest!" He then asked another hijacker in the cockpit, "Is that it? I mean, shall we put it down?" to which the other replied, "Yes, put it in it, and pull it down."[88]

The passengers continued their assault and at 10:02:23, a hijacker said, "Pull it down! Pull it down!" The hijackers remained at the controls but must have judged that the passengers were only seconds from overcoming them. The airplane headed down; the control wheel was turned hard to the right. The airplane rolled onto its back, and one of the hijackers began shouting "Allah is the greatest. Allah is the greatest." With the sounds of the passenger counterattack continuing, the aircraft plowed into an empty field in Shanksville, Pennsylvania, at 580 miles per hour, about 20 minutes' flying time from Washington, D.C.[89]

Jarrah's objective was to crash his airliner into symbols of the American Republic, the Capitol or the White House. He was defeated by the alerted, unarmed passengers of United 93.

## 1.2 IMPROVISING A HOMELAND DEFENSE

**The FAA and NORAD**

On 9/11, the defense of U.S. airspace depended on close interaction between two federal agencies: the FAA and the North American Aerospace Defense Command (NORAD). The most recent hijacking that involved U.S. air traffic controllers, FAA management, and military coordination had occurred in 1993.[90] In order to understand how the two agencies interacted eight years later, we will review their missions, command and control structures, and working relationship on the morning of 9/11.

**FAA Mission and Structure.** As of September 11, 2001, the FAA was mandated by law to regulate the safety and security of civil aviation. From an air traffic controller's perspective, that meant maintaining a safe distance between airborne aircraft.[91]

Many controllers work at the FAA's 22 Air Route Traffic *Control Centers*. They are grouped under regional offices and coordinate closely with the national Air Traffic Control System *Command Center*, located in Herndon,



*FAA Air Traffic Control Centers*



*Reporting structure, Northeast Air Defense Sector*
Graphics courtesy of ESRI

Virginia, which oversees daily traffic flow within the entire airspace system. FAA headquarters is ultimately responsible for the management of the National Airspace System. The *Operations Center* located at FAA headquarters receives notifications of incidents, including accidents and hijackings.[92]

FAA Control Centers often receive information and make operational decisions independently of one another. On 9/11, the four hijacked aircraft were monitored mainly by the centers in Boston, New York, Cleveland, and Indianapolis. Each center thus had part of the knowledge of what was going on across the system. What Boston knew was not necessarily known by centers in New York, Cleveland, or Indianapolis, or for that matter by the Command Center in Herndon or by FAA headquarters in Washington.

Controllers track airliners such as the four aircraft hijacked on 9/11 primarily by watching the data from a signal emitted by each aircraft's transponder equipment. Those four planes, like all aircraft traveling above 10,000 feet, were required to emit a unique transponder signal while in flight.[93]

On 9/11, the terrorists turned off the transponders on three of the four hijacked aircraft. With its transponder off, it is possible, though more difficult, to track an aircraft by its primary radar returns. But unlike transponder data, primary radar returns do not show the aircraft's identity and altitude. Controllers at centers rely so heavily on transponder signals that they usually do not display primary radar returns on their radar scopes. But they can change the configuration of their scopes so they can see primary radar returns. They did this on 9/11 when the transponder signals for three of the aircraft disappeared.[94]

Before 9/11, it was not unheard of for a commercial aircraft to deviate slightly from its course, or for an FAA controller to lose radio contact with a pilot for a short period of time. A controller could also briefly lose a commercial aircraft's transponder signal, although this happened much less frequently. However, the simultaneous loss of radio and transponder signal would be a rare and alarming occurrence, and would normally indicate a catastrophic system failure or an aircraft crash. In all of these instances, the job of the controller was to reach out to the aircraft, the parent company of the aircraft, and other planes in the vicinity in an attempt to reestablish communications and set the aircraft back on course. Alarm bells would not start ringing until these efforts—which could take five minutes or more—were tried and had failed.[95]

**NORAD Mission and Structure.** NORAD is a binational command established in 1958 between the United States and Canada. Its mission was, and is, to defend the airspace of North America and protect the continent. That mission does not distinguish between internal and external threats; but because NORAD was created to counter the Soviet threat, it came to define its job as defending against external attacks.[96]

The threat of Soviet bombers diminished significantly as the Cold War ended, and the number of NORAD alert sites was reduced from its Cold War high of 26. Some within the Pentagon argued in the 1990s that the alert sites

## 2

# THE FOUNDATION OF
# THE NEW TERRORISM

## 2.1 A DECLARATION OF WAR

In February 1998, the 40-year-old Saudi exile Usama Bin Ladin and a fugitive Egyptian physician, Ayman al Zawahiri, arranged from their Afghan headquarters for an Arabic newspaper in London to publish what they termed a fatwa issued in the name of a "World Islamic Front." A fatwa is normally an interpretation of Islamic law by a respected Islamic authority, but neither Bin Ladin, Zawahiri, nor the three others who signed this statement were scholars of Islamic law. Claiming that America had declared war against God and his messenger, they called for the murder of any American, anywhere on earth, as the "individual duty for every Muslim who can do it in any country in which it is possible to do it."[1]

Three months later, when interviewed in Afghanistan by ABC-TV, Bin Ladin enlarged on these themes.[2] He claimed it was more important for Muslims to kill Americans than to kill other infidels. "It is far better for anyone to kill a single American soldier than to squander his efforts on other activities," he said. Asked whether he approved of terrorism and of attacks on civilians, he replied: "We believe that the worst thieves in the world today and the worst terrorists are the Americans. Nothing could stop you except perhaps retaliation in kind. We do not have to differentiate between military or civilian. As far as we are concerned, they are all targets."

*Note: Islamic names often do not follow the Western practice of the consistent use of surnames. Given the variety of names we mention, we chose to refer to individuals by the last word in the names by which they are known: Nawaf al Hazmi as Hazmi, for instance, omitting the article "al" that would be part of their name in their own societies. We generally make an exception for the more familiar English usage of "Bin" as part of a last name, as in Bin Ladin. Further, there is no universally accepted way to transliterate Arabic words and names into English. We have relied on a mix of common sense, the sound of the name in Arabic, and common usage in source materials, the press, or government documents. When we quote from a source document, we use its transliteration, e.g., "al Qida" instead of al Qaeda.*

Though novel for its open endorsement of indiscriminate killing, Bin Ladin's 1998 declaration was only the latest in the long series of his public and private calls since 1992 that singled out the United States for attack.

In August 1996, Bin Ladin had issued his own self-styled fatwa calling on Muslims to drive American soldiers out of Saudi Arabia. The long, disjointed document condemned the Saudi monarchy for allowing the presence of an army of infidels in a land with the sites most sacred to Islam, and celebrated recent suicide bombings of American military facilities in the Kingdom. It praised the 1983 suicide bombing in Beirut that killed 241 U.S. Marines, the 1992 bombing in Aden, and especially the 1993 firefight in Somalia after which the United States "left the area carrying disappointment, humiliation, defeat and your dead with you."[3]

Bin Ladin said in his ABC interview that he and his followers had been preparing in Somalia for another long struggle, like that against the Soviets in Afghanistan, but "the United States rushed out of Somalia in shame and disgrace." Citing the Soviet army's withdrawal from Afghanistan as proof that a ragged army of dedicated Muslims could overcome a superpower, he told the interviewer: "We are certain that we shall—with the grace of Allah—prevail over the Americans." He went on to warn that "If the present injustice continues . . . , it will inevitably move the battle to American soil."[4]

Plans to attack the United States were developed with unwavering single-mindedness throughout the 1990s. Bin Ladin saw himself as called "to follow in the footsteps of the Messenger and to communicate his message to all nations,"[5] and to serve as the rallying point and organizer of a new kind of war to destroy America and bring the world to Islam.

## 2.2 BIN LADIN'S APPEAL IN THE ISLAMIC WORLD

It is the story of eccentric and violent ideas sprouting in the fertile ground of political and social turmoil. It is the story of an organization poised to seize its historical moment. How did Bin Ladin—with his call for the indiscriminate killing of Americans—win thousands of followers and some degree of approval from millions more?

The history, culture, and body of beliefs from which Bin Ladin has shaped and spread his message are largely unknown to many Americans. Seizing on symbols of Islam's past greatness, he promises to restore pride to people who consider themselves the victims of successive foreign masters. He uses cultural and religious allusions to the holy Qur'an and some of its interpreters. He appeals to people disoriented by cyclonic change as they confront modernity and globalization. His rhetoric selectively draws from multiple sources—Islam, history, and the region's political and economic malaise. He also stresses grievances against the United States widely shared in the Muslim world. He

Case 1:03-cv-09848-GBD-SN   Document 274-1   Filed 05/19/11   Page 18 of 83

refuge in the United States. From his headquarters in Jersey City, he distributed messages calling for the murder of unbelievers.[28]

The most important Egyptian in Bin Ladin's circle was a surgeon, Ayman al Zawahiri, who led a strong faction of the Egyptian Islamic Jihad. Many of his followers became important members in the new organization, and his own close ties with Bin Ladin led many to think of him as the deputy head of al Qaeda. He would in fact become Bin Ladin's deputy some years later, when they merged their organizations.[29]

## Bin Ladin Moves to Sudan

By the fall of 1989, Bin Ladin had sufficient stature among Islamic extremists that a Sudanese political leader, Hassan al Turabi, urged him to transplant his whole organization to Sudan. Turabi headed the National Islamic Front in a coalition that had recently seized power in Khartoum.[30] Bin Ladin agreed to help Turabi in an ongoing war against African Christian separatists in southern Sudan and also to do some road building. Turabi in return would let Bin Ladin use Sudan as a base for worldwide business operations and for preparations for jihad.[31] While agents of Bin Ladin began to buy property in Sudan in 1990,[32] Bin Ladin himself moved from Afghanistan back to Saudi Arabia.

In August 1990, Iraq invaded Kuwait. Bin Ladin, whose efforts in Afghanistan had earned him celebrity and respect, proposed to the Saudi monarchy that he summon mujahideen for a jihad to retake Kuwait. He was rebuffed, and the Saudis joined the U.S.-led coalition. After the Saudis agreed to allow U.S. armed forces to be based in the Kingdom, Bin Ladin and a number of Islamic clerics began to publicly denounce the arrangement. The Saudi government exiled the clerics and undertook to silence Bin Ladin by, among other things, taking away his passport. With help from a dissident member of the royal family, he managed to get out of the country under the pretext of attending an Islamic gathering in Pakistan in April 1991.[33] By 1994, the Saudi government would freeze his financial assets and revoke his citizenship.[34] He no longer had a country he could call his own.

Bin Ladin moved to Sudan in 1991 and set up a large and complex set of intertwined business and terrorist enterprises. In time, the former would encompass numerous companies and a global network of bank accounts and nongovernmental institutions. Fulfilling his bargain with Turabi, Bin Ladin used his construction company to build a new highway from Khartoum to Port Sudan on the Red Sea coast. Meanwhile, al Qaeda finance officers and top operatives used their positions in Bin Ladin's businesses to acquire weapons, explosives, and technical equipment for terrorist purposes. One founding member, Abu Hajer al Iraqi, used his position as head of a Bin Ladin investment company to carry out procurement trips from western Europe to the Far East. Two others, Wadi al Hage and Mubarak Douri, who had become acquainted in Tuc-

group from southern Yemen headed by a Yemeni member of Bin Ladin's Islamic Army Shura; some in the group had trained at an al Qaeda camp in Sudan.[44]

Al Qaeda leaders set up a Nairobi cell and used it to send weapons and trainers to the Somali warlords battling U.S. forces, an operation directly supervised by al Qaeda's military leader.[45] Scores of trainers flowed to Somalia over the ensuing months, including most of the senior members and weapons training experts of al Qaeda's military committee. These trainers were later heard boasting that their assistance led to the October 1993 shootdown of two U.S. Black Hawk helicopters by members of a Somali militia group and to the subsequent withdrawal of U.S. forces in early 1994.[46]

In November 1995, a car bomb exploded outside a Saudi-U.S. joint facility in Riyadh for training the Saudi National Guard. Five Americans and two officials from India were killed. The Saudi government arrested four perpetrators, who admitted being inspired by Bin Ladin. They were promptly executed. Though nothing proves that Bin Ladin ordered this attack, U.S. intelligence subsequently learned that al Qaeda leaders had decided a year earlier to attack a U.S. target in Saudi Arabia, and had shipped explosives to the peninsula for this purpose. Some of Bin Ladin's associates later took credit.[47]

In June 1996, an enormous truck bomb detonated in the Khobar Towers residential complex in Dhahran, Saudi Arabia, that housed U.S. Air Force personnel. Nineteen Americans were killed, and 372 were wounded. The operation was carried out principally, perhaps exclusively, by Saudi Hezbollah, an organization that had received support from the government of Iran. While the evidence of Iranian involvement is strong, there are also signs that al Qaeda played some role, as yet unknown.[48]

In this period, other prominent attacks in which Bin Ladin's involvement is at best cloudy are the 1993 bombing of the World Trade Center, a plot that same year to destroy landmarks in New York, and the 1995 Manila air plot to blow up a dozen U.S. airliners over the Pacific. Details on these plots appear in chapter 3.

Another scheme revealed that Bin Ladin sought the capability to kill on a mass scale. His business aides received word that a Sudanese military officer who had been a member of the previous government cabinet was offering to sell weapons-grade uranium. After a number of contacts were made through intermediaries, the officer set the price at $1.5 million, which did not deter Bin Ladin. Al Qaeda representatives asked to inspect the uranium and were shown a cylinder about 3 feet long, and one thought he could pronounce it genuine. Al Qaeda apparently purchased the cylinder, then discovered it to be bogus.[49] But while the effort failed, it shows what Bin Ladin and his associates hoped to do. One of the al Qaeda representatives explained his mission: "it's easy to kill more people with uranium."[50]

Bin Ladin seemed willing to include in the confederation terrorists from

almost every corner of the Muslim world. His vision mirrored that of Sudan's Islamist leader, Turabi, who convened a series of meetings under the label Popular Arab and Islamic Conference around the time of Bin Ladin's arrival in that country. Delegations of violent Islamist extremists came from all the groups represented in Bin Ladin's Islamic Army Shura. Representatives also came from organizations such as the Palestine Liberation Organization, Hamas, and Hezbollah.[51]

Turabi sought to persuade Shiites and Sunnis to put aside their divisions and join against the common enemy. In late 1991 or 1992, discussions in Sudan between al Qaeda and Iranian operatives led to an informal agreement to cooperate in providing support—even if only training—for actions carried out primarily against Israel and the United States. Not long afterward, senior al Qaeda operatives and trainers traveled to Iran to receive training in explosives. In the fall of 1993, another such delegation went to the Bekaa Valley in Lebanon for further training in explosives as well as in intelligence and security. Bin Ladin reportedly showed particular interest in learning how to use truck bombs such as the one that had killed 241 U.S. Marines in Lebanon in 1983. The relationship between al Qaeda and Iran demonstrated that Sunni-Shia divisions did not necessarily pose an insurmountable barrier to cooperation in terrorist operations. As will be described in chapter 7, al Qaeda contacts with Iran continued in ensuing years.[52]

Bin Ladin was also willing to explore possibilities for cooperation with Iraq, even though Iraq's dictator, Saddam Hussein, had never had an Islamist agenda—save for his opportunistic pose as a defender of the faithful against "Crusaders" during the Gulf War of 1991. Moreover, Bin Ladin had in fact been sponsoring anti-Saddam Islamists in Iraqi Kurdistan, and sought to attract them into his Islamic army.[53]

To protect his own ties with Iraq, Turabi reportedly brokered an agreement that Bin Ladin would stop supporting activities against Saddam. Bin Ladin apparently honored this pledge, at least for a time, although he continued to aid a group of Islamist extremists operating in part of Iraq (Kurdistan) outside of Baghdad's control. In the late 1990s, these extremist groups suffered major defeats by Kurdish forces. In 2001, with Bin Ladin's help they re-formed into an organization called Ansar al Islam. There are indications that by then the Iraqi regime tolerated and may even have helped Ansar al Islam against the common Kurdish enemy.[54]

With the Sudanese regime acting as intermediary, Bin Ladin himself met with a senior Iraqi intelligence officer in Khartoum in late 1994 or early 1995. Bin Ladin is said to have asked for space to establish training camps, as well as assistance in procuring weapons, but there is no evidence that Iraq responded to this request.[55] As described below, the ensuing years saw additional efforts to establish connections.

Khowst, out of an apparent hope that he would now expand the camps and make them available for training Kashmiri militants.[67]

Yet Bin Ladin was in his weakest position since his early days in the war against the Soviet Union. The Sudanese government had canceled the registration of the main business enterprises he had set up there and then put some of them up for public sale. According to a senior al Qaeda detainee, the government of Sudan seized everything Bin Ladin had possessed there.[68]

He also lost the head of his military committee, Abu Ubaidah al Banshiri, one of the most capable and popular leaders of al Qaeda. While most of the group's key figures had accompanied Bin Ladin to Afghanistan, Banshiri had remained in Kenya to oversee the training and weapons shipments of the cell set up some four years earlier. He died in a ferryboat accident on Lake Victoria just a few days after Bin Ladin arrived in Jalalabad, leaving Bin Ladin with a need to replace him not only in the Shura but also as supervisor of the cells and prospective operations in East Africa.[69] He had to make other adjustments as well, for some al Qaeda members viewed Bin Ladin's return to Afghanistan as occasion to go off in their own directions. Some maintained collaborative relationships with al Qaeda, but many disengaged entirely.[70]

For a time, it may not have been clear to Bin Ladin that the Taliban would be his best bet as an ally. When he arrived in Afghanistan, they controlled much of the country, but key centers, including Kabul, were still held by rival warlords. Bin Ladin went initially to Jalalabad, probably because it was in an area controlled by a provincial council of Islamic leaders who were not major contenders for national power. He found lodgings with Younis Khalis, the head of one of the main mujahideen factions. Bin Ladin apparently kept his options open, maintaining contacts with Gulbuddin Hekmatyar, who, though an Islamic extremist, was also one of the Taliban's most militant opponents. But after September 1996, when first Jalalabad and then Kabul fell to the Taliban, Bin Ladin cemented his ties with them.[71]

That process did not always go smoothly. Bin Ladin, no longer constrained by the Sudanese, clearly thought that he had new freedom to publish his appeals for jihad. At about the time when the Taliban were making their final drive toward Jalalabad and Kabul, Bin Ladin issued his August 1996 fatwa, saying that "We . . . have been prevented from addressing the Muslims," but expressing relief that "by the grace of Allah, a safe base here is now available in the high Hindu Kush mountains in Khurasan." But the Taliban, like the Sudanese, would eventually hear warnings, including from the Saudi monarchy.[72]

Though Bin Ladin had promised Taliban leaders that he would be circumspect, he broke this promise almost immediately, giving an inflammatory interview to CNN in March 1997. The Taliban leader Mullah Omar promptly "invited" Bin Ladin to move to Kandahar, ostensibly in the interests of Bin Ladin's own security but more likely to situate him where he might be easier to control.[73]

There is also evidence that around this time Bin Ladin sent out a number of feelers to the Iraqi regime, offering some cooperation. None are reported to have received a significant response. According to one report, Saddam Hussein's efforts at this time to rebuild relations with the Saudis and other Middle Eastern regimes led him to stay clear of Bin Ladin.[74]

In mid-1998, the situation reversed; it was Iraq that reportedly took the initiative. In March 1998, after Bin Ladin's public fatwa against the United States, two al Qaeda members reportedly went to Iraq to meet with Iraqi intelligence. In July, an Iraqi delegation traveled to Afghanistan to meet first with the Taliban and then with Bin Ladin. Sources reported that one, or perhaps both, of these meetings was apparently arranged through Bin Ladin's Egyptian deputy, Zawahiri, who had ties of his own to the Iraqis. In 1998, Iraq was under intensifying U.S. pressure, which culminated in a series of large air attacks in December.[75]

Similar meetings between Iraqi officials and Bin Ladin or his aides may have occurred in 1999 during a period of some reported strains with the Taliban. According to the reporting, Iraqi officials offered Bin Ladin a safe haven in Iraq. Bin Ladin declined, apparently judging that his circumstances in Afghanistan remained more favorable than the Iraqi alternative. The reports describe friendly contacts and indicate some common themes in both sides' hatred of the United States. But to date we have seen no evidence that these or the earlier contacts ever developed into a collaborative operational relationship. Nor have we seen evidence indicating that Iraq cooperated with al Qaeda in developing or carrying out any attacks against the United States.[76]

Bin Ladin eventually enjoyed a strong financial position in Afghanistan, thanks to Saudi and other financiers associated with the Golden Chain. Through his relationship with Mullah Omar—and the monetary and other benefits that it brought the Taliban—Bin Ladin was able to circumvent restrictions; Mullah Omar would stand by him even when other Taliban leaders raised objections. Bin Ladin appeared to have in Afghanistan a freedom of movement that he had lacked in Sudan. Al Qaeda members could travel freely within the country, enter and exit it without visas or any immigration procedures, purchase and import vehicles and weapons, and enjoy the use of official Afghan Ministry of Defense license plates. Al Qaeda also used the Afghan state-owned Ariana Airlines to courier money into the country.[77]

The Taliban seemed to open the doors to all who wanted to come to Afghanistan to train in the camps. The alliance with the Taliban provided al Qaeda a sanctuary in which to train and indoctrinate fighters and terrorists, import weapons, forge ties with other jihad groups and leaders, and plot and staff terrorist schemes. While Bin Ladin maintained his own al Qaeda guesthouses and camps for vetting and training recruits, he also provided support to and bene-

fited from the broad infrastructure of such facilities in Afghanistan made available to the global network of Islamist movements. U.S. intelligence estimates put the total number of fighters who underwent instruction in Bin Ladin–supported camps in Afghanistan from 1996 through 9/11 at 10,000 to 20,000.[78]

In addition to training fighters and special operators, this larger network of guesthouses and camps provided a mechanism by which al Qaeda could screen and vet candidates for induction into its own organization. Thousands flowed through the camps, but no more than a few hundred seem to have become al Qaeda members. From the time of its founding, al Qaeda had employed training and indoctrination to identify "worthy" candidates.[79]

Al Qaeda continued meanwhile to collaborate closely with the many Middle Eastern groups—in Egypt, Algeria, Yemen, Lebanon, Morocco, Tunisia, Somalia, and elsewhere—with which it had been linked when Bin Ladin was in Sudan. It also reinforced its London base and its other offices around Europe, the Balkans, and the Caucasus. Bin Ladin bolstered his links to extremists in South and Southeast Asia, including the Malaysian–Indonesian JI and several Pakistani groups engaged in the Kashmir conflict.[80]

The February 1998 fatwa thus seems to have been a kind of public launch of a renewed and stronger al Qaeda, after a year and a half of work. Having rebuilt his fund-raising network, Bin Ladin had again become the rich man of the jihad movement. He had maintained or restored many of his links with terrorists elsewhere in the world. And he had strengthened the internal ties in his own organization.

