# 9/11

# AND TERRORIST TRAVEL

## Staff Report of the National Commission on Terrorist Attacks Upon the United States



# 9/11 AND TERRORIST TRAVEL

Staff Report of the National Commission on Terrorist Attacks Upon the United States

By

*Thomas R. Eldridge*
*Susan Ginsburg*
*Walter T. Hempel II*
*Janice L. Kephart*
*Kelly Moore*

and

*Joanne M. Accolla, Staff Assistant*
*Alice Falk, Editor*

**Note from the Executive Director**

The Commission staff organized its work around specialized studies, or monographs, prepared by each of the teams. We used some of the evolving draft material for these studies in preparing the seventeen staff statements delivered in conjunction with the Commission's 2004 public hearings. We used more of this material in preparing draft sections of the Commission's final report. Some of the specialized staff work, while not appropriate for inclusion in the report, nonetheless offered substantial information or analysis that was not well represented in the Commission's report. In a few cases this supplemental work could be prepared to a publishable standard, either in an unclassified or classified form, before the Commission expired.

This study is on immigration, border security and terrorist travel issues. It was prepared principally by Thomas Eldridge, Susan Ginsburg, Walter T. Hempel II, Janice Kephart, and Kelly Moore, with assistance from Joanne Accolla, and editing assistance from Alice Falk. As in all staff studies, they often relied on work done by their colleagues.

This is a study by Commission staff. While the Commissioners have been briefed on the work and have had the opportunity to review earlier drafts of some of this work, they have not approved this text and it does not necessarily reflect their views.

Philip Zelikow

*9/11 and Terrorist Travel*
Staff Report, August 21, 2004

**Table of Contents**

**Note from the Executive Director**

**List of Illustrations**

**Preface**

**1. Introduction: A Factual Overview of the September 11 Border Story**

**2. The September 11 Travel Operation – a Chronology**

**3. Terrorist Entry and Embedding Tactics, 1993-2001**
    3.1 The Redbook
    3.2 Terrorist Travel Tactics by Plot
    3.3 Al Qaeda's Organizational Structure for Travel and Travel Tactics

**4. Immigration and Border Security Evolve, 1993 to 2001**
    4.1 The Intelligence Community
    4.2 The State Department
    4.3 The Immigration and Naturalization Service

**5. Planning and Executing Entry for the 9/11 Plot**
    5.1 The State Department
    5.2 The Immigration and Naturalization Service
    5.3 Finding a Fair Verdict

**6. Crisis Management and Response Post-September 11**
    6.1 The Intelligence Community
    6.2 The Department of State
    6.3 The Department of Justice
    6.4 Response at the Borders, 9/11-9/20, 2001
    6.5 The Department of Homeland Security

**Appendix A: Graphics**
**Appendix B: The Saudi Flights**
**Appendix C: Immigration Histories of Certain Individuals with Terrorist
        Connections**

# List of Illustrations

**In Appendix A:**

- Mohamed Atta's visa
- Ramzi Binalshibh's visa application
- Ziad Jarrah's charred visa recovered in Somerset County, Penn.
- Hani Hanjour's visa application
- Marwan al Shehhi's application to change his immigration status
- Mohand al Shehri's visa application
- Ahmad al Haznawi's visa application
- Saeed al Ghamdi's visa application
- Ahmed al Nami's visa application
- Mohamed Atta's revised immigration arrival record
- Handwritten notes of immigration official re: Atta's record
- Mohamed Atta's Florida state driver's license
- Saeed al Ghamdi's Immigration arrival record
- Saeed al Ghamdi's Customs declaration
- Salem al Hazmi's USA*ID* identification card
- Khalid al Mihdhar's USA*ID* identification card
- Khalid Sheikh Mohammed's alias visa application
- Ahmed al Ghamdi's state of Virginia identification card photo

**Preface**

It is perhaps obvious to state that terrorists cannot plan and carry out attacks in the United States if they are unable to enter the country. Yet prior to September 11, while there were efforts to enhance border security, no agency of the U.S. government thought of border security as a tool in the counterterrorism arsenal. Indeed, even after 19 hijackers demonstrated the relative ease of obtaining a U.S. visa and gaining admission into the United States, border security still is not considered a cornerstone of national security policy. We believe, for reasons we discuss in the following pages, that it must be made one.