The inner core of al Qaeda continued to be a hierarchical top-down group with defined positions, tasks, and salaries. Most but not all in this core swore fealty (or *bayat*) to Bin Ladin. Other operatives were committed to Bin Ladin or to his goals and would take assignments for him, but they did not swear bayat and maintained, or tried to maintain, some autonomy. A looser circle of adherents might give money to al Qaeda or train in its camps but remained essentially independent. Nevertheless, they constituted a potential resource for al Qaeda.[81]

Now effectively merged with Zawahiri's Egyptian Islamic Jihad,[82] al Qaeda promised to become the general headquarters for international terrorism, without the need for the Islamic Army Shura. Bin Ladin was prepared to pick up where he had left off in Sudan. He was ready to strike at "the head of the snake."

Al Qaeda's role in organizing terrorist operations had also changed. Before the move to Afghanistan, it had concentrated on providing funds, training, and weapons for actions carried out by members of allied groups. The attacks on the U.S. embassies in East Africa in the summer of 1998 would take a different form—planned, directed, and executed by al Qaeda, under the direct supervision of Bin Ladin and his chief aides.

**The Embassy Bombings**

As early as December 1993, a team of al Qaeda operatives had begun casing targets in Nairobi for future attacks. It was led by Ali Mohamed, a former Egyptian army officer who had moved to the United States in the mid-1980s, enlisted in the U.S. Army, and became an instructor at Fort Bragg. He had provided guidance and training to extremists at the Farouq mosque in Brooklyn, including some who were subsequently convicted in the February 1993 attack on the World Trade Center. The casing team also included a computer expert whose write-ups were reviewed by al Qaeda leaders.[83]

The team set up a makeshift laboratory for developing their surveillance photographs in an apartment in Nairobi where the various al Qaeda operatives and leaders based in or traveling to the Kenya cell sometimes met. Banshiri, al Qaeda's military committee chief, continued to be the operational commander of the cell; but because he was constantly on the move, Bin Ladin had dispatched another operative, Khaled al Fawwaz, to serve as the on-site manager. The technical surveillance and communications equipment employed for these casing missions included state-of-the-art video cameras obtained from China and from dealers in Germany. The casing team also reconnoitered targets in Djibouti.[84]

As early as January 1994, Bin Ladin received the surveillance reports, complete with diagrams prepared by the team's computer specialist. He, his top military committee members—Banshiri and his deputy, Abu Hafs al Masri (also known as Mohammed Atef)—and a number of other al Qaeda leaders reviewed the reports. Agreeing that the U.S. embassy in Nairobi was an easy target because a car bomb could be parked close by, they began to form a plan. Al Qaeda had begun developing the tactical expertise for such attacks months earlier, when some of its operatives—top military committee members and several operatives who were involved with the Kenya cell among them—were sent to Hezbollah training camps in Lebanon.[85]

The cell in Kenya experienced a series of disruptions that may in part account for the relatively long delay before the attack was actually carried out. The difficulties Bin Ladin began to encounter in Sudan in 1995, his move to Afghanistan in 1996, and the months spent establishing ties with the Taliban may also have played a role, as did Banshiri's accidental drowning.

In August 1997, the Kenya cell panicked. The London *Daily Telegraph* reported that Madani al Tayyib, formerly head of al Qaeda's finance committee, had turned himself over to the Saudi government. The article said (incorrectly) that the Saudis were sharing Tayyib's information with the U.S. and British authorities.[86] At almost the same time, cell members learned that U.S. and Kenyan agents had searched the Kenya residence of Wadi al Hage, who had become the new on-site manager in Nairobi, and that Hage's telephone was being tapped. Hage was a U.S. citizen who had worked with Bin Ladin in Afgha-

nistan in the 1980s, and in 1992 he went to Sudan to become one of al Qaeda's major financial operatives. When Hage returned to the United States to appear before a grand jury investigating Bin Ladin, the job of cell manager was taken over by Harun Fazul, a Kenyan citizen who had been in Bin Ladin's advance team to Sudan back in 1990. Harun faxed a report on the "security situation" to several sites, warning that "the crew members in East Africa is [*sic*] in grave danger" in part because "America knows . . . that the followers of [Bin Ladin] . . . carried out the operations to hit Americans in Somalia." The report provided instructions for avoiding further exposure.[87]

On February 23, 1998, Bin Ladin issued his public fatwa. The language had been in negotiation for some time, as part of the merger under way between Bin Ladin's organization and Zawahiri's Egyptian Islamic Jihad. Less than a month after the publication of the fatwa, the teams that were to carry out the embassy attacks were being pulled together in Nairobi and Dar es Salaam. The timing and content of their instructions indicate that the decision to launch the attacks had been made by the time the fatwa was issued.[88]

The next four months were spent setting up the teams in Nairobi and Dar es Salaam. Members of the cells rented residences, and purchased bomb-making materials and transport vehicles. At least one additional explosives expert was brought in to assist in putting the weapons together. In Nairobi, a hotel room was rented to put up some of the operatives. The suicide trucks were purchased shortly before the attack date.[89]

While this was taking place, Bin Ladin continued to push his public message. On May 7, the deputy head of al Qaeda's military committee, Mohammed Atef, faxed to Bin Ladin's London office a new fatwa issued by a group of sheikhs located in Afghanistan. A week later, it appeared in *Al Quds al Arabi*, the same Arabic-language newspaper in London that had first published Bin Ladin's February fatwa, and it conveyed the same message—the duty of Muslims to carry out holy war against the enemies of Islam and to expel the Americans from the Gulf region. Two weeks after that, Bin Ladin gave a video-taped interview to ABC News with the same slogans, adding that "we do not differentiate between those dressed in military uniforms and civilians; they are all targets in this *fatwa*."[90]

By August 1, members of the cells not directly involved in the attacks had mostly departed from East Africa. The remaining operatives prepared and assembled the bombs, and acquired the delivery vehicles. On August 4, they made one last casing run at the embassy in Nairobi. By the evening of August 6, all but the delivery teams and one or two persons assigned to remove the evidence trail had left East Africa. Back in Afghanistan, Bin Ladin and the al Qaeda leadership had left Kandahar for the countryside, expecting U.S. retaliation. Declarations taking credit for the attacks had already been faxed to the joint al Qaeda–Egyptian Islamic Jihad office in Baku, with instructions to stand by

set a bomb in an attempt to kill U.S. troops in Aden in 1992. State Department sources even saw suspicious links with Omar Abdel Rahman, the "Blind Sheikh" in the New York area, commenting that Bin Ladin seemed "committed to financing 'Jihads' against 'anti Islamic' regimes worldwide." After the department designated Sudan a state sponsor of terrorism in 1993, it put Bin Ladin on its TIPOFF watchlist, a move that might have prevented his getting a visa had he tried to enter the United States. As late as 1997, however, even the CIA's Counterterrorist Center continued to describe him as an "extremist financier."[1]

In 1996, the CIA set up a special unit of a dozen officers to analyze intelligence on and plan operations against Bin Ladin. David Cohen, the head of the CIA's Directorate of Operations, wanted to test the idea of having a "virtual station"—a station based at headquarters but collecting and operating against a subject much as stations in the field focus on a country. Taking his cue from National Security Advisor Anthony Lake, who expressed special interest in terrorist finance, Cohen formed his virtual station as a terrorist financial links unit. He had trouble getting any Directorate of Operations officer to run it; he finally recruited a former analyst who was then running the Islamic Extremist Branch of the Counterterrorist Center. This officer, who was especially knowledgeable about Afghanistan, had noticed a recent stream of reports about Bin Ladin and something called al Qaeda, and suggested to Cohen that the station focus on this one individual. Cohen agreed. Thus was born the Bin Ladin unit.[2]

In May 1996, Bin Ladin left Sudan for Afghanistan. A few months later, as the Bin Ladin unit was gearing up, Jamal Ahmed al Fadl walked into a U.S. embassy in Africa, established his bona fides as a former senior employee of Bin Ladin, and provided a major breakthrough of intelligence on the creation, character, direction, and intentions of al Qaeda. Corroborating evidence came from another walk-in source at a different U.S. embassy. More confirmation was supplied later that year by intelligence and other sources, including material gathered by FBI agents and Kenyan police from an al Qaeda cell in Nairobi.[3]

By 1997, officers in the Bin Ladin unit recognized that Bin Ladin was more than just a financier. They learned that al Qaeda had a military committee that was planning operations against U.S. interests worldwide and was actively trying to obtain nuclear material. Analysts assigned to the station looked at the information it had gathered and "found connections everywhere," including links to the attacks on U.S. troops in Aden and Somalia in 1992 and 1993 and to the Manila air plot in the Philippines in 1994–1995.[4]

The Bin Ladin station was already working on plans for offensive operations against Bin Ladin. These plans were directed at both physical assets and sources of finance. In the end, plans to identify and attack Bin Ladin's money sources did not go forward.[5]

In late 1995, when Bin Ladin was still in Sudan, the State Department and the CIA learned that Sudanese officials were discussing with the Saudi gov-

5

# AL QAEDA AIMS AT THE
# AMERICAN HOMELAND

## 5.1 TERRORIST ENTREPRENEURS

By early 1999, al Qaeda was already a potent adversary of the United States. Bin Ladin and his chief of operations, Abu Hafs al Masri, also known as Mohammed Atef, occupied undisputed leadership positions atop al Qaeda's organizational structure. Within this structure, al Qaeda's worldwide terrorist operations relied heavily on the ideas and work of enterprising and strong-willed field commanders who enjoyed considerable autonomy. To understand how the organization actually worked and to introduce the origins of the 9/11 plot, we briefly examine three of these subordinate commanders: Khalid Sheikh Mohammed (KSM), Riduan Isamuddin (better known as Hambali), and Abd al Rahim al Nashiri. We will devote the most attention to Khalid Sheikh Mohammed, the chief manager of the "planes operation."

**Khalid Sheikh Mohammed**
No one exemplifies the model of the terrorist entrepreneur more clearly than Khalid Sheikh Mohammed, the principal architect of the 9/11 attacks. KSM followed a rather tortuous path to his eventual membership in al Qaeda.[1] Highly educated and equally comfortable in a government office or a terrorist safehouse, KSM applied his imagination, technical aptitude, and managerial skills to hatching and planning an extraordinary array of terrorist schemes. These ideas included conventional car bombing, political assassination, aircraft bombing, hijacking, reservoir poisoning, and, ultimately, the use of aircraft as missiles guided by suicide operatives.

Like his nephew Ramzi Yousef (three years KSM's junior), KSM grew up in Kuwait but traces his ethnic lineage to the Baluchistan region straddling Iran and Pakistan. Raised in a religious family, KSM claims to have joined the Muslim Brotherhood at age 16 and to have become enamored of violent jihad at youth camps in the desert. In 1983, following his graduation from secondary

145

(NGO) in Peshawar and Jalalabad; sponsored by Sayyaf, it was designed to aid young Afghan mujahideen. In 1992, KSM spent some time fighting alongside the mujahideen in Bosnia and supporting that effort with financial donations. After returning briefly to Pakistan, he moved his family to Qatar at the suggestion of the former minister of Islamic affairs of Qatar, Sheikh Abdallah bin Khalid bin Hamad al Thani. KSM took a position in Qatar as project engineer with the Qatari Ministry of Electricity and Water. Although he engaged in extensive international travel during his tenure at the ministry—much of it in furtherance of terrorist activity—KSM would hold his position there until early 1996, when he fled to Pakistan to avoid capture by U.S. authorities.[5]

KSM first came to the attention of U.S. law enforcement as a result of his cameo role in the first World Trade Center bombing. According to KSM, he learned of Ramzi Yousef's intention to launch an attack inside the United States in 1991 or 1992, when Yousef was receiving explosives training in Afghanistan. During the fall of 1992, while Yousef was building the bomb he would use in that attack, KSM and Yousef had numerous telephone conversations during which Yousef discussed his progress and sought additional funding. On November 3, 1992, KSM wired $660 from Qatar to the bank account of Yousef's co-conspirator, Mohammed Salameh. KSM does not appear to have contributed any more substantially to this operation.[6]

Yousef's instant notoriety as the mastermind of the 1993 World Trade Center bombing inspired KSM to become involved in planning attacks against the United States. By his own account, KSM's animus toward the United States stemmed not from his experiences there as a student, but rather from his violent disagreement with U.S. foreign policy favoring Israel. In 1994, KSM accompanied Yousef to the Philippines, and the two of them began planning what is now known as the Manila air or "Bojinka" plot—the intended bombing of 12 U.S. commercial jumbo jets over the Pacific during a two-day span. This marked the first time KSM took part in the actual planning of a terrorist operation. While sharing an apartment in Manila during the summer of 1994, he and Yousef acquired chemicals and other materials necessary to construct bombs and timers. They also cased target flights to Hong Kong and Seoul that would have onward legs to the United States. During this same period, KSM and Yousef also developed plans to assassinate President Clinton during his November 1994 trip to Manila, and to bomb U.S.-bound cargo carriers by smuggling jackets containing nitrocellulose on board.[7]

KSM left the Philippines in September 1994 and met up with Yousef in Karachi following their casing flights. There they enlisted Wali Khan Amin Shah, also known as Usama Asmurai, in the Manila air plot. During the fall of 1994, Yousef returned to Manila and successfully tested the digital watch timer he had invented, bombing a movie theater and a Philippine Airlines flight en route to Tokyo. The plot unraveled after the Philippine authorities discovered Yousef's bomb-making operation in Manila; but by that time, KSM was safely

that Bin Ladin likely agreed to meet with him because of the renown of his nephew, Yousef.[10]

At the meeting, KSM briefed Bin Ladin and Atef on the first World Trade Center bombing, the Manila air plot, the cargo carriers plan, and other activities pursued by KSM and his colleagues in the Philippines. KSM also presented a proposal for an operation that would involve training pilots who would crash planes into buildings in the United States. This proposal eventually would become the 9/11 operation.[11]

KSM knew that the successful staging of such an attack would require personnel, money, and logistical support that only an extensive and well-funded organization like al Qaeda could provide. He thought the operation might appeal to Bin Ladin, who had a long record of denouncing the United States.[12]

From KSM's perspective, Bin Ladin was in the process of consolidating his new position in Afghanistan while hearing out others' ideas, and had not yet settled on an agenda for future anti-U.S. operations. At the meeting, Bin Ladin listened to KSM's ideas without much comment, but did ask KSM formally to join al Qaeda and move his family to Afghanistan.[13]

KSM declined. He preferred to remain independent and retain the option of working with other mujahideen groups still operating in Afghanistan, including the group led by his old mentor, Sayyaf. Sayyaf was close to Ahmed Shah Massoud, the leader of the Northern Alliance. Therefore working with him might be a problem for KSM because Bin Ladin was building ties to the rival Taliban.

After meeting with Bin Ladin, KSM says he journeyed onward to India, Indonesia, and Malaysia, where he met with Jemaah Islamiah's Hambali. Hambali was an Indonesian veteran of the Afghan war looking to expand the jihad into Southeast Asia. In Iran, KSM rejoined his family and arranged to move them to Karachi; he claims to have relocated by January 1997.[14]

After settling his family in Karachi, KSM tried to join the mujahid leader Ibn al Khattab in Chechnya. Unable to travel through Azerbaijan, KSM returned to Karachi and then to Afghanistan to renew contacts with Bin Ladin and his colleagues. Though KSM may not have been a member of al Qaeda at this time, he admits traveling frequently between Pakistan and Afghanistan in 1997 and the first half of 1998, visiting Bin Ladin and cultivating relationships with his lieutenants, Atef and Sayf al Adl, by assisting them with computer and media projects.[15]

According to KSM, the 1998 bombings of the U.S. embassies in Nairobi and Dar es Salaam marked a watershed in the evolution of the 9/11 plot. KSM claims these bombings convinced him that Bin Ladin was truly committed to attacking the United States. He continued to make himself useful, collecting news articles and helping other al Qaeda members with their outdated computer equipment. Bin Ladin, apparently at Atef's urging, finally decided to give KSM the green light for the 9/11 operation sometime in late 1998 or early 1999.[16]

KSM then accepted Bin Ladin's standing invitation to move to Kandahar and work directly with al Qaeda. In addition to supervising the planning and preparations for the 9/11 operation, KSM worked with and eventually led al Qaeda's media committee. But KSM states he refused to swear a formal oath of allegiance to Bin Ladin, thereby retaining a last vestige of his cherished autonomy.[17]

At this point, late 1998 to early 1999, planning for the 9/11 operation began in earnest. Yet while the 9/11 project occupied the bulk of KSM's attention, he continued to consider other possibilities for terrorist attacks. For example, he sent al Qaeda operative Issa al Britani to Kuala Lumpur, Malaysia, to learn about the jihad in Southeast Asia from Hambali. Thereafter, KSM claims, at Bin Ladin's direction in early 2001, he sent Britani to the United States to case potential economic and "Jewish" targets in New York City. Furthermore, during the summer of 2001, KSM approached Bin Ladin with the idea of recruiting a Saudi Arabian air force pilot to commandeer a Saudi fighter jet and attack the Israeli city of Eilat. Bin Ladin reportedly liked this proposal, but he instructed KSM to concentrate on the 9/11 operation first. Similarly, KSM's proposals to Atef around this same time for attacks in Thailand, Singapore, Indonesia, and the Maldives were never executed, although Hambali's Jemaah Islamiah operatives did some casing of possible targets.[18]

KSM appears to have been popular among the al Qaeda rank and file. He was reportedly regarded as an effective leader, especially after the 9/11 attacks. Co-workers describe him as an intelligent, efficient, and even-tempered manager who approached his projects with a single-minded dedication that he expected his colleagues to share. Al Qaeda associate Abu Zubaydah has expressed more qualified admiration for KSM's innate creativity, emphasizing instead his ability to incorporate the improvements suggested by others. Nashiri has been similarly measured, observing that although KSM floated many general ideas for attacks, he rarely conceived a specific operation himself.[19] Perhaps these estimates reflect a touch of jealousy; in any case, KSM was plainly a capable coordinator, having had years to hone his skills and build relationships.

## Hambali

Al Qaeda's success in fostering terrorism in Southeast Asia stems largely from its close relationship with Jemaah Islamiah (JI). In that relationship, Hambali became the key coordinator. Born and educated in Indonesia, Hambali moved to Malaysia in the early 1980s to find work. There he claims to have become a follower of the Islamist extremist teachings of various clerics, including one named Abdullah Sungkar. Sungkar first inspired Hambali to share the vision of establishing a radical Islamist regime in Southeast Asia, then furthered Hambali's instruction in jihad by sending him to Afghanistan in 1986. After undergoing training at Rasul Sayyaf's Sada camp (where KSM would later train), Hambali fought against the Soviets; he eventually returned to Malaysia after 18

Ladin reportedly instructed him to case the Port of Aden, on the southern coast, instead.[30] The eventual result was an attempted attack on the USS *The Sullivans* in January 2000 and the successful attack, in October 2000, on the USS *Cole.*

Nashiri's success brought him instant status within al Qaeda. He later was recognized as the chief of al Qaeda operations in and around the Arabian Peninsula. While Nashiri continued to consult Bin Ladin on the planning of subsequent terrorist projects, he retained discretion in selecting operatives and devising attacks. In the two years between the *Cole* bombing and Nashiri's capture, he would supervise several more proposed operations for al Qaeda. The October 6, 2002, bombing of the French tanker *Limburg* in the Gulf of Aden also was Nashiri's handiwork. Although Bin Ladin urged Nashiri to continue plotting strikes against U.S. interests in the Persian Gulf, Nashiri maintains that he actually delayed one of these projects because of security concerns.[31] Those concerns, it seems, were well placed, as Nashiri's November 2002 capture in the United Arab Emirates finally ended his career as a terrorist.