Congress gave the Commission the mandate to study, evaluate, and report on "immigration, nonimmigrant visas and border security" as these areas relate to the events of 9/11. This staff report represents 14 months of such research. It is based on thousands of pages of documents we reviewed from the State Department, the Immigration and Naturalization Service, the Department of Homeland Security, the Department of Justice, the Federal Bureau of Investigation, the Central Intelligence Agency, the Department of Defense, approximately 25 briefings on various border security topics, and more than 200 interviews. We are grateful to all who assisted and supported us along the way.

The story begins with "A Factual Overview of the September 11 Border Story." This introduction summarizes many of the key facts of the hijackers' entry into the United States. In it, we endeavor to dispel the myth that their entry into the United States was "clean and legal." It was not. Three hijackers carried passports with indicators of Islamic extremism linked to al Qaeda; two others carried passports manipulated in a fraudulent manner. It is likely that several more hijackers carried passports with similar fraudulent manipulation. Two hijackers lied on their visa applications. Once in the United States, two hijackers violated the terms of their visas. One overstayed his visa. And all but one obtained some form of state identification. We know that six of the hijackers used these state issued identifications to check in for their flights on September 11. Three of them were fraudulently obtained.

The chronology that follows in chapter 2, "The September 11 Travel Operation," is a detailed account of how each hijacker acquired a visa and entered the United States. In all, they had 25 contacts with consular officers and 43 contacts with immigration and customs authorities. They began acquiring their visas in April 1999 and began entering the country in December 2000. They successfully entered the United States 33 times over 21 months, through nine airports of entry, most of which were on the East Coast. Neither the consular officers who adjudicated their visas nor the immigration inspectors who admitted them into the country had any knowledge of fraudulent al Qaeda documents.

The next chapter, "Terrorist Entry and Embedding Tactics, 1993 to 2001," explores the topic of fraudulent documents, which terrorists have long used to support their international travel. Indeed, the CIA studied these documents and published their commonalities as far back as the 1980s. They even made a training video for border inspectors to help them detect such fraud. This effort was abandoned in the early 1990s,

just as the United States experienced the first attack on the World Trade Center in 1993. We reviewed information available on terrorist travel practices in the 1990s and identified numerous entry and embedding tactics, unknown at the time of these earlier attacks in the United States owing to the lack of analysis. No government agency systematically would analyze terrorists' travel patterns until after 9/11, thus missing critical opportunities to disrupt their plans.

Chapter 4, "Immigration and Border Security Evolve, 1993 to 2001," provides an overview of counterterrorism activities as they relate to border security in the Intelligence Community, the State Department, and the Immigration and Naturalization Service. Here we explore the evolution of the terrorist watchlist and explain the process of applying for a visa and for gaining entry into the United States. The reader is introduced to the Bureau of Consular Affairs in the State Department and visa policy in general. The various INS units working on counterterrorism are discussed, along with enforcement of immigration law and the immigration benefits system.

Chapter 5, "Planning and Executing Entry for the 9/11 Plot," discusses visa issuance and admission into the United States as it specifically applied to the hijackers. Thus, visa policy in Berlin, the United Arab Emirates, and Saudi Arabia, where the hijackers received their visas, is explored in depth. Similarly, we review aspects of the admission of the hijackers in detail, noting the immigration violations they committed. On both topics, visas and entry, we include excerpts of interviews with consular, immigration, and customs officials involved in the admission of the hijackers. We conclude with an assessment of how well the State Department and the INS performed in the period prior to 9/11.

"Crisis Management and Response Post–September 11," chapter 6, reports on actions taken by the intelligence community, the departments of State and Justice, and the INS following the attacks, up to the establishment of the Department of Homeland Security. Particular attention is paid to programs implemented by the Justice Department, in some cases as part of the interagency process, including the Interview Project, Visa Condor, the Absconder Apprehension Initiative, and NSEERS, the National Security Exit and Entry Registration System.

Appendix A contains graphics relevant to the 9/11 plot.  In Appendix B, "The Saudi Flights," we examine the facts and circumstances surrounding the departure of Saudi nationals from the United States in the days after the 9/11 attack. The procedure followed for each flight, including the inspection of passengers and their belongings, is covered in detail.  Finally, in Appendix C, we describe the immigration histories of certain terrorists.