## 5.2 THE "PLANES OPERATION"

According to KSM, he started to think about attacking the United States after Yousef returned to Pakistan following the 1993 World Trade Center bombing. Like Yousef, KSM reasoned he could best influence U.S. policy by targeting the country's economy. KSM and Yousef reportedly brainstormed together about what drove the U.S. economy. New York, which KSM considered the economic capital of the United States, therefore became the primary target. For similar reasons, California also became a target for KSM.[32]

KSM claims that the earlier bombing of the World Trade Center taught him that bombs and explosives could be problematic, and that he needed to graduate to a more novel form of attack. He maintains that he and Yousef began thinking about using aircraft as weapons while working on the Manila air/Bojinka plot, and speculated about striking the World Trade Center and CIA headquarters as early as 1995.[33]

Certainly KSM was not alone in contemplating new kinds of terrorist operations. A study reportedly conducted by Atef, while he and Bin Ladin were still in Sudan, concluded that traditional terrorist hijacking operations did not fit the needs of al Qaeda, because such hijackings were used to negotiate the release of prisoners rather than to inflict mass casualties. The study is said to have considered the feasibility of hijacking planes and blowing them up in flight, paralleling the Bojinka concept. Such a study, if it actually existed, yields significant insight into the thinking of al Qaeda's leaders: (1) they rejected hijackings aimed at gaining the release of imprisoned comrades as too complex, because al Qaeda had no friendly countries in which to land a plane and

then negotiate; (2) they considered the bombing of commercial flights in midair—as carried out against Pan Am Flight 103 over Lockerbie, Scotland—a promising means to inflict massive casualties; and (3) they did not yet consider using hijacked aircraft as weapons against other targets.[34]

KSM has insisted to his interrogators that he always contemplated hijacking and crashing large commercial aircraft. Indeed, KSM describes a grandiose original plan: a total of ten aircraft to be hijacked, nine of which would crash into targets on both coasts—they included those eventually hit on September 11 plus CIA and FBI headquarters, nuclear power plants, and the tallest buildings in California and the state of Washington. KSM himself was to land the tenth plane at a U.S. airport and, after killing all adult male passengers on board and alerting the media, deliver a speech excoriating U.S. support for Israel, the Philippines, and repressive governments in the Arab world. Beyond KSM's rationalizations about targeting the U.S. economy, this vision gives a better glimpse of his true ambitions. This is theater, a spectacle of destruction with KSM as the self-cast star—the superterrorist.[35]

KSM concedes that this proposal received a lukewarm response from al Qaeda leaders skeptical of its scale and complexity. Although Bin Ladin listened to KSM's proposal, he was not convinced that it was practical. As mentioned earlier, Bin Ladin was receiving numerous ideas for potential operations—KSM's proposal to attack U.S. targets with commercial airplanes was only one of many.[36]

KSM presents himself as an entrepreneur seeking venture capital and people. He simply wanted al Qaeda to supply the money and operatives needed for the attack while retaining his independence. It is easy to question such a statement. Money is one thing; supplying a cadre of trained operatives willing to die is much more. Thus, although KSM contends he would have been just as likely to consider working with any comparable terrorist organization, he gives no indication of what other groups he thought could supply such exceptional commodities.[37]

KSM acknowledges formally joining al Qaeda, in late 1998 or 1999, and states that soon afterward, Bin Ladin also made the decision to support his proposal to attack the United States using commercial airplanes as weapons. Though KSM speculates about how Bin Ladin came to share his preoccupation with attacking America, Bin Ladin in fact had long been an opponent of the United States. KSM thinks that Atef may have persuaded Bin Ladin to approve this specific proposal. Atef's role in the entire operation is unquestionably very significant but tends to fade into the background, in part because Atef himself is not available to describe it. He was killed in November 2001 by an American air strike in Afghanistan.[38]

Bin Ladin summoned KSM to Kandahar in March or April 1999 to tell him that al Qaeda would support his proposal. The plot was now referred to within al Qaeda as the "planes operation."[39]

**The Plan Evolves**

Bin Ladin reportedly discussed the planes operation with KSM and Atef in a series of meetings in the spring of 1999 at the al Matar complex near Kandahar. KSM's original concept of using one of the hijacked planes to make a media statement was scrapped, but Bin Ladin considered the basic idea feasible. Bin Ladin, Atef, and KSM developed an initial list of targets. These included the White House, the U.S. Capitol, the Pentagon, and the World Trade Center. According to KSM, Bin Ladin wanted to destroy the White House and the Pentagon, KSM wanted to strike the World Trade Center, and all of them wanted to hit the Capitol. No one else was involved in the initial selection of targets.[40]

Bin Ladin also soon selected four individuals to serve as suicide operatives: Khalid al Mihdhar, Nawaf al Hazmi, Khallad, and Abu Bara al Yemeni. During the al Matar meetings, Bin Ladin told KSM that Mihdhar and Hazmi were so eager to participate in an operation against the United States that they had already obtained U.S. visas. KSM states that they had done so on their own after the suicide of their friend Azzam (Nashiri's cousin) in carrying out the Nairobi bombing. KSM had not met them. His only guidance from Bin Ladin was that the two should eventually go to the United States for pilot training.[41]

Hazmi and Mihdhar were Saudi nationals, born in Mecca. Like the others in this initial group of selectees, they were already experienced mujahideen. They had traveled together to fight in Bosnia in a group that journeyed to the Balkans in 1995. By the time Hazmi and Mihdhar were assigned to the planes operation in early 1999, they had visited Afghanistan on several occasions.[42]

Khallad was another veteran mujahid, like much of his family. His father had been expelled from Yemen because of his extremist views. Khallad had grown up in Saudi Arabia, where his father knew Bin Ladin, Abdullah Azzam, and Omar Abdel Rahman (the "Blind Sheikh"). Khallad departed for Afghanistan in 1994 at the age of 15. Three years later, he lost his lower right leg in a battle with the Northern Alliance, a battle in which one of his brothers died. After this experience, he pledged allegiance to Bin Ladin—whom he had first met as a child in Jeddah—and volunteered to become a suicide operative.[43]

When Khallad applied for a U.S. visa, however, his application was denied. Earlier in 1999, Bin Ladin had sent Khallad to Yemen to help Nashiri obtain explosives for the planned ship-bombing and to obtain a visa to visit the United States, so that he could participate in an operation there. Khallad applied under another name, using the cover story that he would be visiting a medical clinic to obtain a new prosthesis for his leg. Another al Qaeda operative gave Khallad the name of a person living in the United States whom Khallad could use as a point of contact on a visa application. Khallad contacted this individual to help him get an appointment at a U.S. clinic. While Khallad was waiting for the letter from the clinic confirming the appointment, however, he was arrested by Yemeni authorities. The arrest resulted from mistaken identity: Khallad was driving the car of another conspirator in the ship-bombing plot who was wanted by the Yemeni authorities.[44]

Khallad was released sometime during the summer of 1999, after his father and Bin Ladin intervened on his behalf. Khallad learned later that the al Qaeda leader, apparently concerned that Khallad might reveal Nashiri's operation while under interrogation, had contacted a Yemeni official to demand Khallad's release, suggesting that Bin Ladin would not confront the Yemenis if they did not confront him. This account has been corroborated by others. Giving up on acquiring a U.S. visa and concerned that the United States might learn of his ties to al Qaeda, Khallad returned to Afghanistan.[45]

Travel issues thus played a part in al Qaeda's operational planning from the very start. During the spring and summer of 1999, KSM realized that Khallad and Abu Bara, both of whom were Yemenis, would not be able to obtain U.S. visas as easily as Saudi operatives like Mihdhar and Hazmi. Although Khallad had been unable to acquire a U.S. visa, KSM still wanted him and Abu Bara, as well as another Yemeni operative from Bin Ladin's security detail, to participate in the planes operation. Yet because individuals with Saudi passports could travel much more easily than Yemeni, particularly to the United States, there were fewer martyrdom opportunities for Yemenis. To overcome this problem, KSM decided to split the planes operation into two components.[46]

The first part of the planes operation—crashing hijacked aircraft into U.S. targets—would remain as planned, with Mihdhar and Hazmi playing key roles. The second part, however, would now embrace the idea of using suicide operatives to blow up planes, a refinement of KSM's old Manila air plot. The operatives would hijack U.S.-flagged commercial planes flying Pacific routes across East Asia and destroy them in midair, possibly with shoe bombs, instead of flying them into targets. (An alternate scenario apparently involved flying planes into U.S. targets in Japan, Singapore, or Korea.) This part of the operation has been confirmed by Khallad, who said that they contemplated hijacking several planes, probably originating in Thailand, South Korea, Hong Kong, or Malaysia, and using Yemenis who would not need pilot training because they would simply down the planes. All the planes hijacked in the United States and East Asia were to be crashed or exploded at about the same time to maximize the attack's psychological impact.[47]

### Training and Deployment to Kuala Lumpur

In the fall of 1999, the four operatives selected by Bin Ladin for the planes operation were chosen to attend an elite training course at al Qaeda's Mes Aynak camp in Afghanistan. Bin Ladin personally selected the veteran fighters who received this training, and several of them were destined for important operations. One example is Ibrahim al Thawar, or Nibras, who would participate in the October 12, 2000, suicide attack on the USS *Cole*. According to KSM, this training was not given specifically in preparation for the planes operation or any other particular al Qaeda venture. Although KSM claims not to have been involved with the training or to have met with the future 9/11 hijackers at Mes

Emirates, Lebanon, and Yemen—they had formed a close-knit group as students in Hamburg, Germany. The new recruits had come to Afghanistan aspiring to wage jihad in Chechnya. But al Qaeda quickly recognized their potential and enlisted them in its anti-U.S. jihad.

## 5.3 THE HAMBURG CONTINGENT

Although Bin Ladin, Atef, and KSM initially contemplated using established al Qaeda members to execute the planes operation, the late 1999 arrival in Kandahar of four aspiring jihadists from Germany suddenly presented a more attractive alternative. The Hamburg group shared the anti-U.S. fervor of the other candidates for the operation, but added the enormous advantages of fluency in English and familiarity with life in the West, based on years that each member of the group had spent living in Germany. Not surprisingly, Mohamed Atta, Ramzi Binalshibh, Marwan al Shehhi, and Ziad Jarrah would all become key players in the 9/11 conspiracy.

### Mohamed Atta

Mohamed Atta was born on September 1, 1968, in Kafr el Sheikh, Egypt, to a middle-class family headed by his father, an attorney. After graduating from Cairo University with a degree in architectural engineering in 1990, Atta worked as an urban planner in Cairo for a couple of years. In the fall of 1991, he asked a German family he had met in Cairo to help him continue his education in Germany. They suggested he come to Hamburg and invited him to live with them there, at least initially. After completing a course in German, Atta traveled to Germany for the first time in July 1992. He resided briefly in Stuttgart and then, in the fall of 1992, moved to Hamburg to live with his host family. After enrolling at the University of Hamburg, he promptly transferred into the city engineering and planning course at the Technical University of Hamburg-Harburg, where he would remain registered as a student until the fall of 1999. He appears to have applied himself fairly seriously to his studies (at least in comparison to his jihadist friends) and actually received his degree shortly before traveling to Afghanistan. In school, Atta came across as very intelligent and reasonably pleasant, with an excellent command of the German language.[64]

When Atta arrived in Germany, he appeared religious, but not fanatically so. This would change, especially as his tendency to assert leadership became increasingly pronounced. According to Binalshibh, as early as 1995 Atta sought to organize a Muslim student association in Hamburg. In the fall of 1997, he joined a working group at the Quds mosque in Hamburg, a group designed to bridge the gap between Muslims and Christians. Atta proved a poor bridge, however, because of his abrasive and increasingly dogmatic personality. But

among those who shared his beliefs, Atta stood out as a decisionmaker. Atta's friends during this period remember him as charismatic, intelligent, and persuasive, albeit intolerant of dissent.[65]

In his interactions with other students, Atta voiced virulently anti-Semitic and anti-American opinions, ranging from condemnations of what he described as a global Jewish movement centered in New York City that supposedly controlled the financial world and the media, to polemics against governments of the Arab world. To him, Saddam Hussein was an American stooge set up to give Washington an excuse to intervene in the Middle East. Within his circle, Atta advocated violent jihad. He reportedly asked one individual close to the group if he was "ready to fight for [his] belief" and dismissed him as too weak for jihad when the person declined. On a visit home to Egypt in 1998, Atta met one of his college friends. According to this friend, Atta had changed a great deal, had grown a beard, and had "obviously adopted fundamentalism" by that time.[66]

## Ramzi Binalshibh

Ramzi Binalshibh was born on May 1, 1972, in Ghayl Bawazir, Yemen. There does not seem to be anything remarkable about his family or early background. A friend who knew Binalshibh in Yemen remembers him as "religious, but not too religious." From 1987 to 1995, Binalshibh worked as a clerk for the International Bank of Yemen. He first attempted to leave Yemen in 1995, when he applied for a U.S. visa. After his application was rejected, he went to Germany and applied for asylum under the name Ramzi Omar, claiming to be a Sudanese citizen seeking asylum. While his asylum petition was pending, Binalshibh lived in Hamburg and associated with individuals from several mosques there. In 1997, after his asylum application was denied, Binalshibh went home to Yemen but returned to Germany shortly thereafter under his true name, this time registering as a student in Hamburg. Binalshibh continually had academic problems, failing tests and cutting classes; he was expelled from one school in September 1998.[67]

According to Binalshibh, he and Atta first met at a mosque in Hamburg in 1995. The two men became close friends and became identified with their shared extremist outlook. Like Atta, by the late 1990s Binalshibh was decrying what he perceived to be a "Jewish world conspiracy." He proclaimed that the highest duty of every Muslim was to pursue jihad, and that the highest honor was to die during the jihad. Despite his rhetoric, however, Binalshibh presented a more amiable figure than the austere Atta, and was known within the community as being sociable, extroverted, polite, and adventuresome.[68]

In 1998, Binalshibh and Atta began sharing an apartment in the Harburg section of Hamburg, together with a young student from the United Arab Emirates named Marwan al Shehhi.[69]

**Marwan al Shehhi**

Marwan al Shehhi was born on May 9, 1978, in Ras al Khaimah, the United Arab Emirates. His father, who died in 1997, was a prayer leader at the local mosque. After graduating from high school in 1995, Shehhi joined the Emirati military and received half a year of basic training before gaining admission to a military scholarship program that would fund his continued study in Germany.[70]

Shehhi first entered Germany in April 1996. After sharing an apartment in Bonn for two months with three other scholarship students, Shehhi moved in with a German family, with whom he resided for several months before moving into his own apartment. During this period, he came across as very religious, praying five times a day. Friends also remember him as convivial and "a regular guy," wearing Western clothes and occasionally renting cars for trips to Berlin, France, and the Netherlands.[71]

As a student, Shehhi was less than a success. Upon completing a course in German, he enrolled at the University of Bonn in a program for technical, mathematical, and scientific studies. In June 1997, he requested a leave from his studies, citing the need to attend to unspecified "problems" in his home country. Although the university denied his request, Shehhi left anyway, and consequently was compelled to repeat the first semester of his studies. In addition to having academic difficulties at this time, Shehhi appeared to become more extreme in the practice of his faith; for example, he specifically avoided restaurants that cooked with or served alcohol. In late 1997, he applied for permission to complete his course work in Hamburg, a request apparently motivated by his desire to join Atta and Binalshibh. Just how and when the three of them first met remains unclear, although they seemed to know each other already when Shehhi relocated to Hamburg in early 1998. Atta and Binalshibh moved into his apartment in April.[72]

The transfer to Hamburg did not help Shehhi's academic progress; he was directed by the scholarship program administrators at the Emirati embassy to repeat his second semester starting in August 1998, but back in Bonn. Shehhi initially flouted this directive, however, and did not reenroll at the University of Bonn until the following January, barely passing his course there. By the end of July 1999, he had returned to Hamburg, applying to study shipbuilding at the Technical University and, more significantly, residing once again with Atta and Binalshibh, in an apartment at 54 Marienstrasse.[73]

After Shehhi moved in with Atta and Binalshibh, his evolution toward Islamic fundamentalism became more pronounced. A fellow Emirati student who came to Hamburg to visit Shehhi noticed he no longer lived as comfortably as before. Shehhi now occupied an old apartment with a roommate, had no television, and wore inexpensive clothes. When asked why he was living so frugally, Shehhi responded that he was living the way the Prophet had lived.[74] Similarly, when someone asked why he and Atta never laughed, Shehhi retorted, "How can you laugh when people are dying in Palestine?"[75]

## Ziad Jarrah

Born on May 11, 1975, in Mazraa, Lebanon, Ziad Jarrah came from an affluent family and attended private, Christian schools. Like Atta, Binalshibh, and Shehhi, Jarrah aspired to pursue higher education in Germany. In April 1996, he and a cousin enrolled at a junior college in Greifswald, in northeastern Germany. There Jarrah met and became intimate with Aysel Senguen, the daughter of Turkish immigrants, who was preparing to study dentistry.[76]

Even with the benefit of hindsight, Jarrah hardly seems a likely candidate for becoming an Islamic extremist. Far from displaying radical beliefs when he first moved to Germany, he arrived with a reputation for knowing where to find the best discos and beaches in Beirut, and in Greifswald was known to enjoy student parties and drinking beer. Although he continued to share an apartment in Greifswald with his cousin, Jarrah was mostly at Senguen's apartment. Witnesses interviewed by German authorities after 9/11, however, recall that Jarrah started showing signs of radicalization as early as the end of 1996. After returning from a trip home to Lebanon, Jarrah started living more strictly according to the Koran. He read brochures in Arabic about jihad, held forth to friends on the subject of holy war, and professed disaffection with his previous life and a desire not to leave the world "in a natural way."[77]

In September 1997, Jarrah abruptly switched his intended course of study from dentistry to aircraft engineering—at the Technical University of Hamburg-Harburg. His motivation for this decision remains unclear. The rationale he expressed to Senguen—that he had been interested in aviation since playing with toy airplanes as a child—rings somewhat hollow. In any event, Jarrah appears already to have had Hamburg contacts by this time, some of whom may have played a role in steering him toward Islamic extremism.[78]

Following his move to Hamburg that fall, he began visiting Senguen in Greifswald on weekends, until she moved to the German city of Bochum one year later to enroll in dental school. Around the same time, he began speaking increasingly about religion, and his visits to Senguen became less and less frequent. He began criticizing her for not being religious enough and for dressing too provocatively. He grew a full beard and started praying regularly. He refused to introduce her to his Hamburg friends because, he told her, they were religious Muslims and her refusal to become more observant embarrassed him. At some point in 1999, Jarrah told Senguen that he was planning to wage a jihad because there was no greater honor than to die for Allah. Although Jarrah's transformation generated numerous quarrels, their breakups invariably were followed by reconciliation.[79]

## Forming a Cell

In Hamburg, Jarrah had a succession of living accommodations, but he apparently never resided with his future co-conspirators. It is not clear how and when he became part of Atta's circle. He became particularly friendly with Binalshibh after meeting him at the Quds mosque in Hamburg, which Jarrah

began attending regularly in late 1997. The worshippers at this mosque featured an outspoken, flamboyant Islamist named Mohammed Haydar Zammar. A well-known figure in the Muslim community (and to German and U.S. intelligence agencies by the late 1990s), Zammar had fought in Afghanistan and relished any opportunity to extol the virtues of violent jihad. Indeed, a witness has reported hearing Zammar press Binalshibh to fulfill his duty to wage jihad. Moreover, after 9/11, Zammar reportedly took credit for influencing not just Binalshibh but the rest of the Hamburg group. In 1998, Zammar encouraged them to participate in jihad and even convinced them to go to Afghanistan.[80]

Owing to Zammar's persuasion or some other source of inspiration, Atta, Binalshibh, Shehhi, and Jarrah eventually prepared themselves to translate their extremist beliefs into action. By late 1999, they were ready to abandon their student lives in Germany in favor of violent jihad. This final stage in their evolution toward embracing Islamist extremism did not entirely escape the notice of the people around them. The foursome became core members of a group of radical Muslims, often hosting sessions at their Marienstrasse apartment that involved extremely anti-American discussions. Meeting three to four times a week, the group became something of a "sect" whose members, according to one participant in the meetings, tended to deal only with each other.[81] Atta's rent checks for the apartment provide evidence of the importance that the apartment assumed as a center for the group, as he would write on them the notation "Dar el Ansar," or "house of the followers."[82]

In addition to Atta, Binalshibh, Shehhi, and Jarrah, the group included other extremists, some of whom also would attend al Qaeda training camps and, in some instances, would help the 9/11 hijackers as they executed the plot:

- Said Bahaji, son of a Moroccan immigrant, was the only German citizen in the group. Educated in Morocco, Bahaji returned to Germany to study electrical engineering at the Technical University of Hamburg-Harburg. He spent five months in the German army before obtaining a medical discharge, and lived with Atta and Binalshibh at 54 Marienstrasse for eight months between November 1998 and July 1999. Described as an insecure follower with no personality and with limited knowledge of Islam, Bahaji nonetheless professed his readiness to engage in violence. Atta and Binalshibh used Bahaji's computer for Internet research, as evidenced by documents and diskettes seized by German authorities after 9/11.[83]
- Zakariya Essabar, a Moroccan citizen, moved to Germany in February 1997 and to Hamburg in 1998, where he studied medical technology. Soon after moving to Hamburg, Essabar met Binalshibh and the others through a Turkish mosque. Essabar turned extremist fairly suddenly, probably in 1999, and reportedly pressured one acquaintance with physical force to become more religious, grow a beard, and

compel his wife to convert to Islam. Essabar's parents were said to have made repeated but unsuccessful efforts to sway him from this lifestyle. Shortly before the 9/11 attacks, he would travel to Afghanistan to communicate the date for the attacks to the al Qaeda leadership.[84]

- Mounir el Motassadeq, another Moroccan, came to Germany in 1993, moving to Hamburg two years later to study electrical engineering at the Technical University. A witness has recalled Motassadeq saying that he would kill his entire family if his religious beliefs demanded it. One of Motassadeq's roommates recalls him referring to Hitler as a "good man" and organizing film sessions that included speeches by Bin Ladin. Motassadeq would help conceal the Hamburg group's trip to Afghanistan in late 1999.[85]

- Abdelghani Mzoudi, also a Moroccan, arrived in Germany in the summer of 1993, after completing university courses in physics and chemistry. Mzoudi studied in Dortmund, Bochum, and Muenster before moving to Hamburg in 1995. Mzoudi described himself as a weak Muslim when he was home in Morocco, but much more devout when he was back in Hamburg. In April 1996, Mzoudi and Motas-sadeq witnessed the execution of Atta's will.[86]

During the course of 1999, Atta and his group became ever more extreme and secretive, speaking only in Arabic to conceal the content of their conver-sations.[87] When the four core members of the Hamburg cell left Germany to journey to Afghanistan late that year, it seems unlikely that they already knew about the planes operation; no evidence connects them to al Qaeda before that time. Witnesses have attested, however, that their pronouncements reflected ample predisposition toward taking some action against the United States.[88] In short, they fit the bill for Bin Ladin, Atef, and KSM.

### Going to Afghanistan

The available evidence indicates that in 1999, Atta, Binalshibh, Shehhi, and Jar-rah decided to fight in Chechnya against the Russians. According to Binal-shibh, a chance meeting on a train in Germany caused the group to travel to Afghanistan instead. An individual named Khalid al Masri approached Binal-shibh and Shehhi (because they were Arabs with beards, Binalshibh thinks) and struck up a conversation about jihad in Chechnya. When they later called Masri and expressed interest in going to Chechnya, he told them to contact Abu Musab in Duisburg, Germany. Abu Musab turned out to be Mohamedou Ould Slahi, a significant al Qaeda operative who, even then, was well known to U.S. and German intelligence, though neither government apparently knew he was operating in Germany in late 1999. When telephoned by Binalshibh and Shehhi, Slahi reportedly invited these promising recruits to come see him in Duisburg.[89]

Binalshibh, Shehhi, and Jarrah made the trip. When they arrived, Slahi

explained that it was difficult to get to Chechnya at that time because many travelers were being detained in Georgia. He recommended they go to Afghanistan instead, where they could train for jihad before traveling onward to Chechnya. Slahi instructed them to obtain Pakistani visas and then return to him for further directions on how to reach Afghanistan. Although Atta did not attend the meeting, he joined in the plan with the other three. After obtaining the necessary visas, they received Slahi's final instructions on how to travel to Karachi and then Quetta, where they were to contact someone named Umar al Masri at the Taliban office.[90]

Following Slahi's advice, Atta and Jarrah left Hamburg during the last week of November 1999, bound for Karachi. Shehhi left for Afghanistan around the same time; Binalshibh, about two weeks later. Binalshibh remembers that when he arrived at the Taliban office in Quetta, there was no one named Umar al Masri. The name, apparently, was simply a code; a group of Afghans from the office promptly escorted him to Kandahar. There Binalshibh rejoined Atta and Jarrah, who said they already had pledged loyalty to Bin Ladin and urged him to do the same. They also informed him that Shehhi had pledged as well and had already left for the United Arab Emirates to prepare for the mission. Binalshibh soon met privately with Bin Ladin, accepted the al Qaeda leader's invitation to work under him, and added his own pledge to those of his Hamburg colleagues. By this time, Binalshibh claims, he assumed he was volunteering for a martyrdom operation.[91]

Atta, Jarrah, and Binalshibh then met with Atef, who told them they were about to undertake a highly secret mission. As Binalshibh tells it, Atef instructed the three to return to Germany and enroll in flight training. Atta—whom Bin Ladin chose to lead the group—met with Bin Ladin several times to receive additional instructions, including a preliminary list of approved targets: the World Trade Center, the Pentagon, and the U.S. Capitol.[92] The new recruits also learned that an individual named Rabia al Makki (Nawaf al Hazmi) would be part of the operation.[93]

In retrospect, the speed with which Atta, Shehhi, Jarrah, and Binalshibh became core members of the 9/11 plot—with Atta designated its operational leader—is remarkable. They had not yet met with KSM when all this occurred. It is clear, then, that Bin Ladin and Atef were very much in charge of the operation. That these candidates were selected so quickly—before comprehensive testing in the training camps or in operations—demonstrates that Bin Ladin and Atef probably already understood the deficiencies of their initial team, Hazmi and Mihdhar. The new recruits from Germany possessed an ideal combination of technical skill and knowledge that the original 9/11 operatives, veteran fighters though they were, lacked. Bin Ladin and Atef wasted no time in assigning the Hamburg group to the most ambitious operation yet planned by al Qaeda.