> **Exploring the Link between Human Smugglers and Terrorists**
>
> In July 2001, the CIA warned of a possible link between human smugglers and terrorist groups, including Hamas, Hezbollah, and Egyptian Islamic Jihad.[149] Indeed, there is evidence to suggest that since 1999 human smugglers have facilitated the travel of terrorists associated with more than a dozen extremist groups.[150] With their global reach and connections to fraudulent document vendors and corrupt government officials, human smugglers clearly have the "credentials" necessary to aid terrorist travel.
>
> We have already seen that documents are critical to terrorists—they are needed by those wishing to plan and carry out attacks. Documents are similarly critical to human smugglers, who have access to document vendors able to obtain genuine passports and visas from corrupt government officials.[151] Corrupt officials are also paid off to allow illegal migrants to pass through travel and security checkpoints.[152]
>
> These connections combine with lax immigration and border security in many countries to make human smuggling an attractive avenue for terrorists in need of travel facilitation.[153] Following the September 11 attacks, additional information surfaced linking al Qaeda to human smugglers. Following the coalition attack on Tora Bora, human smugglers assisted fighters fleeing Afghanistan and Pakistan. In January 2002, smugglers helped about 400 fighters in Taftan, Pakistan, to escape to Iran.[154] Finally, there are uncorroborated law enforcement reports suggesting that associates of al Qaeda used smugglers in Latin America to travel through the region in 2002 before traveling onward to the United States.[155]
>
> To date, only one human smuggler with suspected links to terrorists has been convicted in the United States.[156]

---

[1] CIA document, Redbook, 1992 ed.

[2] Ibid.

[3] The CIA claimed that they did not receive new data to analyze. The FBI did not share what they gathered from their law enforcement investigations with the CIA. Commission interview, Feb. 25, 2004.

[4] Gazi Ibrahim Abu Mezer, who planned to destroy the Atlantic Avenue subway in Brooklyn with explosives in 1997, was arrested on his third attempt to illegally enter the United States along the northwest border with Canada. He was arrested by the New York City police on July 31, 1997. Bombs were found in his apartment. Abdel Hakim Tizegha claimed to have entered the United States in Boston as a stowaway on the *Mustapha Ben Boulaid*, a tanker owned by an Algerian energy company used to transport liquefied natural gas.

[5] CIA analytic report, "A Reference Guide for Terrorist Passports," Apr. 14, 2003.

[6] *United States v Mohammed A. Salameh, et al.,* No. 94-1312(L), U.S. Court of Appeals for the Second Circuit, p. 21.

[7] His application was later denied. Abohalima was indicted as an accessory after the fact for assisting the WTC1 attackers.

[8] Center for Immigration Studies, *The Open Door: How Militant Islamic Terrorists Entered and Remained in the United States, 1993 to 2001*, Stephen A. Camarota, p. 25.

[9] Although there is no evidence that any of these marriages were fraudulent, Abu Zubaydah said that some al Qaeda operatives married American women to obtain U.S. visas. Usama Bin Ladin reportedly did not approve of this tactic, saying it violated the sanctity of marriage. KSM, however, allegedly believed it was

65

---

from a government office, by either creating an actual file in a false name or by putting a supplied photo onto the biographical information from a legitimate file. Ibid.

[93] Intelligence report, information on Abu Zubaydah, Aug. 24, 2000; Intelligence report, interrogation of a detainee, Feb. 25, 2002.

[94] Intelligence report, interrogation of Abu Zubaydah, June 7, 2002. Abu Zubaydah claims he applied for a U.S. student visa in Riyadh, Saudi Arabia, sometime between 1987 and 1989, but claims he was denied. The State Department, however, was unable to locate a record of this. After one year in India, he claims he arranged to visit a computer programming school in Missouri with the help of a Palestinian friend in Saudi Arabia. As a Palestinian, he did not have a passport, but rather a refugee travel document so he said he borrowed the Kuwaiti passport of a friend to make the trip. Although he did not formally meet with anyone at the school and never enrolled, he said he walked around the campus and picked up some brochures.

[95] Intelligence report, information on Abu Zubaydah, Aug. 24, 2000.