Bin Ladin and Atef also plainly judged that Atta was best suited to be the

tactical commander of the operation. Such a quick and critical judgment invites speculation about whether they had already taken Atta's measure at some earlier meeting. To be sure, some gaps do appear in the record of Atta's known whereabouts during the preceding years. One such gap is February–March 1998, a period for which there is no evidence of his presence in Germany and when he conceivably could have been in Afghanistan.[94] Yet to date, neither KSM, Binalshibh, nor any other al Qaeda figure interrogated about the 9/11 plot has claimed that Atta or any other member of the Hamburg group traveled to Afghanistan before the trip in late 1999.

While the four core Hamburg cell members were in Afghanistan, their associates back in Hamburg handled their affairs so that their trip could be kept secret. Motassadeq appears to have done the most. He terminated Shehhi's apartment lease, telling the landlord that Shehhi had returned to the UAE for family reasons, and used a power of attorney to pay bills from Shehhi's bank account.[95] Motassadeq also assisted Jarrah, offering to look after Aysel Senguen in Jarrah's absence. Said Bahaji attended to similar routine matters for Atta and Binalshibh, thereby helping them remain abroad without drawing attention to their absence.[96]

### Preparing for the Operation

In early 2000, Atta, Jarrah, and Binalshibh returned to Hamburg. Jarrah arrived first, on January 31, 2000.[97] According to Binalshibh, he and Atta left Kandahar together and proceeded first to Karachi, where they met KSM and were instructed by him on security and on living in the United States. Shehhi apparently had already met with KSM before returning to the UAE. Atta returned to Hamburg in late February, and Binalshibh arrived shortly thereafter. Shehhi's travels took him to the UAE (where he acquired a new passport and a U.S. visa), Saudi Arabia, Bahrain, and one or more other destinations. Shehhi also returned to Germany, possibly sometime in March.[98]

After leaving Afghanistan, the hijackers made clear efforts to avoid appearing radical. Once back in Hamburg, they distanced themselves from conspicuous extremists like Zammar, whom they knew attracted unwanted attention from the authorities.[99] They also changed their appearance and behavior. Atta wore Western clothing, shaved his beard, and no longer attended extremist mosques. Jarrah also no longer wore a full beard and, according to Senguen, acted much more the way he had when she first met him. And when Shehhi, while still in the UAE in January 2000, held a belated wedding celebration (he actually had been married in 1999), a friend of his was surprised to see that he had shaved off his beard and was acting like his old self again.[100]

But Jarrah's apparent efforts to appear less radical did not completely conceal his transformation from his Lebanese family, which grew increasingly concerned about his fanaticism. Soon after Jarrah returned to Germany, his father asked Jarrah's cousin—a close companion from boyhood—to intercede. The

cousin's ensuing effort to persuade Jarrah to depart from "the path he was tak-ing" proved unavailing.[101] Yet Jarrah clearly differed from the other hijackers in that he maintained much closer contact with his family and continued his intimate relationship with Senguen. These ties may well have caused him to harbor some doubts about going through with the plot, even as late as the sum-mer of 2001, as discussed in chapter 7.

After leaving Afghanistan, the four began researching flight schools and avi-ation training. In early January 2000, Ali Abdul Aziz Ali—a nephew of KSM living in the UAE who would become an important facilitator in the plot—used Shehhi's credit card to order a Boeing 747-400 flight simulator program and a Boeing 767 flight deck video, together with attendant literature; Ali had all these items shipped to his employer's address. Jarrah soon decided that the schools in Germany were not acceptable and that he would have to learn to fly in the United States. Binalshibh also researched flight schools in Europe, and in the Netherlands he met a flight school director who recommended flight schools in the United States because they were less expensive and required shorter training periods.[102]

In March 2000, Atta emailed 31 different U.S. flight schools on behalf of a small group of men from various Arab countries studying in Germany who, while lacking prior training, were interested in learning to fly in the United States. Atta requested information about the cost of the training, potential financing, and accommodations.[103]

Before seeking visas to enter the United States, Atta, Shehhi, and Jarrah obtained new passports, each claiming that his old passport had been lost. Pre-sumably they were concerned that the Pakistani visas in their old passports would raise suspicions about possible travel to Afghanistan. Shehhi obtained his visa on January 18, 2000; Atta, on May 18; and Jarrah, on May 25.[104] Binal-shibh's visa request was rejected, however, as were his three subsequent appli-cations.[105] Binalshibh proved unable to obtain a visa, a victim of the generalized suspicion that visa applicants from Yemen—especially young men applying in another country (Binalshibh first applied in Berlin)—might join the ranks of undocumented aliens seeking work in the United States. Before 9/11, security concerns were not a major factor in visa issuance unless the applicant already was on a terrorist watchlist, and none of these four men was. Concerns that Binalshibh intended to immigrate to the United States doomed his chances to participate firsthand in the 9/11 attacks. Although Binalshibh had to remain behind, he would provide critical assistance from abroad to his co-conspirators.

Once again, the need for travel documents dictated al Qaeda's plans.

**Travel**

It should by now be apparent how significant travel was in the planning under-taken by a terrorist organization as far-flung as al Qaeda. The story of the plot includes references to dozens of international trips. Operations required travel,

as did basic communications and the movement of money. Where electronic communications were regarded as insecure, al Qaeda relied even more heavily on couriers.

KSM and Abu Zubaydah each played key roles in facilitating travel for al Qaeda operatives. In addition, al Qaeda had an office of passports and host country issues under its security committee. The office was located at the Kandahar airport and was managed by Atef. The committee altered papers, including passports, visas, and identification cards.[106]

Moreover, certain al Qaeda members were charged with organizing passport collection schemes to keep the pipeline of fraudulent documents flowing. To this end, al Qaeda required jihadists to turn in their passports before going to the front lines in Afghanistan. If they were killed, their passports were recycled for use.[107] The operational mission training course taught operatives how to forge documents. Certain passport alteration methods, which included substituting photos and erasing and adding travel cachets, were also taught. Manuals demonstrating the technique for "cleaning" visas were reportedly circulated among operatives. Mohamed Atta and Zakariya Essabar were reported to have been trained in passport alteration.[108]

The purpose of all this training was twofold: to develop an institutional capacity for document forgery and to enable operatives to make necessary adjustments in the field. It was well-known, for example, that if a Saudi traveled to Afghanistan via Pakistan, then on his return to Saudi Arabia his passport, bearing a Pakistani stamp, would be confiscated. So operatives either erased the Pakistani visas from their passports or traveled through Iran, which did not stamp visas directly into passports.[109]

## 5.4 A MONEY TRAIL?

Bin Ladin and his aides did not need a very large sum to finance their planned attack on America. The 9/11 plotters eventually spent somewhere between $400,000 and $500,000 to plan and conduct their attack. Consistent with the importance of the project, al Qaeda funded the plotters. KSM provided his operatives with nearly all the money they needed to travel to the United States, train, and live. The plotters' tradecraft was not especially sophisticated, but it was good enough. They moved, stored, and spent their money in ordinary ways, easily defeating the detection mechanisms in place at the time.[110] The origin of the funds remains unknown, although we have a general idea of how al Qaeda financed itself during the period leading up to 9/11.

### General Financing

As we explained in chapter 2, Bin Ladin did not fund al Qaeda through a personal fortune and a network of businesses in Sudan. Instead, al Qaeda relied primarily on a fund-raising network developed over time. The CIA

The Defense Department favored strong action. Deputy Secretary Wolfowitz questioned the United States' ability to deliver Bin Ladin and bring him to justice. He favored going after Bin Ladin as part of a larger air strike, similar to what had been done in the 1986 U.S. strike against Libya. General Myers emphasized the Predator's value for surveillance, perhaps enabling broader air strikes that would go beyond Bin Ladin to attack al Qaeda's training infrastructure.[256]

The principals also discussed which agency—CIA or Defense—should have the authority to fire a missile from the armed Predator.[257]

At the end, Rice summarized the meeting's conclusions. The armed Predator capability was needed but not ready. The Predator would be available for the military to consider along with its other options. The CIA should consider flying reconnaissance-only missions. The principals—including the previously reluctant Tenet—thought that such reconnaissance flights were a good idea, combined with other efforts to get actionable intelligence. Tenet deferred an answer on the additional reconnaissance flights, conferred with his staff after the meeting, and then directed the CIA to press ahead with them.[258]

A few days later, a final version of the draft presidential directive was circulated, incorporating two minor changes made by the principals.[259]

On September 9, dramatic news arrived from Afghanistan. The leader of the Northern Alliance, Ahmed Shah Massoud, had granted an interview in his bungalow near the Tajikistan border with two men whom the Northern Alliance leader had been told were Arab journalists. The supposed reporter and cameraman—actually al Qaeda assassins—then set off a bomb, riddling Massoud's chest with shrapnel. He died minutes later.

On September 10, Hadley gathered the deputies to finalize their three-phase, multiyear plan to pressure and perhaps ultimately topple the Taliban leadership.[260]

That same day, Hadley instructed DCI Tenet to have the CIA prepare new draft legal authorities for the "broad covert action program" envisioned by the draft presidential directive. Hadley also directed Tenet to prepare a separate section "authorizing a broad range of other covert activities, including authority to capture or to use lethal force" against al Qaeda command-and-control elements. This section would supersede the Clinton-era documents. Hadley wanted the authorities to be flexible and broad enough "to cover any additional UBL–related covert actions contemplated."[261]

Funding still needed to be located. The military component remained unclear. Pakistan remained uncooperative. The domestic policy institutions were largely uninvolved. But the pieces were coming together for an integrated policy dealing with al Qaeda, the Taliban, and Pakistan.

to his trips, Jarrah made hundreds of phone calls to her and communicated frequently by email.[51]

Jarrah was supposed to be joined at FFTC by Ramzi Binalshibh, who even sent the school a deposit. But Binalshibh could not obtain a U.S. visa. His first applications in May and June 2000 were denied because he lacked established ties in Germany ensuring his return from a trip to the United States. In September, he went home to Yemen to apply for a visa from there, but was denied on grounds that he also lacked sufficient ties to Yemen. In October, he tried one last time, in Berlin, applying for a student visa to attend "aviation language school," but the prior denials were noted and this application was denied as well, as incomplete.[52]

Unable to participate directly in the operation, Binalshibh instead took on the role of coordinating between KSM and the operatives in the United States. Apart from sending a total of about $10,000 in wire transfers to Atta and Shehhi during the summer of 2000, one of Binalshibh's first tasks in his new role as plot coordinator was to assist another possible pilot, Zacarias Moussaoui.[53]

In the fall of 2000, KSM had sent Moussaoui to Malaysia for flight training, but Moussaoui did not find a school he liked. He worked instead on other terrorist schemes, such as buying four tons of ammonium nitrate for bombs to be planted on cargo planes flying to the United States. When KSM found out, he recalled Moussaoui back to Pakistan and directed him to go to the United States for flight training. In early October, Moussaoui went to London. When Binalshibh visited London in December, he stayed at the same 16-room dormitory where Moussaoui was still residing. From London, Moussaoui sent inquiries to the Airman Flight School in Norman, Oklahoma.[54]

Confronting training or travel problems with Hazmi, Mihdhar, Binalshibh, and Moussaoui, al Qaeda was looking for another possible pilot candidate. A new recruit with just the right background conveniently presented himself in Afghanistan.

## The Fourth Pilot: Hani Hanjour

Hani Hanjour, from Ta'if, Saudi Arabia, first came to the United States in 1991 to study at the Center for English as a Second Language at the University of Arizona. He seems to have been a rigorously observant Muslim. According to his older brother, Hani Hanjour went to Afghanistan for the first time in the late 1980s, as a teenager, to participate in the jihad and, because the Soviets had already withdrawn, worked for a relief agency there.[55]

In 1996, Hanjour returned to the United States to pursue flight training, after being rejected by a Saudi flight school. He checked out flight schools in Florida, California, and Arizona; and he briefly started at a couple of them before returning to Saudi Arabia. In 1997, he returned to Florida and then, along with two friends, went back to Arizona and began his flight training there in earnest. After about three months, Hanjour was able to obtain his private

his intended address as the Marriott Hotel, New York City, but instead spent one night at another New York hotel. He then joined the group of hijackers in Paterson, reuniting with Nawaf al Hazmi after more than a year. With two months remaining, all 19 hijackers were in the United States and ready to take the final steps toward carrying out the attacks.[119]

### Assistance from Hezbollah and Iran to al Qaeda

As we mentioned in chapter 2, while in Sudan, senior managers in al Qaeda maintained contacts with Iran and the Iranian-supported worldwide terrorist organization Hezbollah, which is based mainly in southern Lebanon and Beirut. Al Qaeda members received advice and training from Hezbollah.

Intelligence indicates the persistence of contacts between Iranian security officials and senior al Qaeda figures after Bin Ladin's return to Afghanistan. Khallad has said that Iran made a concerted effort to strengthen relations with al Qaeda after the October 2000 attack on the USS *Cole*, but was rebuffed because Bin Ladin did not want to alienate his supporters in Saudi Arabia. Khallad and other detainees have described the willingness of Iranian officials to facilitate the travel of al Qaeda members through Iran, on their way to and from Afghanistan. For example, Iranian border inspectors would be told not to place telltale stamps in the passports of these travelers. Such arrangements were particularly beneficial to Saudi members of al Qaeda.[120]

Our knowledge of the international travels of the al Qaeda operatives selected for the 9/11 operation remains fragmentary. But we now have evidence suggesting that 8 to 10 of the 14 Saudi "muscle" operatives traveled into or out of Iran between October 2000 and February 2001.[121]

In October 2000, a senior operative of Hezbollah visited Saudi Arabia to coordinate activities there. He also planned to assist individuals in Saudi Arabia in traveling to Iran during November. A top Hezbollah commander and Saudi Hezbollah contacts were involved.[122]

Also in October 2000, two future muscle hijackers, Mohand al Shehri and Hamza al Ghamdi, flew from Iran to Kuwait. In November, Ahmed al Ghamdi apparently flew to Beirut, traveling—perhaps by coincidence—on the same flight as a senior Hezbollah operative. Also in November, Salem al Hazmi apparently flew from Saudi Arabia to Beirut.[123]

In mid-November, we believe, three of the future muscle hijackers, Wail al Shehri, Waleed al Shehri, and Ahmed al Nami, all of whom had obtained their U.S. visas in late October, traveled in a group from Saudi Arabia to Beirut and then onward to Iran. An associate of a senior Hezbollah operative was on the same flight that took the future hijackers to Iran. Hezbollah officials in Beirut and Iran were expecting the arrival of a group during the same time period. The travel of this group was important enough to merit the attention of senior figures in Hezbollah.[124]

Later in November, two future muscle hijackers, Satam al Suqami and Majed

Moqed, flew into Iran from Bahrain. In February 2001, Khalid al Mihdhar may have taken a flight from Syria to Iran, and then traveled further within Iran to a point near the Afghan border.[125]

KSM and Binalshibh have confirmed that several of the 9/11 hijackers (at least eight, according to Binalshibh) transited Iran on their way to or from Afghanistan, taking advantage of the Iranian practice of not stamping Saudi passports. They deny any other reason for the hijackers' travel to Iran. They also deny any relationship between the hijackers and Hezbollah.[126]

In sum, there is strong evidence that Iran facilitated the transit of al Qaeda members into and out of Afghanistan before 9/11, and that some of these were future 9/11 hijackers. There also is circumstantial evidence that senior Hezbollah operatives were closely tracking the travel of some of these future muscle hijackers into Iran in November 2000. However, we cannot rule out the possibility of a remarkable coincidence—that is, that Hezbollah was actually focusing on some other group of individuals traveling from Saudi Arabia during this same time frame, rather than the future hijackers.[127]

We have found no evidence that Iran or Hezbollah was aware of the planning for what later became the 9/11 attack. At the time of their travel through Iran, the al Qaeda operatives themselves were probably not aware of the specific details of their future operation.

After 9/11, Iran and Hezbollah wished to conceal any past evidence of cooperation with Sunni terrorists associated with al Qaeda. A senior Hezbollah official disclaimed any Hezbollah involvement in 9/11.[128]

We believe this topic requires further investigation by the U.S. government.

## 7.4 FINAL STRATEGIES AND TACTICS

**Final Preparations in the United States**
During the early summer of 2001, Atta, assisted by Shehhi, was busy coordinating the arrival of most of the muscle hijackers in southern Florida—picking them up at the airport, finding them places to stay, and helping them settle in the United States.[129]

The majority settled in Florida. Some opened bank accounts, acquired mailboxes, and rented cars. Several also joined local gyms, presumably to stay fit for the operation. Upon first arriving, most stayed in hotels and motels; but by mid-June, they settled in shared apartments relatively close to one another and Atta.[130] Though these muscle hijackers did not travel much after arriving in the United States, two of them, Waleed al Shehri and Satam al Suqami, took unusual trips.

On May 19, Shehri and Suqami flew from Fort Lauderdale to Freeport, the Bahamas, where they had reservations at the Bahamas Princess Resort. The two were turned away by Bahamian officials on arrival, however, because they

lacked visas; they returned to Florida that same day. They likely took this trip to renew Suqami's immigration status, as Suqami's legal stay in the United States ended May 21.[131]

On July 30, Shehri traveled alone from Fort Lauderdale to Boston. He flew to San Francisco the next day, where he stayed one night before returning via Las Vegas. While this travel may have been a casing flight—Shehri traveled in first class on the same type of aircraft he would help hijack on September 11 (a Boeing 767) and the trip included a layover in Las Vegas—Shehri was neither a pilot nor a plot leader, as were the other hijackers who took surveillance flights.[132]

The three Hamburg pilots—Atta, Shehhi, and Jarrah—took the first of their cross-country surveillance flights early in the summer. Shehhi flew from New York to Las Vegas via San Francisco in late May. Jarrah flew from Baltimore to Las Vegas via Los Angeles in early June. Atta flew from Boston to Las Vegas via San Francisco at the end of June. Each traveled in first class, on United Airlines. For the east-west transcontinental leg, each operative flew on the same type of aircraft he would pilot on September 11 (Atta and Shehhi, a Boeing 767; Jarrah, a Boeing 757).[133] Hanjour and Hazmi, as noted below, took similar cross-country surveillance flights in August.

Jarrah and Hanjour also received additional training and practice flights in the early summer. A few days before departing on his cross-country test flight, Jarrah flew from Fort Lauderdale to Philadelphia, where he trained at Hortman Aviation and asked to fly the Hudson Corridor, a low-altitude "hallway" along the Hudson River that passes New York landmarks like the World Trade Center. Heavy traffic in the area can make the corridor a dangerous route for an inexperienced pilot. Because Hortman deemed Jarrah unfit to fly solo, he could fly this route only with an instructor.[134]

Hanjour, too, requested to fly the Hudson Corridor about this same time, at Air Fleet Training Systems in Teterboro, New Jersey, where he started receiving ground instruction soon after settling in the area with Hazmi. Hanjour flew the Hudson Corridor, but his instructor declined a second request because of what he considered Hanjour's poor piloting skills. Shortly thereafter, Hanjour switched to Caldwell Flight Academy in Fairfield, New Jersey, where he rented small aircraft on several occasions during June and July. In one such instance on July 20, Hanjour—likely accompanied by Hazmi—rented a plane from Caldwell and took a practice flight from Fairfield to Gaithersburg, Maryland, a route that would have allowed them to fly near Washington, D.C. Other evidence suggests that Hanjour may even have returned to Arizona for flight simulator training earlier in June.[135]

There is no indication that Atta or Shehhi received any additional flight training in June. Both were likely too busy organizing the newly arrived muscle hijackers and taking their cross-country surveillance flights. Atta, moreover, needed to coordinate with his second-in-command, Nawaf al Hazmi.[136]

Although Atta and Hazmi appear to have been in Virginia at about the same time in early April, they probably did not meet then. Analysis of late April communications associated with KSM indicates that they had wanted to get together in April but could not coordinate the meeting.[137] Atta and Hazmi probably first met in the United States only when Hazmi traveled round-trip from Newark to Miami between June 19 and June 25.