[96] Intelligence report, interrogation of a detainee, Feb. 25, 2002.

[97] Ibid.

[98] Intelligence report, interrogation of Abu Zubaydah, July 10, 2002. In January 1999, Ahmed Ressam reportedly stayed at the Khaldan safehouse, where Abu Zubaydah bought his plane ticket to Canada and doctored the visa in Ressam's Canadian passport.

[99] Intelligence report, profile of Abu Zubaydah, June 14, 2000.

[100] Intelligence report, interrogation of Abu Zubaydah, May 23, 2002. Zubaydah claims that members of the Egyptian Islamic Jihad, various Algerian groups and others came to him to learn his techniques.

[101] Intelligence report, interrogation of Abu Zubaydah, May 23, 2002. Zubaydah also strictly limited the movement of travelers, almost never allowing them to leave the safehouse for any reason. Instead, individuals who blended into the local community were used to get clothes, food and whatever else was needed.

[102] Intelligence reports, interrogations of Abu Zubaydah, May 23, 2002, Oct. 29, 2002, and Nov. 7, 2002.

[103] Intelligence reports, interrogation of Abu Zubaydah, Sept. 25 and Dec. 4, 2002.

[104] Ibid.

[105] Intelligence report, interrogation of a detainee, Apr. 24, 2003.

[106] Intelligence report, interrogation of Abu Zubaydah, Dec. 4, 2002; Intelligence report, interrogation of a detainee, Apr. 24, 2003.

[107] Intelligence report, interrogation of Abu Zubaydah, Dec. 4, 2002.

[108] Intelligence report, interrogation of Abu Zubaydah, Sept. 25, 2002.

[109] Intelligence reports, interrogation of Abu Zubaydah, Sept. 25, 2002, Dec. 4, 2002, Apr. 2, 2003, and Apr. 21, 2003. According to Abu Zubaydah, The African Facilitator procured construction and other necessary supplies in Pakistan and delivered them to Afghanistan, and although he operated openly in Afghanistan, he was more cautious in Pakistan..

[110] Intelligence report, interrogation of Abu Zubaydah, June 9, 2003.

[111] Intelligence reports, interrogation of Abu Zubaydah, Sept. 25, 2002, Dec. 4, 2002, and Apr. 2, 2003. "Ordinary" mujahid who needed help with their documents were required to report to The African Facilitator who would prioritize the work for the Kenyan forgers. Senior al Qaeda members could take a passport directly to the Kenyans.

[112] Intelligence report, interrogation of Abu Zubaydah, Dec. 4, 2002.

[113] Intelligence report, "Collection of 400 Passports of Dead Mujahidin," June 7, 2002.

[114] Intelligence report, information on Riyadh, Jan. 26, 2002; Intellience report, interrogation of Abu Zubaydah, Aug. 26, 2002.

[115] Intelligence report, interrogation of Riyadh, Jan. 28, 2004; Intelligence report, interrogation of a detainee, Sept. 15, 2003.

[116] Intelligence report, interrogation of a detainee, Sept. 15, 2003.

[117] Intelligence report, information on Riyadh, Jan. 26, 2002..

[118] Intelligence report, interrogation of Riyadh, Jan. 28, 2004; Intelligence report, interrogation of a detainee, Sept. 15, 2003. .

[119] Intelligence report, interrogation of Riyadh, Jan. 28, 2004; Intelligence report, Analysis of detainee interviews, Sept. 12, 2002. Many detainees mention Riyadh as a facilitator in Karachi, Pakistan. From Karachi, many were directed to another facilitator in Quetta, Pakistan, who arranged transportation over the

border into Afghanistan. The large number of detainees who took the Karachi-Quetta-Kandahar route suggests that the facilitators were coordinating their activities.

[120] Intelligence report, Interrogation of Riyadh, Jan. 28, 2004. For more on Riyadh's post 9/11 role as money facilitator see Intelligence report, interrogation of Riyadh, Apr. 6, 2004.

[121] CIA analytic reports, "Clandestine Travel Facilitators: Key Enablers of Terrorism," Dec. 31, 2002 and Analysis of Passports, Jan. 2004.