After he returned to New Jersey, Hazmi's behavior began to closely parallel that of the other hijackers. He and Hanjour, for instance, soon established new bank accounts, acquired a mailbox, rented cars, and started visiting a gym. So did the four other hijackers who evidently were staying with them in New Jersey. Several also obtained new photo identification, first in New Jersey and then at the Virginia Department of Motor Vehicles, where Hazmi and Hanjour had obtained such documents months earlier, likely with help from their Jordanian friend, Rababah.[138]

Atta probably met again with Hazmi in early July. Returning from his initial cross-country surveillance flight, Atta flew into New York. Rather than return immediately to Florida, he checked into a New Jersey hotel. He picked up tickets to travel to Spain at a travel agency in Paterson on July 4 before departing for Fort Lauderdale. Now that the muscle hijackers had arrived, he was ready to meet with Ramzi Binalshibh for the last time.[139]

### The Meeting in Spain

After meeting with Atta in Berlin in January 2001, Binalshibh had spent much of the spring of 2001 in Afghanistan and Pakistan, helping move the muscle hijackers as they passed through Karachi. During the Berlin meeting, the two had agreed to meet later in the year in Kuala Lumpur to discuss the operation in person again. In late May, Binalshibh reported directly to Bin Ladin at an al Qaeda facility known as "Compound Six" near Kandahar.[140]

Bin Ladin told Binalshibh to instruct Atta and the others to focus on their security and that of the operation, and to advise Atta to proceed as planned with the targets discussed before Atta left Afghanistan in early 2000—the World Trade Center, the Pentagon, the White House, and the Capitol. According to Binalshibh, Bin Ladin said he preferred the White House over the Capitol, asking Binalshibh to confirm that Atta understood this preference. Binalshibh says Bin Ladin had given the same message to Waleed al Shehri for conveyance to Atta earlier that spring. Binalshibh also received permission to meet Atta in Malaysia. Atef provided money for the trip, which KSM would help Binalshibh arrange in Karachi.[141]

In early June, Binalshibh traveled by taxi from Kandahar to Quetta, Pakistan, where al Qaeda courier Abu Rahmah took him to KSM. According to Binalshibh, KSM provided a plane ticket to Malaysia and a fraudulent Saudi passport to use for the trip. KSM told him to ask Atta to select a date for the attacks. Binalshibh was to return to Germany and then inform KSM of the date. KSM

also gave Binalshibh the email address of Zacarias Moussaoui for future contact. Binalshibh then left for Kuala Lumpur.[142]

Binalshibh contacted Atta upon arriving in Malaysia and found a change in plan. Atta could not travel because he was too busy helping the new arrivals settle in the United States. After remaining in Malaysia for approximately three weeks, Binalshibh went to Bangkok for a few days before returning to Germany. He and Atta agreed to meet later at a location to be determined.[143]

In early July, Atta called Binalshibh to suggest meeting in Madrid, for reasons Binalshibh claims not to know. He says he preferred Berlin, but that he and Atta knew too many people in Germany and feared being spotted together. Unable to buy a ticket to Madrid at the height of the tourist season, Binalshibh booked a seat on a flight to Reus, near Barcelona, the next day. Atta was already en route to Madrid, so Binalshibh phoned Shehhi in the United States to inform him of the change in itinerary.[144]

Atta arrived in Madrid on July 8. He spent the night in a hotel and made three calls from his room, most likely to coordinate with Binalshibh. The next day, Atta rented a car and drove to Reus to pick up Binalshibh; the two then drove to the nearby town of Cambrils. Hotel records show Atta renting rooms in the same area until July 19, when he returned his rental car in Madrid and flew back to Fort Lauderdale. On July 16, Binalshibh returned to Hamburg, using a ticket Atta had purchased for him earlier that day. According to Binalshibh, they did not meet with anyone else while in Spain.[145]

Binalshibh says he told Atta that Bin Ladin wanted the attacks carried out as soon as possible. Bin Ladin, Binalshibh conveyed, was worried about having so many operatives in the United States. Atta replied that he could not yet provide a date because he was too busy organizing the arriving hijackers and still needed to coordinate the timing of the flights so that the crashes would occur simultaneously. Atta said he required about five to six weeks before he could provide an attack date. Binalshibh advised Atta that Bin Ladin had directed that the other operatives not be informed of the date until the last minute. Atta was to provide Binalshibh with advance notice of at least a week or two so that Binalshibh could travel to Afghanistan and report the date personally to Bin Ladin.[146]

As to targets, Atta understood Bin Ladin's interest in striking the White House. Atta said he thought this target too difficult, but had tasked Hazmi and Hanjour to evaluate its feasibility and was awaiting their answer. Atta said that those two operatives had rented small aircraft and flown reconnaissance flights near the Pentagon. Atta explained that Hanjour was assigned to attack the Pentagon, Jarrah the Capitol, and that both Atta and Shehhi would hit the World Trade Center. If any pilot could not reach his intended target, he was to crash the plane. If Atta could not strike the World Trade Center, he planned to crash his aircraft directly into the streets of New York. Atta told Binalshibh that each pilot had volunteered for his assigned target, and that the assignments were subject to change.[147]

During the Spain meeting, Atta also mentioned that he had considered targeting a nuclear facility he had seen during familiarization flights near New York—a target they referred to as "electrical engineering." According to Binalshibh, the other pilots did not like the idea. They thought a nuclear target would be difficult because the airspace around it was restricted, making reconnaissance flights impossible and increasing the likelihood that any plane would be shot down before impact. Moreover, unlike the approved targets, this alternative had not been discussed with senior al Qaeda leaders and therefore did not have the requisite blessing. Nor would a nuclear facility have particular symbolic value. Atta did not ask Binalshibh to pass this idea on to Bin Ladin, Atef, or KSM, and Binalshibh says he did not mention it to them until after September 11.[148]

Binalshibh claims that during their time in Spain, he and Atta also discussed how the hijackings would be executed. Atta said he, Shehhi, and Jarrah had encountered no problems carrying box cutters on cross-country surveillance flights. The best time to storm the cockpit would be about 10–15 minutes after takeoff, when the cockpit doors typically were opened for the first time. Atta did not believe they would need any other weapons. He had no firm contingency plan in case the cockpit door was locked. While he mentioned general ideas such as using a hostage or claiming to have a bomb, he was confident the cockpit doors would be opened and did not consider breaking them down a viable idea. Atta told Binalshibh he wanted to select planes departing on long flights because they would be full of fuel, and that he wanted to hijack Boeing aircraft because he believed them easier to fly than Airbus aircraft, which he understood had an autopilot feature that did not allow them to be crashed into the ground.[149]

Finally, Atta confirmed that the muscle hijackers had arrived in the United States without incident. They would be divided into teams according to their English-speaking ability. That way they could assist each other before the operation and each team would be able to command the passengers in English. According to Binalshibh, Atta complained that some of the hijackers wanted to contact their families to say goodbye, something he had forbidden. Atta, moreover, was nervous about his future communications with Binalshibh, whom he instructed to obtain new telephones upon returning to Germany. Before Binalshibh left Spain, he gave Atta eight necklaces and eight bracelets that Atta had asked him to buy when he was recently in Bangkok, believing that if the hijackers were clean shaven and well dressed, others would think them wealthy Saudis and give them less notice.[150]

As directed, upon returning from Spain, Binalshibh obtained two new phones, one to communicate with Atta and another to communicate with KSM and others, such as Zacarias Moussaoui. Binalshibh soon contacted KSM and, using code words, reported the results of his meeting with Atta. This important exchange occurred in mid–July.[151]

The conversation covered various topics. For example, Jarrah was to send Binalshibh certain personal materials from the hijackers, including copies of their

passports, which Binalshibh in turn would pass along to KSM, probably for subsequent use in al Qaeda propaganda.[152]

The most significant part of the mid-July conversation concerned Jarrah's troubled relationship with Atta. KSM and Binalshibh both acknowledge that Jarrah chafed under Atta's authority over him. Binalshibh believes the disagreement arose in part from Jarrah's family visits. Moreover, Jarrah had been on his own for most of his time in the United States because Binalshibh's visa difficulty had prevented the two of them from training together. Jarrah thus felt excluded from the decisionmaking. Binalshibh had to act as a broker between Jarrah and Atta.[153]

Concerned that Jarrah might withdraw from the operation at this late stage, KSM emphasized the importance of Atta and Jarrah's resolving their differences. Binalshibh claims that such concern was unwarranted, and in their mid-July discussion reassured KSM that Atta and Jarrah would reconcile and be ready to move forward in about a month, after Jarrah visited his family. Noting his concern and the potential for delay, KSM at one point instructed Binalshibh to send "the skirts" to "Sally"—a coded instruction to Binalshibh to send funds to Zacarias Moussaoui. While Binalshibh admits KSM did direct him to send Moussaoui money during the mid-July conversation, he denies knowing exactly why he received this instruction—though he thought the money was being provided "within the framework" of the 9/11 operation.[154]

KSM may have instructed Binalshibh to send money to Moussaoui in order to help prepare Moussaoui as a potential substitute pilot for Jarrah. On July 20, 2001, Aysel Senguen, Jarrah's girlfriend, purchased a one-way ticket for Jarrah from Miami to Dusseldorf. On Jarrah's previous four trips from the United States to see Senguen and his family in Lebanon, he had always traveled with a round-trip ticket. When Jarrah departed Miami on July 25, Atta appears to have driven him to the airport, another unique circumstance.[155]

Binalshibh picked up Jarrah at the airport in Dusseldorf on July 25. Jarrah wanted to see Senguen as soon as possible, so he and Binalshibh arranged to meet a few days later. When they did, they had an emotional conversation during which Binalshibh encouraged Jarrah to see the plan through.[156]

While Jarrah was in Germany, Binalshibh and Moussaoui were in contact to arrange for the transfer of funds. Binalshibh received two wire transfers from Hawsawi in the UAE totaling $15,000 and, within days, relayed almost all of this money to Moussaoui in two installments.[157]

Moussaoui had been taking flight lessons at the Airman Flight School in Norman, Oklahoma, since February but stopped in late May. Although at that point he had only about 50 hours of flight time and no solo flights to his credit, Moussaoui began making inquiries about flight materials and simulator training for Boeing 747s. On July 10, he put down a $1,500 deposit for flight simulator training at Pan Am International Flight Academy in Eagan, Minnesota, and by the end of the month, he had received a simulator schedule to train from

**Readying the Attacks**

A week after he returned from meeting Binalshibh in Spain, Atta traveled to Newark, probably to coordinate with Hazmi and give him additional funds. Atta spent a few days in the area before returning to Florida on July 30. The month of August was busy, as revealed by a set of contemporaneous Atta-Binalshibh communications that were recovered after September 11.[165]

On August 3, for example, Atta and Binalshibh discussed several matters, such as the best way for the operatives to purchase plane tickets and the assignment of muscle hijackers to individual teams. Atta and Binalshibh also revisited the question of whether to target the White House. They discussed targets in coded language, pretending to be students discussing various fields of study: "architecture" referred to the World Trade Center, "arts" the Pentagon, "law" the Capitol, and "politics" the White House.[166]

Binalshibh reminded Atta that Bin Ladin wanted to target the White House. Atta again cautioned that this would be difficult. When Binalshibh persisted, Atta agreed to include the White House but suggested they keep the Capitol as an alternate target in case the White House proved too difficult. Atta also suggested that the attacks would not happen until after the first week in September, when Congress reconvened.[167]

Atta and Binalshibh also discussed "the friend who is coming as a tourist"— a cryptic reference to candidate hijacker Mohamed al Kahtani (mentioned above), whom Hawsawi was sending the next day as "the last one" to "complete the group." On August 4, Atta drove to the Orlando airport to meet Kahtani. Upon arrival, however, Kahtani was denied entry by immigration officials because he had a one-way ticket and little money, could not speak English, and could not adequately explain what he intended to do in the United States. He was sent back to Dubai. Hawsawi contacted KSM, who told him to help Kahtani return to Pakistan.[168]

On August 7, Atta flew from Fort Lauderdale to Newark, probably to coordinate with Hazmi. Two days later, Ahmed al Ghamdi and Abdul Aziz al Omari, who had been living in New Jersey with Hazmi and Hanjour, flew to Miami—probably signifying that the four hijacking teams had finally been assigned. While Atta was in New Jersey, he, Hazmi, and Hanjour all purchased tickets for another set of surveillance flights. Like Shehhi, Jarrah, Atta, and Waleed al Shehri before them, Hazmi and Hanjour each flew in first class on the same type of aircraft they would hijack on 9/11 (a Boeing 757), and on transcontinental flights that connected to Las Vegas. This time, however, Atta himself also flew directly to Las Vegas, where all three stayed on August 13–14. Beyond Las Vegas's reputation for welcoming tourists, we have seen no credible evidence explaining why, on this occasion and others, the operatives flew to or met in Las Vegas.[169]

Through August, the hijackers kept busy with their gym training and the pilots took frequent practice flights on small rented aircraft. The operatives also

attack. Abu Hafs the Mauritanian reportedly even wrote Bin Ladin a message basing opposition to the attacks on the Qur'an.[183]

According to KSM, in late August, when the operation was fully planned, Bin Ladin formally notified the al Qaeda Shura Council that a major attack against the United States would take place in the coming weeks. When some council members objected, Bin Ladin countered that Mullah Omar lacked authority to prevent al Qaeda from conducting jihad outside Afghanistan. Though most of the Shura Council reportedly disagreed, Bin Ladin persisted. The attacks went forward.[184]

The story of dissension within al Qaeda regarding the 9/11 attacks is probably incomplete. The information on which the account is based comes from sources who were not privy to the full scope of al Qaeda and Taliban planning. Bin Ladin and Atef, however, probably would have known, at least, that

- The general Taliban offensive against the Northern Alliance would rely on al Qaeda military support.
- Another significant al Qaeda operation was making progress during the summer—a plot to assassinate the Northern Alliance leader, Ahmed Shah Massoud. The operatives, disguised as journalists, were in Massoud's camp and prepared to kill him sometime in August. Their appointment to see him was delayed.[185]

But on September 9, the Massoud assassination took place. The delayed Taliban offensive against the Northern Alliance was apparently coordinated to begin as soon as he was killed, and it got under way on September 10.[186]

As they deliberated earlier in the year, Bin Ladin and Atef would likely have remembered that Mullah Omar was dependent on them for the Massoud assassination and for vital support in the Taliban military operations. KSM remembers Atef telling him that al Qaeda had an agreement with the Taliban to eliminate Massoud, after which the Taliban would begin an offensive to take over Afghanistan. Atef hoped Massoud's death would also appease the Taliban when the 9/11 attacks happened. There are also some scant indications that Omar may have been reconciled to the 9/11 attacks by the time they occurred.[187]

### Moving to Departure Positions

In the days just before 9/11, the hijackers returned leftover funds to al Qaeda and assembled in their departure cities. They sent the excess funds by wire transfer to Hawsawi in the UAE, about $26,000 altogether.[188]

The hijackers targeting American Airlines Flight 77, to depart from Dulles, migrated from New Jersey to Laurel, Maryland, about 20 miles from Washington, D.C. They stayed in a motel during the first week in September and spent

8

# "THE SYSTEM WAS
# BLINKING RED"

## 8.1 THE SUMMER OF THREAT

As 2001 began, counterterrorism officials were receiving frequent but fragmentary reports about threats. Indeed, there appeared to be possible threats almost everywhere the United States had interests—including at home.

To understand how the escalation in threat reporting was handled in the summer of 2001, it is useful to understand how threat information in general is collected and conveyed. Information is collected through several methods, including signals intelligence and interviews of human sources, and gathered into intelligence reports. Depending on the source and nature of the reporting, these reports may be highly classified—and therefore tightly held—or less sensitive and widely disseminated to state and local law enforcement agencies. Threat reporting must be disseminated, either through individual reports or through threat advisories. Such advisories, intended to alert their recipients, may address a specific threat or be a general warning.

Because the amount of reporting is so voluminous, only a select fraction can be chosen for briefing the president and senior officials. During 2001, Director of Central Intelligence George Tenet was briefed regularly regarding threats and other operational information relating to Usama Bin Ladin.[1] He in turn met daily with President Bush, who was briefed by the CIA through what is known as the President's Daily Brief (PDB). Each PDB consists of a series of six to eight relatively short articles or briefs covering a broad array of topics; CIA staff decides which subjects are the most important on any given day. There were more than 40 intelligence articles in the PDBs from January 20 to September 10, 2001, that related to Bin Ladin. The PDB is considered highly sensitive and is distributed to only a handful of high-level officials.[2]

The Senior Executive Intelligence Brief (SEIB), distributed to a broader group of officials, has a similar format and generally covers the same subjects as the PDB. It usually contains less information so as to protect sources and

254

methods. Like their predecessors, the Attorney General, the FBI Director, and Richard Clarke, the National Security Council (NSC) counterterrorism coordinator, all received the SEIB, not the PDB.[3] Clarke and his staff had extensive access to terrorism reporting, but they did not have access to internal, nondisseminated information at the National Security Agency (NSA), CIA, or FBI.

### The Drumbeat Begins

In the spring of 2001, the level of reporting on terrorist threats and planned attacks increased dramatically to its highest level since the millennium alert. At the end of March, the intelligence community disseminated a terrorist threat advisory, indicating a heightened threat of Sunni extremist terrorist attacks against U.S. facilities, personnel, and other interests.[4]

On March 23, in connection with discussions about possibly reopening Pennsylvania Avenue in front of the White House, Clarke warned National Security Advisor Condoleezza Rice that domestic or foreign terrorists might use a truck bomb—their "weapon of choice"—on Pennsylvania Avenue. That would result, he said,  in the destruction of the West Wing and parts of the residence.[5] He also told her that he thought there were terrorist cells within the United States, including al Qaeda.

The next week, Rice was briefed on the activities of Abu Zubaydah and on CIA efforts to locate him. As pointed out in chapter 6, Abu Zubaydah had been a major figure in the millennium plots. Over the next few weeks, the CIA repeatedly issued warnings—including calls from DCI Tenet to Clarke—that Abu Zubaydah was planning an operation in the near future. One report cited a source indicating that Abu Zubaydah was planning an attack in a country that CIA analysts thought might be Israel, or perhaps Saudi Arabia or India. Clarke relayed these reports to Rice.[6]

In response to these threats, the FBI sent a message to all its field offices on April 13, summarizing reporting to date. It asked the offices to task all resources, including human sources and electronic databases, for any information pertaining to "current operational activities relating to Sunni extremism." It did not suggest that there was a domestic threat.[7]

The interagency Counterterrorism Security Group (CSG) that Clarke chaired discussed the Abu Zubaydah reports on April 19. The next day, a briefing to top officials reported "Bin Ladin planning multiple operations." When the deputies discussed al Qaeda policy on April 30, they began with a briefing on the threat.[8]

In May 2001, the drumbeat of reporting grew louder with reports to top officials that "Bin Ladin public profile may presage attack" and "Bin Ladin network's plans advancing." In early May, a walk-in to the FBI claimed there was a plan to launch attacks on London, Boston, and New York. Attorney General John Ashcroft was briefed by the CIA on May 15 regarding al Qaeda generally and the current threat reporting specifically. The next day brought a report

that a phone call to a U.S. embassy had warned that Bin Ladin supporters were planning an attack in the United States using "high explosives." On May 17, based on the previous day's report, the first item on the CSG's agenda was "UBL: Operation Planned in U.S."[9] The anonymous caller's tip could not be corroborated.

Late May brought reports of a possible hostage plot against Americans abroad to force the release of prisoners, including Sheikh Omar Abdel Rahman, the "Blind Sheikh," who was serving a life sentence for his role in the 1993 plot to blow up sites in New York City. The reporting noted that operatives might opt to hijack an aircraft or storm a U.S. embassy. This report led to a Federal Aviation Administration (FAA) information circular to airlines noting the potential for "an airline hijacking to free terrorists incarcerated in the United States." Other reporting mentioned that Abu Zubaydah was planning an attack, possibly against Israel, and expected to carry out several more if things went well. On May 24 alone, counterterrorism officials grappled with reports alleging plots in Yemen and Italy, as well as a report about a cell in Canada that an anonymous caller had claimed might be planning an attack against the United States.[10]

Reports similar to many of these were made available to President Bush in morning intelligence briefings with DCI Tenet, usually attended by Vice President Dick Cheney and National Security Advisor Rice. While these briefings discussed general threats to attack America and American interests, the specific threats mentioned in these briefings were all overseas.