[122] CIA analytic report, "Clandestine Travel Facilitators," p. 3. According to Abu Zubaydah, in Turkey an Iraqi or a Kurd was a reliable forger. For $5,500 he would provide documents to travel to Europe. A Saudi-based forger from Chad bought real passports from foreign drug addicts and re-sold them. Zubaydah also claims that real Pakistani passports could be bought by anyone with money. See also Intelligence report, interrogation of Abu Zubaydah, Nov. 1, 2002, and Intelligence report, "Acquisition of Libyan passports by an Abu Zubaydah operative in the Netherlands," Dec. 6, 2000.

[123] CIA analytic report, Analysis of Passports, pp. 11-12

[124] Testimony of Brian Parr re interview with Yousef, Oct. 22, 1997, *United States of America v. Ramzi Ahmed Yousef and Eyad Ismoil* (S.D.N.Y.).

[125] CIA analytic report, Analysis of Passports, p. 12.

[126] Intelligence report, interrogation of a detainee, Sept. 9, 2003.

[127] FBI documents, Oct. 3, 1999; Intelligence reports, interrogation of Abu Zubaydah, Dec. 4, 2002 and Apr. 10, 2003.

[128] Ibid. A travel agency arranged an Australian visa for Khalid Sheikh Mohamed (KSM), al Qaeda's chief operational planner and the mastermind of the Sept. 11 attacks. The agency submitted his visa application on Aug. 13, 2001, the same day they submitted an application for another al Qaeda operative. The same address and employer were listed on both applications. KSM received his visa, although there is no evidence he ever used it  FBI case file, June 21, 2002

[129] Intelligence report, interrogation of Abu Zubaydah, Oct. 10, 2002. Abu Zubaydah discusses smuggling routes from Afghanistan into Pakistan and Iran, and assessed that Yemen was the easiest place to conduct smuggling operations.  Intelligence report, "International organized crime: overview of Pakistani 'Mafia' activities in Azerbaijan," June 18, 2002.

[130] CIA analytic report, "Clandestine Travel Facilitators," p. 3.

[131] Intelligence report, "Information from Saudi detainees on Mujahedin travel to Afghanistan via Iran," Mar. 13, 2002.

[132] CIA analytic report, "Clandestine Travel Facilitators*,*" p. 1.

[133] DHS email from Dan C. to Commission staff, "CODEL Brief," Apr. 16, 2004.

[134] CIA analytic report, "Clandestine Travel Facilitators," p. 6.

[135] Ibid.

[136] Intelligence report, interrogation of a detainee, Sept. 9, 2003. KSM used an alias Saudi passport, adding entry and exit stamps to "age it." See Intelligence report, interrogation of a detainee, Nov. 20, 2002, in which a detainee maintains that the immigration stamps in his passport are false and were put in his passport by Abd al-Rahim al-Nashiri's support network in Karachi to cover up the detainee's time in Afghanistan. See also, FBI document, Feb. 9, 2003, reporting a detainee's claim that he went to Kandahar to pick up his passport after it had been modified with forged stamps showing him visiting Malaysia, Thailand, Egypt and Pakistan.

[137] CIA analytic report, Analysis of Passports, p. 1.

[138] Intelligence report, interrogation of a detainee, Sept. 9, 2003. KSM said that Usama Bin Ladin approved the use of all alias passports. In Intelligence report, Nov. 23, 2002 it is reported that a detainee said all Saudi jihadists in Pakistan used fake Saudi passports to prevent their true identity from being discovered by Pakistani authorities at the airports. See also, CIA analytic report, Analysis of Passports, p. 25, stating that terrorists also have used false supporting documents, including credit cards and video rental cards to support the alias under which they are traveling.

[139] Intelligence reports, interrogation of Abu Zubaydah, May 27, 2002 and Nov. 1, 2002.  According to Abu Zubaydah, it cost $400-$1,000 for a Saudi passport.

[140] CIA analytic report, "Fraudulently Acquired Saudi Passports," p. 1.

[141] Intelligence report, interrogation of Abu Zubaydah, May 27, 2002. According to Abu Zubaydah, KSM preferred to use Saudi Arabia as a transit point because it was easy for Saudi passport holders to acquire tourist and student visas to the United States.