On May 29, Clarke suggested that Rice ask DCI Tenet what more the United States could do to stop Abu Zubaydah from launching "a series of major terrorist attacks," probably on Israeli targets, but possibly on U.S. facilities. Clarke wrote to Rice and her deputy, Stephen Hadley, "When these attacks occur, as they likely will, we will wonder what more we could have done to stop them." In May, CIA Counterterrorist Center (CTC) Chief Cofer Black told Rice that the current threat level was a 7 on a scale of 1 to 10, as compared to an 8 during the millennium.[11]

## High Probability of Near-Term "Spectacular" Attacks

Threat reports surged in June and July, reaching an even higher peak of urgency. The summer threats seemed to be focused on Saudi Arabia, Israel, Bahrain, Kuwait, Yemen, and possibly Rome, but the danger could be anywhere—including a possible attack on the G-8 summit in Genoa. A June 12 CIA report passing along biographical background information on several terrorists mentioned, in commenting on Khalid Sheikh Mohammed, that he was recruiting people to travel to the United States to meet with colleagues already there so that they might conduct terrorist attacks on Bin Ladin's behalf. On June 22, the CIA notified all its station chiefs about intelligence suggesting a possible al Qaeda suicide attack on a U.S. target over the next few days. DCI Tenet asked that all U.S. ambassadors be briefed.[12]

That same day, the State Department notified all embassies of the terrorist threat and updated its worldwide public warning. In June, the State Department initiated the Visa Express program in Saudi Arabia as a security measure, in order to keep long lines of foreigners away from vulnerable embassy spaces. The program permitted visa applications to be made through travel agencies, instead of directly at the embassy or consulate.[13]

A terrorist threat advisory distributed in late June indicated a high probability of near-term "spectacular" terrorist attacks resulting in numerous casualties. Other reports' titles warned, "Bin Ladin Attacks May be Imminent" and "Bin Ladin and Associates Making Near-Term Threats." The latter reported multiple attacks planned over the coming days, including a "severe blow" against U.S. and Israeli "interests" during the next two weeks.[14]

On June 21, near the height of the threat reporting, U.S. Central Command raised the force protection condition level for U.S. troops in six countries to the highest possible level, Delta. The U.S. Fifth Fleet moved out of its port in Bahrain, and a U.S. Marine Corps exercise in Jordan was halted. U.S. embassies in the Persian Gulf conducted an emergency security review, and the embassy in Yemen was closed. The CSG had foreign emergency response teams, known as FESTs, ready to move on four hours' notice and kept up the terrorism alert posture on a "rolling 24 hour basis."[15]

On June 25, Clarke warned Rice and Hadley that six separate intelligence reports showed al Qaeda personnel warning of a pending attack. An Arabic television station reported Bin Ladin's pleasure with al Qaeda leaders who were saying that the next weeks "will witness important surprises" and that U.S. and Israeli interests will be targeted. Al Qaeda also released a new recruitment and fund-raising tape. Clarke wrote that this was all too sophisticated to be merely a psychological operation to keep the United States on edge, and the CIA agreed. The intelligence reporting consistently described the upcoming attacks as occurring on a calamitous level, indicating that they would cause the world to be in turmoil and that they would consist of possible multiple—but not necessarily simultaneous—attacks.[16]

On June 28, Clarke wrote Rice that the pattern of al Qaeda activity indicating attack planning over the past six weeks "had reached a crescendo." "A series of new reports continue to convince me and analysts at State, CIA, DIA [Defense Intelligence Agency], and NSA that a major terrorist attack or series of attacks is likely in July," he noted. One al Qaeda intelligence report warned that something "very, very, very, very" big was about to happen, and most of Bin Ladin's network was reportedly anticipating the attack. In late June, the CIA ordered all its station chiefs to share information on al Qaeda with their host governments and to push for immediate disruptions of cells.[17]

The headline of a June 30 briefing to top officials was stark: "Bin Ladin Planning High-Profile Attacks." The report stated that Bin Ladin operatives expected near-term attacks to have dramatic consequences of catastrophic pro-

portions. That same day, Saudi Arabia declared its highest level of terror alert. Despite evidence of delays possibly caused by heightened U.S. security, the planning for attacks was continuing.[18]

On July 2, the FBI Counterterrorism Division sent a message to federal agencies and state and local law enforcement agencies summarizing information regarding threats from Bin Ladin. It warned that there was an increased volume of threat reporting, indicating a potential for attacks against U.S. targets abroad from groups "aligned with or sympathetic to Usama Bin Ladin." Despite the general warnings, the message further stated, "The FBI has no information indicating a credible threat of terrorist attack in the United States." However, it went on to emphasize that the possibility of attack in the United States could not be discounted. It also noted that the July 4 holiday might heighten the threats. The report asked recipients to "exercise extreme vigilance" and "report suspicious activities" to the FBI. It did not suggest specific actions that they should take to prevent attacks.[19]

Disruption operations against al Qaeda–affiliated cells were launched involving 20 countries. Several terrorist operatives were detained by foreign governments, possibly disrupting operations in the Gulf and Italy and perhaps averting attacks against two or three U.S. embassies. Clarke and others told us of a particular concern about possible attacks on the Fourth of July. After it passed uneventfully, the CSG decided to maintain the alert.[20]

To enlist more international help, Vice President Cheney contacted Saudi Crown Prince Abdullah on July 5. Hadley apparently called European counterparts, while Clarke worked with senior officials in the Gulf. In late July, because of threats, Italy closed the airspace over Genoa and mounted antiaircraft batteries at the Genoa airport during the G-8 summit, which President Bush attended.[21]

At home, the CSG arranged for the CIA to brief intelligence and security officials from several domestic agencies. On July 5, representatives from the Immigration and Naturalization Service (INS), the FAA, the Coast Guard, the Secret Service, Customs, the CIA, and the FBI met with Clarke to discuss the current threat. Attendees report that they were told not to disseminate the threat information they received at the meeting. They interpreted this direction to mean that although they could brief their superiors, they could not send out advisories to the field. An NSC official recalls a somewhat different emphasis, saying that attendees were asked to take the information back to their home agencies and "do what you can" with it, subject to classification and distribution restrictions. A representative from the INS asked for a summary of the information that she could share with field offices. She never received one.[22]

That same day, the CIA briefed Attorney General Ashcroft on the al Qaeda threat, warning that a significant terrorist attack was imminent. Ashcroft was told that preparations for multiple attacks were in late stages or already com-

plete and that little additional warning could be expected. The briefing addressed only threats outside the United States.[23]

The next day, the CIA representative told the CSG that al Qaeda members believed the upcoming attack would be "spectacular," qualitatively different from anything they had done to date.[24]

Apparently as a result of the July 5 meeting with Clarke, the interagency committee on federal building security was tasked to examine security measures. This committee met on July 9, when 37 officials from 27 agencies and organizations were briefed on the "current threat level" in the United States. They were told that not only the threat reports from abroad but also the recent convictions in the East Africa bombings trial, the conviction of Ahmed Ressam, and the just-returned Khobar Towers indictments reinforced the need to "exercise extreme vigilance." Attendees were expected to determine whether their respective agencies needed enhanced security measures.[25]

On July 18, 2001, the State Department provided a warning to the public regarding possible terrorist attacks in the Arabian Peninsula.[26]

Acting FBI Director Thomas Pickard told us he had one of his periodic conference calls with all special agents in charge on July 19. He said one of the items he mentioned was the need, in light of increased threat reporting, to have evidence response teams ready to move at a moment's notice, in case of an attack.[27] He did not task field offices to try to determine whether any plots were being considered within the United States or to take any action to disrupt any such plots.

In mid-July, reporting started to indicate that Bin Ladin's plans had been delayed, maybe for as long as two months, but not abandoned. On July 23, the lead item for CSG discussion was still the al Qaeda threat, and it included mention of suspected terrorist travel to the United States.[28]

On July 31, an FAA circular appeared alerting the aviation community to "reports of possible near-term terrorist operations . . . particularly on the Arabian Peninsula and/or Israel." It stated that the FAA had no credible evidence of specific plans to attack U.S. civil aviation, though it noted that some of the "currently active" terrorist groups were known to "plan and train for hijackings" and were able to build and conceal sophisticated explosive devices in luggage and consumer products.[29]

Tenet told us that in his world "the system was blinking red." By late July, Tenet said, it could not "get any worse."[30] Not everyone was convinced. Some asked whether all these threats might just be deception. On June 30, the SEIB contained an article titled "Bin Ladin Threats Are Real." Yet Hadley told Tenet in July that Deputy Secretary of Defense Paul Wolfowitz questioned the reporting. Perhaps Bin Ladin was trying to study U.S. reactions. Tenet replied that he had already addressed the Defense Department's questions on this point; the reporting was convincing. To give a sense of his anxiety at the time, one senior

official in the Counterterrorist Center told us that he and a colleague were considering resigning in order to go public with their concerns.[31]

**The Calm Before the Storm**

On July 27, Clarke informed Rice and Hadley that the spike in intelligence about a near-term al Qaeda attack had stopped. He urged keeping readiness high during the August vacation period, warning that another report suggested an attack had just been postponed for a few months "but will still happen."[32]

On August 1, the FBI issued an advisory that in light of the increased volume of threat reporting and the upcoming anniversary of the East Africa embassy bombings, increased attention should be paid to security planning. It noted that although most of the reporting indicated a potential for attacks on U.S. interests abroad, the possibility of an attack in the United States could not be discounted.[33]

On August 3, the intelligence community issued an advisory concluding that the threat of impending al Qaeda attacks would likely continue indefinitely. Citing threats in the Arabian Peninsula, Jordan, Israel, and Europe, the advisory suggested that al Qaeda was lying in wait and searching for gaps in security before moving forward with the planned attacks.[34]

During the spring and summer of 2001, President Bush had on several occasions asked his briefers whether any of the threats pointed to the United States. Reflecting on these questions, the CIA decided to write a briefing article summarizing its understanding of this danger. Two CIA analysts involved in preparing this briefing article believed it represented an opportunity to communicate their view that the threat of a Bin Ladin attack in the United States remained both current and serious.[35] The result was an article in the August 6 Presidential Daily Brief titled "Bin Ladin Determined to Strike in US." It was the 36th PDB item briefed so far that year that related to Bin Ladin or al Qaeda, and the first devoted to the possibility of an attack in the United States.

The President told us the August 6 report was historical in nature. President Bush said the article told him that al Qaeda was dangerous, which he said he had known since he had become President. The President said Bin Ladin had long been talking about his desire to attack America. He recalled some operational data on the FBI, and remembered thinking it was heartening that 70 investigations were under way. As best he could recollect, Rice had mentioned that the Yemenis' surveillance of a federal building in New York had been looked into in May and June, but there was no actionable intelligence.

He did not recall discussing the August 6 report with the Attorney General or whether Rice had done so. He said that if his advisers had told him there was a cell in the United States, they would have moved to take care of it. That never happened.[36]

Although the following day's SEIB repeated the title of this PDB, it did not contain the reference to hijackings, the alert in New York, the alleged casing

*The following is the text of an item from the Presidential Daily Brief received by President George W. Bush on August 6, 2001.[37] Redacted material is indicated by brackets.*

Bin Ladin Determined To Strike in US

***Clandestine, foreign government, and media reports indicate Bin Ladin since 1997 has wanted to conduct terrorist attacks in the US.*** Bin Ladin implied in US television interviews in 1997 and 1998 that his followers would follow the example of World Trade Center bomber Ramzi Yousef and "bring the fighting to America."

After US missile strikes on his base in Afghanistan in 1998, Bin Ladin told followers he wanted to retaliate in Washington, according to a [—] service.

An Egyptian Islamic Jihad (EIJ) operative told an [—] service at the same time that Bin Ladin was planning to exploit the operative's access to the US to mount a terrorist strike.

***The millennium plotting in Canada in 1999 may have been part of Bin Ladin's first serious attempt to implement a terrorist strike in the US.*** Convicted plotter Ahmed Ressam has told the FBI that he conceived the idea to attack Los Angeles International Airport himself, but that Bin Ladin lieutenant Abu Zubaydah encouraged him and helped facilitate the operation. Ressam also said that in 1998 Abu Zubaydah was planning his own US attack.

Ressam says Bin Ladin was aware of the Los Angeles operation.

***Although Bin Ladin has not succeeded, his attacks against the US Embassies in Kenya and Tanzania in 1998 demonstrate that he prepares operations years in advance and is not deterred by setbacks.*** Bin Ladin associates surveilled our Embassies in Nairobi and Dar es Salaam as early as 1993, and some members of the Nairobi cell planning the bombings were arrested and deported in 1997.

***Al-Qa'ida members—including some who are US citizens—have resided in or traveled to the US for years, and the group apparently maintains a support structure that could aid attacks.*** Two al-Qua'da members found

guilty in the conspiracy to bomb our embassies in East Africa were US citizens, and a senior EIJ member lived in California in the mid-1990s.

A clandestine source said in 1998 that a Bin Ladin cell in New York was recruiting Muslim-American youth for attacks.

*We have not been able to corroborate some of the more sensational threat reporting, such as that from a [—] service in 1998 saying that Bin Ladin wanted to hijack a US aircraft to gain the release of "Blind Shaykh" 'Umar 'Abd al-Rahman and other US-held extremists.*

Nevertheless, FBI information since that time indicates patterns of suspicious activity in this country consistent with preparations for hijackings or other types of attacks, including recent surveillance of federal buildings in New York.

The FBI is conducting approximately 70 full field investigations throughout the US that it considers Bin Ladin-related. CIA and the FBI are investigating a call to our Embassy in the UAE in May saying that a group of Bin Ladin supporters was in the US planning attacks with explosives.

of buildings in New York, the threat phoned in to the embassy, or the fact that the FBI had approximately 70 ongoing bin Ladin–related investigations.[38] No CSG or other NSC meeting was held to discuss the possible threat of a strike in the United States as a result of this report.

Late in the month, a foreign service reported that Abu Zubaydah was considering mounting terrorist attacks in the United States, after postponing possible operations in Europe. No targets, timing, or method of attack were provided.[39]

We have found no indication of any further discussion before September 11 among the President and his top advisers of the possibility of a threat of an al Qaeda attack in the United States. DCI Tenet visited President Bush in Crawford, Texas, on August 17 and participated in PDB briefings of the President between August 31 (after the President had returned to Washington) and September 10. But Tenet does not recall any discussions with the President of the domestic threat during this period.[40]

Most of the intelligence community recognized in the summer of 2001 that the number and severity of threat reports were unprecedented. Many officials told us that they knew something terrible was planned, and they were desperate to stop it. Despite their large number, the threats received contained few

specifics regarding time, place, method, or target. Most suggested that attacks were planned against targets overseas; others indicated threats against unspecified "U.S. interests." We cannot say for certain whether these reports, as dramatic as they were, related to the 9/11 attacks.

### Government Response to the Threats

National Security Advisor Rice told us that the CSG was the "nerve center" for running the crisis, although other senior officials were involved over the course of the summer. In addition to his daily meetings with President Bush, and weekly meetings to go over other issues with Rice, Tenet was speaking regularly with Secretary of State Colin Powell and Secretary of Defense Donald Rumsfeld. The foreign policy principals routinely talked on the telephone every day on a variety of topics.[41]

Hadley told us that before 9/11, he and Rice did not feel they had the job of coordinating domestic agencies. They felt that Clarke and the CSG (part of the NSC) were the NSC's bridge between foreign and domestic threats.[42]

There was a clear disparity in the levels of response to foreign versus domestic threats. Numerous actions were taken overseas to disrupt possible attacks—enlisting foreign partners to upset terrorist plans, closing embassies, moving military assets out of the way of possible harm. Far less was done domestically—in part, surely, because to the extent that specifics did exist, they pertained to threats overseas. As noted earlier, a threat against the embassy in Yemen quickly resulted in its closing. Possible domestic threats were more vague. When reports did not specify where the attacks were to take place, officials presumed that they would again be overseas, though they did not rule out a target in the United States. Each of the FBI threat advisories made this point.[43]

Clarke mentioned to National Security Advisor Rice at least twice that al Qaeda sleeper cells were likely in the United States. In January 2001, Clarke forwarded a strategy paper to Rice warning that al Qaeda had a presence in the United States. He noted that two key al Qaeda members in the Jordanian cell involved in the millennium plot were naturalized U.S. citizens and that one jihadist suspected in the East Africa bombings had "informed the FBI that an extensive network of al Qida 'sleeper agents' currently exists in the US." He added that Ressam's abortive December 1999 attack revealed al Qaeda supporters in the United States.[44] His analysis, however, was based not on new threat reporting but on past experience.

The September 11 attacks fell into the void between the foreign and domestic threats. The foreign intelligence agencies were watching overseas, alert to foreign threats to U.S. interests there. The domestic agencies were waiting for evidence of a domestic threat from sleeper cells within the United States. No one was looking for a foreign threat to domestic targets. The threat that was coming was not from sleeper cells. It was foreign—but from foreigners who had infiltrated into the United States.

A second cause of this disparity in response is that domestic agencies did not know what to do, and no one gave them direction. Cressey told us that the CSG did not tell the agencies how to respond to the threats. He noted that the agencies that were operating overseas did not need direction on how to respond; they had experience with such threats and had a "playbook." In contrast, the domestic agencies did not have a game plan. Neither the NSC (including the CSG) nor anyone else instructed them to create one.[45]

This lack of direction was evident in the July 5 meeting with representatives from the domestic agencies. The briefing focused on overseas threats. The domestic agencies were not questioned about how they planned to address the threat and were not told what was expected of them. Indeed, as noted earlier, they were specifically told they could not issue advisories based on the briefing.[46] The domestic agencies' limited response indicates that they did not perceive a call to action.

Clarke reflected a different perspective in an email to Rice on September 15, 2001. He summarized the steps taken by the CSG to alert domestic agencies to the possibility of an attack in the United States. Clarke concluded that domestic agencies, including the FAA, knew that the CSG believed a major al Qaeda attack was coming and could be in the United States.

Although the FAA had authority to issue security directives mandating new security procedures, none of the few that were released during the summer of 2001 increased security at checkpoints or on board aircraft. The information circulars mostly urged air carriers to "exercise prudence" and be alert. Prior to 9/11, the FAA did present a CD-ROM to air carriers and airport authorities describing the increased threat to civil aviation. The presentation mentioned the possibility of suicide hijackings but said that "fortunately, we have no indication that any group is currently thinking in that direction."[47] The FAA conducted 27 special security briefings for specific air carriers between May 1, 2001, and September 11, 2001. Two of these briefings discussed the hijacking threat overseas. None discussed the possibility of suicide hijackings or the use of aircraft as weapons. No new security measures were instituted.[48]

Rice told us she understood that the FBI had tasked its 56 U.S. field offices to increase surveillance of suspected terrorists and to reach out to informants who might have information about terrorist plots. An NSC staff document at the time describes such a tasking as having occurred in late June but does not indicate whether it was generated by the NSC or the FBI. Other than the previously described April 13 communication sent to all FBI field offices, however, the FBI could not find any record of having received such a directive. The April 13 document asking field offices to gather information on Sunni extremism did not mention any possible threat within the United States and did not order surveillance of suspected operatives. The NSC did not specify what the FBI's directives should contain and did not review what had been issued earlier.[49]

Acting FBI Director Pickard told us that in addition to his July 19 conference call, he mentioned the heightened terrorist threat in individual calls with the special agents in charge of field offices during their annual performance review discussions. In speaking with agents around the country, we found little evidence that any such concerns had reached FBI personnel beyond the New York Field Office.[50]

The head of counterterrorism at the FBI, Dale Watson, said he had many discussions about possible attacks with Cofer Black at the CIA. They had expected an attack on July 4. Watson said he felt deeply that something was going to happen. But he told us the threat information was "nebulous." He wished he had known more. He wished he had had "500 analysts looking at Usama Bin Ladin threat information instead of two."[51]

Attorney General Ashcroft was briefed by the CIA in May and by Pickard in early July about the danger. Pickard said he met with Ashcroft once a week in late June, through July, and twice in August. There is a dispute regarding Ashcroft's interest in Pickard's briefings about the terrorist threat situation. Pickard told us that after two such briefings Ashcroft told him that he did not want to hear about the threats anymore. Ashcroft denies Pickard's charge. Pickard says he continued to present terrorism information during further briefings that summer, but nothing further on the "chatter" the U.S. government was receiving.[52]

The Attorney General told us he asked Pickard whether there was intelligence about attacks in the United States and that Pickard said no. Pickard said he replied that he could not assure Ashcroft that there would be no attacks in the United States, although the reports of threats were related to overseas targets. Ashcroft said he therefore assumed the FBI was doing what it needed to do. He acknowledged that in retrospect, this was a dangerous assumption. He did not ask the FBI what it was doing in response to the threats and did not task it to take any specific action. He also did not direct the INS, then still part of the Department of Justice, to take any specific action.[53]

In sum, the domestic agencies never mobilized in response to the threat. They did not have direction, and did not have a plan to institute. The borders were not hardened. Transportation systems were not fortified. Electronic surveillance was not targeted against a domestic threat.[54] State and local law enforcement were not marshaled to augment the FBI's efforts. The public was not warned.

The terrorists exploited deep institutional failings within our government. The question is whether extra vigilance might have turned up an opportunity to disrupt the plot. As seen in chapter 7, al Qaeda's operatives made mistakes. At least two such mistakes created opportunities during 2001, especially in late August.

## 8.2 LATE LEADS—MIHDHAR, MOUSSAOUI, AND KSM

In chapter 6 we discussed how intelligence agencies successfully detected some of the early travel in the planes operation, picking up the movements of Khalid al Mihdhar and identifying him, and seeing his travel converge with someone they perhaps could have identified but did not—Nawaf al Hazmi—as well as with less easily identifiable people such as Khallad and Abu Bara. These observations occurred in December 1999 and January 2000. The trail had been lost in January 2000 without a clear realization that it had been lost, and without much effort to pick it up again. Nor had the CIA placed Mihdhar on the State Department's watchlist for suspected terrorists, so that either an embassy or a port of entry might take note if Mihdhar showed up again.

On four occasions in 2001, the CIA, the FBI, or both had apparent opportunities to refocus on the significance of Hazmi and Mihdhar and reinvigorate the search for them. After reviewing those episodes we will turn to the handling of the Moussaoui case and some late leads regarding Khalid Sheikh Mohammed.

### January 2001: Identification of Khallad

Almost one year after the original trail had been lost in Bangkok, the FBI and the CIA were working on the investigation of the *Cole* bombing. They learned of the link between a captured conspirator and a person called "Khallad." They also learned that Khallad was a senior security official for Bin Ladin who had helped direct the bombing (we introduced Khallad in chapter 5, and returned to his role in the *Cole* bombing in chapter 6).[55]

One of the members of the FBI's investigative team in Yemen realized that he had heard of Khallad before, from a joint FBI/CIA source four months earlier. The FBI agent obtained from a foreign government a photo of the person believed to have directed the *Cole* bombing. It was shown to the source, and he confirmed that the man in that photograph was the same Khallad he had described.[56]

In December 2000, on the basis of some links associated with Khalid al Mihdhar, the CIA's Bin Ladin unit speculated that Khallad and Khalid al Mihdhar might be one and the same.[57]

The CIA asked that a Kuala Lumpur surveillance photo of Mihdhar be shown to the joint source who had identified Khallad. In early January 2001, two photographs from the Kuala Lumpur meeting were shown to the source. One was a known photograph of Mihdhar, the other a photograph of a then unknown subject. The source did not recognize Mihdhar. But he indicated he was 90 percent certain that the other individual was Khallad.[58]

This meant that Khallad and Mihdhar were two different people. It also meant that there was a link between Khallad and Mihdhar, making Mihdhar seem even more suspicious.[59] Yet we found no effort by the CIA to renew the long-abandoned search for Mihdhar or his travel companions.

In addition, we found that the CIA did not notify the FBI of this identification. DCI Tenet and Cofer Black testified before Congress's Joint Inquiry into 9/11 that the FBI had access to this identification from the beginning. But drawing on an extensive record, including documents that were not available to the CIA personnel who drafted that testimony, we conclude this was not the case. The FBI's primary *Cole* investigators had no knowledge that Khallad had been in Kuala Lumpur with Mihdhar and others until after the September 11 attacks. Because the FBI had not been informed in January 2000 about Mihdhar's possession of a U.S. visa, it had not then started looking for him in the United States. Because it did not know of the links between Khallad and Mihdhar, it did not start looking for him in January 2001.[60]

This incident is an example of how day-to-day gaps in information sharing can emerge even when there is mutual goodwill. The information was from a joint FBI/CIA source who spoke essentially no English and whose languages were not understood by the FBI agent on the scene overseas. Issues of travel and security necessarily kept short the amount of time spent with the source. As a result, the CIA officer usually did not translate either questions or answers for his FBI colleague and friend.[61]

For interviews without simultaneous translation, the FBI agent on the scene received copies of the reports that the CIA disseminated to other agencies regarding the interviews. But he was not given access to the CIA's internal operational reports, which contained more detail. It was there—in reporting to which FBI investigators did not have access—that information regarding the January 2001 identification of Khallad appeared. The CIA officer does not recall this particular identification and thus cannot say why it was not shared with his FBI colleague. He might not have understood the possible significance of the new identification.[62]

In June 2000, Mihdhar left California and returned to Yemen. It is possible that if, in January 2001, the CIA had resumed its search for him, placed him on the State Department's TIPOFF watchlist, or provided the FBI with the information, he might have been found—either before or at the time he applied for a new visa in June 2001, or when he returned to the United States on July 4.

**Spring 2001: Looking Again at Kuala Lumpur**

By mid-May 2001, as the threat reports were surging, a CIA official detailed to the International Terrorism Operations Section at the FBI wondered where the attacks might occur. We will call him "John." Recalling the episode about the Kuala Lumpur travel of Mihdhar and his associates, "John" searched the CIA's databases for information regarding the travel. On May 15, he and an official at the CIA reexamined many of the old cables from early 2000, including the information that Mihdhar had a U.S. visa, and that Hazmi had come to Los Angeles on January 15, 2000.[63]

The CIA official who reviewed the cables took no action regarding them.