[142] Intelligence report, interrogation of a detainee, Sept. 9, 2003.
[143] Intelligence reports, interrogation of Abu Zubaydah, Aug. 26, 2002 and Nov. 1, 2002.  According to Abu Zubaydah, he had access to a number of forgers who, for a relatively small amount of money, would alter the passports of many countries.
[144] CIA analytic report, "Fraudulently Acquired Saudi Passports," p. 1.
[145] CIA analytic report, "Fraudulently Acquired Saudi Passports," p. 2.
[146] CIA analytic report, Analysis of Passports, p. 13; Intelligence report, interrogation of a detainee, Sept. 9, 2003.  KSM photo-substituted an alias Saudi passport with his own picture in proper Saudi attire.
[147] CIA analytic report, Analysis of Passports, p. 15.
[148] CIA analytic report, Analysis of Passports, p. 19.
[149] CIA analytic report, "Expanding Links Between Human Smugglers and Extremists: Threats to the United States," July 6, 2001, p. ii.
[150] CIA analytic report, "Expanding Links," p. 1.
[151] One smuggler, Salim Boughader-Mucharrafille, smuggled Lebanese nationals sympathetic to Hamas and Hizbollah into the United States and relied on corrupt Mexican officials in Beirut, Mexico City and Tijuana to facilitate their travel. Specifically, Boughader obtained Mexican tourist visas from an official at the Mexican embassy in Beirut to facilitate the travel of humans to Mexico. DOJ, INS Background or briefing paper on Operation Tabouli, Nov. 14, 2002; CIA analytic report, "Expanding Links," p. ii.
[152] CIA analytic report, "Expanding Links," p. ii.
[153] Human smugglers are also logistical experts, arranging for lodging and travel. CIA analytic report, "Expanding Links," p. ii.
[154] CIA analytic report, "Clandestine Travel Facilitators: Key Enablers of Terrorism," Dec. 2002, p3.
[155]  Ibid.
[156] Boughader was charged with human smuggling and sentenced to 11 months in prison. After serving his sentence he was deported to Mexico where he was arrested along with several other members of his smuggling ring. They face criminal charges and if convicted could serve lengthy jail times.

the Department of State should increase the number of posts with full-time regional security officers (RSOs), who should be trained in "terrorist methods of operation" and provided "with the ability to examine their areas of responsibility from the offensive point of view, to look for vulnerabilities as seen through the eyes of the attacker."[121]

From August 2000 through the summer of 2001, the RSO in Riyadh looked at the embassy and saw the large crowds congregating outside and inside as a security threat. He was "very much in favor of ideas to minimize people coming into the embassy unnecessarily." One RSO in Riyadh during this time told the Commission that "people were very sensitive to the fact that we were the most targeted embassy on Earth." During the height of the travel season, as 800 people a day came into the embassy in Riyadh to apply for visas. When Furey suggested there might be a way to significantly lower this number through the Visa Express Program, the RSO said he "jump[ed] at the opportunity to lower it to 50 [a day]."[122]

On June 26, 2001, Furey wrote to Mary Ryan touting the security virtues of the program:

> The number of people on the street and coming through the gates should be only 15 percent of what it was last summer. The RSO is happy, the guard force is happy, the public loves the service (no more long lines and they can go to the travel agencies in the evening and not take time off from work), we love it (no more crowd control stress and reduced work for the FSNs) and now this afternoon [we] discovered the most amazing thing—the Saudi Government loves it.[123]

Thus, in late June 2001, when intelligence indicated that al Qaeda was planning a major attack against U.S. interests in the near future, the Visa Express Program in Saudi Arabia was expanded to include all applicants in Saudi Arabia.[124]

This extension generated some controversy in Jeddah. The consular officer processing most applications believed it created havoc with the visa workflow in the busy summer months of 2001.[125] It also established uniform procedures in the two visa issuing posts. In so doing, the program largely ended the differences in visa and interview policy between Jeddah and Riyadh.[126]

At the same time, Visa Express eliminated an important aspect of visa work that had existed before its creation: the ability of consular officers and staff to eyeball visa applicants when they presented their applications. It also became impossible for the consular officer to select an individual for an interview on the basis of some concern—including one related to security—without drawing attention to the decision. In other words, the Visa Express Program removed the element of surprise from visa interviews. Whereas previously a consular officer could decide to interview an applicant for any reason, or—as one said they sometimes did—for no reason, after the program's implementation, the consular officer was required to send formal notice to the applicant via a travel agency that an interview was requested.[127]