"John," however, began a lengthy exchange with a CIA analyst, whom we will call "Dave," to figure out what these cables meant. "John" was aware of how dangerous Khallad was—at one point calling him a "major league killer." He concluded that "something bad was definitely up." Despite the U.S. links evident in this traffic, "John" made no effort to determine whether any of these individuals was in the United States. He did not raise that possibility with his FBI counterpart. He was focused on Malaysia.[64]

"John" described the CIA as an agency that tended to play a "zone defense." He was worrying solely about Southeast Asia, not the United States. In contrast, he told us, the FBI tends to play "man-to-man."[65]

Desk officers at the CIA's Bin Ladin unit did not have "cases" in the same sense as an FBI agent who works an investigation from beginning to end. Thus, when the trail went cold after the Kuala Lumpur meeting in January 2000, the desk officer moved on to different things. By the time the March 2000 cable arrived with information that one of the travelers had flown to Los Angeles, the case officer was no longer responsible for follow-up. While several individuals at the Bin Ladin unit opened the cable when it arrived in March 2000, no action was taken.[66]

The CIA's zone defense concentrated on "where," not "who." Had its information been shared with the FBI, a combination of the CIA's zone defense and the FBI's man-to-man approach might have been productive.

### June 2001: The Meeting in New York

"John's" review of the Kuala Lumpur meeting did set off some more sharing of information, getting the attention of an FBI analyst whom we will call "Jane." "Jane" was assigned to the FBI's *Cole* investigation. She knew that another terrorist involved in that operation, Fahd al Quso, had traveled to Bangkok in January 2000 to give money to Khallad.[67]

"Jane" and the CIA analyst, "Dave," had been working together on *Cole*-related issues. Chasing Quso's trail, "Dave" suggested showing some photographs to FBI agents in New York who were working on the *Cole* case and had interviewed Quso.[68]

"John" gave three Kuala Lumpur surveillance pictures to "Jane" to show to the New York agents. She was told that one of the individuals in the photographs was someone named Khalid al Mihdhar. She did not know why the photographs had been taken or why the Kuala Lumpur travel might be significant, and she was not told that someone had identified Khallad in the photographs. When "Jane" did some research in a database for intelligence reports, Intelink, she found the original NSA reports on the planning for the meeting. Because the CIA had not disseminated reports on its tracking of Mihdhar, "Jane" did not pull up any information about Mihdhar's U.S. visa or about travel to the United States by Hazmi or Mihdhar.[69]

"Jane," "Dave," and an FBI analyst who was on detail to the CIA's Bin Ladin

unit went to New York on June 11 to meet with the agents about the *Cole* case. "Jane" brought the surveillance pictures. At some point in the meeting she showed the photographs to the agents and asked whether they recognized Quso in any of them. The agents asked questions about the photographs—Why were they taken? Why were these people being followed? Where are the rest of the photographs?[70]

The only information "Jane" had about the meeting—other than the photographs—were the NSA reports that she had found on Intelink. These reports, however, contained caveats that their contents could not be shared with criminal investigators without the permission of the Justice Department's Office of Intelligence Policy and Review (OIPR). Therefore "Jane" concluded that she could not pass on information from those reports to the agents. This decision was potentially significant, because the signals intelligence she did not share linked Mihdhar to a suspected terrorist facility in the Middle East. The agents would have established a link to the suspected facility from their work on the embassy bombings case. This link would have made them very interested in learning more about Mihdhar.[71] The sad irony is that the agents who found the source were being kept from obtaining the fruits of their own work.

"Dave," the CIA analyst, knew more about the Kuala Lumpur meeting. He knew that Mihdhar possessed a U.S. visa, that his visa application indicated that he intended to travel to New York, that Hazmi had traveled to Los Angeles, and that a source had put Mihdhar in the company of Khallad. No one at the meeting asked him what he knew; he did not volunteer anything. He told investigators that as a CIA analyst, he was not authorized to answer FBI questions regarding CIA information. "Jane" said she assumed that if "Dave" knew the answers to questions, he would have volunteered them. The New York agents left the meeting without obtaining information that might have started them looking for Mihdhar.[72]

Mihdhar had been a weak link in al Qaeda's operational planning. He had left the United States in June 2000, a mistake KSM realized could endanger the entire plan—for to continue with the operation, Mihdhar would have to travel to the United States again. And unlike other operatives, Mihdhar was not "clean": he had jihadist connections. It was just such connections that had brought him to the attention of U.S. officials.

Nevertheless, in this case KSM's fears were not realized. Mihdhar received a new U.S. visa two days after the CIA–FBI meeting in New York. He flew to New York City on July 4. No one was looking for him.

## August 2001: The Search for Mihdhar and Hazmi Begins and Fails

During the summer of 2001 "John," following a good instinct but not as part of any formal assignment, asked "Mary," an FBI analyst detailed to the CIA's Bin Ladin unit, to review all the Kuala Lumpur materials one more time. She had been at the New York meeting with "Jane" and "Dave" but had not

looked into the issues yet herself. "John" asked her to do the research in her free time.[73]

"Mary" began her work on July 24. That day, she found the cable reporting that Mihdhar had a visa to the United States. A week later, she found the cable reporting that Mihdhar's visa application—what was later discovered to be his first application—listed New York as his destination. On August 21, she located the March 2000 cable that "noted with interest" that Hazmi had flown to Los Angeles in January 2000. She immediately grasped the significance of this information.[74]

"Mary" and "Jane" promptly met with an INS representative at FBI headquarters. On August 22, the INS told them that Mihdhar had entered the United States on January 15, 2000, and again on July 4, 2001. "Jane" and "Mary" also learned that there was no record that Hazmi had left the country since January 2000, and they assumed he had left with Mihdhar in June 2000. They decided that if Mihdhar was in the United States, he should be found.[75]

They divided up the work. "Mary" asked the Bin Ladin unit to draft a cable requesting that Mihdhar and Hazmi be put on the TIPOFF watchlist. Both Hazmi and Mihdhar were added to this watchlist on August 24.[76]

"Jane" took responsibility for the search effort inside the United States. As the information indicated that Mihdhar had last arrived in New York, she began drafting what is known as a lead for the FBI's New York Field Office. A lead relays information from one part of the FBI to another and requests that a particular action be taken. She called an agent in New York to give him a "heads-up" on the matter, but her draft lead was not sent until August 28. Her email told the New York agent that she wanted him to get started as soon as possible, but she labeled the lead as "Routine"—a designation that informs the receiving office that it has 30 days to respond.[77]

The agent who received the lead forwarded it to his squad supervisor. That same day, the supervisor forwarded the lead to an intelligence agent to open an intelligence case—an agent who thus was behind "the wall" keeping FBI intelligence information from being shared with criminal prosecutors. He also sent it to the *Cole* case agents and an agent who had spent significant time in Malaysia searching for another Khalid: Khalid Sheikh Mohammad.[78]

The suggested goal of the investigation was to locate Mihdhar, determine his contacts and reasons for being in the United States, and possibly conduct an interview. Before sending the lead, "Jane" had discussed it with "John," the CIA official on detail to the FBI. She had also checked with the acting head of the FBI's Bin Ladin unit. The discussion seems to have been limited to whether the search should be classified as an intelligence investigation or as a criminal one. It appears that no one informed higher levels of management in either the FBI or CIA about the case.[79] There is no evidence that the lead, or the search for these terrorist suspects, was substantively discussed at any level

above deputy chief of a section within the Counterterrorism Division at FBI headquarters.

One of the *Cole* case agents read the lead with interest, and contacted "Jane" to obtain more information. "Jane" argued, however, that because the agent was designated a "criminal" FBI agent, not an intelligence FBI agent, the wall kept him from participating in any search for Mihdhar. In fact, she felt he had to destroy his copy of the lead because it contained NSA information from reports that included caveats ordering that the information not be shared without OIPR's permission. The agent asked "Jane" to get an opinion from the FBI's National Security Law Unit (NSLU) on whether he could open a criminal case on Mihdhar.[80]

"Jane" sent an email to the *Cole* case agent explaining that according to the NSLU, the case could be opened only as an intelligence matter, and that if Mihdhar was found, only designated intelligence agents could conduct or even be present at any interview. She appears to have misunderstood the complex rules that could apply to this situation.[81]

The FBI agent angrily responded:

> Whatever has happened to this—someday someone will die—and wall or not—the public will not understand why we were not more effective and throwing every resource we had at certain "problems."
>
>   Let's hope the National Security Law Unit will stand behind their decisions then, especially since the biggest threat to us now, UBL, is getting the most "protection."

"Jane" replied that she was not making up the rules; she claimed that they were in the relevant manual and "ordered by the [FISA] Court and every office of the FBI is required to follow them including FBI NY."[82]

It is now clear that everyone involved was confused about the rules governing the sharing and use of information gathered in intelligence channels. Because Mihdhar was being sought for his possible connection to or knowledge of the *Cole* bombing, he could be investigated or tracked under the existing *Cole* criminal case. No new criminal case was needed for the criminal agent to begin searching for Mihdhar. And as NSA had approved the passage of its information to the criminal agent, he could have conducted a search using all available information. As a result of this confusion, the criminal agents who were knowledgeable about al Qaeda and experienced with criminal investigative techniques, including finding suspects and possible criminal charges, were thus excluded from the search.[83]

The search was assigned to one FBI agent, and it was his very first counterterrorism lead. Because the lead was "routine," he was given 30 days to open an intelligence case and make some unspecified efforts to locate Mihdhar. He started the process a few days later. He checked local New York databases for

criminal record and driver's license information and checked the hotel listed on Mihdhar's U.S. entry form. Finally, on September 11, the agent sent a lead to Los Angeles, because Mihdhar had initially arrived in Los Angeles in January 2000.[84]

We believe that if more resources had been applied and a significantly different approach taken, Mihdhar and Hazmi might have been found. They had used their true names in the United States. Still, the investigators would have needed luck as well as skill to find them prior to September 11 even if such searches had begun as early as August 23, when the lead was first drafted.[85]

Many FBI witnesses have suggested that even if Mihdhar had been found, there was nothing the agents could have done except follow him onto the planes. We believe this is incorrect. Both Hazmi and Mihdhar could have been held for immigration violations or as material witnesses in the *Cole* bombing case. Investigation or interrogation of them, and investigation of their travel and financial activities, could have yielded evidence of connections to other participants in the 9/11 plot. The simple fact of their detention could have derailed the plan. In any case, the opportunity did not arise.

## Phoenix Memo

The Phoenix memo was investigated thoroughly by the Joint Inquiry and the Department of Justice Inspector General.[86] We will recap it briefly here. In July 2001, an FBI agent in the Phoenix field office sent a memo to FBI headquarters and to two agents on international terrorism squads in the New York Field Office, advising of the "possibility of a coordinated effort by Usama Bin Ladin" to send students to the United States to attend civil aviation schools. The agent based his theory on the "inordinate number of individuals of investigative interest" attending such schools in Arizona.[87]

The agent made four recommendations to FBI headquarters: to compile a list of civil aviation schools, establish liaison with those schools, discuss his theories about Bin Ladin with the intelligence community, and seek authority to obtain visa information on persons applying to flight schools. His recommendations were not acted on. His memo was forwarded to one field office. Managers of the Usama Bin Ladin unit and the Radical Fundamentalist unit at FBI headquarters were addressees, but they did not even see the memo until after September 11. No managers at headquarters saw the memo before September 11, and the New York Field Office took no action.[88]

As its author told investigators, the Phoenix memo was not an alert about suicide pilots. His worry was more about a Pan Am Flight 103 scenario in which explosives were placed on an aircraft. The memo's references to aviation training were broad, including aeronautical engineering.[89] If the memo had been distributed in a timely fashion and its recommendations acted on promptly, we do not believe it would have uncovered the plot. It might well, however, have sensitized the FBI so that it might have taken the Moussaoui matter more seriously the next month.

**Zacarias Moussaoui**

On August 15, 2001, the Minneapolis FBI Field Office initiated an intelligence investigation on Zacarias Moussaoui. As mentioned in chapter 7, he had entered the United States in February 2001, and had begun flight lessons at Airman Flight School in Norman, Oklahoma. He resumed his training at the Pan Am International Flight Academy in Eagan, Minnesota, starting on August 13. He had none of the usual qualifications for flight training on Pan Am's Boeing 747 flight simulators. He said he did not intend to become a commercial pilot but wanted the training as an "ego boosting thing." Moussaoui stood out because, with little knowledge of flying, he wanted to learn how to "take off and land" a Boeing 747.[90]

The agent in Minneapolis quickly learned that Moussaoui possessed jihadist beliefs. Moreover, Moussaoui had $32,000 in a bank account but did not provide a plausible explanation for this sum of money. He had traveled to Pakistan but became agitated when asked if he had traveled to nearby countries while in Pakistan (Pakistan was the customary route to the training camps in Afghanistan). He planned to receive martial arts training, and intended to purchase a global positioning receiver. The agent also noted that Moussaoui became extremely agitated whenever he was questioned regarding his religious beliefs. The agent concluded that Moussaoui was "an Islamic extremist preparing for some future act in furtherance of radical fundamentalist goals." He also believed Moussaoui's plan was related to his flight training.[91]

Moussaoui can be seen as an al Qaeda mistake and a missed opportunity. An apparently unreliable operative, he had fallen into the hands of the FBI. As discussed in chapter 7, Moussaoui had been in contact with and received money from Ramzi Binalshibh. If Moussaoui had been connected to al Qaeda, questions should instantly have arisen about a possible al Qaeda plot that involved piloting airliners, a possibility that had never been seriously analyzed by the intelligence community.

The FBI agent who handled the case in conjunction with the INS representative on the Minneapolis Joint Terrorism Task Force suspected that Moussaoui might be planning to hijack a plane. Minneapolis and FBI headquarters debated whether Moussaoui should be arrested immediately or surveilled to obtain additional information. Because it was not clear whether Moussaoui could be imprisoned, the FBI case agent decided the most important thing was to prevent Moussaoui from obtaining any further training that he could use to carry out a potential attack.[92]

As a French national who had overstayed his visa, Moussaoui could be detained immediately. The INS arrested Moussaoui on the immigration violation. A deportation order was signed on August 17, 2001.[93]

The agents in Minnesota were concerned that the U.S. Attorney's Office in Minneapolis would find insufficient probable cause of a crime to obtain a criminal warrant to search Moussaoui's laptop computer.[94] Agents at FBI headquarters believed there was insufficient probable cause. Minneapolis therefore

sought a special warrant under the Foreign Intelligence Surveillance Act to conduct the search (we introduced FISA in chapter 3).

To do so, however, the FBI needed to demonstrate probable cause that Moussaoui was an agent of a foreign power, a demonstration that was not required to obtain a criminal warrant but was a statutory requirement for a FISA warrant.[95] The case agent did not have sufficient information to connect Moussaoui to a "foreign power," so he reached out for help, in the United States and overseas.

The FBI agent's August 18 message requested assistance from the FBI legal attaché in Paris. Moussaoui had lived in London, so the Minneapolis agent sought assistance from the legal attaché there as well. By August 24, the Minneapolis agent had also contacted an FBI detailee and a CIA desk officer at the Counterterrorist Center about the case.[96]

The FBI legal attaché's office in Paris first contacted the French government on August 16 or 17, shortly after speaking to the Minneapolis case agent on the telephone. On August 22 and 27, the French provided information that made a connection between Moussaoui and a rebel leader in Chechnya, Ibn al Khattab. This set off a spirited debate between the Minneapolis Field Office, FBI headquarters, and the CIA as to whether the Chechen rebels and Khattab were sufficiently associated with a terrorist organization to constitute a "foreign power" for purposes of the FISA statute. FBI headquarters did not believe this was good enough, and its National Security Law Unit declined to submit a FISA application.[97]

After receiving the written request for assistance, the legal attaché in London had promptly forwarded it to his counterparts in the British government, hand-delivering the request on August 21. On August 24, the CIA also sent a cable to London and Paris regarding "subjects involved in suspicious 747 flight training" that described Moussaoui as a possible "suicide hijacker." On August 28, the CIA sent a request for information to a different service of the British government; this communication warned that Moussaoui might be expelled to Britain by the end of August. The FBI office in London raised the matter briefly with British officials as an aside, after a meeting about a more urgent matter on September 3, and sent the British service a written update on September 5. The case was not handled by the British as a priority amid a large number of other terrorist-related inquiries.[98]

On September 4, the FBI sent a teletype to the CIA, the FAA, the Customs Service, the State Department, the INS, and the Secret Service summarizing the known facts regarding Moussaoui. It did not report the case agent's personal assessment that Moussaoui planned to hijack an airplane. It did contain the FAA's comment that it was not unusual for Middle Easterners to attend flight training schools in the United States.[99]

Although the Minneapolis agents wanted to tell the FAA from the beginning about Moussaoui, FBI headquarters instructed Minneapolis that it could

not share the more complete report the case agent had prepared for the FAA. The Minneapolis supervisor sent the case agent in person to the local FAA office to fill in what he thought were gaps in the FBI headquarters teletype.[100] No FAA actions seem to have been taken in response.

There was substantial disagreement between Minneapolis agents and FBI headquarters as to what Moussaoui was planning to do. In one conversation between a Minneapolis supervisor and a headquarters agent, the latter complained that Minneapolis's FISA request was couched in a manner intended to get people "spun up." The supervisor replied that was precisely his intent. He said he was "trying to keep someone from taking a plane and crashing into the World Trade Center." The headquarters agent replied that this was not going to happen and that they did not know if Moussaoui was a terrorist.[101]

There is no evidence that either FBI Acting Director Pickard or Assistant Director for Counterterrorism Dale Watson was briefed on the Moussaoui case prior to 9/11. Michael Rolince, the FBI assistant director heading the Bureau's International Terrorism Operations Section (ITOS), recalled being told about Moussaoui in two passing hallway conversations but only in the context that he might be receiving telephone calls from Minneapolis complaining about how headquarters was handling the matter. He never received such a call. Although the acting special agent in charge of Minneapolis called the ITOS supervisors to discuss the Moussaoui case on August 27, he declined to go up the chain of command at FBI headquarters and call Rolince.[102]

On August 23, DCI Tenet was briefed about the Moussaoui case in a briefing titled "Islamic Extremist Learns to Fly."[103] Tenet was also told that Moussaoui wanted to learn to fly a 747, paid for his training in cash, was interested to learn the doors do not open in flight, and wanted to fly a simulated flight from London to New York. He was told that the FBI had arrested Moussaoui because of a visa overstay and that the CIA was working the case with the FBI. Tenet told us that no connection to al Qaeda was apparent to him at the time. Seeing it as an FBI case, he did not discuss the matter with anyone at the White House or the FBI. No connection was made between Moussaoui's presence in the United States and the threat reporting during the summer of 2001.[104]

On September 11, after the attacks, the FBI office in London renewed their appeal for information about Moussaoui. In response to U.S. requests, the British government supplied some basic biographical information about Moussaoui. The British government informed us that it also immediately tasked intelligence collection facilities for information about Moussaoui. On September 13, the British government received new, sensitive intelligence that Moussaoui had attended an al Qaeda training camp in Afghanistan. It passed this intelligence to the United States on the same day. Had this information been available in late August 2001, the Moussaoui case would almost certainly have received intense, high-level attention.[105]

The FBI also learned after 9/11 that the millennium terrorist Ressam, who

by 2001 was cooperating with investigators, recognized Moussaoui as some-
one who had been in the Afghan camps.[106] As mentioned above, before 9/11
the FBI agents in Minneapolis had failed to persuade supervisors at headquar-
ters that there was enough evidence to seek a FISA warrant to search Mous-
saoui's computer hard drive and belongings. Either the British information or
the Ressam identification would have broken the logjam.

A maximum U.S. effort to investigate Moussaoui conceivably could have
unearthed his connections to Binalshibh. Those connections might have
brought investigators to the core of the 9/11 plot. The Binalshibh connection
was recognized shortly after 9/11, though it was not an easy trail to find. Dis-
covering it would have required quick and very substantial cooperation from
the German government, which might well have been difficult to obtain.

However, publicity about Moussaoui's arrest and a possible hijacking threat
might have derailed the plot.[107] With time, the search for Mihdhar and Hazmi
and the investigation of Moussaoui might also have led to a breakthrough that
would have disrupted the plot.

**Khalid Sheikh Mohammed**
Another late opportunity was presented by a confluence of information
regarding Khalid Sheikh Mohammed received by the intelligence community
in the summer of 2001. The possible links between KSM, Moussaoui, and an
individual only later identified as Ramzi Binalshibh would remain undiscov-
ered, however.

Although we readily equate KSM with al Qaeda today, this was not the case
before 9/11. KSM, who had been indicted in January 1996 for his role in the
Manila air plot, was seen primarily as another freelance terrorist, associated
with Ramzi Yousef. Because the links between KSM and Bin Ladin or al
Qaeda were not recognized at the time, responsibility for KSM remained in
the small Islamic Extremist Branch of the Counterterrorist Center, not in the
Bin Ladin unit.

Moreover, because KSM had already been indicted, he became targeted
for arrest. In 1997, the Counterterrorist Center added a Renditions Branch
to help find wanted fugitives. Responsibility for KSM was transferred to this
branch, which gave the CIA a "man-to-man" focus but was not an analyti-
cal unit. When subsequent information came, more critical for analysis than
for tracking, no unit had the job of following up on what the information
might mean.[108]

For example, in September 2000, a source had reported that an individual
named Khalid al-Shaykh al-Ballushi was a key lieutenant in al Qaeda. Al-
Ballushi means "from Baluchistan," and KSM is from Baluchistan. Recogniz-
ing the possible significance of this information, the Bin Ladin unit sought
more information. When no information was forthcoming, the Bin Ladin unit

dropped the matter.[109] When additional pieces of the puzzle arrived in the spring and summer of 2001, they were not put together.