[14] Consular Officer No. 10 interview (Mar. 1, 2004).
[15] Ibid., stating "From a security standpoint, we viewed them as safe bets."
[16] DOS OIG MOC, Consular Officer No. 10, Jan. 19, 2003.
[17] Ibid.
[18] Consular Officer No. 10 interview (Mar. 1, 2004).
[19] DOS OIG MOC, Consular Officer No. 7, Feb. 11, 2003.
[20] Ibid.
[21] Consular Officer No. 10 interview (Mar. 1, 2004); DOS OIG MOC, Consular Officer No. 10, Jan. 19, 2003.
[22] DOS OIG MOC, Consular Officer No. 7, Feb. 11, 2003.
[23] DOS OIG MOC, Consular Officer No. 10, Jan. 19, 2003.
[24] DOS OIG MOC, Consular Officer No. 7, Feb. 11, 2003.
[25] DOS OIG MOC, Consular Officer No. 10, Jan. 19, 2003.
[26] Consular Officer No. 10 interview (Mar. 1, 2004).
[27] Ibid., estimating that 70% used the drop box and 30% the travel agency.
[28] DOS OIG MOC, Consular Officer No. 7, Feb. 11, 2003; DOS OIG MOC, Consular Officer No. 10, Jan. 19, 2003.
[29] Albert A. Thibault, Jr. interview (Nov. 5, 2003).
[30] Arthur M. interview (Oct. 14, 2003).
[31] Testimony of Consular Officer No. 1 before the U.S. House of Representatives, Aug. 1, 2002.
[32] Carl C. interview (Oct. 29, 2003). Consular officials in Saudi Arabia and in Washington uniformly told the Commission that they could not recall receiving any letters from Congress urging them *to deny* visas before 9/11. Rather, consular officials told the Commission that members of Congress were their most faithful correspondents and were constantly urging them *to issue* visas to individuals in Saudi Arabia who were constituents' family members or other individuals with connections to their legislative districts.
[33] Consular Officer No. 6 interview (Oct. 14, 2003); Consular Officer No. 11 interview (Dec. 30, 2003).
[34] Ibid.
[35] This statistic is an estimate prepared by consular officials in Saudi Arabia at the request of the General Accounting Office and memorialized in GAO workpapers. The difficulty in measuring this more precisely is that the State Department electronic record-keeping system did not record whether a visa applicant was interviewed prior to September 11, 2001. Travis Farris interview (Sept. 29, 2003).
[36] Carl C. interview (Oct. 29, 2003).
[37] Consular Officer No. 11 interview (Dec. 30, 2003).
[38] Ibid.
[39] Ibid.
[40] Ibid.
[41] Carl C. interview (Oct. 29, 2003).
[42] DOS memo to Riyadh Consul General Allen K., May 7, 2000.
[43] GAO record, telephone interview of Allen K., July 10, 2002.
[44] Ibid.
[45] DOS cable, Jeddah 001185, Dec. 10, 2001.
[46] DOS cable, "Riyadh Fraud Issues," Aug. 4, 2000.
[47] Ibid. (emphasis added).
[48] Carl C. interview (Oct. 29, 2003).
[49] DOS cable, Jeddah 001225, Nov. 9, 1999.
[50] DOS email, from Allen K. to Judith McCloskey, Aug. 5, 2002.
[51] INA sec. 214(b), 8 U.S.C. sec. 1184(b); testimony of Consular Officer No. 1 before U.S. House of Representatives Committee on Government Reform, Aug. 1, 2002.
[52] Testimony of Consular Officer No. 3 before U.S. House of Representatives Committee on Government Reform, Aug. 1, 2002.
[53] Tom Furey interview (Dec. 5, 2003); testimony of Consular Officer No. 2 before U.S. House of Representatives Committee on Government Reform, Aug. 1, 2002.
[54] See DOS cable, Riyadh Fraud Issues, Aug. 2000, stating "Saudis are generally good visa risks, and most Saudi applicants are processed without interview."

---

[55] DOS OIG MOC, Consular Officer No. 11, Jan. 20, 2003; testimony of Consular Officer No. 3 before U.S. House of Representatives Committee on Government Reform, Aug. 1, 2002.