The first piece of the puzzle concerned some intriguing information associated with a person known as "Mukhtar" that the CIA had begun analyzing in April 2001. The CIA did not know who Mukhtar was at the time—only that he associated with al Qaeda lieutenant Abu Zubaydah and that, based on the nature of the information, he was evidently involved in planning possible terrorist activities.[110]

The second piece of the puzzle was some alarming information regarding KSM. On June 12, 2001, a CIA report said that "Khaled" was actively recruiting people to travel outside Afghanistan, including to the United States where colleagues were reportedly already in the country to meet them, to carry out terrorist-related activities for Bin Ladin. CIA headquarters presumed from the details of the reporting that this person was Khalid Sheikh Mohammed. In July, the same source was shown a series of photographs and identified a photograph of Khalid Sheikh Mohammed as the Khaled he had previously discussed.[111]

The final piece of the puzzle arrived at the CIA's Bin Ladin unit on August 28 in a cable reporting that KSM's nickname was Mukhtar. No one made the connection to the reports about Mukhtar that had been circulated in the spring. This connection might also have underscored concern about the June reporting that KSM was recruiting terrorists to travel, including to the United States. Only after 9/11 would it be discovered that Muhktar/KSM had communicated with a phone that was used by Binalshibh, and that Binalshibh had used the same phone to communicate with Moussaoui, as discussed in chapter 7. As in the Moussaoui situation already described, the links to Binalshibh might not have been an easy trail to find and would have required substantial cooperation from the German government. But time was short, and running out.[112]

## Time Runs Out

As Tenet told us, "the system was blinking red" during the summer of 2001. Officials were alerted across the world. Many were doing everything they possibly could to respond to the threats.

Yet no one working on these late leads in the summer of 2001 connected the case in his or her in-box to the threat reports agitating senior officials and being briefed to the President. Thus, these individual cases did not become national priorities. As the CIA supervisor "John" told us, no one looked at the bigger picture; no analytic work foresaw the lightning that could connect the thundercloud to the ground.[113]

We see little evidence that the progress of the plot was disturbed by any government action. The U.S. government was unable to capitalize on mistakes made by al Qaeda. Time ran out.

travel, entry, and immigration—was not seen as a national security matter. Public figures voiced concern about the "war on drugs," the right level and kind of immigration, problems along the southwest border, migration crises originating in the Caribbean and elsewhere, or the growing criminal traffic in humans. The immigration system as a whole was widely viewed as increasingly dysfunctional and badly in need of reform. In national security circles, however, only smuggling of weapons of mass destruction carried weight, not the entry of terrorists who might use such weapons or the presence of associated foreign-born terrorists.

For terrorists, travel documents are as important as weapons. Terrorists must travel clandestinely to meet, train, plan, case targets, and gain access to attack. To them, international travel presents great danger, because they must surface to pass through regulated channels, present themselves to border security officials, or attempt to circumvent inspection points.

In their travels, terrorists use evasive methods, such as altered and counterfeit passports and visas, specific travel methods and routes, liaisons with corrupt government officials, human smuggling networks, supportive travel agencies, and immigration and identity fraud. These can sometimes be detected.

Before 9/11, no agency of the U.S. government systematically analyzed terrorists' travel strategies. Had they done so, they could have discovered the ways in which the terrorist predecessors to al Qaeda had been systematically but detectably exploiting weaknesses in our border security since the early 1990s.

We found that as many as 15 of the 19 hijackers were potentially vulnerable to interception by border authorities. Analyzing their characteristic travel documents and travel patterns could have allowed authorities to intercept 4 to 15 hijackers and more effective use of information available in U.S. government databases could have identified up to 3 hijackers.[32]

Looking back, we can also see that the routine operations of our immigration laws—that is, aspects of those laws not specifically aimed at protecting against terrorism—inevitably shaped al Qaeda's planning and opportunities. Because they were deemed not to be bona fide tourists or students as they claimed, five conspirators that we know of tried to get visas and failed, and one was denied entry by an inspector. We also found that had the immigration system set a higher bar for determining whether individuals are who or what they claim to be—and ensuring routine consequences for violations—it could potentially have excluded, removed, or come into further contact with several hijackers who did not appear to meet the terms for admitting short-term visitors.[33]

Our investigation showed that two systemic weaknesses came together in our border system's inability to contribute to an effective defense against the 9/11 attacks: a lack of well-developed counterterrorism measures as a part of border security and an immigration system not able to deliver on its basic commitments, much less support counterterrorism. These weaknesses have been reduced but are far from being overcome.

53. Regarding intelligence reports, the Daily Intelligence Summary (DIS) prepared by the FAA's Office of Civil Aviation Intelligence was reviewed first by an assistant to Acting Deputy Administrator Belger, who would inform him of any information that she felt merited his attention. Belger in turn would determine whether the information needed to be raised with Administrator Garvey. Garvey told us that she maintained an open door policy and counted on her security staff to keep her informed on any pressing issues. Jane Garvey interview (Oct. 21, 2003); Monte Belger interview (Nov. 24, 2003); Cathal Flynn interview (Sept. 9, 2003); Shirley Miller interview (Mar. 30, 2004); Claudio Manno interview (Oct. 1, 2003). Regarding the intelligence unit, see Nicholas Grant interview (May 26, 2004); Claudio Manno interview (Oct. 1, 2003); Mike Canavan interview (Nov. 4, 2003); Alexander T. Wells, *Commercial Aviation Safety* (McGraw-Hill, 2001), p. 308.

54. On the threat to civil aviation, see Lee Longmire interview (Oct. 28, 2003). On CAPPS, also known as CAPS (Computer Assisted Profiling System), see FAA security directive, "Threat to Air Carriers," SD 97-01, Oct. 27, 1997. The profile was derived from information on the Passenger Name Record and did not include factors such as race, creed, color, or national origin. In addition to those chosen by the algorithm, a number of other passengers were selected at random, both to address concerns about discrimination and to deter terrorists from figuring out the algorithm and gaming the system. On no-fly lists, see FAA security directive, "Threat to U.S. Air Carriers," SD 95, Apr. 24, 2000. Some of the individuals on the no-fly list were in U.S. custody as of 9/11. See Kevin G. Hall, Alfonso Chardy, and Juan O. Tamayo, "Mix-Up Almost Permitted Deportation of Men Suspected of Terrorist Activities," *Miami Herald*, Sept. 19, 2001; FAA security directive, "Threat to U.S. Aircraft Operators," SD 108-1, Aug. 28, 2001. On the Gore Commission, see *Final Report of the White House Commission on Aviation Safety and Security*, Feb. 12, 1997, p. 28. On the TIPOFF database (used to screen visa applicants and persons seeking permission to enter the United States against the names of known or suspected terrorists), see DOS cable, State 182167, "Fighting Terrorism: Visas Viper Procedures," Oct. 19, 2001. Finally, on the watchlist, officials told us that large lists were difficult to implement, particularly when they weren't accompanied by numeric data such as date of birth that would enable an air carrier to distinguish the terrorist from others around the world who had his or her name. In addition, the U.S. intelligence community was required to approve the "no-fly" listing of an individual in order to protect sources and methods. Matt Kormann interview (Feb. 13, 2004).

55. On selectees, see James Padgett interview (Oct. 7, 2003). Their bags were either screened for explosives or held off their flight until they were confirmed to be aboard. See FAA security directive, "Threat to Air Carriers," SD 97-01 Oct. 27, 1997. Under the previous noncomputerized profiling system, selectees were subject to secondary screening of their carry-on belongings, and checked baggage. See FAA security directive, "Threat to Air Carriers," SD 96-05, Aug. 19, 1996.

56. FAA report, "Air Carrier Standard Security Program," May 2001; FAA regulations, "Screening of Passengers and Property," 14 C.F.R. § 108.9 (1999); Leo Boivin interview (Sept. 17, 2003).

57. "Knives with blades under 4 inches, such as Swiss Army Knives, scout knives, pocket utility knives, etc. may be allowed to enter the sterile area. However, some knives with blades under 4 inches could be considered by a reasonable person to be a 'menacing knife' and/or may be illegal under local law and should not be allowed to enter the sterile area." See FAA regulations, Air Carriers Checkpoint Operations Guide, Aug. 1999; see also Air Transport Association Regional Airlines Association report, "Checkpoint Operations Guide," Aug. 1999; Cathal Flynn interview (Sept. 9, 2003); Lee Longmire interview (Oct. 28, 2003); Leo Boivin interview (Sept. 17, 2003). A 1994 FAA assessment of the threat to civil aviation in the United States stated that "system vulnerabilities also exist with respect to hijackings . . . aircraft can be hijacked with either fake weapons or hoax explosive devices. Cabin crew or passengers can also be threatened with objects such as short blade knives, which are allowable on board aircraft." See FAA report, "The Threat to U.S. Civil Aviation in the United States," Sept. 1994.

58. On random and continuous screening, see Janet Riffe interview (Feb. 26, 2004); FAA report, "Air Carrier Standard Security Program," May 2001. On the 9/11 hijackers, see Intelligence report, interrogation of Ramzi Binalshibh, Oct. 1, 2002; FAA records, Intelligence Case File 98–96.

59. Courtney Tucker interview (June 3, 2004); Kenneth Mead prepared statement, May 22, 2003. Some air carrier officials, however, enjoyed a strong reputation for leadership in aviation security, including United Airlines' Ed Soliday. Bruce Butterworth interview (Sept. 29, 2003); Cathal Flynn interview (Sept. 9, 2003); Steven Jenkins interview (Feb. 24, 2004).

60. Mike Morse interview (Sept. 15, 2003). Regarding training, see FAA report, "Air Carrier Standard Security Program," May 2001.

61. On a hardened cockpit door making little difference, see Tim Ahern interview (Oct. 8, 2004). For regulations governing the doors, see FAA regulations, "Miscellaneous Equipment" (emergency exit), 14 C.F.R. § 121.313 (2001); FAA regulations, "Closing and locking of flight crew compartment door," 14 C.F.R. § 121.587 (2001). Also compromising cockpit security was the use of common locks (one key fit the cockpits of all Boeing aircraft) and the absence of procedures to properly manage and safeguard cockpit keys. Michael Woodward interview (Jan. 25, 2004). For the quote on reinforced cockpit doors, see Byron Okada, "Air Rage Prompts Call for Safety Measures: The FAA Is Expected to Release a Report Today," *Fort Worth Star-Telegram*, Jan. 10, 2001, p. 1.

62. James Underwood interview (Sept. 17, 2004); Mike Canavan interview (Nov. 4, 2003).

of toothpaste and shaving cream with metallic exteriors, so that if the metal detector at the airport was triggered, the inspector would attribute the alarm to the other items. He also carried art supplies, which he hoped would explain the presence of a box cutter if anyone asked. Ibid.

60. For Khallad's return to Kuala Lumpur, see Intelligence report, interrogation of Khallad, May 30, 2003. For Hazmi's arrival and stay at the clinic, see Intelligence report, interrogation of Khallad, July 31, 2003. For Mihdhar's arrival, see FBI report, "Hijackers Timeline," Nov. 14, 2003 (citing 265A-NY-280350, serial 24808). For their stay at Sufaat's apartment, see CIA analytic report, "The Plot and the Plotters," June 1, 2003, p. 11; Intelligence report, interrogation of Khallad, Aug. 22, 2003. For Khallad's discussions with Hazmi and Khallad's knowledge of the operation, see Intelligence report, interrogation of Khallad, July 31, 2003.

61. For the Bangkok meeting, see CIA analytic report, "The Plot and the Plotters," June 1, 2003, pp. 49–50. For relocation of the meeting to Bangkok, see Intelligence reports, interrogations of Khallad, Aug. 18, 2003; Jan. 7, 2004. Fahd al Quso, a close friend of Khallad's, accompanied Nibras on the trip to Bangkok to take money to Khallad. Quso claims that the amount was $36,000. FBI report of investigation, interview of Quso, Jan. 31, 2001. Khallad claims that it was only $10,000 to $12,000. Intelligence reports, interrogations of Khallad,  May 30, 2003; Aug. 18, 2003. Khallad has identified contradictory purposes for the money: a donation to charities benefiting amputees, see Intelligence report, interrogation of Khallad, Aug. 8, 2003; and to advance the ship-bombing operation, see Intelligence report, interrogation of Khallad, Jan. 7, 2004. Khallad has explicitly denied giving any of the money he received from Nibras and Quso to Hazmi and Mihdhar. Intelligence reports, interrogations of Khallad, Aug. 8, 2003; Jan. 7, 2004. Given the separate reporting from KSM that he gave Hazmi and Mihdhar $8,000 each before they traveled to the United States, we have insufficient evidence to conclude that the Nibras/Quso money helped finance the planes operation. Intelligence report, interrogation of KSM, June 15, 2004. For Hazmi and Mihdhar's interest in traveling to Bangkok, see Intelligence report, interrogation of Khallad, Jan. 7, 2004. For Hambali's assistance, see Intelligence report, interrogation of Khallad, Aug. 8, 2003. For Abu Bara's return to Yemen, see Intelligence report, interrogation of Khallad, May 30, 2003.

62. For the hotel arrangements, see Intelligence report, interrogation of Khallad, Jan. 7, 2004. For the two groups not meeting with each other, see Intelligence report, interrogation of Khallad, Aug. 18, 2003. For Khallad's subsequent actions, see Intelligence report, interrogation of Khallad, July 31, 2003.

63. For Bin Ladin's cancellation of the East Asian operation, see Intelligence report, interrogation of KSM, Aug. 18, 2003. For Hazmi and Mihdhar's departure, see Intelligence report, interrogation of Khallad, Aug. 8, 2003. For their arrival in Los Angeles, see FBI report, "Hijackers Timeline," Nov. 14, 2003 (citing 265A-NY-280350-CG, serial 4062; 265A-NY-280350-302, serial 7134).

64. On Atta's family background, see FBI report, "Hijackers Timeline," Nov. 14, 2003 (citing FBI electronic communication from Cairo dated Sept. 13, 2001); CIA analytic report, "The Plot and the Plotters," June 1, 2003, p. 23. For details on his study in Germany, see German Bundeskriminalamt (BKA) report, investigative summary re Atta, June 24, 2002; Federal Prosecutor General (Germany), response to Commission letter, June 25, 2004, pp. 3–4. Atta's host family in Hamburg soon asked him to move out. Between 1993 and 1998, Atta shared a one-bedroom apartment in Hamburg with a fellow student, who moved out after having problems with Atta and was succeeded by another roommate. See German BKA report, investigative summary re Atta, June 24, 2002. On Atta's character, see German BKA investigation of Said Bahaji, summary of interrogation of Shahid Nickels on Oct. 30, 2001.

65. On the Muslim student association in Hamburg, see Intelligence report, interrogation of Ramzi Binalshibh, Oct. 2, 2002. On the Muslim-Christian working group and Atta, see German BKA investigation of Bahaji, summary of interrogation of Michael Krause on Oct. 11, 2001; German BKA investigation of Bahaji, summary of interrogation of Nickels on Oct. 30, 2001. Much of the information about Atta and his friends in Hamburg comes from Nickels, a German national who converted to Islam while in high school and spent considerable time with Atta's circle between 1997 and 1999. Nickels testified at the trials in Germany of Mounir el Motassadeq and Abdelghani Mzoudi on 9/11–related charges.

66. German BKA investigation of Bahaji, summary of interrogation of Nickels on Oct. 30, 2001, pp. 8, 15; federal prosecutor's closing argument, Motassadeq trial, Feb. 5, 2003. On Atta's fundamentalism, see FBI electronic communication, "Khaled A. Shoukry," June 17, 2002.

67. German BKA report, investigative summary re Binalshibh, July 4, 2002; Federal Prosecutor General (Germany), response to Commission letter, June 25, 2004, pp. 3–4; FBI report of investigation, interview of Fuad Omar Bazarah, Apr. 9, 2004; Intelligence report, interrogation of Binalshibh, Sept. 24, 2002. Binalshibh used various names, such as Ramzi Omar or Ramzi al Sheiba. In May 1998, months before he was expelled from school, German authorities had issued a warrant to arrest and deport "Ramzi Omar." German BKA report, investigative summary re Binalshibh, July 4, 2002. But Binalshibh was no longer using this alias, so the German authorities did not discover that he and Ramzi Omar were the same person until after the attacks of September 11. Ibid.

68. Intelligence report, interrogation of Binalshibh, Oct. 2, 2002; German BKA investigation of Bahaji, summary of interrogation of Nickels on Oct. 30, 2001; German BKA report, investigative summary re Binalshibh, July 4, 2002.

2002. For his training at Pan Am International Flight Academy and completion by March 2001, see FBI report, "Hijackers Timeline," Dec. 5, 2003 (Feb. 8, 2001, entries citing 265A-NY-280350, serial 2870; 265A-NY-280350-PX, serials 334, 1033). For the Academy's instructor's reaction, see FBI report of investigation, interview of James Milton, Apr. 12, 2002; FBI electronic communication, Penttbom investigation, Sept. 16, 2001, pp. 2–3. For his perseverance, see ibid., p. 3. For vacating their apartment, see FBI report, "Hijackers Timeline," Dec. 5, 2003 (Mar. 31, 2001, entry citing 265A-NY-280350-PX, serial 762). During the cross-country drive, Hazmi received a speeding ticket in Oklahoma on April 1, 2001. Ibid. (citing 265A-NY-280350-W, serial 693, items k2453, k2454; 265A-NY-280350-OC, serial 1541; 265A-NY-280350-302, serials 58753, 58757). For arrival in Virginia, see ibid. (citing 265A-NY-280350-NH, serial 1859).

65. For Atta's training at Huffman, see, e.g., FBI report, "Hijackers Timeline," Dec. 5, 2003 (Nov. 19, 2000, entry citing 265A-280350-TP-5382). For Atta's certificate, see ibid. (Nov. 20, 2000, entry citing FAA records). For Shehhi's training at Huffman, see FBI report of investigation, interview of Erik Seiberlich, Sept. 12, 2001. For Shehhi's certificate, see FBI report, "Summary of Penttbom Investigation," Feb. 29, 2004, p. 20. For Atta and Shehhi taking the commercial pilot test, see FBI report, "Hijackers Timeline," Dec. 5, 2003 (Dec. 19, 2000, entry citing 265A-NY-280350-302-9715, serial 26590). For Atta and Shehhi's commercial pilot licenses, see ibid. (Dec. 21, 2000, entries citing FAA records; 265A-NY-280350-302-2340). For Atta and Shehhi's simulator training, see ibid. (Dec. 30, 2000, entry citing 265A-NY-280350-302, serial 1177). For Jarrah's training, see ibid. (Dec. 15, 2000, entries citing 265D-NY-280350-1399, serial 8048).

66. For Jarrah's trip to Beirut and return trip with Senguen, see FBI letterhead memorandum, profile of Jarrah, Mar. 20, 2002. For Senguen accompanying Jarrah to flight training, see German BKA report, investigative summary re Jarrah, July 18, 2002, p. 60. According to Binalshibh, Senguen visited Jarrah in order to verify that he actually was studying to become a pilot. Intelligence report, interrogation of Binalshibh, June 9, 2004. For Jarrah's second trip to Beirut and visiting Senguen, see FBI letterhead memorandum, profile of Jarrah, Mar. 20, 2002; FBI electronic communication, Penttbom investigation, Sept. 18, 2001, p. 5.

67. For Atta's trip to Germany and meeting with Binalshibh, see Intelligence reports, interrogations of Binalshibh, Sept. 24, 2002; Dec. 10, 2002; FBI Penttbom timeline briefing (Dec. 10–11, 2003). For Atta giving money to Binalshibh, see ibid. For Atta returning to Florida, see FBI report, "Hijackers Timeline," Dec. 5, 2003 (Jan. 10, 2001, entry citing INS NIIS report; 265A-NY-280350-302, serial 7134). For Binalshibh's trip to Afghanistan, see FBI Penttbom timeline briefing (Dec. 10–11, 2003).

68. For Shehhi's trip, see FBI report, "Hijackers Timeline," Dec. 5, 2003 (Jan. 11 and 12, 2001, entries citing 265A-NY-280350-TP, serials 11182, 11183; 265A-NY-280350-OUT, serials 2248, 2256, Intelligence report). We do not have information on what Shehhi did in Morocco. Atta's cell phone was used on January 2 to call the Moroccan embassy in Washington, D.C. before Shehhi left. FBI report, "Hijackers Timeline," Dec. 5, 2003 (citing cellular telephone records). Shehhi's trip occurred at a time when Abdelghani Mzoudi, one of the Hamburg cell associates, was also in Morocco. Mzoudi claims he went home to Morocco to get married but could not because he was injured in a car accident there. German BKA report, investigative summary re Mzoudi, Jan. 13, 2003, p. 43. He denies having met with Shehhi, and neither German nor U.S. investigators have uncovered evidence of a meeting. See Federal Prosecutor General (Germany), response to Commission letter, June 25, 2004. For Shehhi's family contacting the UAE embassy, which contacted Hamburg police, and the UAE official's search, see German BKA report, investigative summary re Shehhi, July 9, 2002, p. 23. For Shehhi's call home, see FBI report, "Hijackers Timeline," Dec. 5, 2003 (citing 265A-NY-280350-BN-98). For the search being called off, see German BKA report, investigative summary re Shehhi, July 9, 2002, p. 24.

69. Reports that Atta was in the Prague airport on May 30–31, 2000, and that he was turned back because he lacked a visa appear to be a case of mistaken identity: a Pakistani traveler with a name similar to Atta's attempted to enter the Czech Republic from Saudi Arabia via Germany but was forced to return to Germany because he lacked a valid Czech visa. CIA cable, report re traveler to Prague, Dec. 8, 2001.

70. For Czech source reporting and credibility assessment, see CIA briefing (Jan. 28, 2004); Eliska T. interview (May 20, 2004). For the information being reported to CIA, see CIA briefing (Jan. 28, 2004). For the leak and the ministers' statements, see CIA briefing (Jan. 28, 2004); Shirley interview (Apr. 29, 2004). On April 4, 2001, Atta cashed an $8,000 check at a bank in Virginia Beach; he appears on a bank surveillance tape. For FBI evidence of Atta being in Virginia Beach, see FBI report, "Hijackers Timeline," Dec. 5, 2003 (Apr. 4, 2001, entry citing 265A-NY-280350-302-615, 688, 896, 898). For FBI evidence of Atta being in Coral Springs, see ibid. (Apr. 11, 2001, entries citing 265A-NY-280350-302, serial 381; 265A-NY-280350-MM, serials 3817, 5214). For Czech government finding no evidence of Atta's presence and having evidence that Ani was not in Prague, see CIA briefing (Jan. 28, 2004). Aside from scrutinizing various official records, the Czech government also reviewed surveillance photos taken outside the Iraqi embassy. CIA briefing (Jan. 28, 2004); Shirley interview (Apr. 29, 2004). None of the people photographed that day resembled Atta, although the surveillance only operated from 8:00 A.M. to 3:00 P.M. CIA cable, review of surveillance photos, Feb. 27, 2002. For Ani's denials of any meetings and request to superiors, see CIA briefing (Jan. 28, 2004); Intelligence report, interrogation of Ahmad Khalil Ibrahim Samir al Ani, Oct. 1, 2003. For KSM's denial of the meeting, see Shirley interview (Apr. 29, 2004). Binalshibh has stated that Atta and