[56] Consular Officer No. 11 interview (Dec. 30, 2003); DOS OIG MOC, Tom Furey, Jan. 28, 2003.

[57] Consular Officer No. 11 interview (Dec. 30, 2003); DOS OIG MOC, Consular Section Chief Miguel O., Jan. 23, 2003; testimony of Consular Officer No. 3 before U.S. House of Representatives Committee on Government Reform, Aug. 1, 2002, stating "It was the same way that that's the presumption for many Europeans;" Tom Furey interview (Dec. 5, 2003), stating Saudis were treated like citizens of countries in the Visa Waiver Program and for the same reasons.

[58] DOS OIG MOC, Consular Officer No. 11, Jan. 28, 2003.

[59] DOS OIG MOC, Tom Furey, Jan. 28, 2003; DOS OIG MOC, Catherine Barry, Dec. 13, 2002, quoting Ms. Barry as saying that both Saudi Arabia and the UAE were "de facto visa waiver countries."

[60] CIA research paper, "Saudi Arabia's Islamic Awakening," Feb. 1993.

[61] INS record, 2001 Statistical Yearbook, Table 58 (Deportable Aliens Located by Status at Entry and Region and Country of Nationality Fiscal Year 2001). This was fewer than from Liechtenstein (42) and Norway (49), and contrasts with the 1,315,678 from Mexico.

[62] DOS cable, Riyadh 10070, Nov. 25, 1991.

[63] GAO analysis of economic data on Saudi Arabia, prepared by Bruce Kutnick, July 16, 2002.

[64] **(S)** CIA research paper, "Saudi Arabia's Islamic Awakening," Feb. 1993.

[65] Testimony of Consular Officer No. 2 before U.S. House of Representatives Committee on Government Reform, Aug. 1, 2002.

[66] Testimony of Consular Officer No. 3, before U.S. House of Representatives Committee on Government Reform, August 1, 2002.

[67] Testimony of Consular Officer No. 2, before U.S. House of Representatives Committee on Government Reform, Aug. 1, 2002; testimony of Consular Officer No. 3 before U.S. House of Representatives Committee on Government Reform, Aug. 1, 2002, stating "they weren't looking for jobs even though they were unemployed."

[68] Testimony of Consular Officer No. 4 before U.S. House of Representatives Committee on Government Reform, Aug. 1, 2002.

[69] DOS OIG MOC, Consular Officer No. 13, Jan. 23, 2003.

[70] DOS memo, Tasker #252, prepared in the summer of 2000, "Best Practices already in effect at post include… interview by exception for applicants from Saudi Arabia, Bahrain, Oman, Qatar, Kuwait, and the United Arab Emirates;" Consular Officer No. 11 interview (Dec. 30, 2003).

[71] DOS cable, "Interviews by Exception," 98 State 160236.

[72] Consular Officer No. 11 interview (Dec. 30, 2003)

[73] This view is supported by findings of the General Accounting Office which compiled statistics on the refusal rates for Riyadh and Jeddah during the year before September 11, 2001. According to the GAO, consular officers in Riyadh refused .15 percent of Saudi citizen visa applicants during the period from September 11, 2000 to April 30, 2001, while consular officers in Jeddah refused approximately 1.07 percent of Saudi citizen applicants in the same time period. For reasons discussed, infra, the interview rate for Saudi citizens applying in Jeddah probably dropped beginning in September 2000, so the difference may have been greater before that date.

[74] Consular Officer No.5 interview (Mar. 2, 2004); DOS Office of Inspector General Memorandum of Conversation, Consular Officer No. 5, Feb. 5, 2003.

[75] Consular Officer No. 12 interview (Feb. 24, 2004).

[76] Ibid.

[77] Ibid.

[78] Ibid.

[79] Ibid.

[80] Consular Officer No. 6 interview (Oct. 14, 2003).

[81] Testimony of Consular Officer No. 1 before U.S. House of Representatives Committee on Government Reform, Aug. 1, 2002.

[82] Ibid.

[83] Testimony of Consular Officer No. 2 before U.S. House of Representatives Committee on Government Reform, Aug. 1, 2002.

[84] Consular Officer No. 13 interview (Feb. 24, 2004).