UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------x

IN RE TERRORIST ATTACKS ON
SEPTEMBER 11, 2001

--------------------------------------------------------x

|  |  |
|---|---|
| **FIONA HAVLISH**, in her own right | : |
| and as Executrix of the **ESTATE OF** | : |
| **DONALD G. HAVLISH, JR**., Deceased, | : |
|  | : |
| **RUSSA STEINER** in her own right | : |
| and as Executrix of the **ESTATE OF** | : |
| **WILLIAM R. STEINER**, Deceased, | : |
|  | : |
| **CLARA CHIRCHIRILLO**, in her | : |
| own right and as Executrix of the | : |
| **ESTATE OF PETER CHIRCHIRILLO**, | : |
| Deceased, | : |
|  | : |
| **TARA BANE** in her own right | : |
| and as Executrix of the **ESTATE OF** | : |
| **MICHAEL A. BANE**, Deceased, | : |
|  | : |
| **GRACE M. PARKINSON-GODSHALK** | : |
| in her own right and as Administratrix of | : |
| of the **ESTATE OF WILLIAM R.** | : |
| **GODSHALK**, Deceased | : |
|  | : |
| **ELLEN L. SARACINI**, in her | : |
| own right and as Executrix of the **ESTATE** | : |
| **OF VICTOR J. SARACINI**, Deceased | : |
|  | : |
| **THERESANN LOSTRANGIO**, in her | : |
| own right and as Executrix of the **ESTATE** | : |
| **OF JOSEPH LOSTRANGIO**, Deceased | : |
|  | : |
| **JUDITH REISS**, in her own right | : |
| and as Administratrix of the **ESTATE** | : |
| **OF JOSHUA SCOTT REISS**, Deceased | : |
|  | : |
| **WILLIAM COALE,** in his own right | : |
| and as Administrator of the **ESTATE OF** | : |
| **JEFFREY ALAN COALE**, Deceased | : |
|  | : |

Civil Action No.
03 MDL 1570 (RCC)

CIVIL ACTION NO. 03-CV-9848 - RCC

*Case Transferred from the United States*
*District Court for the District of Columbia*
*Case Number    1:02CV00305*

**PATRICIA J. PERRY** in her own right          :
and as Administratrix of the **ESTATE OF**      :
**JOHN WILLIAM PERRY,** Deceased                :
                                                :
**RALPH MAERZ, Jr.**, as the parent             :
and on behalf of the family of                  :
**NOELL MAERZ**, Deceased                       :
                                                :
**LINDA and MARTIN PANIK**, as the              :
parents and on behalf of the family of          :
**LT. JONAS MARTIN PANIK**, Deceased            :
                                                :
**MARTINA LYNE-ANNA PANIK**, as the             :
sister of **LT. JONAS MARTIN PANIK**,           :
Deceased                                        :
                                                :
**STEPHEN L. CARTLEDGE**, as husband            :
of **SANDRA WRIGHT CARTLEDGE,**                 :
Deceased                                        :
                                                :
**LOISANNE DIEHL,** in her own right            :
and as Executrix of the **ESTATE**              :
**OF MICHAEL DIEHL**, Deceased                  :
                                                :
**TINA GRAZIOSO,** in her own right             :
and as Executrix of the **ESTATE**              :
**OF JOHN GRAZIOSO**, Deceased                  :
                                                :
**JOANNE LOVETT,** in her own right             :
and as Executrix of the **ESTATE**              :
**OF BRIAN NUNEZ**, Deceased                    :
                                                :
**GRACE KNESKI,** in her own right              :
and as Administratrix of the **ESTATE**         :
**OF STEVEN CAFIERO**, Deceased                 :
                                                :
**CHRISTINE PAPASSO,** in her own right         :
and as Executrix of the **ESTATE**              :
**OF SALVATORE T. PAPASSO**,                    :
Deceased                                        :
                                                :
**PATRICIA MILANO,** in her own right           :
and as Executrix of the **ESTATE**              :
**OF PETER T. MILANO**, Deceased                :
                                                :
**DIANE ROMERO,** in her own right              :

and as Administratrix of the **ESTATE**                  :
**OF ELVIN ROMERO**, Deceased                           :
                                                         :
**JOANNE M. RENZI**, as the sibling                     :
of **VICTOR J. SARACINI**, Deceased                     :
                                                         :
**ANNE C. SARACINI**, as the parent                     :
of **VICTOR J. SARACINI**, Deceased                     :
                                                         :
**CHRISTINA BANE-HAYES**, as the                        :
Sibling of **MICHAEL A. BANE**, Deceased :
                                                         :
**DONALD BANE**, as the parent                          :
of **MICHAEL A. BANE**, Deceased                        :
                                                         :
**DONALD G. HAVLISH, SR.**, as the                      :
parent of **DONALD G. HAVLISH, JR.**,                   :
Deceased                                                 :
                                                         :
**WILLIAM HAVLISH** and **SUSAN**                       :
**CONKLIN** as the siblings                             :
of **DONALD G. HAVLISH, JR.**,                          :
Deceased                                                 :
                                                         :
**EXPEDITO C. SANTILLAN,** in his                       :
Own right and as Administrator of the                    :
**ESTATE OF MARIA THERESA**                             :
**SANTILLAN**, Deceased                                 :
                                                         :
**ESTHER SANTILLAN,** as the parent of :
**MARIA THERESA SANTILLAN,**                            :
Deceased                                                 :
                                                         :
**LIVIA CHIRCHIRILLO**  and                             :
**CATHERINE DEBLIECK**, as the siblings :
of **PETER CHIRCHIRILLO,** Deceased                     :

**MICHELLE WRIGHT**, as the daughter     :
of **SANDRA WRIGHT**, Deceased          :
                                        :
**ED and GLORIA RUSSIN**, as the parents :
of **STEVEN RUSSIN**, Deceased          :
                                        :
**BARRY RUSSIN**, as the brother of     :
**STEVEN RUSSIN**, Deceased             :
                                        :
**LOREN ROSENTHAL**, in her own right   :
And as Executrix of the **ESTATE OF**   :
**RICHARD ROSENTHAL**, Deceased         :
                                        :
**SANDRA STRAUB**, in her own right     :
And as Executrix of the **ESTATE OF**   :
**EDWARD W. STRAUB**, Deceased          :
                                        :
**MARGARET MAURO**, in her own right    :
As sister of **DOROTHY MAURO**,         :
Deceased and as Administratrix of the   :
**ESTATE OF DOROTHY MAURO**,            :
Deceased                                :
                                        :
**ALEX ROWE**, as the father of         :
**NICHOLAS ROWE**, Deceased             :
                                        :
**VINCENT A. OGNIBENE**, in his own     :
Right as father of **PHILIP PAUL**      :
**OGNIBENE**, Deceased, and as the Co-  :
Executor of the **ESTATE OF PHILIP**    :
**PAUL OGNIBENE**, Deceased             :
                                        :
**LEONARD and LEONA ZEPLIN**,           :
As the parents of **MARC SCOTT ZEPLIN**,:
Deceased                                :
                                        :
**JOSLIN ZEPLIN**, as sister of **MARC**:
**SCOTT ZEPLIN**, Deceased              :
                                        :
**IVY MORENO**, in her own right as mother :
Of **YVETTE NICOLE MORENO**,            :
Deceased, and as Administratrix of the  :
**ESTATE OF YVETTE NICOLE**             :
**MORENO**, Deceased                    :
**MORRIS DORF**, in his own right as    :
Father of **STEPHEN SCOTT DORF**,       :

Deceased, and as Executrix of the **ESTATE**     :
**OF STEPHEN SCOTT DORF**, Deceased     :
                                        :
**MICHELLE DORF, ANN MARIE DORF**:
**ROBERT DORF, JOSEPH DORF**, and     :
**LINDA SAMMUT** as siblings of     :
**STEPHEN SCOTT DORF**, Deceased     :
                                        :
**PAUL SCHERTZER**, in his own right as     :
Father of **SCOTT SCHERTZER**, Deceased:
And as Executor of the **ESTATE OF**     :
**SCOTT SCHERTZER**, Deceased     :
                                        :
**KRYSTYNA BORYCZEWSKI**, in her     :
Own right as mother of **MARTIN**     :
**BORYCZEWSKI**, Deceased, and as the     :
Executrix of the **ESTATE OF MARTIN**     :
**BORYCZEWSKI**, Deceased     :
                                        :
**MICHAEL BORYCZEWSKI** as father of     :
**MARTIN BORYCZEWSKI**, Deceased     :
                                        :
**JULIA BORYCZEWSKI and MICHELE**:
**BORYCZEWSKI** as sisters of **MARTIN**     :
**BORYCZEWSKI**, Deceased     :
                                        :
**MARIE ANN PAPROCKI**, in her own     :
Right as sister of **DENIS LAVELLE**,     :
Deceased, and as the Executrix of the     :
**ESTATE OF DENIS LAVELLE** Deceased:
                                        :
**CHRISLAN FULLER MANUEL**, as     :
Executrix of the **ESTATE OF META**     :
**L. WALKER**, Deceased     :
                                        :
**RONI LEVINE**, in her own right, and as     :
Executrix of the **ESTATE OF ROBERT**     :
**LEVINE**, Deceased     :
                                        :
**MARIA REGINA MERWIN**, in her own     :
Right, and as Executrix of the **ESTATE**     :
**OF RONALD GAMBOA**, Deceased     :
                                        :
**GERALD W. BINGHAM**, as father of     :
**GERALD KENDALL BINGHAM a/k/a**     :
**MARK K. BINGHAM**, Deceased     :

|  | : |
| --- | --- |
| **GEORGE N. AND ANGELA** | : |
| **STERGIOPOULOS**, in their own right as | : |
| Parents, and as Co-Executors of the | : |
| **ESTATE OF ANDREW** | : |
| **STERGIOPOULOS**, Deceased | : |
|  | : |
| **MAUREEN R. HALVORSON**, in her own | : |
| Right, and as Executrix of the **ESTATE OF** | : |
| **JAMES D. HALVORSON**, Deceased | : |
|  | : |
| **MAUREEN R. HALVORSON** | : |
| As sister of **WILLIAM WILSON** deceased | : |
|  | : |
| **DOYLE RAYMOND WARD**, in his own | : |
| Right, and as Administrator of the **ESTATE** | : |
| **OF TIMOTHY RAYMOND WARD**, | : |
| Deceased | : |
|  | : |
| **RAMON MELENDEZ**, in his own right, | : |
| And as Administrator of the **ESTATE OF** | : |
| **MARY MELENDEZ**, Deceased | : |
|  | : |
| **FRANCES M. COFFEY**, in her own right, | : |
| And as Executrix of the **ESTATE OF** | : |
| **DANIEL M. COFFEY**, Deceased | : |
|  | : |
| **DANIEL D. COFFEY, M.D. and** | : |
| **KEVIN M. COFFEY**, as sons of | : |
| **DANIEL M. COFFEY**, Deceased | : |
|  | : |
| **FRANCES M. COFFEY**, in her own right, | : |
| And as Administratrix of the **ESTATE OF** | : |
| **JASON M. COFFEY**, Deceased | : |
|  | : |
| **DANIEL D. COFFEY, M.D. and** | : |
| **KEVIN M. COFFEY**, as brothers of | : |
| **JASON M. COFFEY**, Deceased | : |
|  | : |
|  | : |
| **JOYCE ANN RODAK**, in her own right, | : |
| And as parent and natural guardian of minor | : |
| children **CHELSEA NICOLE RODAK and** | : |
| **DEVON MARIE RODAK**, and as the | : |
| Executrix of the **ESTATE OF JOHN M.** | : |
| **RODAK**, Deceased | : |

6

|  | : |
|---|---|
| **JOANNE RODAK GORI**, as sister of | : |
| **JOHN M. RODAK**, Deceased | : |
|  | : |
| **JOHN and REGINA RODAK**, as parents | : |
| Of **JOHN M. RODAK**, Deceased | : |
|  | : |
| **RICHARD A. CAPRONI**, in his own right | : |
| And as Administrator of the **ESTATE OF** | : |
| **RICHARD A. CAPRONI**, Deceased | : |
|  | : |
| **DOLORES CAPRONI**, as mother of | : |
| **RICHARD A. CAPRONI**, Deceased | : |
|  | : |
| **CHRISTOPHER CAPRONI, MICHAEL** | : |
| **CAPRONI and LISA CAPRONI**, as | : |
| Siblings of **RICHARD A. CAPRONI**, | : |
| Deceased | : |
|  | : |
| **JOAN E. TINO**, in her own right and as | : |
| Executrix of the **ESTATE OF JENNIFER** | : |
| **M. TINO**, Deceased | : |
|  | : |
| **PAMELA SCHIELE**, as sister of | : |
| **JENNIFER M. TINO**, Deceased | : |
|  | : |
| **CHRISTINE BARTON**, in her own right | : |
| And as Administratrix of the **ESTATE OF** | : |
| **JEANMARIE WALLENDORF**, Deceased | : |
|  | : |
| **HELEN ROSENTHAL**, as sister of | : |
| **JOSH ROSENTHAL**, Deceased | : |
|  | : |
| **ALICE CARPENETO**, in her own right as | : |
| Mother of **JOYCE ANN CARPENETO**, | : |
| Deceased | : |
|  | : |
|  | : |
| **RONALD S. SLOAN**, in his own right and | : |
| As Executor of the **ESTATE OF PAUL K.** | : |
| **SLOAN**, Deceased | : |
|  | : |
| **FU MEI CHIEN HUANG**, as mother of | : |
| **HWEIDAR JIAN**, Deceased | : |
|  | : |
| **HUI CHIEN CHEN, HUICHUN JIAN** | : |

**HUI-CHIAN JIAN, HUI-ZON JIAN**, as   :
Siblings of **HWEIDAR JIAN**, Deceased
  :
  :
**HAOMIN JIAN**, as son of **HWEIDAR**   :
**JIAN**, Deceased
  :
  :
**MICHAEL LOGUIDICE**, as brother of   :
**CATHERINE LISA LOGUIDICE**,
  :
Deceased
  :
  :
**RODNEY RATCHFORD**, in his own right :
And as parent and natural guardian of
  :
**RODENY M. RATCHFORD**, a minor   :
**MARSHEE R. RATHCFORD**, a minor   :
**MIRANDA C. RATCHFORD**, a minor   :
And as Executor of the **ESTATE OF**   :
**MARSHA DIANAH RATCHFORD**,
  :
Deceased
  :
  :
**JIN LIU**, in her own right   :
And as parent and natural guardian of
  :
**ALAN GU**, a minor   :
And as Executor of the **ESTATE OF**   :
**LIMING GU**   :
  :
**KATHERINE SOULAS**, in her own   :
Right, and as Executrix of the **ESTATE OF** :
**TIMOTHY P. SOULAS**   :
  :
**RAYMOND ANTHONY SMITH**, in his   :
Own right, and as Administrator of the
**ESTATE OF GEORGE ERIC SMITH**   :
  :
**CORAZON FERNANDEZ,** in her own   :
Right and as Administrator of the **ESTATE** :
**OF JUDY FERNANDEZ**, Deceased   :
  :
**KEITH A. BRADKOWSKI**,   :
as Administrator of the   :
**ESTATE OF JEFFREY D. COLLMAN**   :

**DWAYNE COLLMAN,** as father of    :
**JEFFREY D. COLLMAN**, Deceased    :
   :
and    :
   :
**BRIAN COLLMAN,**    :
**CHARLES COLLMAN,** and    :
**BRENDA SORENSON**, siblings of    :
**JEFFREY D. COLLMAN,** Deceased    :
   :
Plaintiffs    :
   :
v.    :
   :
**SHEIKH USAMAH BIN-MUHAMMAD** :
**BIN-LADEN**, a.k.a. OSAMA BIN-LADEN :
    Last known location    :
    Afghanistan    :
   :
**THE TALIBAN**, a.k.a. the Islamic    :
Emirate of Afghanistan    :
an unincorporated association    :
    Last known location    :
    Afghanistan    :
   :
**MUHAMMAD OMAR**, individually    :
    Last known location    :
    Afghanistan    :
   :
**AL QAEDA/ISLAMIC ARMY**,    :
an unincorporated association    :
    Last known location    :
    Afghanistan    :
   :
***FOREIGN STATE DEFENDANTS***:    :
   :
**THE ISLAMIC REPUBLIC OF IRAN**,    :
    c/o Permanent Mission of Iran    :
    to the United Nations    :
    622 Third Avenue    :
    New York, NY  10017    :
   :
**THE REPUBLIC OF IRAQ**,    :
    c/o The Permanent Representative    :
    of Iraq to the United Nations    :
    14 East 79th Street    :

New York, NY  10021   :
   or      :
The Iraqi Interest Section  :
c/o The Algerian Embassy :
1801 P Street, N.W.   :
Washington, DC  20036  :
          :

***AGENCIES AND ISTRUMENTALITIES*** :
***OF THE ISLAMIC REPUBLIC OF IRAN*** :
          :

**AYATOLLAH ALI HOSEINI-**  :
**KHAMENEI,** Supreme Leader  :
 c/o Permanent Mission of Iran :
 to the United Nations   :
 622 Third Avenue    :
 New York, NY  10017   :
          :

**ALI AKBAR HASHEMI RAFSANJANI** :
Previously Identified and Served as Unidentified Terrorist 1
 c/o Permanent Mission of Iran :
 to the United Nations   :
 622 Third Avenue    :
 New York, NY  10017   :
          :

**IRANIAN MINISTRY OF**   :
**INFORMATION AND SECURITY** :
 c/o Permanent Mission of Iran :
 to the United Nations   :
 622 Third Avenue    :
 New York, NY  10017   :
          :

**THE ISLAMIC REVOLUTIONARY** :
**GUARD CORPS**      :
 c/o Permanent Mission of Iran :
 to the United Nations   :
 622 Third Avenue    :
 New York, NY  10017   :
 Washington, DC  20007  :
          :

**HEZBOLLAH,**      :
an unincorporated association  :
 c/o Permanent Mission of Iran :
 to the United Nations   :
 622 Third Avenue    :
 New York, NY  10017   :
          :

**THE IRANIAN MINISTRY**                        :
**OF PETROLEUM**                                :
    c/o Bijan Namdar-Zanganeh            :
    Hafez Crossing, Taleghani Avenue     :
    Before Hafez Bridge                  :
    Tehran, Iran                         :
                                         :

**THE NATIONAL IRANIAN**                        :
**TANKER CORPORATION**                          :
Previously identified as Unidentified Terrorist 2
    c/o Mohammed Souri, Chairman         :
    #67 and 88; Atefi Street; Africa Ave. :
    Tehran, Iran                         :
                                         :

**THE NATIONAL IRANIAN**                        :
**OIL CORPORATION**                             :
Previously Identified as Unidentified Terrorist 3
    c/o Madhi Mir Maezzei                 :
    Chief Managing Director               :
    Hafez Crossing, Taleghani Avenue      :
    P.O. Box 1863                         :
    Tehran, Iran                          :
                                          :

**THE NATIONAL IRANIAN**                        :
**GAS COMPANY**                                 :
Previously Identified as Unidentified Terrorist 4
    #410, Mafatteh Crossing,              :
    Taleghani Avenue                      :
    P.O. Box 6394,4533                    :
    Tehran, Iran                          :
                                          :

**IRAN AIRLINES**                               :
Previously Identified as Unidentified Terrorist 5
    c/o Eng. Davoud Keshavarzian          :
    Chairman and CEO                      :
    Iran Air H.Q.                         :
    Mahrabad Airport                      :
    Tehran, Iran                          :
                                          :

**THE NATIONAL IRANIAN**                        :
**PETROCHEMICAL COMPANY**                       :
Previously Identified as Unidentified Terrorist 6
    #46 Haft Tir Square                   :
    Karimkhan Zand Boulevard              :
    P.O. Box 11365-3484                   :
    Tehran, Iran                          :

11

                :

**IRANIAN MINISTRY OF**        :
**ECONOMIC AFFAIRS AND FINANCE**  :
     c/o Safdar Hoseini        :
     Sour Esrafil Street,       :
     Bab Homayoun Avenue     :
     Tehran, Iran          :
                :

**IRANIAN MINISTRY OF**        :
**COMMERCE**              :
     c/o Mohammad Shariat-Madari  :
     492 Valy-e Asr Avenue    :
     Between Taleghani Crossroad and :
     Valy-e Asr Square       :
     Tehran, Iran          :
                :

**IRANIAN MINISTRY OF DEFENSE**  :
**AND ARMED FORCES LOGISTICS**  :
     Ali Shamkhani Dabestan Street :
     Seyyed Khandan Bridge    :
     Resalat Expressway      :
     Tehran, Iran          :
                :

**THE CENTRAL BANK OF THE**    :
**ISLAMIC REPUBLIC OF IRAN**    :
Previously Identified as Unidentified Terrorist 7
     c/o Ebrahim Sheibany     :
     Governor           :
     Miramad Boulevard, #144   :
     Tehran, Iran          :
                :

***AGENCIES AND ISTRUMENTALITIES*** :
  ***OF THE REPUBLIC OF IRAQ***   :
                :

**SADDAM HUSSEIN,** President   :
     c/o The Permanent Representative :
     of Iraq to the United Nations :
     14 East 79th Street     :
     New York, NY  10021    :
         or          :
     The Iraqi Interest Section  :
     c/o The Algerian Embassy   :
     1801 P Street, N.W.      :
     Washington, DC  20036    :
                :

**IRAQ MINISTRY OF DEFENSE**   :

c/o The Permanent Representative :
of Iraq to the United Nations :
14 East 79th Street :
New York, NY  10021 :
     or :
The Iraqi Interest Section :
c/o The Algerian Embassy :
1801 P Street, N.W. :
Washington, DC  20036 :
  :

**IRAQ MINISTRY OF FINANCE** :
c/o The Permanent Representative :
of Iraq to the United Nations :
14 East 79th Street :
New York, NY  10021 :
     or :
The Iraqi Interest Section :
c/o The Algerian Embassy :
1801 P Street, N.W. :
Washington, DC  20036 :
  :

**IRAQ MINISTRY OF OIL** :
c/o The Permanent Representative :
of Iraq to the United Nations :
14 East 79th Street :
New York, NY  10021 :
     or :
The Iraqi Interest Section :
c/o The Algerian Embassy :
1801 P Street, N.W. :
Washington, DC  20036 :
  :

**IRAQ INTELLIGENCE SERVICE** :
c/o The Permanent Representative :
of Iraq to the United Nations :
14 East 79th Street :
New York, NY  10021 :
     or :
The Iraqi Interest Section :
c/o The Algerian Embassy :
1801 P Street, N.W. :
Washington, DC  20036 :
  :

**QUSAI HUSSEIN** :
c/o The Permanent Representative :
of Iraq to the United Nations :

13

14 East 79th Street                    :
New York, NY  10021                               :
        or                                        :
The Iraqi Interest Section                        :
c/o The Algerian Embassy                          :
1801 P Street, N.W.                               :
Washington, DC  20036                             :
                                                  :
**UNIDENTIFIED TERRORIST**                        :
**DEFENDANTS 8-500,**                             :
                                                  :
                    Defendants                    :


## THIRD AMENDED COMPLAINT

On September 11, 2001, 3029 individuals were murdered when nineteen terrorists

caused four airliners to crash into the World Trade Center Towers in New York, the

Pentagon Building in Arlington County, Virginia and a field near the town of Shanksville,

Pennsylvania.  The nineteen hijackers (hereinafter collectively referred to as the "Al

Qaeda Hijackers" or the "Hijackers") were members of a terrorist network known as "Al

Qaeda."  The Al Qaeda organization, with the aid and assistance of various individuals,

organizations and governments, trained, funded and supported the hijackers.  The leader

of Al Qaeda, Osama Bin Laden, has admitted his participation in and responsibility for

the September 11 attacks.  This action is brought by certain estate representatives and

family members of the victims and all related persons with standing under the Federal

Sovereign Immunities Act (hereinafter referred to collectively as "Plaintiffs").  Plaintiffs,

through their undersigned attorneys, do hereby bring this Third Amended Complaint

seeking damages arising out of those terrorist attacks. Plaintiffs demand judgment against

all named defendants, as well as Unidentified Terrorist Defendants 8 through 500

(referred to collectively herein as the "Unidentified Terrorist Defendants").  Plaintiffs,

through their undersigned attorneys, do hereby bring this Third Amended Complaint

seeking damages arising out of those terrorist attacks and state as follows:

<u>**JURISDICTION AND VENUE**</u>

1.      Jurisdiction arises pursuant to 28 U.S.C. §§ 1330(a), 1331 and 1332(a)(2)

and 18 U.S.C. § 2388.  Jurisdiction also arises based on defendants' violations of 28

U.S.C. §§ 1605A (the Foreign Sovereign Immunities Act), 28 U.S.C. §1350 ("Alien Tort

Act"), the Torture Victim Protection Act, PL 102-256, 106 Stat. 73 (reprinted at 28

U.S.C.A. §1350 note (West 1993)), and 18 U.S.C. §2333.

2.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(d) and

1391(f)(4).

3.      As herein alleged, actions for wrongful death, personal injury and related

torts perpetrated by foreign states, such as defendants Iran and Iraq, through their

agencies and instrumentalities, and through their officials, employees and agents, fall

within the exceptions to jurisdictional immunity under 28 U.S.C. §§1605A.

<u>**PLAINTIFFS**</u>

<u>***ORIGINAL PLAINTIFFS***</u>

4.      Plaintiff **Fiona Havlish** is a resident of the Commonwealth of Pennsylvania

and is the surviving spouse of **Donald G. Havlish, Jr.**, a decedent who was killed as a

result of a terrorist attack on the World Trade Center Towers in New York City on

September 11, 2001.  **Donald G. Havlish, Jr.** was employed by AON, Inc. and worked

on the 101st floor of the South Tower of the World Trade Center, Two World Trade

Center, New York, New York.

5.      The Plaintiff **Fiona Havlish** has been appointed the **Executrix of the Estate of Donald G. Havlish, Jr**.

6.      Plaintiff **Fiona Havlish** brings this action on her own behalf, on behalf of the **Estate of Donald G. Havlish, Jr.**, and on behalf of all heirs of **Donald G. Havlish, Jr.**, in their own right and in their capacities as beneficiaries of the Wrongful Death, Survival and other claims pled in this Amended Complaint.

7.      Plaintiff **Russa Steiner** is a resident of the Commonwealth of Pennsylvania and is the surviving spouse of **William R. Steiner**, a decedent who was killed as a result of a terrorist attack on the World Trade Center Towers in New York City on September 11, 2001.  **William R. Steiner** was employed by Marsh, Inc. on the 97th floor of the North Tower of the World Trade Center, One World Trade Center, New York, New York.

8.      Plaintiff **Russa Steiner** has been appointed the **Executrix of the Estate of William R. Steiner**.

9.      Plaintiff **Russa Steiner** brings this action on her own behalf, on behalf of the **Estate of William R. Steiner**, and on behalf of all heirs of **William R. Steiner**, in their own right and in their capacities as beneficiaries of the Wrongful Death, Survival and other claims pled in this Amended Complaint.

10.     Plaintiff **Clara Chirchirillo** is a resident of the Commonwealth of Pennsylvania and is the surviving spouse of **Peter Chirchirillo**, a decedent who was killed as a result of a terrorist attack on the World Trade Center Towers in New York City

on September 11, 2001.  **Peter Chirchirillo** was employed by Marsh, Inc. on the 98th

floor of the North Tower in the World Trade Center, One World Trade Center, New

York, New York.

11.     Plaintiff **Clara Chirchirillo** has been appointed the **Executrix of the**

**Estate of Peter Chirchirillo.**

12.     Plaintiff **Clara Chirchirillo** brings this action on her own behalf, on behalf

of the **Estate of Peter Chirchirillo**, and on behalf of all heirs of **Peter Chirchirillo**, in

their own right and in their capacities as beneficiaries of the Wrongful Death, Survival

and other claims pled in this Amended Complaint.

13.     Plaintiff **Tara Bane** is a resident of the Commonwealth of Pennsylvania

and is the surviving spouse of **Michael A. Bane**, a decedent who was killed as a result of

a terrorist attack on the World Trade Center Towers in New York City on September 11,

2001.  **Michael A. Bane** was employed by Marsh & McLennan Company on the 100th

floor of the North Tower of the World Trade Center, One World Trade Center, New

York, New York.

14.     Plaintiff **Tara Bane** has been appointed the **Executrix of the Estate of**

**Michael A. Bane.**

15.     Plaintiff **Tara Bane** brings this action on her own behalf, on behalf of the

**Estate of Michael A. Bane**, and on behalf of all heirs of **Michael A. Bane**, in their own

right and in their capacities as beneficiaries of the Wrongful Death, Survival and other

claims pled in this Amended Complaint.

16.     Plaintiff **Grace M. Parkinson-Godshalk** is a resident of the Commonwealth of Pennsylvania and is the surviving relative (natural mother) of **William R. Godshalk**, a resident of the State of New York and a decedent who was killed as a result of a terrorist attack on the World Trade Center Towers in New York City on September 11, 2001.  **William R. Godshalk** was employed by Keefe, Bruyette & Woods located on the 89th floor of the South Tower, Two World Trade Center, New York, New York.

17.     Plaintiff **Grace M. Parkinson-Godshalk** has been appointed the Administratrix of the **Estate of William R. Godshalk**.

18.     Plaintiff **Grace M. Parkinson-Godshalk** brings this action on her own behalf, on behalf of the **Estate of William R. Godshalk**, and on behalf of all heirs of **William R. Godshalk**, in their own right and in their capacities as beneficiaries of the Wrongful Death, Survival and other claims pled in this Amended Complaint.

19.     Plaintiff **Ellen L. Saracini** is a resident of the Commonwealth of the Pennsylvania and is the surviving spouse of **Victor J. Saracini**, a decedent who was killed as a result of a terrorist attack on the World Trade Center Towers in New York City on September 11, 2001.  **Victor J. Saracini** was employed by United Airlines and was the pilot of United Flight 175 which crashed into the South Tower, Two World Trade Center, New York.

20.     Plaintiff **Ellen L. Saracini** has been appointed the **Executrix of the Estate of Victor J. Saracini.**

21.     Plaintiff **Ellen L. Saracini** brings this action on her own behalf, on behalf of the **Estate of Victor J. Saracini**, and on behalf of all heirs of **Victor J. Saracini,** in their own right and in their capacities of beneficiaries of the Wrongful Death Survival and other claims pled in this Amended Complaint.

22.     Plaintiff **Theresann Lostrangio** is a resident of the Commonwealth of Pennsylvania and is the surviving spouse of **Joseph Lostrangio**, a decedent who was killed as a result of a terrorist attack on the World Trade Center Towers in New York City on September 11, 2001.  **Joseph Lostrangio** was employed by Devonshire Group on the 77th Floor of the North Tower in the World Trade Center, One World Trade Center, New York, New York.

23.     Plaintiff **Theresann Lostrangio** has been appointed the Executrix of the **Estate of Joseph Lostrangio**.

24.     Plaintiff **Theresann Lostrangio** brings this action on her own behalf, on behalf of the **Estate of Joseph Lostrangio** and on behalf of all heirs of **Joseph Lostrangio**, in their own right and in their capacities as beneficiaries of the Wrongful Death, Survival and other claims pled in this Amended Complaint.

### *ADDITIONAL PLAINTIFFS*

28.     Plaintiff **Judith Jackson Reiss** is a resident of the Commonwealth of Pennsylvania and is a surviving relative (natural mother) of **Joshua Scott Reiss**, a citizen of the Commonwealth of Pennsylvania and a decedent who was killed as a result of a terrorist attack on the World Trade Center Towers in New York City on September 11,

2001.  **Joshua Scott Reiss** was employed by the Cantor Fitzgerald firm, located on the 105th floor of the North Tower, One World Trade Center, New York, New York.

29.     Plaintiff **Judith Reiss** has been appointed the Administratrix of the **Estate of Joshua Scott Reiss.**

30.     Plaintiff, **Judith Reiss** brings this action on her own behalf, on behalf of the **Estate of Joshua Scott Reiss**, and on behalf of all heirs of **Joshua Scott Reiss**, in their own right and in their capacities as beneficiaries of the Wrongful Death, Survival and other claims pled in this Amended Complaint.

31.     Plaintiff **William Coale** is a resident of the Commonwealth of Pennsylvania and is a surviving relative (natural father) of **Jeffrey Alan Coale**, a citizen of the Commonwealth of Pennsylvania and a decedent who was killed as a result of a terrorist attack on the World Trade Center Towers in New York City on September 11, 2001. **Jeffrey Alan Coale** was employed as the Assistant Wine Steward at the Windows On the World restaurant, located on the 106th floor of the North Tower, One World Trade Center, New York, New York.

32.     Plaintiff **William Coale** has been appointed the Administrator of the **Estate of Jeffrey Alan Coale.**

33.     Plaintiff, **William Coale** brings this action on his own behalf, on behalf of the **Estate of Jeffrey Alan Coale**, and on behalf of all heirs of **Jeffrey Alan Coale**, in their own right and in their capacities as beneficiaries of the Wrongful Death, Survival and other claims pled in this Amended Complaint.

34. Plaintiff **Patricia J. Perry** is a resident of the State of New York and is the surviving spouse of **John William Perry**, a decedent who was killed as a result of a terrorist attack on the World Trade Center Towers in New York City on September 11, 2001. **John William Perry,** an officer with the New York City Police Department, was on the mezzanine at the time of the collapse of the South Tower, Two World Trade Center, New York, New York.

35. Plaintiff **Patricia J. Perry** has been appointed the Administratrix of the **Estate of John William Perry**.

36. Plaintiff **Patricia J. Perry** brings this action on her own behalf, on behalf of the **Estate of John William Perry** and on behalf of all heirs of **John William Perry**, in their own right and in their capacities as beneficiaries of the Wrongful Death, Survival and other claims pled in this Amended Complaint.

37. Plaintiff **Ralph S. Maerz, Jr.** is a resident of the Commonwealth of Pennsylvania and is the surviving relative (natural father) of **Noell Maerz**, a citizen of the State of New York and a decedent who was killed as a result of a terrorist attack on the World Trade Center Towers in New York City on September 11, 2001. **Noell Maerz** was a bond trader employed at Euro Brokers, located on the 84th floor of the South Tower, Two World Trade Center, New York, New York.

38. **Ralph S. Maerz, Jr.** brings this action on his own behalf and on behalf of the family members of **Noell Maerz** entitled to recover damages on the causes of action set forth herein.

21

39.     Plaintiffs **Linda Panik** and **Martin Panik** are residents of the Commonwealth of Pennsylvania and are the surviving parents of **Lt. Jonas Martin Panik**, a citizen of the State of Maryland and a decedent who was killed as a result of a terrorist attack on the Pentagon on September 11, 2001.  **Lt. Panik** was a Navy Intelligence officer working in the "hot wash room" when the defendants caused American Airlines Flight 77 to crash into the Pentagon Building.  At the time of the attack, **Lt. Panik** was in the process of providing a telephone briefing to other Navy Intelligence officers concerning the terrorist attacks in New York.

40.     **Martina Lyne-Anna Panik** is a resident of the State of Maryland and is a surviving relative (sister) of **Lt. Jonas Martin Panik**, an officer in the United States Navy who was killed as a result of a terrorist attack on the Pentagon Building in Arlington County, Virginia on September 11, 2001.

41.     Plaintiff **Stephen L. Cartledge** is a resident of the Commonwealth of Pennsylvania and is the surviving spouse of **Sandra Wright Cartledge**, a citizen of the Commonwealth of Pennsylvania and a decedent who was killed as a result of a terrorist attack on the World Trade Center Towers in New York City on September 11, 2001.  **Sandra Wright Cartledge** was a Facilities Manager at Aon Corp., located on the 102nd floor of the South Tower, Two World Trade Center, New York, New York.

42.     **Stephen L. Cartledge** brings this action on his own behalf and on behalf of the family members of **Sandra Wright Cartledge**  entitled to recover damages on the causes of action set forth herein.

43.     Plaintiff **Loisanne Diehl** is a resident of the State of New Jersey and is the surviving spouse of **Michael Diehl**, a decedent who was killed as a result of a terrorist attack on the World Trade Center Towers in New York City on September 11, 2001. **Michael Diehl** was employed by Fiduciary Trust International on the 90th Floor of the South Tower of the World Trade Center, Two World Trade Center, New York, New York.

44.     Plaintiff **Loisanne Diehl** has been appointed the Executrix of the **Estate of Michael Diehl** .

45.     Plaintiff **Loisanne Diehl** brings this action on her own behalf, on behalf of the **Estate of Michael Diehl** and on behalf of all heirs of **Michael Diehl**, in their own right and in their capacities as beneficiaries of the Wrongful Death, Survival and other claims pled in this Amended Complaint.

46.     Plaintiff **Tina Grazioso** is a resident of the State of New Jersey and is the surviving spouse of **John Grazioso**, a decedent who was killed as a result of a terrorist attack on the World Trade Center Towers in New York City on September 11, 2001. **John Grazioso** was employed by E-Speed (Cantor Fitzgerald) on the 105th Floor of the North Tower of the World Trade Center, One World Trade Center, New York, New York.

47.     Plaintiff **Tina Grazioso** has been appointed the Executrix of the **Estate of John Grazioso**.

48.     Plaintiff **Tina Grazioso** brings this action on her own behalf, on behalf of

the **Estate of John Grazioso** and on behalf of all heirs of **John Grazioso**, in their own right and in their capacities as beneficiaries of the Wrongful Death, Survival and other claims pled in this Amended Complaint.

49.     Plaintiff **Joanne Lovett** is a resident of the State of New York and is a surviving relative (natural mother) of **Brian Nunez**, a decedent who was killed as a result of a terrorist attack on the World Trade Center Towers in New York City on September 11, 2001. **Brian Nunez** was employed by E-Speed (Cantor Fitzgerald) on the 104th Floor of the North Tower of the World Trade Center, One World Trade Center, New York, New York.

50.     Plaintiff **Joanne Lovett** has been appointed the Executrix of the **Estate of Brian Nunez.**

51.     Plaintiff **Joanne Lovett** brings this action on her own behalf, on behalf of the **Estate of Brian Nunez** and on behalf of all heirs of **Brian Nunez**, in their own right and in their capacities as beneficiaries of the Wrongful Death, Survival and other claims pled in this Amended Complaint.

52.     Plaintiff **Grace Kneski** is a resident of the State of South Carolina and is a surviving relative (natural mother) of **Steven Cafiero**, a decedent who was killed as a result of a terrorist attack on the World Trade Center Towers in New York City on September 11, 2001. **Steven Cafiero** was employed by AON, Inc. and worked on the 92nd floor of the South Tower of the World Trade Center, Two World Trade Center, New York, New York.

53.    Plaintiff **Grace Kneski** has been appointed the Executrix of the **Estate of Steven Cafiero**.

54.    Plaintiff **Grace Kneski** brings this action on her own behalf, on behalf of the **Estate of Steven Cafiero** and on behalf of all heirs of **Steven Cafiero**, in their own right and in their capacities as beneficiaries of the Wrongful Death, Survival and other claims pled in this Amended Complaint.

55.     Plaintiff **Christine Papasso** is a resident of the State of New York and is the surviving spouse of **Salvatore T. Papasso**, a decedent who was killed as a result of a terrorist attack on the World Trade Center Towers in New York City on September 11, 2001. **Salvatore T. Papasso** was employed by the New York State Department of Tax and Finance on the 86th Floor of the South Tower in the World Trade Center, Two World Trade Center, New York, New York.

56.    Plaintiff **Christine Papasso** has been appointed the Executrix of the **Estate of Salvatore T. Papasso**.

57.    Plaintiff **Christine Papasso** brings this action on her own behalf, on behalf of the **Estate of Salvatore T. Papasso** and on behalf of all heirs of **Salvatore T. Papasso**, in their own right and in their capacities as beneficiaries of the Wrongful Death, Survival and other claims pled in this Amended Complaint.

58.    Plaintiff **Patricia Milano** is a resident of the State of New Jersey and is the surviving spouse of **Peter T. Milano**, a decedent who was killed as a result of a terrorist attack on the World Trade Center Towers in New York City on September 11, 2001.

**Peter T. Milano** was employed by Cantor Fitzgerald on the 104th Floor of the North Tower of the World Trade Center, One World Trade Center, New York, New York.

59.     Plaintiff **Patricia Milano** has been appointed the Executrix of the **Estate of Peter T. Milano**.

60.     Plaintiff **Patricia Milano** brings this action on her own behalf, on behalf of the **Estate of Peter T. Milano** and on behalf of all heirs of **Peter T. Milano**, in their own right and in their capacities as beneficiaries of the Wrongful Death, Survival and other claims pled in this Amended Complaint.

61.     Plaintiff **Diane Romero** is a resident of the State of New Jersey and is the surviving spouse of **Elvin Romero**, a decedent who was killed as a result of a terrorist attack on the World Trade Center Towers in New York City on September 11, 2001. **Elvin Romero** was employed by Cantor Fitzgerald on the 104th Floor of the North Tower of the World Trade Center, One World Trade Center, New York, New York.

62.     Plaintiff **Diane Romero** has been appointed the Administratrix of the **Estate of Elvin Romero**.

63.     Plaintiff **Diane Romero** brings this action on her own behalf, on behalf of the **Estate of Elvin Romero** and on behalf of all heirs of **Elvin Romero**, in their own right and in their capacities as beneficiaries of the Wrongful Death, Survival and other claims pled in this Amended Complaint.

64.     Plaintiff **Joanne Renzi** is a resident of the State of New Jersey and is a surviving sibling of **Victor J. Saracini**, a decedent who was killed as a result of a

terrorist attack on the World Trade Center Towers in New York City on September 11, 2001. **Victor J. Saracini** was employed by United Airlines and was the pilot of United Flight 175 which crashed into the South Tower, Two World Trade Center, New York.

65.     Plaintiff **Anne C. Saracini** is a resident of the State of New Jersey and is the surviving mother of **Victor J. Saracini**, a decedent who was killed as a result of a terrorist attack on the World Trade Center Towers in New York City on September 11, 2001. **Victor J. Saracini** was employed by United Airlines and was the pilot of United Flight 175 which crashed into the South Tower, Two World Trade Center, New York.

66.     Plaintiff **Christina Bane-Hayes** is a resident of the State of Virginia and is a surviving sibling of **Michael A. Bane**, a decedent who was killed as a result of a terrorist attack on the World Trade Center Towers in New York City on September 11, 2001. **Michael A. Bane** was employed by Marsh & McLennan Company on the 100th floor of the North Tower of the World Trade Center, One World Trade Center, New York, New York.

67.     Plaintiff **Donald Bane** is a resident of the State of New York and is the surviving father of **Michael A. Bane**, a decedent who was killed as a result of a terrorist attack on the World Trade Center Towers in New York City on September 11, 2001. **Michael A. Bane** was employed by Marsh & McLennan Company on the 100th floor of the North Tower of the World Trade Center, One World Trade Center, New York, New York.

68.     Plaintiffs **William Havlish and Susan Conklin** are residents of the State

of Georgia and are the surviving siblings of **Donald G. Havlish, Jr.**, a decedent who was

killed as a result of a terrorist attack on the World Trade Center Towers in New York City

on September 11, 2001.  **Donald G. Havlish, Jr.** was employed by AON, Inc. and

worked on the 101st floor of the South Tower of the World Trade Center, Two World

Trade Center, New York, New York.

69.     Plaintiff **Donald Havlish, Sr.** is a resident of the State of South Carolina

and is the surviving father of **Donald G. Havlish, Jr.**, a decedent who was killed as a

result of a terrorist attack on the World Trade Center Towers in New York City on

September 11, 2001.  **Donald G. Havlish, Jr.** was employed by AON, Inc. and worked

on the 101st floor of the South Tower of the World Trade Center, Two World Trade

Center, New York, New York.

70.     Plaintiff **Expedito Santillan** is a resident of the State of New Jersey and is

the surviving father of **Maria Theresa Santillan**, a decedent who was killed as a result of

a terrorist attack on the World Trade Center Towers in New York City on September 11,

2001.  **Maria Theresa Santillan** worked on the 103rd Floor of the North Tower of the

World Trade Center, One World Trade Center, New York, New York.

71.     Plaintiff **Expedito Santillan** has been appointed the Administrator of the

**Estate of Maria Theresa Santillan.**

72.     Plaintiff **Expedito Santillan** brings this action on his own behalf, on behalf

of the **Estate of Maria Theresa Santillan** and on behalf of all heirs of **Maria Theresa**

**Santillan**, in their own right and in their capacities as beneficiaries of the Wrongful

Death, Survival and other claims pled in this Amended Complaint.

73.     Plaintiff **Esther Santillan** is a resident of the State of New Jersey and is a surviving mother of **Maria Theresa Santillan**, a decedent who was killed as a result of a terrorist attack on the World Trade Center Towers in New York City on September 11, 2001. **Maria Theresa Santillan** worked on the 103rd Floor of the North Tower of the World Trade Center, One World Trade Center, New York, New York.

74.     Plaintiffs **Livia Chirchirillo** and **Catherine Deblieck** are residents of the State of New York and the Commonwealth of Pennsylvania respectively.  **Livia Chirchirillo** and **Catherine Deblieck** are the surviving siblings of **Peter Chirchirillo**, a decedent who was killed as a result of the terrorist attack on the World Trade Center Towers in New York City on September 11, 2001.  **Peter Chirchirillo** worked on the 98th Floor of the North Tower of the World Trade Center, One World Trade Center, New York, New York.

75.     Plaintiff **Michelle Wright** is a resident of the State of New Jersey and the surviving daughter of **Sandra Wright**, a decedent who was killed as a result of the terrorist attack on the World Trade Center Towers in New York City on September 11, 2001.  **Sandra Wright** worked on the 102nd Floor of the South Tower of the World Trade Center, Two World Trade Center, New York, New York.

76.     Plaintiffs **Ed and Gloria Russin** are residents of the State of New Jersey and the surviving parents of **Steven Russin**, a decedent who was killed as a result of the terrorist attack on the World Trade Center Towers in New York City on September 11,

2001.  **Steven Russin** worked on the 104th Floor of the North Tower of the World Trade Center, One World Trade Center, New York, New York.

77.     Plaintiff **Barry Russin** is a resident of the State of New Jersey and the surviving brother of **Steven Russin**, a decedent who was killed as a result of the terrorist attack on the World Trade Center Towers in New York City on September 11, 2001. **Steven Russin** worked on the 104th Floor of the North Tower of the World Trade Center, One World Trade Center, New York, New York.

78.     Plaintiff **Loren Rosenthal** is a resident of the State of New Jersey and is the surviving spouse of **Richard Rosenthal**, a decedent who was killed as a result of the terrorist attack on the World Trade Center Towers in New York City on September 11, 2001.  **Richard Rosenthal** worked on the 101st Floor of the North Tower of the World Trade Center, One World Trade Center, New York, New York.

79.     Plaintiff **Loren Rosenthal** has been appointed as the Executrix of the **Estate of Richard Rosenthal**.

80.     Plaintiff **Loren Rosenthal** brings this action on her own behalf, on behalf of the **Estate of Richard Rosenthal,** and on behalf of all heirs of **Richard Rosenthal**, in their own right and in their capacities as beneficiaries of the Wrongful Death, Survival and other claims pled in this Amended Complaint.

81.     Plaintiff **Sandra Straub** is a resident of the Commonwealth of Massachusetts and is the surviving spouse of **Edward W. Straub**, a decedent who was killed as a result of the terrorist attack on the World Trade Center Towers in New York

City on September 11, 2001.  At the time of the attack, **Edward W. Straub** was located outside the South Tower of the World Trade Center, Two World Trade Center, New York, New York.

82.    Plaintiff **Sandra Straub** has been appointed as the Executrix of the **Estate of Edward W. Straub**.

83.    Plaintiff **Sandra Straub** brings this action on her own behalf, on behalf of the **Estate of Edward W. Straub**, and on behalf of all heirs of **Edward W. Straub**, in their own right and in their capacities as beneficiaries of the Wrongful Death, Survival and other claims pled in this Amended Complaint.

84.    Plaintiff **Margaret Mauro** is a resident of the State of Tennessee and is the surviving sister of **Dorothy Mauro**, a decedent who was killed as a result of the terrorist attack on the World Trade Center Towers in New York City on September 11, 2001. **Dorothy Mauro** worked on the 97th Floor of the North Tower of the World Trade Center, One World Trade Center, New York, New York.

85.    Plaintiff **Margaret Mauro** has been appointed as the Administratrix of the **Estate of Dorothy Mauro**.

86.    Plaintiff **Margaret Mauro** brings this action on her own behalf, on behalf of the **Estate of Dorothy Mauro** and on behalf of all heirs of **Dorothy Mauro** in their o9wn right and in their capacities as beneficiaries of the Wrongful Death, Survival and other claims pled in this Amended Complaint.

87.    Plaintiff **Alex Rowe** is a resident of Gauteng, South Africa and is the

surviving father of **Nicholas Rowe**, a decedent who was killed as a result of the terrorist

attack on the World Trade Center Towers in New York City on September 11, 2001.

**Nicolas Rowe** worked on the 106th Floor of the North Tower of the World Trade Center,

One World Trade Center, New York, New York.

88.     Plaintiff **Vincent A. Ognibene** is a resident of the State of New York and is

the surviving father of **Philip Paul Ognibene**, a decedent who was killed as a result of

the terrorist attack on the World Trade Center Towers in New York City on September

11, 2001.  **Philip Paul Ognibene** worked on the 89th Floor of the South Tower of the

World Trade Center, Two World Trade Center, New York, New York.

89.     Plaintiff **Vincent A. Ognibene** has been appointed as co-Executor of the

**Estate of Philip Paul Ognibene**.

90.     Plaintiff **Vincent A. Ognibene** brings this action on his own behalf, on

behalf of the **Estate of Philip Paul Ognibene**, and on behalf of all heirs of **Philip Paul**

**Ognibene** in their own right and in their capacities as beneficiaries of the Wrongful

Death, Survival and other claims pled in this Amended Complaint.

91.     Plaintiffs **Leonard and Leona Zeplin** are residents of the State of New

York and the surviving parents of **Marc Scott Zeplin**, a decedent who was killed as a

result of the terrorist attack on the World Trade Center Towers in New York City on

September 11, 2001.  **Marc Scott Zeplin** worked on the 104th Floor of the South Tower

of the World Trade Center, Two World Trade Center, New York, New York.

92.     Plaintiff **Joslin Zeplin** is a resident of the State of New York and the

surviving sister of **Marc Scott Zeplin**, a decedent who was killed as a result of the terrorist attack on the World Trade Center Towers in New York City on September 11, 2001. **Marc Scott Zeplin** worked on the 104th Floor of the South Tower of the World Trade Center, Two World Trade Center, New York, New York.

93.     Plaintiff **Ivy Moreno** is a resident of the State of New York and the surviving mother of **Yvette Nichole Moreno**, a decedent who was killed as a result of the terrorist attack on the World Trade Center Towers in New York City on September 11, 2001. **Yvette Nichole Moreno** worked on the 92nd Floor of the North Tower of the World Trade Center, One World Trade Center, New York, New York.

94.     Plaintiff **Ivy Moreno** has been appointed Administratrix of the **Estate of Yvette Nichole Moreno**.

95.     Plaintiff **Ivy Moreno** bring this action on her own behalf, on behalf of the **Estate of Yvette Nichole Moreno**, and on behalf of all heirs of **Yvette Nichole Moreno** in their own right and in their capacities as beneficiaries of the Wrongful Death, Survival and other claims pled in this Amended Complaint.

96.     Plaintiff **Morris Dorf** is a resident of the State of New Jersey and the surviving father of **Stephen Scott Dorf**, a decedent who was killed as a result of the terrorist attack on the World Trade Center Towers in New York City on September 11, 2001. **Stephen Scott Dorf** worked on the 84th Floor of the South Tower of the World Trade Center, Two World Trade Center, New York, New York.

97.     Plaintiff **Morris Dorf** has been appointed as the Executor of the **Estate of**

**Stephen Scott Dorf**.

98.     Plaintiff **Morris Dorf** brings this action on his own behalf, on behalf of the **Estate of Stephen Scott Dorf**, and on behalf of all heirs of **Stephen Scott Dorf,** in their own right and in their capacities as beneficiaries of the Wrongful Death, Survival and other claims pled in this Amended Complaint.

99.     Plaintiffs **Michelle Dorf, Ann Marie Dorf, Robert Dorf and Linda Sammut** are residents of the State of New Jersey, and plaintiff **Joseph Dorf** is a resident of the State of New York, and they are the surviving siblings of **Stephen Scott Dorf**, a decedent who was killed as a result of the terrorist attack on the World Trade Center Towers in New York City on September 11, 2001.  **Stephen Scott Dorf** worked on the 84th Floor of the South Tower of the World Trade Center, Two World Trade Center, New York, New York.

100.     Plaintiff **Paul Schertzer** is a resident of the State of New Jersey and is the surviving father of **Scott Schertzer**, a decedent who was killed as a result of the terrorist attack on the World Trade Center Towers in New York City on September 11, 2001. **Scott Schertzer** worked on the 104th Floor of the North Tower of the World Trade Center, One World Trade Center, New York, New York.

101.     Plaintiff **Paul Schertzer** has been appointed as Executor of the **Estate of Scott Schertzer**.

102.     Plaintiff **Paul Schertzer** brings this action on his own behalf, on behalf of the **Estate of Scott Schertzer** and on behalf of all heirs of **Scott Schertzer**, in their own

right and in their capacities as beneficiaries of the Wrongful Death, Survival and other claims pled in this Amended Complaint.

103.    Plaintiffs **Michael and Krystyna Boryczewski** are residents of the State of New Jersey and are the surviving parents of **Martin Boryczewski**, a decedent who was killed as a result of the terrorist attack on the World Trade Center Towers in New York City on September 11, 2001.  **Martin Boryczewski** worked on the 104th Floor of the North Tower of the World Trade Center, One World Trade Center.

104.    Plaintiff **Krystyna Boryczewski** has been appointed as the Executrix of the **Estate of Martin Boryczewski**.

105.    Plaintiff **Krystyna Boryczewski** brings this action on her own behalf, on behalf of the **Estate of Martin Boryczewski**, and on behalf of all heirs of **Martin Boryczewski**, in their own right and in their capacities as beneficiaries of the Wrongful Death, Survival and other claims pled in this Amended Complaint.

106.    Plaintiffs **Julia and Michele Boryczewski** are residents of the State of New Jersey and are the surviving siblings of **Martin Boryczewski**, a decedent who was killed as a result of the terrorist attack on the World Trade Center Towers in New York City on September 11, 2001.  **Martin Boryczewski** worked on the 104th Floor of the North Tower of the World Trade Center, One World Trade Center, New York, New York.

107.    Plaintiff **Marie Ann Paprocki** is a resident of the State of New York and is the surviving sister of **Denis Lavelle**, a decedent who was killed as a result of the terrorist attack on the World Trade Center Towers in New York City on September 11, 2011.

**Denis Lavelle** worked on the 94th Floor of the North Tower of the World Trade Center, One World Trade Center, New York, New York.

108.   Plaintiff **Marie Ann Paprocki** has been appointed as Executrix of the **Estate of Denis Lavelle**.

109.   Plaintiff **Marie Ann Paprocki** brings this action on her own behalf, on behalf of the **Estate of Denis Lavelle**, and on behalf of all heirs of **Denis Lavelle**, in their own right and in their capacities as beneficiaries of the Wrongful Death, Survival, and other claims pled in this Amended Complaint.

110.   Plaintiff **Chrislan Fuller Manuel** is a resident of the State of Michigan and is the surviving aunt of **Meta L. Walker**, a decedent who was killed as a result of the terrorist attack on the Pentagon on September 11, 2011.  **Meta L. Walker** worked on the 1st Floor, "E" Wing of the Pentagon when the defendants caused American Airlines Flight 77 to crash into the Pentagon Building.

111.   Plaintiff **Chrislan Fuller Manuel** has been appointed as the Executrix of the **Estate of Meta L. Walker**.

112.   Plaintiff **Chrislan Fuller Manuel** brings this action on Behalf of the **Estate of Meta L. Walker**, and on behalf of all heirs of **Meta L. Walker**, in their own right and in their capacities as beneficiaries of the Wrongful Death, Survival, and other claims pled in this Amended Complaint.

113.   Plaintiff **Roni Levine** is a resident of the State of New York and the surviving spouse of **Robert Levine**, a decedent who was killed as a result of the terrorist

attack on the World Trade Center Towers in New York City on September 11, 2001.

**Robert Levine** worked on the 104th Floor of the North Tower of the World Trade Center, One World Trade Center, New York, New York.

114.    Plaintiff **Roni Levine** has been appointed as the Executrix of the **Estate of Robert Levine**.

115.    Plaintiff **Roni Levine** brings this action on her own behalf, on behalf of the **Estate of Robert Levine**, and on behalf of all heirs of **Robert Levine**, in their own right and in their capacities as beneficiaries of the Wrongful Death, Survival, and other claims pled in this Amended Complaint.

116.    Plaintiff **Maria Regine Merwin** is a resident of the Commonwealth of Kentucky and is the sister of **Ronald Gamboa**, a decedent who was killed as a result of the terrorist attack on the World Trade Center Towers on September 11, 2001. **Ronald Gamboa** was a passenger on United Airlines Flight 175 which the defendants caused to crash into the South Tower of the World Trade Center.

117.    Plaintiff **Maria Regina Merwin** has been appointed as the Executrix of the **Estate of Ronald Gamboa**.

118.    Plaintiff **Maria Regina Merwin** brings this action on her own behalf, on behalf of the **Estate of Ronald Gamboa**, and on behalf of all heirs of **Ronald Gamboa**, in their own right and in their capacities as beneficiaries of the Wrongful Death, Survival, and other claims pled in this Amended Complaint.

119.    Plaintiff **Gerald Bingham** is a resident of the State of Tennessee and is the

surviving father of **Gerald Kendall Bingham a/k/a Mark K. Bingham**, a decedent who was killed as a result of a terrorist hijacking and subsequent crash of United Airlines Flight 93 in a field near the town of Shanksville, Pennsylvania on September 11, 2001.

120.   Plaintiffs **Angela and George Stergiopoulos** are residents of the State of New York and are the surviving parents of **Andrew Stergiopoulos**, a decedent who was killed as a result of the terrorist attack on the World Trade Center Towers in New York City on September 11, 2001.  **Andrew Stergiopoulos**, worked on the 105th Floor of the North Tower of the World Trade Center, One World Trade Center, New York, New York.

121.   Plaintiffs **Angela and George Stergiopoulos** have been appointed as co-Executors of the **Estate of Andrew Stergiopoulos**.

122.   Plaintiffs **Angela and George Stergiopoulos** bring this action on their own behalf, on behalf of the **Estate of Andrew Stergiopoulos**, and on behalf of all heirs of **Andrew Stergiopoulos**, in their own right and in their capacities as beneficiaries of the Wrongful Death, Survival, and other claims pled in this Amended Complaint.

123.   Plaintiff **Maureen R. Halvorson** is a resident of the State of Connecticut and is the surviving spouse of **James D. Halvorson**, a decedent who was killed as a result of the terrorist attack on the World Trade Center Towers in New York City on September 11, 2001.  **James D. Halvorson** worked on the 99th Floor of the North Tower of the World Trade Center, One World Trade Center, New York, New York.

124.   Plaintiff **Maureen R. Halvorson** is the surviving sister of **William Wilson**,

a decedent who was killed as a result of the terrorist attack on the World Trade Center

Towers in New York City on September 11, 2001.  **William Wilson** worked in the World

Trade Center Towers, New York, New York.

125.    Plaintiff **Maureen R. Halvorson** has been appointed as the Executrix of the

**Estate of James D. Halvorson**.

126.    Plaintiff **Maureen R. Halvorson** brings this action on her own behalf as

spouse of James D. Halvorson and sibling of William Wilson.  Maureen R. Halvorson

also brings this action on behalf of the **Estate of James D. Halvorson**, and on behalf of

all heirs of **James D. Halvorson**, in their own right and in their capacities as beneficiaries

of the Wrongful Death, Survival, and other claims pled in this Amended Complaint.

127.    Plaintiff **Doyle Raymond Ward** is a resident of the State of Claifornia and

is the surviving father of **Timothy Raymond Ward**, a decedent who was killed as a

result of the terrorist attack on the World Trade Center Towers in New York City on

September 11, 2001.  **Timothy Raymond Ward** was a passenger on United Airlines

Flight 175 which was hijacked by the defendants and which the defendants caused  to

crash into the South Tower of the World Trade Center, Two World Trade Center, New

York, New York.

128.    Plaintiff **Doyle Raymond Ward** has been appointed as the Administrator

of the **Estate of Timothy Raymond Ward**.

129.    Plaintiff **Doyle Raymond Ward** brings this action on his own behalf, on

behalf of the **Estate of Timothy Raymond Ward**, and on behalf of all heirs of **Timothy**

**Raymond Ward**, in their own right and in their capacities as beneficiaries of the

Wrongful Death, Survival, and other claims pled in this Amended Complaint.

130.   Plaintiff **Ramon Melendez** is a resident of the Commonwealth of

Pennsylvania and is the surviving spouse of **Mary Melendez**, a decedent who was killed

as a result of the terrorist attack on the World Trade Center Towers in New York City on

September 11, 2001.  **Mary Melendez** worked on the 90th Floor of the South Tower of

the World Trade Center, Two World Trade Center, New York, New York.

131.   Plaintiff **Ramon Melendez** has been appointed as the Administrator of the

**Estate of Mary Melendez**.

132.   Plaintiff **Ramon Melendez** brings this action on his own behalf, on behalf

of the **Estate of Mary Melendez**, and on behalf of all heirs of **Mary Melendez**, in their

known right and in their capacities as beneficiaries of the Wrongful Death, Survival, and

other claims pled in this Amended Complaint.

133.   Plaintiff **Frances Coffey** is a resident of the State of New York and is the

surviving spouse of **Daniel M. Coffey**, a decedent who was killed as a result of the

terrorist attack on the World Trade Center Towers in New York City on September 11,

2001.  **Daniel M. Coffey** worked on the 94th Floor of the North Tower of the World

Trade Center, One World Trade Center, New York, New York.

134.   Plaintiff **Frances M. Coffey** has been appointed as the Executrix of the

**Estate of Daniel M. Coffey**.

135.   Plaintiff **Frances M. Coffey** brings this action on her own behalf, on behalf

40

of the **Estate of Daniel M. Coffey**, and on behalf of all heirs of **Daniel M. Coffey**, in their own right and in their capacities as beneficiaries of the Wrongful Death, Survival, and other claims pled in this Amended Complaint.

136.    Plaintiffs **Daniel D. Coffey** and **Kevin M. Coffey** are residents of the State of New York.  **Daniel D. Coffey and Kevin M. Coffey** are the surviving sons of **Daniel M. Coffey**, a decedent who was killed as a result of the terrorist attack on the World Trade Center Towers in New York City on September 11, 2001.

137.    Plaintiff **Frances M. Coffey** is a resident of the State of New York and is the surviving mother of **Jason M. Coffey**, a decedent who was killed as a result of the terrorist attack on the World Trade Center Towers in New York City on September 11, 2001.  **Jason M. Coffey** worked on the 98th Floor of the North Tower of the World Trade Center, One World Trade Center, New York, New York.

138.    Plaintiff **Frances M. Coffey** has been appointed as Administratrix of the **Estate of Jason M. Coffey**.

139.    Plaintiff **Frances M. Coffey** brings this action on her own behalf, on behalf of the **Estate of Jason M. Coffey**, and on behalf of all heirs of **Jason M. Coffey**, in their own right and in their capacities as beneficiaries of the Wrongful Death, Survival, and other claims pled in this Amended Complaint.

140.    Plaintiff **Daniel D. Coffey** is a resident of the State of Louisiana and plaintiff **Kevin M. Coffey** is a resident of the State of New York.  **Daniel D. Coffey and Kevin M. Coffey** are the surviving siblings of **Jason M. Coffey**, a decedent who was

killed as a result of the terrorist attack on the World Trade Center Towers in New York City on September 11, 2001.

141.   Plaintiff **Joyce Ann Rodak** is a resident of the State of New Jersey and is the surviving spouse of **John M. Rodak**, a decedent who was killed as a result of the terrorist attack on the World Trade Center Towers in New York City on September 11, 2001.  **John M. Rodak** worked on the 104th Floor of the South Tower of the World Trade Center, Two World Trade Center, New York, New York.

142.   Plaintiff **Joyce Ann Rodak** is the parent and natural guardian of minor plaintiffs **Chelsea Nicole Rodak and Devon Marie Rodak**, the surviving minor children of **John M. Rodak**.

143.   Plaintiff **Joyce Ann Rodak** has been appointed as the Executrix of the **Estate of John M. Rodak**.

144.   Plaintiff **Joyce Ann Rodak** brings this action on her own behalf, as parent and natural guardian of minor plaintiffs **Chelsea Nicole Rodak and Devon Marie Rodak**, on behalf of the **Estate of John M. Rodak**, and on behalf of all heirs of **John M. Rodak**, in their own right and in their capacities as beneficiaries of the Wrongful Death, Survival, and other claims pled in this Amended Complaint.

145.   Plaintiff **Joanne Rodak Gori** is a resident of the Commonwealth of Pennsylvania and is the surviving sister of **John M. Rodak**, a decedent who was killed as a result of the terrorist attack on the World Trade Center Towers in New York City on September 11, 2001.

42

146.     Plaintiffs **John and Regina Rodak** are residents of the Commonwealth of Pennsylvania and the surviving parents of **John M. Rodak**, a decedent who was killed as a result of the terrorist attack on the World Trade Center Towers in New York City on September 11, 2001.

147.     Plaintiffs **Richard A. Caproni and Dolores Caproni** are residents of the State of Maryland and are the surviving parents of **Richard A. Caproni**, a decedent who was killed as a result of the terrorist attack on the World Trade Center Tower in New York City on September 11, 2001.  **Richard A. Caproni** worked on the 98th Floor of the North Tower of the World Trade Center, One World Trade Center, New York, New York.

148.     Plaintiff **Richard A. Caproni, Sr.** has been appointed as the Administrator of the **Estate of Richard A. Caproni**.

149.     Plaintiff **Richard A. Caproni** brings this action on his own behalf, on behalf of the **Estate of Richard A. Caproni**, and on behalf of all heirs of **Richard A. Caproni**, in their own right and in their capacities as beneficiaries of the Wrongful Death, Survival and other claims pled in this Amended Complaint.

150.     Plaintiff **Christopher Caproni** is a resident of the State of Maryland, and plaintiffs **Michael Caproni and Lisa Caproni** are residents of the State of New York. Plaintiffs **Christopher Caproni, Michael Caproni and Lisa Caproni** are the surviving siblings of **Richard A Caproni**, a decedent killed as a result of the terrorist attack on the World Trade Center Towers in New York City on September 11, 2001.

151.    Plaintiff **Joan E. Tino** is a resident of the State of New Jersey and is the surviving mother of **Jennifer Tino**, a decedent who was killed as a result of the terrorist attack on the World Trade Center Towers in New York City on September 11, 2001. **Jennifer Tino** worked on the 96th Floor of the North Tower of the World Trade Center, One World Trade Center, New York, New York.

152.    Plaintiff **Joan E. Tino** has been appointed as the Executrix of the **Estate of Jennifer Tino**.

153.    Plaintiff **Joan E. Tino** brings this action on her own behalf, on behalf of the **Estate of Jennifer Tino**, and on behalf of all heirs of **Jennifer Tino**, in their own right and in their capacities as beneficiaries of the Wrongful Death, Survival, and other claims pled in this Amended Complaint.

154.    Plaintiff **Pamela Schiele** is a resident of the State of New Jersey and is the surviving sister if **Jennifer Tino**, a decedent who was killed as a result of the terrorist attack on the World Trade Center Towers in New York City on September 11, 2001.

155.    Plaintiff **Christine Barton** is a resident of the State of Florida and is the surviving mother of **Jeanmarie Wallendorf**, a decedent who was killed as a result of the terrorist attack on the World Trade Center Towers in New York City on September 11, 2001.  **Jeanmarie Wallendorf** worked on the 89th Floor of the South Tower of the World Trade Center, Two World Trade Center, New York, New York.

156.    Plaintiff **Christine Barton** has been appointed as the Administratrix of the **Estate of Jeanmarie Wallendorf**.

157.   Plaintiff **Christine Barton** brings this action on her own behalf, on behalf of the **Estate of Jeanmarie Wallendorf**, and on behalf of all heirs of **Jeanmarie Wallendorf**, in their own right and in the capacities as beneficiaries of the Wrongful Death, Survival, and other claims pled in this Amended Complaint.

158.   Plaintiff **Helen Rosenthal** is a resident of the State of New York and is the surviving sister of **Josh Rosenthal**, a decedent who was killed as a result of the terrorist attack on the World Trade Center Towers in New York City on September 11, 2001.

159.   Plaintiff **Alice Carpeneto** is a resident of the State of New York and is the surviving mother of **Joyce Ann Carpeneto**, a decedent who was killed as a result of the terrorist attack on the World Trade Center Towers in New York City on September 11, 2001.  **Joyce Ann Carpeneto** worked on the 83rd Floor of the North Tower of the World Trade Center, One World Trade Center, New York, New York.

160.   Plaintiff **Ronald S. Sloan** is a resident of the State of California and is the surviving father of **Paul K. Sloan**, a decedent who was killed as a result of the terrorist attack on the World trade Center Towers in New York City on September 11, 2001.  **Paul K. Sloan** worked on the 89th Floor of the South Tower of the World Trade Center, Two World Trade Center, New York, New York.

161.   Plaintiff **Ronald S. Sloan** has been appointed as the Executor of the **Estate of Paul K. Sloan**.

162.   Plaintiff **Ronald S. Sloan** brings this action on his own behalf, on behalf of the **Estate of Paul K. Sloan**, and on behalf of all heirs of **Paul K. Sloan**, in their own

right and in their capacities as beneficiaries of the Wrongful Death, Survival, and other claims pled in this Amended Complaint.

163.   Plaintiffs **Huichun Jian, Hui-Chuan Jian, Hui-Chien Chen and Hui-Zon Jian** are residents of Taiwan and are the surviving siblings of **Hweidar Jian**, a decedent who was killed as a result of the terrorist attack on the World Trade Center Towers in New York City on September 11, 2001.  **Hweidar Jian** worked on the 103rd Floor of the North Tower of the World Trade Center, One World Trade Center, New York, New York.

164.   Plaintiff **Haomin Jian** is a resident of the State of New Jersey and is the surviving son of **Hweidar Jian**, a decedent who was killed as a result of the terrorist attack on the World Trade Center Towers in New York City on September 11, 2001. **Hweidar Jian** worked on the 103rd Floor of the North Tower of the World Trade Center, One World Trade Center, New York, New York.

165.   Plaintiff **FuMei Chien Huang** is a resident of the State of New Jersey and is the surviving mother of **Hweidar Jian**, a decedent who was killed as a result of the terrorist attack on the World Trade Center Towers in New York City on September 11, 2001.  **Hweidar Jian** worked on the 103rd Floor of the North Tower of the World Trade Center, One World Trade Center, New York, New York.

166.   Plaintiff **Michael LoGuidice** is a resident of the State of Florida and is the surviving brother of **Catherine LoGuidice**, a decedent who was killed as a result of the terrorist attack on the World Trade Center Towers in New York City on September 11,

46

2001.  **Catherine LoGuidice** worked 105th Floor of the North Tower of the World Trade Center, One World Trade Center, New York, New York.

167.    Plaintiff **Rodney Ratchford** is a resident of the State of Alabama and is the surviving husband of **Marsha Dianah Ratchford**, a decedent who was killed as a result of the terrorist attack on the Pentagon on September 11, 2001.

168.    Plaintiff **Rodney Ratchford** is the parent and natural guardian of **Rodney M. Ratchford, Marshee R. Ratchford and Miranda C. Ratchford**, the minor children of decedent **Marsha Dianah Ratchford**.

169.    Plaintiff **Rodney Ratchford** has been appointed as the Executor of the **Estate of Marsha Dianah Ratchford**.

170.    Plaintiff **Rodney Ratchford** brings this action on his own behalf, as parent and natural guardian of minor plaintiffs **Rodney M. Ratchford, Marshee R. Ratchford and Miranda C. Ratchford,** on behalf of the **Estate of Marsha Dianah Ratchford**, and on behalf of all heirs of **Marsha Dianah Ratchford**, in their own right and in their capacities  as beneficiaries of the Wrongful Death, Survival, and other claims pled in this Amended Complaint.

171.    Plaintiff **JIN LIU** is a resident of the State of New Jersey and is the surviving spouse of **LIMING GU**, a decedent who was killed as a result of the terrorist attack on the World Trade Center on September 11, 2001.  **LIMING GU** worked on the 95th Floor of the North Tower of the World Trade Center, One World Trade Center, New York, New York.

172.   Plaintiff **JIN LIU** has been appointed as the Executor of the **Estate of Liming Gu**.

173.   Plaintiff **JIN LIU** brings this action on her own behalf, as parent and natural guardian of minor plaintiff **ALAN GU**, on behalf of the **Estate of Liming Gu**, and on behalf of all heirs of **Liming Gu**, in their own right and in their capacities  as beneficiaries of the Wrongful Death, Survival, and other claims pled in this Amended Complaint.

174.    Plaintiff **Katherine Soulas** is a resident of the State of New Jersey and is the surviving spouse of **Timothy P. Soulas**, a decedent who was killed as a result of a terrorist attack on the World Trade Center Towers in New York City on September 11, 2001.  **Timothy P. Soulas** was employed by Cantor Fitzgerald on the 105th floor of the North Tower in the World Trade Center, One World Trade Center, New York, New York.

175.   Plaintiff **Katherine Soulas** has been appointed the **Executrix of the Estate of Timothy P. Soulas.**

176.   Plaintiff **Katherine Soulas** brings this action on her own behalf, on behalf of the **Estate of Timothy P. Soulas**, and on behalf of all heirs of **Timothy P. Soulas**, in their own right and in their capacities as beneficiaries of the Wrongful Death, Survival and other claims pled in this Amended Complaint.

177.   Plaintiff **Raymond Anthony Smith**  is a resident of the Commonwealth of Pennsylvania and is the brother of **George Eric Smith**, a decedent who was killed as a result of a terrorist attack on the World Trade Center Towers in New York City on

September 11, 2001. **George Eric Smith** was employed by SunGard Asset Management Systems on the 97th floor of the South Tower in the World Trade Center, Two World Trade Center, New York, New York.

178.     Plaintiff **Raymond Anthony Smith** has been appointed the **Administrator of the Estate of George Eric Smith.**

179.     Plaintiff **Raymond Anthony Smith** brings this action on his own behalf, on behalf of the **Estate of George Eric Smith**, and on behalf of all heirs of **George Eric Smith**, in their own right and in their capacities as beneficiaries of the Wrongful Death, Survival and other claims pled in this Amended Complaint.

180.     Plaintiff **Corazon Fernandez** is a resident of the State of New Jersey and is the surviving mother of **Judy Fernandez**, a decedent who was killed as a result of a terrorist attack on the World Trade Center Towers in New York City on September 11, 2001. **Judy Fernandez** was employed by Cantor Fitzgerald in the North Tower, One World Trade Center.

181.     Plaintiff **Corazon Fernandez** brings this action on her own behalf and on behalf of the **Estate of Judy Fernandez** and all heirs of **Judy Fernandez**, in their own right and in their capacities as beneficiaries of the Wrongful Death, Survival and other claims pled in this Amended Complaint.

182.

183.     Plaintiff **Keith A. Bradkowski** is a resident of the state of Arizona and is the appointed Administrator of the Estate of **Jeffrey D. Collman**, a decedent who was

killed as a result of a terrorist attack on the World Trade Center Towers in New York City on September 11, 2001.  **Jeffrey D. Collman** was employed by American Airlines and was a flight attendant on American flight no. 11 which crashed into the North Tower, One World Trade Center.

184.     Plaintiff **Keith A. Bradkowski** brings this action on behalf of the **Estate of Jeffrey D. Collman**, and on behalf of all heirs of **Jeffrey D. Collman**, in their own right and in their capacities as beneficiaries of the Wrongful Death, Survival and other claims pled in this Amended Complaint.

185.     Plaintiff **Dwayne W. Collman** is a resident of the State of Illinois and is the surviving father of **Jeffrey D. Collman**, a decedent who was killed as a result of a terrorist attack on the World Trade Center Towers in New York City on September 11, 2001.  **Jeffrey D. Collman** was employed by American Airlines and was a flight attendant on American flight no. 11 which crashed into the North Tower, One World Trade Center.

186.     Plaintiffs **Charles Collman,** a resident of the state of Florida, **Brian Collman**, a resident of the state of Nevada, and **Brenda Sorenson**, a resident of the State of Illinois, are surviving siblings of **Jeffrey D. Collman**, a decedent who was killed as a result of a terrorist attack on the World Trade Center Towers in New York City on September 11, 2001.  **Jeffrey D. Collman** was employed by American Airlines and was a flight attendant on American flight no. 11 which crashed into the North Tower, One World Trade Center.

## DEFENDANTS

### *Osama Bin Laden*

187.    Defendant Sheikh Usamah Bin-Muhammad Bin-Laden (hereinafter referred to as "Osama Bin Laden" or "Bin Laden") is a former citizen of Saudi Arabia whose last known residence was in Afghanistan and whose current whereabouts are unknown.  At all times material hereto, Osama Bin Laden planned, conspired, funded, directed, controlled, and engaged in terrorist activities and pursuits involving intentional and willful mass murder of thousands of innocent men, women, and children.  The end result of those activities was the murder of all Decedents on September 11, 2001.

188.    Defendant Osama Bin Laden announced what he declared to be "jihad" - holy war - against the United States on numerous occasions since 1996.  On February 23, 1998, Bin Laden urged jihad against Americans and published in the newspaper *Al Quds al-Arabi* the following:  "*the ruling to kill the Americans and their allies - civilians and military - is an individual duty for every Muslim who can do it in any country in which it is possible to do it.*"  On August 20, 1998, President Clinton advised that the United States was taking military action against terrorist objectives in Afghanistan and Sudan:  "*Our target was terror ☐ our mission was clear to strike at the network of radical groups affiliated with and funded by Osama Bin Laden, perhaps the preeminent organizer and financer of international terrorism in the world today.*"  On August 21, 1998, the United States Department of State found that: "*Bin Laden's network leads, funds and inspires a wide range of Islamic extremist groups that perpetrate acts of terrorism around the*

*world."*

189.   In conducting his terrorist activities, Osama Bin Laden received financial, logistical and other material support from the Foreign State Defendants.

### The Taliban and Muhammad Omar

190.   At all relevant times, as of 1996, defendant the Taliban was a political regime operating as the Islamic Emirate of Afghanistan.  The Taliban governed the vast majority of the population of Afghanistan.  The term "*Taliban*" means "pupils" or "students" and is used for those seminarians or students of religious schools who are politically and militarily active in militant Islamic groups.  The Taliban movement started among the Afghan refugees trained in the religious schools of Pakistan financed by private Saudi funding.  Armed with religious fervor and supplied by Pakistani army intelligence, these seminarians/students were organized into a fighting force.  The Afghan Civil War enabled the Taliban☐s gradual takeover of Afghanistan.  The Taliban regime imposed their ultra-purest vision of Islam with strict religious doctrine.  Accordingly, the Taliban regime was deeply hostile to women, Shiites and minorities.  The regime eliminated all aspects of modern culture, human rights and any form of dissent.

191.   The Taliban was an unincorporated association described by the U.S. Department of Treasury, Office of Foreign Asset Control (the "OFAC") in its Overview of Sanctions Regulations as: "*(1) the political/military entity headquartered in Kandahar, Afghanistan that, as of October 21, 1999, exercised de facto control over Kandahar, Farah, Helmund, Nimruz, Herat, Badghis, Ghowr, Oruzghon, Zabol, Paktiha, Ghanzi, Nangarhar, Lowgar, Vardan, Faryab, Jowlan, Balkh, Paktiha, and Kabul; (2) its*

*agencies and instrumentalities; (3) associated blocked persons, as determined by the U.S.*

*Department of the Treasury and published in the Federal Register, and listed on OFAC's*

*list of 'Specially Designated Nationals and Blocked Persons' (the SDN List)."*

192.    Operating as the Islamic Emirate of Afghanistan, the Taliban controlled

almost all the territory and people currently known as the Islamic State of Afghanistan.

The Taliban, as the Islamic Emirate of Afghanistan, maintained governmental

institutions, and conducted relations with other states and with international institutions.

193.    At all relevant times, the Taliban, operating under the guise of a sovereign

state (the Islamic Emirate of Afghanistan), acted through its agencies and

instrumentalities, and through its officials, employees, and agents, some of whom are

identified herein.  As a result of the decisive actions of the Afghan people, the United

States, Great Britain and other states after September 11, 2001, the Taliban no longer

controls any territory and has ceased to function as a government.  Although many of its

officials are in hiding, some of its senior operatives are believed to be detained by the

United States.

194.    The Taliban, operating as the Islamic Emirate of Afghanistan, was deemed

to have supported terrorist activities according to former President Clinton's July 4, 1999,

Executive Order No. 13129 and the continuation Order of June 30, 2001, issued by

President George W. Bush.  In addition, after the terrorist acts on September 11, 2001,

President George W. Bush and other senior U.S. officials clearly designated the Taliban

regime as having supported the terrorists.  For example, <u>see</u> President George W. Bush's

address to a joint session of Congress in September 2001, his address to American people

on October 15, 2001, and Executive Order No. 13224 on Terrorist Financing (September 24, 2001).

195.    Defendant the Taliban used the Islamic Emirate of Afghanistan and its agencies, instrumentalities, officials, employees and agents, some of whom are identified herein, to engage in government-sponsored acts of conspiracy, terrorism, murder, mayhem and/or provision of material support and/or resources for said acts, within its borders as well as those of the United States and other countries. The end result of those activities was the murder of the Decedents on September 11, 2001.

196.    In various public statements, defendant the Taliban has admitted that it harbored, supported and was working in concert with Osama Bin Laden, the leader and organizer of defendant Al Qaeda.

197.    Defendant the Taliban, operating as the Islamic Emirate of Afghanistan, used its agencies, instrumentalities, officials, employees, and agents to provide support for the organization, training, financing and execution of the September 11, 2001 hijackings and suicide missions of United Airlines Flight No. 175 into Two World Trade Center (South Tower), American Airlines Flight No. 11 into One World Trade Center (North Tower), American Airlines Flight No. 77 into the Pentagon Building and United Airlines Flight No. 93 into a field in Western Pennsylvania (collectively referred to herein as the "Terrorist Hijacked Flights").

198.    In conducting its terrorist activities, the Taliban received financial, logistical and other material support from the Foreign State Defendants.

199.    Defendant Muhammad Omar ("Omar") founded the Taliban in 1996.  Since

then, Omar has been the leading member of the Taliban's six member ruling council and is reportedly responsible for all financial matters. Initially, Muhammad Omar was an obscure guerilla commander during the Afghan Civil War. However, by 1994, Omar had a following of thousands motivated by religious militancy and proceeded by 1996 to oust the Soviets and competing warlords. Known as "Commander of the Faithful," Omar, individually and through the Taliban organization which he controlled, supplied material support to Al Qaeda and Bin Laden in furtherance of their terrorist plans to murder Americans. The activities of Omar as described herein were outside the scope of immunity, if any, provided by the Foreign Sovereign Immunities Act and related statutes.

200.   In conducting his terrorist activities, Omar received financial, logistical and other material support from the Foreign State Defendants.

201.   Defendants the Taliban and Omar willfully engaged in acts of terrorism, murder, mayhem, and/or the provision of material support and/or resources for said acts, within the borders of Afghanistan, the United States and other countries, and across state and national boundaries as described more fully herein. The end result of those activities was the murder of all Decedents on September 11, 2001.

### Al Qaeda  and Its Operatives

202.   Defendant Al Qaeda/Islamic Army (hereinafter "Al Qaeda") is an unincorporated association and terrorist organization dedicated to the destruction of the United States and its citizens. At relevant times, the Al Qaeda organization was headquartered in Afghanistan and involved a cluster of military-ideological camps dedicated to their goal of establishing a universal Islamic state through the use of

violence.  Al Qaeda maintains terrorist cells throughout the world.

203.    Defendant Al Qaeda uses violence, bombings, murder, mayhem and other terrorist tactics in order to pursue its unlawful objectives.  At relevant times, Al Qaeda was supported, controlled, funded, protected, aided and abetted by all defendants, particularly Bin Laden, the Taliban, Iran, Iraq and their agencies, instrumentalities, agents, officials and employees.

### The Al Qaeda Directors

204.    Defendant Al Qaeda was founded, headed and directed by defendant Osama Bin Laden.  In addition to Bin Laden, certain individuals were responsible for the direction and management of Al Qaeda's terrorist activities, including the terrorist attacks of September 11, 2001.  Those individuals acted both individually and as agents, instrumentalities, officials, representatives, officers and employees of Al Qaeda in exporting terror to the United States and other countries.  These individuals, hereinafter referred to collectively as the "Al Qaeda Directors," include the following persons:

(a)    Muhammad Atef ("Atef") (a.k.a. Subhi Abu Sitta; Abu Hafs Al Masri; a.k.a. Abdullah, Sheikh Taysir; a.k.a. Abu Hafs; a.k.a. Abu Sitta, Subhi; a.k.a. Atef, Muhammad; a.k.a. Atif, Mohamed; a.k.a. Atif, Muhammad; a.k.a. El Khabir, Abu Hafs el Masry; a.k.a. Taysir)  was a citizen of Egypt and was the second-in-command of Al Qaeda prior to his death.  Atef was a member of Al Qaeda's consultation council and military committee.  He was killed in a U.S. bombing raid in Afghanistan on November 18, 2001.

(b)    Sayf al-Adl (a.k.a. Saif al-'Adil) was born in Egypt on April 11,

56

1963.  Sayf al-Adl is listed by the FBI as one of the "Most Wanted Terrorists."

The FBI believes him to be affiliated with the Egyptian Islamic Jihad ("EIJ"), a

terrorist organization that provides support to Al Qaeda.  It is believed that Sayf al-

Adl assumed the leadership of Al Qaeda's military operations upon the death of

Muhammad Atef.  Sayf al-Adl's last known location was in Afghanistan.

(c)      Shaykh Sa'id (a.k.a. Mustafa Muhammad Ahmad) is Osama Bin

Laden's lieutenant believed to have provided passports, money and logistical

support to the hijackers.  Shaykh Sa'id is believed to be a citizen of Saudi Arabia

whose last known location was in Afghanistan

(d)      Ibn al-Shaykh al-Libi is a Libyan national who is presently in the

custody of the U.S. military. Ibn al-Shaykh al-Libi is a senior Al Qaeda operative

believed to be a member of its military committee.

(e)      Abu Zubaydah ("Zubaydah") (a.k.a. Zayn al-Abidin Muhammad

Husayn, Tariq al-Wahab) is a Palestinian national born on March 12, 1971 in

Riyadh, Saudi Arabia.  Zubaydah is a senior Al Qaeda operative believed to have

been the chief of operations for Osama Bin Laden.  He was the principal recruiter

for Al Qaeda's terrorist camps in Afghanistan.  Zubaydah is also believed to have

been responsible for coordinating millennium terrorist plans and assisting in the

planning of the September 11 attacks.  He was captured in Pakistan by the United

States military and is currently in custody at an overseas location unknown to the

Plaintiffs.  On April 25, 2002, U.S. officials announced that Zubaydah has

provided them with accurate information concerning the Al Qaeda network.

(f)     Abd al-Hadi al-Iraqi (a.k.a. Abu Abdallah) is an Iraqi national and senior Al Qaeda operative.  Abd al-Hadi al-Iraqi ran Al Qaeda training camps in Afghanistan.  His last known location was in Afghanistan

(g)     Ayman al-Zawahiri is the founder of the Egyptian Islamic Jihad, a terrorist organization closely affiliated with Al Qaeda.  Zawahiri, a medical doctor, is a close confidant of, and advisor to, Bin Laden.  On April 15, 2002, the Arab satellite network, Al Jazeera, broadcast a videotape featuring Zawahiri, Bin Laden and one of the Hijackers, Ahmed Alhaznawi.  Among the statements made by Zawahiri on that tape is the following:  "*Those 19 brothers who left us made efforts and offered their lives for the cause of Allah.  Allah has favored them with this conquest which we are enjoying now*."

(h)     Mamdouh Mahmoud Salim ("Salim") is Osama Bin Laden's chief financier and treasurer of Al Qaeda.  Salim is a member of Al Qaeda's consultation council.  Mamdouh Mahmoud Salim is in U.S. custody and is charged with involvement in the bombings of the U.S. Embassies in Nairobi and Dar Es Salaam.  In April 2002, Salim pled guilty to attempted murder of a guard in a New York prison where he is being held.

(i)     Mamoun Darkazanli ("Darkazanli") was born in Syria and was last known to reside in Hamburg, Germany.  Darkazanli is closely linked to Salim and the financial arm of Al Qaeda.  He also met with hijacker Mohammad Atta and Said Bahaji during their preparation for the September 11 attacks.  Darkazanli is believed to be one of the leaders of the German cell of Al Qaeda.

### *The Al Qaeda Hijackers*

205.    Prior to September 11, 2001, Al Qaeda, with the aid, assistance and support of other defendants, planned, funded and coordinated an attack upon American citizens by twenty Al Qaeda operatives.

206.    On September 11, 2001, nineteen of those Al Qaeda operatives carried-out that heinous attack by hijacking four airliners and causing them to crash into the World Trade Center Towers, the Pentagon Building and a field in Shanksville, Pennsylvania. The Al Qaeda operatives who executed that murderous attack were the following:

(a)         Marwan Al-Shehhi, a citizen of Saudi Arabia, has been identified by the FBI as one of the persons who hijacked United Airlines Flight 175 and flew it into the South Tower of the World Trade Center on September 11, 2001.  Marwan Al-Shehhi has used a birth date of May 9, 1978.  Marwan Al-Shehhi is believed to be a pilot and may have been flying the second plane to hit the Trade Center.  Marwan Al-Shehhi went through flight training in Florida with hijacker Muhammad Atta.  Prior to arriving in the United States, Marwan Al-Shehhi was a student at Technical University in Hamburg, Germany with Atta and hijacker Ziad Jarrah.

(b)         Ahmed Hassan Al Qadi Banihammad ("Banihammad"), a citizen of Saudi Arabia, has been identified by the FBI as one of the persons who hijacked United Airlines Flight 175 and flew it into the South Tower of the World Trade Center on September 11, 2001.   Banihammad has listed the Spartan School of Aeronautics in Tulsa, Oklahoma as his home address although school officials

have no record of his attendance.

(c)        Ahmed Alghamdi, also known as Ahmed Salah Alghamdi, a citizen of Saudi Arabia, has been identified by the FBI as one of the persons who hijacked United Airlines Flight 175 and flew it into the South Tower of the World Trade Center on September 11, 2001.   Ahmed Alghamdi has been identified as one of five hijackers who fraudulently obtained state identity cards in Virginia.  *Al Watan,* an Arabic newspaper, reported that Alghamdi was a Saudi from Baha province who left the country in early 2000 for Chechnya.  Immigration records in the Philippines showed he made several visits in the past two years.  Alghamdi has direct links to Osama Bin Laden and the Al Qaeda terrorism network.

(d)        Hamza Alghamdi, also known as Hamza Al-Ghamdi, a citizen of Saudi Arabia, has been identified by the FBI as one of the persons who hijacked United Airlines Flight 175 and flew it into the South Tower of the World Trade Center on September 11, 2001.  U.S. Officials have identified Alghamdi as having known links to Osama Bin Laden☐s Al Qaeda network.

(e)        Mohand Alshehri, a citizen of Saudi Arabia, has been identified by the FBI as one of the persons who hijacked United Airlines Flight 175 and flew it into the South Tower of the World Trade Center on September 11, 2001.

(f)        Satam M. A. Al Suqami, a citizen of the United Arab Emirates, has been identified by the FBI as one of the persons who hijacked American Airlines Flight 11 and flew it into the North Tower of the World Trade

60

Center on September 11, 2001.  Satam Al Suqami has used a birth date of June 28,

1976.  Investigators have linked Suqami to Raed Hijazi who has been implicated in

a plot to kill Americans and other tourists in Jordan on January 1, 2000.

(g)        Abdulaziz Alomari, a citizen of Saudi Arabia, has been

identified by the FBI as one of the persons who hijacked American Airlines Flight

11 and flew it into the North Tower of the World Trade Center on September 11,

2001.  Abdulaziz Alomari has used birth dates of December 24, 1972 and May 28,

1979.  Alomari is believed to be a pilot.  According to U.S. Authorities, Alomari is

known to have used false identification documents, including a Virginia driver's

license that he fraudulently obtained a month before the attack on the World Trade

Center.

(h)        Waleed M. Alshehri, a citizen of Saudi Arabia, has been

identified by the FBI as one of the persons who hijacked American Airlines Flight

11 and flew it into the North Tower of the World Trade Center on September 11,

2001.  Alshehri held multiple false passports.  Alshehri has used multiple birth

dates including September 13, 1974, January 1, 1976, and March 3, 1976.

Alshehri is known to have had direct contacts with Osama Bin Laden□s Al Qaeda

terrorism network.

(i)        Wail M. Alshehri, a citizen of Saudi Arabia, has been

identified by the FBI as one of the persons who hijacked American Airlines Flight

11 and flew it into the North Tower of the World Trade Center on September 11,

2001.  Alshehri is believed to be a pilot.  Alshehri has used a birth date of

September 1, 1968 and has used a rental address in Hollywood, Florida.

(j)             Mohamed Atta, a citizen of Egypt, has been identified by the FBI as one of the persons who hijacked American Airlines Flight 11 and flew it into the North Tower of the World Trade Center on September 11, 2001.   Atta is believed to have piloted the first plane into the World Trade Center.   Investigation reveals that he studied at the Technical University in Hamburg, Germany and received flight training in Florida.   Investigators believe that Atta met with Iraqi intelligence officials in Prague and also met with Islamic extremists in Spain.   Atta also inquired about crop dusters in Florida.   In Atta's luggage, which did not make American Airlines Flight 11, investigators found a four-page handwritten document in Arabic that included a checklist for the day of the attack.

(k)             Khalid Almihdhar ("Almihdhar"), a citizen of Saudi Arabia, has been identified by the FBI as one of the persons who hijacked American Airlines Flight 77 and flew it into the Pentagon Building on September 11, 2001. Almihdhar is believed to have met with Bin Laden operatives in Malaysia in early 2000.

(l)             Nawaf Alhazmi, a citizen of Saudi Arabia, has been identified by the FBI as one of the persons who hijacked American Airlines Flight 77 and flew it into the Pentagon Building on September 11, 2001.  A car registered to Alhazmi was found at Dulles International Airport the day after the attacks. It contained a cashier's check made out to a flight school in Phoenix.  Also found were four drawings of the cockpit of a 757 jet and a box-cutter type knife.

Alhazmi also had maps of Washington and New York as well as a four-page handwritten document in Arabic which included a checklist for the day of the attack identical to the one found in the luggage of fellow terrorist Mohamed Atta and also identical to a third such document recovered from the crash site in Pennsylvania.  Alhazmi lived with terrorists Almihdhar and Hani Hanjour in the San Diego area during the year 2000.  Alhazmi also had New Jersey mailbox drop addresses in Ft. Lee and Wayne.

(m)        Hani Hanjour, a citizen of Saudi Arabia, has been identified by the FBI as one of the persons who hijacked American Airlines Flight 77 and flew it into the Pentagon Building on September 11, 2001.  Investigators advised that Hanjour is believed to have been at the controls of the Boeing 757 that crashed into the Pentagon.  Hanjour had flight training in San Diego, Phoenix and Scottsdale, Arizona.  Hanjour is one of five hijackers identified as obtaining a false Virginia identity card at the Arlington, Virginia Department of Motor Vehicles on August 2, 2001.  Hanjour lived in the United States intermittently for more than a decade before the attacks.  Hanjour reportedly left his home in the City of Taif, Saudi Arabia for residence in the United Arab Emirates in December 2000.

(n)        Salem Alhazmi, a citizen of Saudi Arabia, has been identified by the FBI as one of the persons who hijacked American Airlines Flight 77 and flew it into the Pentagon Building on September 11, 2001.  Alhazmi is believed to have had addresses in Fort Lee and Wayne, New Jersey.  Alhazmi one of the Hijackers who belonged to a gym in Greenbelt, Maryland, and frequented

the same in early September.  Alhazmi was among five terrorists who acquired

false identification cards on August 2, 2001 from the Virginia Department of

Motor Vehicles.

(o)         Majed Moqed, a citizen of Saudi Arabia, has been identified

by the FBI as one of the persons who hijacked American Airlines Flight 77 and

flew it into the Pentagon Building on September 11, 2001.  Moqed was one of a

number of terrorists who acquired false identification cards in Virginia on August

2, 2001 and who was seen in Maryland between September 2 - 6, 2001 where they

were seen working out at a gym in Greenbelt, Maryland.

(p)         Ziad Samir Jarrah, a citizen of Lebanon, has been identified

by the FBI as one of the persons who hijacked United Airlines Flight 93 on

September 11, 2001.  Jarrah is listed as a pilot in Hamburg, Germany aviation

records and is believed to have been piloting Flight 93 when it crashed in

Pennsylvania.   Jarrah is believed to be part of the Al Qaeda cell in Hamburg,

Germany that included terrorists Mohamed Atta and Marwan Al-Shehhi.

(q)         Ahmed Ibrahim A. Al Haznawi, also known as Ahmed

Alhaznawi ("Alhaznawi"), a citizen of Saudi Arabia, has been identified by the

FBI as one of the persons who hijacked United Airlines Flight 93 and flew it into a

field in Shanksville, Pennsylvania on September 11, 2001.  Alhaznawi has used a

birth date of October 11, 1980 and is believed to be from the Saudi town of

Baljurshi.  News accounts have identified Alhaznawi as the son of a Saudi

religious cleric, Sheik Ibraham Alhaznawi, the leader of a mosque in the Saudi

town of Hezna.  On April 15, 2002, the Arab satellite television network Al

Jazeera broadcast a videotape which shows Alhaznawi reading from a document

dated March 6, 2001 titled "*the last Will of the New York and Washington battle*

*martyrs*."   In discussing his role in the September 11 terrorist attacks, Alhaznawi

states that "*it is time to kill Americans in their homeland, among their sons, and*

*near their forces and intelligence*."

(r)          Saeed Alghamdi, a citizen of Saudi Arabia, has been

identified by the FBI as one of the persons who hijacked United Airlines Flight 93

and flew it into a field in Shanksville, Pennsylvania on September 11, 2001.

Investigators report that Alghamdi had previously been linked to Bin Laden□s Al

Qaeda terrorist network.  Alghamdi has also made several trips to the Philippines

in the last two years.

(s)          Ahmed Alnami, a citizen of Saudi Arabia, has been

identified by the FBI as one of the persons who hijacked United Airlines Flight 93

and flew it into a field in Shanksville, Pennsylvania on September 11, 2001.  There

is little known information about Alnami. He is believed to have lived in Delray

Beach, Florida.

(t)          Zacarias Moussaoui, a.k.a. "Shaqil," a.k.a. "Abu Khalid al

Sahrawi," ("Moussaoui") was born in France of Moroccan descent on May 30,

1968. Before 2001 he was a resident of the United Kingdom.  The United States

government believes that Moussaoui was trained by Al Qaeda with the intent of

participating as the 20th hijacker on September 11, 2001.  He was arrested for

violation of immigration laws and was in a Minnesota prison on September 11, 2001.  Moussaoui traveled in Oklahoma with Marwan Al-Shehi and Mohammed Atta during the last week of July 2001 and the first week of August 2001.  An eyewitness stated that the men were going to Norman, Oklahoma to attend flight school.  Moussaoui is currently under indictment in the United States District Court for the Eastern District of Virginia for, among other things, conspiracy to commit acts of terrorism and the murders of the Decedents. At a hearing on April 22, 2002, Moussaoui stated that he wanted to "*fight against the evil force of the [United States] federal government*," and said the he "*prayed to Allah for the destruction of the United States*."

207.    Al Qaeda has often used instrumentalities and operatives such as the Hijackers to actively engage in terrorist activities against the United States and its citizens.  In conducting those terrorist activities, Al Qaeda has received financial, logistical and other material support from the Foreign State Defendants.

208.    Like the Foreign State Defendants, Al Qaeda and Bin Laden use terrorism as an instrument of policy, as a tool to be used to further political objectives.  Al Qaeda has, over the years, directly carried out murders, bombings and other terrorist acts against its enemies.  It has also provided direct and indirect support to other international terrorist groups and received support in return, often in the form of money, training, sanctuary, documentation, intelligence, weapons and other types of assistance.  The history of Al Qaeda's terrorist activities is set forth below.

### Background of Al Qaeda

209.    In or about 1989, defendants Osama Bin Laden, Muhammad Atef and others founded an international terrorist group that became known as "Al Qaeda" ("the Base").  Osama Bin Laden was the "emir" (prince) of Al Qaeda and was its leader at all relevant times.  Members of Al Qaeda pledged an oath of allegiance (called a "bayat") to Osama Bin Laden and Al Qaeda.

210.    From 1989 until about 1991, Al Qaeda was headquartered in the Islamic Emirate of Afghanistan and Peshawar, Pakistan. In or about 1991, the leadership of Al Qaeda, including its emir, Osama Bin Laden, relocated to the Sudan. Al Qaeda was headquartered in the Sudan from approximately 1991 until approximately 1996 but also maintained a presence and activities in various parts of the world. In 1996, Osama Bin Laden and other members of Al Qaeda  relocated to the Islamic Emirate of Afghanistan.

211.    Osama Bin Laden and Al Qaeda violently opposed the United States for several reasons. First, the United States was regarded as an "infidel nation" because it was not governed in a manner consistent with the group's extremist interpretation of Islam. Second, the United States was viewed as providing essential support for other "infidel" governments and institutions. Third, Al Qaeda opposed the involvement of the United States armed forces in the Gulf War in 1991 and in Operation Restore Hope in Somalia in 1992 and 1993. In particular, Al Qaeda opposed the continued presence of American military forces in Saudi Arabia (and elsewhere on the Arabian peninsula) following the Gulf War. Fourth, Al Qaeda opposed the United States Government because of the arrest, conviction and imprisonment of persons belonging to Al Qaeda or its affiliated terrorist groups or those with whom it worked. For these and other reasons, Bin Laden declared

jihad, or holy war, against the United States, which he has carried out through Al Qaeda and its affiliated organizations.

212.   At relevant times, Al Qaeda functioned both on its own and through terrorist organizations that operated under its umbrella, including Egyptian Islamic Jihad, which was led by defendant Ayman al-Zawahiri, the Islamic Group (also known as "el Gamaa el Islamia" or simply "Gamaa't"), and a number of jihad groups in other countries, including the Sudan, Egypt, Saudi Arabia, Yemen, Somalia, Eritrea, Djibouti, Afghanistan, Pakistan, Bosnia, Croatia, Albania, Algeria, Tunisia, Lebanon, the Philippines, Tajikistan, Azerbaijan, and the Kashmiri region of India and the Chechnyan region of Russia. Al Qaeda also maintained cells and personnel in a number of countries to facilitate its activities, including in Kenya, Tanzania, the United Kingdom, Germany, Canada, Malaysia, and the United States.

213.   Al Qaeda had a command and control structure which included a "majlis al shura" (or consultation council) which discussed and approved major undertakings, including terrorist operations. Al Qaeda also had a "military committee" which considered and approved "military" matters.

214.   Osama Bin Laden and Al Qaeda also forged alliances with the National Islamic Front in the Sudan, with representatives of the government of Iran, and its associated terrorist group Hizballah, and with representatives of the government of Iraq for the purpose of working together against their perceived common enemy in the West, the United States.

215.   Since at least 1989, Osama Bin Laden and Al Qaeda sponsored, managed,

and/or financially supported training camps in the Islamic Emirate of Afghanistan. Those camps were used to instruct members and associates of Al Qaeda and its affiliated terrorist groups in the use of firearms, explosives, chemical weapons, and other weapons of mass destruction. In addition to providing training in the use of various weapons, these camps were used to conduct operational planning against United States targets around the world and experiments in the use of chemical and biological weapons. These camps were also used to train others in security and counterintelligence methods, such as the use of codes and passwords, and to teach members and associates of Al Qaeda about traveling to perform operations. For example, Al Qaeda instructed its members and associates to dress in "Western" attire and to use other methods to avoid detection by security officials. The group also taught its members and associates to monitor media reports of its operations to determine the effectiveness of their terrorist activities.

216.   Since on or about 1996, Osama Bin Laden and others operated Al Qaeda from their headquarters in the Islamic Emirate of Afghanistan. During this time, Bin Laden and others forged close relations with the Taliban and Muhammad Omar in the Islamic Emirate of Afghanistan. Bin Laden openly informed other Al Qaeda members and associates outside Afghanistan of their support of, and alliance with, the Taliban and Muhammad Omar.

217.   One of the principal goals of Al Qaeda was to drive the United States armed forces out of Saudi Arabia (and elsewhere on the Arabian peninsula) and Somalia by violence. These goals eventually evolved into a declaration of jihad (holy war) against America and all Americans. Members of Al Qaeda issued "fatwahs" (rulings on Islamic

law) indicating that such attacks on Americans were both proper and necessary.

218.   At relevant times, Al Qaeda received financial, logistical and material support from the Foreign State Defendants as described below.  Al Qaeda worked in concert with these Foreign State Defendants and others in executing the September 11 attacks and murdering the Decedents.

## The Foreign State Defendants

### *Islamic Republic Of Iran*

219.    Defendant, the Islamic Republic of Iran (hereinafter referred to as "Iran"), is a foreign state within the meaning of 28 U.S.C. § 1391(f).  Iran maintains an Interest Section within the United States at the Embassy of Pakistan at 2204 Wisconsin Avenue, N.W., Washington, D.C. 20007.

220.   Iran has for many years been designated as a foreign state that sponsors terrorism within the meaning of the Export Administration Act of 1979, 50 U.S.C. App. §2405(j), and the Foreign Assistance Act of 1961, 22 U.S.C. § 2371(b).  Iran has also been found to be liable as a state sponsor of international terrorism under 28 U.S.C. §1605(a)(7), especially in connection with acts perpetrated by its state sponsored paramilitary terrorist organization known as "Hizballah" or "Hezbollah," in various cases before this court, including *Anderson v. the Islamic Republic of Iran*, 90 F. Supp.2d 107 (D.D.C. 2000), and  *Cicippio v. The Islamic Republic of Iran*, 18 F.Supp 2d 62 (D.D.C. 1998).

221.   Since the time Iran was designated by the Department of State as a state sponsor of terrorism, a large body of evidence has been collected and analyzed which

shows conclusively that Iran views terrorism as an instrument of state policy, like diplomacy or military power - a tool to be used to further political objectives. The evidence shows that Iran has, over the years, directly carried out assassinations, bombings and other terrorist acts against its enemies. It has also provided direct and indirect support to international terrorist groups in the form of money, training, sanctuary, documentation, intelligence, weapons and other types of assistance, including to defendant Al Qaeda.

222.   To carry out its policy of terrorism and support for terrorist groups, Iran has created and used government organizations including intelligence ministries, the military, special groups and various types of covert entities which are part of the government and are directly answerable to, and receive instructions from, the regime in power.

### The Agencies and Instrumentalities of Iran

223.   As described above, Iran acted through its officials, officers, agents, employees, agencies and instrumentalities in providing material support and resources to defendants Al Qaeda, Bin Laden and other defendants. The support provided by Iran to Bin Laden and Al Qaeda assisted in and contributed to the preparation and execution of the plans that culminated in the Terrorist Hijacked Flights and the extrajudicial killing of the Decedents.

224.   The following defendants, collectively referred to as the "Iranian Instrumentalities," were among the officials, officers, agents, employees, agencies and instrumentalities through which Iran caused, supported and contributed to the terrorist acts that resulted in the death of the Decedents:

(a)      The Supreme Leader, Ayatollah Ali Hoseini-Khamenei

("Khamenei"), the undisputed head of the Iranian government.  Khamenei has

been found to be an instrumentality of Iran for purposes of liability and damages

under the Foreign Sovereign Immunities Act.  *See, e.g., Flatow v. Islamic Republic*

*if Iran,* 999 F.Supp. 1 (D.D.C. 1998).  As head of the Iranian state, Khamenei is

responsible for formulating and executing the nation's policy of supporting

terrorism and terrorist groups such as Al Qaeda.  As a government agent,

Khamenei maintains a presence in the United States through the Permanent

Representative of the Islamic State of Iran to the United Nations, 360 Lexington Avenue,

11th Floor, New York, NY  10017, or through the Iranian Interest Section c/o the Embassy

of Pakistan, 2204 Wisconsin Avenue, NW, Washington, DC  20007.

(b)      At all times relevant hereto, Ali Akbar Hashemi Rafsanjani

("Rafsanjani") was the chairman of the Expediency Discernment Council of the

Islamic Republic of Iran.  As chairman of the council, Rafsanjani is charged with

resolving the differences that arise between the Iranian Parliament and the Council

of Guardians.  In addition to his responsibilities as chairman of the council,

Rafsanjani is a former president of Iran, serving in that capacity from 1989 through

1997, and wields great religious and political power in Iran.  Rafsanjani was

instrumental in planning, sponsoring and hosting several meetings in Iran of Al

Qaeda leaders and other worldwide terrorists.  It was at these meetings that the

final plans for the September 11, 2001 terrorist attacks were discussed and

finalized.  As a government agent, Rafsanjani maintains a presence in the United

States through the Permanent Representative of the Islamic State of Iran to the

United Nations, 360 Lexington Avenue, 11th Floor, New York, NY 10017, or

through the Iranian Interest Section c/o the Embassy of Pakistan, 2204 Wisconsin

Avenue, NW, Washington, DC 20007. In addition, it is believed that Rafsanjani

holds a financial interest in several properties throughout the United States.

(c)     The Iranian Ministry of Information and Security (the "MOIS"), the

Iranian government organization responsible for coordinating Iran's terrorist

activities. The MOIS has been found to be an instrumentality of Iran for purposes

of liability and damages under the Foreign Sovereign Immunities Act. *See, e.g.,*

*Sutherland. v. Islamic Republic of Iran,* 151 F. Supp.2d 27 (D.D.C. 2001). With a

large budget and extensive organization, the MOIS is one of the most powerful

ministries in the Iranian government. The ministry has traditionally operated under

the guidance of the *Velayat –e Faqih* apparatus of the Supreme Leader. The MOIS

is responsible for intelligence collection used to support terrorist operations and for

liaison activities with supported terrorist groups such as Al Qaeda.

(d)     The Islamic Revolutionary Guard Corps. (the "IRGC"), including its

operatives, the Qods Force, the Committee on Foreign Intelligence Abroad and

Committee on Implementation of Actions Abroad. The IRGC and its operatives

are responsible for extraterritorial operations, including terrorist operations. A

primary focus of the Qods Force is training Islamic terrorist groups. It is also

responsible for gathering information required for targeting and attack planning.

As a government agency, the IRGC maintains a presence in the United States

through the Permanent Representative of the Islamic State of Iran to the United

Nations, 360 Lexington Avenue, 11th Floor, New York, NY  10017, or through the

Iranian Interest Section c/o the Embassy of Pakistan, 2204 Wisconsin Avenue,

NW, Washington, DC  20007.

(e)      Hezbollah (alternatively spelled "Hizbollah"), a surrogate of the

MOIS through which the Iranian government executes many of its terrorist plans.

Hizbollah is funded, directed and controlled by the Iranian government. Hizbollah,

as a government agency, maintains a presence in the United States through the

Permanent Representative of the Islamic State of Iran to the United Nations, 360

Lexington Avenue, 11th Floor, New York, NY  10017, or through the Iranian

Interest Section c/o the Embassy of Pakistan, 2204 Wisconsin Avenue, NW,

Washington, DC  20007.

(f)      The Iranian Ministry of Petroleum (the "MOP"), including its

affiliated entities, the National Iranian Gas Company, National Iranian

Petrochemical Company and the Iranian Offshore Oil Company.  The MOP, as a

government agency, maintains a presence in the United States through the

Permanent Representative of the Islamic State of Iran to the United Nations, 360

Lexington Avenue, 11th Floor, New York, NY  10017, or through the Iranian

Interest Section c/o the Embassy of Pakistan, 2204 Wisconsin Avenue, NW,

Washington, DC  20007. The MOP, in conjunction with and through these

affiliated entities, generates substantial money that is used by the Iranian

government to fund its terrorist activities, including its support of Al Qaeda.

(g)     The National Iranian Tanker Corporation ("NITC"), an Iranian corporation wholly owned by the Iranian government.  The NITC, as a government agency, maintains a presence in the United States through the Permanent Representative of the Islamic State of Iran to the United Nations, 360 Lexington Avenue, 11th Floor, New York, NY  10017, or through the Iranian Interest Section c/o the Embassy of Pakistan, 2204 Wisconsin Avenue, NW, Washington, DC 20007.  The NITC funnels funds to the Iranian government with knowledge that the Iranian government uses those funds to support its own terrorist activities as well as those of Al Qaeda.

(h)     National Iranian Oil Corporation ("NIOC"), an Iranian corporation wholly owned by the Iranian government.  The NIOC, as a government agency, maintains a presence in the United States through the Permanent Representative of the Islamic State of Iran to the United Nations, 360 Lexington Avenue, 11th Floor, New York, NY  10017, or through the Iranian Interest Section c/o the Embassy of Pakistan, 2204 Wisconsin Avenue, NW, Washington, DC  20007.  The NIOC funnels funds to the Iranian government with knowledge that the Iranian government uses those funds to support its own terrorist activities as well as those of Al Qaeda.

(i)     National Iranian Gas Company ("NIGC"), an Iranian corporation wholly owned by the Iranian government.  The NIGC, as a government agency, maintains a presence in the United States through the Permanent Representative of the Islamic State of Iran to the United Nations, 360 Lexington Avenue, 11th Floor,

New York, NY  10017, or through the Iranian Interest Section c/o the Embassy of

Pakistan, 2204 Wisconsin Avenue, NW, Washington, DC  20007.  The NIGC

funnels funds to the Iranian government with knowledge that the Iranian

government uses those funds to support its own terrorist activities as well as those

of Al Qaeda.

(j)      Iran Air, an Iranian corporation wholly owned by the Iranian

government.  Iran Air, as a government agency, maintains a presence in the United

States through the Permanent Representative of the Islamic State of Iran to the

United Nations, 360 Lexington Avenue, 11th Floor, New York, NY  10017, or

through the Iranian Interest Section c/o the Embassy of Pakistan, 2204 Wisconsin

Avenue, NW, Washington, DC  20007.  Iran Air funnels funds to the Iranian

government with knowledge that the Iranian government uses those funds to

support its own terrorist activities as well as those of Al Qaeda.  In addition, Iran

Air knowingly assists Iran's efforts to export terrorism by transporting individual

terrorists to destinations of their choosing for the purpose of committing terrorist

acts in foreign countries.

(k)      National Iranian Petrochemical Company ("NIPC"), an Iranian

corporation wholly owned by the Iranian government.  The NIPC, as a government

agency, maintains a presence in the United States through the Permanent

Representative of the Islamic State of Iran to the United Nations, 360 Lexington Avenue,

11th Floor, New York, NY  10017, or through the Iranian Interest Section c/o the Embassy

of Pakistan, 2204 Wisconsin Avenue, NW, Washington, DC  20007.  The NIPC funnels

76

funds to the Iranian government with knowledge that the Iranian government uses those funds to support its own terrorist activities as well as those of Al Qaeda.

(l)     Iranian Ministry of Economic Affairs and Finance ("IMEAF"), an agency of the Iranian government.  The IMEAF, as a government agency, maintains a presence in the United States through the Permanent Representative of the Islamic State of Iran to the United Nations, 360 Lexington Avenue, 11th Floor, New York, NY  10017, or through the Iranian Interest Section c/o the Embassy of Pakistan, 2204 Wisconsin Avenue, NW, Washington, DC  20007.  The IMEAF funnels funds to the Iranian government with knowledge that the Iranian government uses those funds to support its own terrorist activities as well as those of Al Qaeda.

(m)     Iranian Ministry of Commerce ("IMOC"), an agency of the Iranian government.  The IMOC, as a government agency, maintains a presence in the United States through the Permanent Representative of the Islamic State of Iran to the United Nations, 360 Lexington Avenue, 11th Floor, New York, NY  10017, or through the Iranian Interest Section c/o the Embassy of Pakistan, 2204 Wisconsin Avenue, NW, Washington, DC  20007.  The IMOC funnels funds to the Iranian government with knowledge that the Iranian government uses those funds to support its own terrorist activities as well as those of Al Qaeda.

(n)     Iranian Ministry of Defense and Armed Forces Logistics ("IMDAFL"), an agency of the Iranian government.  The IMDAFL, as a government agency, maintains a presence in the United States through the

77

Permanent Representative of the Islamic State of Iran to the United Nations, 360

Lexington Avenue, 11th Floor, New York, NY 10017, or through the Iranian

Interest Section c/o the Embassy of Pakistan, 2204 Wisconsin Avenue, NW,

Washington, DC 20007. The IMDAFL funnels funds to the Iranian government

with knowledge that the Iranian government uses those funds to support its own

terrorist activities as well as those of Al Qaeda.

(o)    The Central Bank of the Islamic Republic of Iran ("CBI"), is a

financial institution wholly owned and operated by the Iranian government. The

CBI, as a government agency, maintains a presence in the United States through

the Permanent Representative of the Islamic State of Iran to the United Nations,

360 Lexington Avenue, 11th Floor, New York, NY 10017, or through the Iranian

Interest Section c/o the Embassy of Pakistan, 2204 Wisconsin Avenue, NW,

Washington, DC 20007. The main offices of the CBI are located at 23 Ferdowsi

Avenue, P.O. Box 11365/8551, Tehran, Iran. The CBI keeps accounts for, grants

loans to and otherwise funnels funds to the Iranian government with knowledge

that the Iranian government uses those funds to support its own terrorist activities

as well as those of Al Qaeda.

225.    Iran has used the Iranian instrumentalities to sponsor terrorist activities

against the United States and its citizens. A major component of Iran's policy of

terrorism is its support of Osama Bin Laden and the Al Qaeda network. The background

of that support is set forth below.

*Background of Iranian Support for Al Qaeda*

226.   On October 31, 1991, Iran hosted the International Conference for the Support of the Muslim Palestinian People's Revolution, which was attended by all radical Palestinian groups, both Islamic and secular.  The conference established a permanent secretariat, funded by Iran, to coordinate pro-intifada activities.  In doing so, Iran tightened its ties to the radical groups Palestinian HAMAS and Islamic Jihad.

227.   On or before 1994, Al Qaeda forged an alliance with the National Islamic Front of Sudan and with representatives of the government of Iran, and its associated terrorist group Hezbollah, for the purpose of working together against their perceived common enemies in the West, particularly the United States.

228.   At various times in or about 1992 and 1996, defendant Osama Bin Laden and other ranking members of Al Qaeda, stated privately to other Al Qaeda members that Al Qaeda should put aside its differences with Shiite Muslim terrorist organizations, including the Government of Iran and its affiliated terrorist group Hezbollah, in order to cooperate against the perceived common enemy, the United States.

229.   Hezbollah is financed by the Iranian Government.  The amounts of Iranian government contributions to Hezbollah have varied over the years, ranging from an estimated 15-20 million dollars annually, to as much as 100-120 million dollars annually.   Sheikh Subhi al-Tufeili, Hezbollah's first leader, stated:

> To deny the Iranian connection to Lebanon's Hezbollah would be
> like denying that the sun provides light to the earth.  Who can deny
> such a thing?

230.   Hezbollah's manifesto, as declared by Hezbollah's spokesman, Sheikh Ibrahim al-Amin states:

79

> We, the sons of Hezbollah's Nation in Lebanon, whose
> vanguard God has given victory in Iran and which has
> established the nucleus of the world's central Islamic state,
> abide by the orders of a single wise and just command
> currently embodied in the supreme examples of Ayatollah
> Khomeini.
>
> From this basis, we in Lebanon are not a closed
> organizational structural party, nor are we a narrow political
> framework, but we are a nation interconnecting with all
> Muslims of the World.  We are linked by a strong ideological
> and political connection - Islam.
>
> From here what befalls the Muslims in Afghanistan, Iraq, the
> Philippines or anywhere else verily afflicts the body of our
> own Islamic nation of which we are an inseparable part, and
> moved to confront it on the basis of our main legal obligation
> in light of the political view decided by our leader Wilayat al-
> Faqih [Ayatollah Khomeini].

231.    At various times in or about 1992 and 1996, Al Qaeda, and its affiliate

Egyptian Islamic Jihad, sent members to Lebanon to receive training from Hezbollah.

232.    Ali Mohamed, charged with the 1998 bombing of the two United States

Embassies in Africa, in his guilty plea hearing on October 20, 2000, testified as follows:

> I was aware of certain contacts between Al Qaeda and al Jihad
> organization, on one side, and Iran and Hezbollah on the other side.
> I arranged security for a meeting in the Sudan between Mughaniyah,
> Hezbollah's chief, and Bin Laden.  Hezbollah provided explosives
> training for Al Qaeda and al Jihad.  Iran supplied Egyptian Jihad
> with weapons.  Iran also used Hezbollah to supply explosives that
> were disguised to look like rocks.

233.    By mid-1995, Dr. Mahdi Chamran Savehi, an Iranian government official

charged with coordinating anti-Western terrorism, met with key Hezbollah leaders from

Lebanon to coordinate training and operational preparations.

234.   At various times in or about 1992 and 1996, Mamdouh Mahmoud Salim, a member of the majlis al Shura (or consultation council) of Al Qaeda met with an Iranian religious official in Khartoum, Sudan as part of an overall effort to arrange a tripartite pact between Al Qaeda, the National Islamic Front of Sudan, and the government of Iran to work together against the United States, Israel and other western countries.

235.   In or about 1996, Iran reorganized its intelligence system by establishing the Supreme Council for Intelligence Affairs directly under President Ali Akhbar Hashemi-Rafsanjani.

236.   As a result of the reorganization in 1996, Iran established two main areas to receive a large allocation of funds and assets: internal security, and the export of the Islamic Revolution, primarily as foreign intelligence and terrorism sponsorship.

237.   A central aspect of this reform was placing Dr. Mahdi Chamran Savehi as Chief of External Intelligence, in charge of the entire network of international terrorism, including the al-Quds forces.

238.   Iran was directly linked to the 1996 Khobar bombing.  The indictment against Ahmed Al-Mughassil and others states:

> From some time in the 1980's until the date of filing of this Indictment, Hizballah, or "Party of God" was the name used by a number of related terrorist organizations operating in Saudi Arabia, Lebanon, Kuwait, and Bahrain, among other places.  These Hizbollah organizations were inspired, supported, and directed by elements of the Iranian government.  Saudi Hizballah Al-Hijaz, was a terrorist organization that operated primarily in the Kingdom of Saudi Arabia and that promoted, among other things, the use of violence against nationals and property of the United States located in Saudi Arabia.  Because Saudi Hizballah was an

outlaw organization in the Kingdom of Saudi Arabia, its
members frequently met and trained in Lebanon, Syria, or
Iran.

239.    According to the United States Justice Department, information was
provided to Iranian officials about the planned Khobar operation by Saudi Hezbollah.
Additionally, an Iranian military officer directed the plotters to surveil sites for attacks
against Americans, and the Saudi Hezbollah leader asserted that he enjoyed close ties to
Iranian officials who were providing his group with financial support.

240.    On June 7, 1996, Iran's spiritual leader, Ayatollah Ali Khamenei, declared
that Hezbollah must reach "all continents and all countries."

241.    In early June of 1996, Iran organized a pan-Islamist summit which had a
primary objective of establishing an international coordination committee to oversee
anticipated escalation in hostilities.  Ayatollah Ahmad Jannati, a close associate of
Ayatollah Khameini, emerged as the official spokesperson for the working group.  The
meeting was organized jointly by the Supreme Council for Intelligence Affairs and IRCG
(Iranian Revolutionary Guard Corps) high command. Attending the working group were
the following:  Ramadan Shallah (head of the Palestine Islamic Jihad); Ahmad Salah,
a.k.a. Mamdouh Mahmoud Salim (Egyptian Islamic Jihad); Imad Mughniyah
(Hezbollah); Muhammad Ali Ahmad (a representative of Al Qaeda and Osama Bin
Laden); Ahmad Jibril (head of the Popular Front for the Liberation of Palestine-General
Command); Imad al-Alami and Mustafa al-Liddawi (HAMAS); and Abdullah Ocalan

(Kurdish People Party).  The summit participants agreed on the unification of their financial system and training.

242.    In or about July 1996, Osama Bin Laden met with an Iranian intelligence official in Afghanistan.

243.    In early October 1996, Osama Bin Laden visited Tehran for consultations. One of the issues addressed was the unification of various Egyptian terrorist organizations.  Iranian intelligence Minister Ali Fallahian chaired the meeting with representatives from the Iranian Interior Ministry, Islamic Guidance Ministry, and Foreign Ministry.  Among the Egyptians attending were the Tehran based aide of defendant Ayman al Zawahiri, Kamal Ujayzah, and Mustafa Hamzah.  The Iranians discussed specific long-term operational plans and explained to the Egyptian attendees that the degree of Iran's support depended on the extent of their unity.  The Egyptian attendees agreed to form a unified command with Osama Bin Laden for operational purposes.

244.    In or about mid-September 1997, the Iranian leadership met to discuss the new course of the anti-American struggle.  The participants included Iran's supreme and spiritual leader Ayatollah Ali Khamenei.  Also present were newly-elected president Mohammad Khatami, former president Ali Akbar Hashemi-Rafsanjani, and the minister of intelligence, Qurban Ali Dari Najafabadi.  Other participants in this conference were: General Rahim Safavi (the Commander-in-Chief of the IRGC); General Mohsen Rezai (former Commander-in-Chief of IRGC, now responsible for reorganizing the Iranian security services and their networks); Ali Fallahian (former intelligence minister);

Mohammed Mohammadi Rayshahri (former intelligence minister, present as Khamenei's special adviser on intelligence affairs); Hossein Sheikh-ol-Islam (Iran's former deputy foreign minister and once again director on the Office of Liberation Movements); Ali Akbar Mohtashemi; General Diya Sayfi (the commander of the IRGC forces in Lebanon); members of the Supreme National Security Council; and senior IRGC and intelligence officials.

245.    In or about September 20-23, 1997, Iranian intelligence organized a major summit of terrorist leaders from all over the world.  Among the participants were:  Imad Mughniyah and Abdul-Hadi Hammadi (Hezbollah); Ayman al-Zawahiri (Egyptian Islamic Jihad); Ahmad Jibril (chief of the Popular Front for the Liberation of Palestine-General Command PFLP-GC); Osama Abu-Hamden and Imad al-Alami (HAMAS); Ramadan al-Shallah (chief of Palestinian Islamic Jihad); and three commanders representing branches of Hezbollah in the Persian Gulf States.

246.    Participants at the summit examined the Islamists' ability to escalate terrorism against the United States and the West.  Several senior Iranian officials addressed the summit and ordered the terrorist leaders to be ready to launch an unprecedented international terrorist campaign.

247.    In or about late September 1997, the Iranian leadership met again to discuss the course of the forthcoming terrorism offensive in light of the resolutions and findings of the recent international terrorist summit.

248.    In or about early October 1997, major preparations began in Afghanistan and Pakistan for an escalation of Islamist terrorism throughout the world.

249.    Osama Bin Laden held a war council in late 1997 in Kandahar with senior Islamist commanders from all over the world to discuss forthcoming operations to undermine the American presence and influence in the Middle East.  Ayman al-Zawahiri participated in this conference.  Conference participants resolved to concentrate on hitting American targets wherever they could be found.

250.    In or about late October 1997, the Vanguard of Conquest and the Egyptian Islamic Jihad group, both under the command of Ayman al-Zawahiri, issued a major communiqué that declared the forthcoming jihad by saying:

> The Islamic Jihad against America's world dominance, the international influence of the Jews, and the U.S. occupation of Muslim lands will continue. … The United States realizes that its real enemy, as it has declared many times, is Islamic extremism, by which it means the Islamic Jihad, the Jihad of the entire Muslim Nation against the world dominance of America, the international influence of the Jews, and the U.S. occupation of Muslim lands.  The Islamic Jihad is against the world dominance of America, the international influence of the Jews, and the U.S. occupation of Muslim lands.  The Islamic Jihad is against the theft of the Muslim Nation's riches, this disgusting robbery, the like of which has not been witnessed in history. … Yes, America's enemy is Islamic extremism, meaning the Islamic Jihad against America's preeminence … the Islamic Jihad which stands against Jewish expansion.

251.    The United States Department of State described Iran as "the most active sponsor of state terrorism in 1997," with its agents held responsible for at least thirteen assassinations, mainly against members of the Kurdish Democratic Party of Iran and the Mujahedin-e Khalq organization, both based in Iraqi Kurdistan.

252.    In the second half of November 1997, Ayatollah Ali Khamenei convened a meeting with General Rahim Safavi and Ahmad Vahidi, the former commander of al-Quds Forces, to discuss the establishment of a new elite terrorist force to carry out spectacular, but deniable, terrorist strikes against the United States and the West.

253.    Al Qaeda telephone bills of international calls between 1996 and 1998 were analyzed by United States investigators, showing that nearly 10% of the outgoing calls from Afghanistan went to Iran.

254.    According to the State Department's *Patterns of Global Terrorism 2000*, Iran remained the most active state sponsor of terrorism in 2000.  It provided increasing support to numerous terrorist groups, including the Lebanese Hezbollah, HAMAS, and the Palestine Islamic Jihad (PIJ), which seek to undermine the Middle East peace negotiations through the use of terrorism.

255.    The State Department's *Patterns of Global Terrorism  2000* also stated that Iran's "Revolutionary Guard Corps (IRGC) and Ministry of Intelligence and Security (MOIS) continued to be involved in the planning and execution of terrorist acts and continued to support a variety of groups that use terrorism to pursue their goals."

256.    In January 2001, Dr. Ayman al-Zawahri and other Al Qaeda leaders met with Iranian intelligence officials at a mountain guesthouse near the town of Varamin, just south of Tehran.  The Iranian delegation was headed by Hojjat-ol eslam Ali Akbar Nateq-Nouri and included Imad Fayez Mugniyeh, a Labanese operative and leader of Hezzbollah who is credited with numerous terrorist attacks on Americans.  The purpose

of the meeting was to plan and coordinate Iranian support for an upcoming Al Qaeda operation against the United States.

257.     On May 4, 2001, a second planning meeting between Al Qaeda and Iranian intelligence officials was held in Iran.  Attendees at this planning meeting included Khamenei, Rafsanjani, and Bin Laden's son, Saad Bin Laden.  Iranian intelligence memos written in the weeks following the meeting advise Iranian operatives to be prepared for U.S. retaliation for an attack planned for September 2001.

258.     Iran and its instrumentalities continued to support Al Qaeda after the September 11 attacks.  Secretary of Defense Donald Rumsfeld stated on February 3, 2002, "We have any number of reports that Iran has been permissive and allowed transit through their country of Al Qaeda."  On February 4, 2002, Rumsfeld elaborated:  "We do have a good deal of information to the effect that Al Qaeda and the Taliban have taken refuge there and others have used it as a transit point.  We have no evidence at all that Iran has tried to stop them, that Iran has tried to turn them over to us or some other country or to incarcerate these people, the Al Qaeda, a terrorist network."

259.     On March 10, 2002, National Security Advisor Condoleezza Rice stated on *Meet the Press*, that eleven Iranian nationals had been captured during Operation Anaconda.  Those captured were believed to be members of Iran's al-Quds forces.

260.     The following remarks were made in a background briefing by a United States Department of Defense official on February 19, 2002:

> Question:     It's been said that al-Qaida moved into Iran,
>               across the border.  Can you shed any light into

the numbers and what kind of support they're
getting from the Iranian government?

Answer:  I can't get into numbers.  Numbers isn't a good
thing anyway, because they're never accurate.
What I can say is – and I think the Secretary of
Defense said – is, we believe the Iranians did
help al-Qaida members into – from Afghanistan
to Iran.  I think I can stick with that.

Question:  Iranian – you mean Iranian government?

Answer:  Yeah.

Question:  At what level?

Answer:  … I can't get into that right now.

Question:  You mean their intelligence, their Revolutionary
Guard …

Answer:  Well, there are certain entities that are involved
in the Iranian support for terrorism.  You know,
there's certain entities within the Iranian
government – the Minister of Intelligence and
Security, the Islamic Revolutionary Guard
Corps, Qods Force – those are the primary
entities that have historically been involved in
support for terrorist groups across the board.  So
those would be the entities that would, you
know, have some role in that type of activity.

261.  Iran continues to be an active supporter of Al Qaeda.  For example, Iranian
security forces have given safe haven and protection in Tehran to Abu Musaab Zarqawi, a
senior Al Qaeda leader who fled the western Afghan city of Herat after the United States
military campaign began.

**The Republic of Iraq**

262.    Defendant, the Republic of Iraq (hereinafter referred to as "Iraq"), is a foreign state within the meaning of 28 U.S.C. § 1391(f).  Iraq maintains an Interest Section in the United States at the Algerian Embassy located at 1801 P Street, NW, Washington, DC 20036.

263.    Iraq has for many years been designated as a foreign state that sponsors terrorism within the meaning of the Export Administration Act of 1979, 50 U.S.C. App. § 2405(j), and the Foreign Assistance Act of 1961, 22 U.S.C. § 2371(b).  Iraq has also been found to be liable as a state sponsor of international terrorism under 28 U.S.C. □605(a)(7) in various cases before this Court, including most recently *Hill. v. The Republic of Iraq,*175 F. Supp.2d 36 (D.D.C. 2001).

264.    As noted above, Iraq has been designated by the Department of State as a state sponsor of terrorism for many years.  During the time it has been so designated, a large body of evidence has been collected and analyzed which shows conclusively that Iraq views terrorism as an instrument of state policy, like diplomacy or military power - a tool to be used to further political objectives.  The evidence shows that Iraq has, over the years, directly carried out assassinations, bombings and other terrorist acts against its enemies.  It has also provided direct and indirect support to international terrorist groups in the form of money, training, sanctuary, documentation, intelligence, weapons and other types of assistance, including to defendant Al Qaeda.

265.    To carry out its policy of terrorism and support for terrorist groups, Iraq has created and used government organizations including intelligence ministries, the military, special groups and various types of covert entities which are part of the government and

are directly answerable to, and receive instructions from, the regime in power.

### *The Agencies and Instrumentalities of Iraq*

266.    As described above, Iraq acted through its officials, officers, agents, employees and instrumentalities in providing material support and resources to defendants Al Qaeda, Bin Laden and other defendants.  The support provided by Iraq to Bin Laden and Al Qaeda assisted in or contributed to the preparation and execution of the plans that culminated in the Terrorist Hijacked Flights and the extrajudicial killing of the Decedents.

267.    The following defendants, collectively referred to as the "Iraqi Instrumentalities," were among the officials, officers, agents, employees, agencies and instrumentalities through which Iraq supported and contributed to the terrorist acts that resulted in the death of the Decedents:

(a)      Saddam Hussein, the president/dictator of Iraq, has been found to be an instrumentality of Iraq for purposes of liability and damages under the Foreign Sovereign Immunities Act.  *See, Hill. v. The Republic of Iraq*, 175 F. Supp.2d 36 (D.D.C. 2001).  As head of the Iraqi state, Hussein is responsible for formulating and executing the nation's policy of supporting terrorism and terrorist groups such as Al Qaeda.  As a government agent, Hussein maintains a presence in the United States through the Permanent Representative of Iraq to the United Nations, 14 East 79th Street, New York, NY  10021, or through the Iraqi Interest Section c/o the Algerian Embassy, 1801 P. Street, NW, Washington, DC  20036.

(b)      Iraqi Ministry of Defense ("IMOD"), an agency of the Iraqi

government.  The IMOD, as a government agency, maintains a presence in the United States through the Permanent Representative of Iraq to the United Nations, 14 East 79th Street, New York, NY  10021, or through the Iraqi Interest Section c/o the Algerian Embassy, 1801 P. Street, NW, Washington, DC  20036.  The IMOD funnels funds to the Iraqi government with knowledge that the Iraqi government uses those funds to support its own terrorist activities as well as those of Al Qaeda.

(c)     Iraqi Ministry of Finance ("IMOF"), an agency of the Iraqi government.  The IMOF, as a government agency, maintains a presence in the United States through the Permanent Representative of Iraq to the United Nations, 14 East 79th Street, New York, NY  10021, or through the Iraqi Interest Section c/o the Algerian Embassy, 1801 P. Street, NW, Washington, DC  20036.  The IMOF funnels funds to the Iraqi government with knowledge that the Iraqi government uses those funds to support its own terrorist activities as well as those of Al Qaeda.

(d)     Iraqi Ministry of Oil ("IMO"), an agency of the Iraqi government. The IMO, as a government agency, maintains a presence in the United States through the Permanent Representative of Iraq to the United Nations, 14 East 79th Street, New York, NY  10021, or through the Iraqi Interest Section c/o the Algerian Embassy, 1801 P. Street, NW, Washington, DC  20036.  The IMO funnels funds to the Iraqi government with knowledge that the Iraqi government uses those funds to support its own terrorist activities as well as those of Al Qaeda.

(e)     The National Oil Company of Iraq ("NOC"), an Iraqi corporation wholly owned by the Iraqi government.  The NOC, as an agency of the Iraqi

government, maintains a presence in the United States through the Permanent Representative of Iraq to the United Nations, 14 East 79th Street, New York, NY 10021, or through the Iraqi Interest Section c/o the Algerian Embassy, 1801 P. Street, NW, Washington, DC  20036.  The NOC funnels funds to the Iraqi government with knowledge that the Iraqi government uses those funds to support its own terrorist activities as well as those of Al Qaeda.

(f)      The State Company for Oil Projects in Iraq ("SCOP"), an Iraqi corporation wholly owned by the Iraqi government.  The SCOP, as an agency of the Iraqi government, maintains a presence in the United States through the Permanent Representative of Iraq to the United Nations, 14 East 79th Street, New York, NY  10021, or through the Iraqi Interest Section c/o the Algerian Embassy, 1801 P. Street, NW, Washington, DC  20036.  The SCOP funnels funds to the Iraqi government with knowledge that the Iraqi government uses those funds to support its own terrorist activities as well as those of Al Qaeda.

(g)      The Oil Exploration Company of Iraq ("OEC"), an Iraqi corporation wholly owned by the Iraqi government.  The OEC, an agency of the Iraqi government, maintains a presence in the United States through the Permanent Representative of Iraq to the United Nations, 14 East 79th Street, New York, NY 10021, or through the Iraqi Interest Section c/o the Algerian Embassy, 1801 P. Street, NW, Washington, DC  20036.  The OEC funnels funds to the Iraqi government with knowledge that the Iraqi government uses those funds to support its own terrorist activities as well as those of Al Qaeda.

(h)      The Northern Oil Company of Iraq ("Northern Oil"), an Iraqi

corporation wholly owned by the Iraqi government.  Northern Oil, as an agency of

the Iraqi government, maintains a presence in the United States through the

Permanent Representative of Iraq to the United Nations, 14 East 79th Street, New

York, NY  10021, or through the Iraqi Interest Section c/o the Algerian Embassy,

1801 P. Street, NW, Washington, DC  20036.  Northern Oil funnels funds to the

Iraqi government with knowledge that the Iraqi government uses those funds to

support its own terrorist activities as well as those of Al Qaeda.


(i)      The Southern Oil Company of Iraq ("Southern Oil"), an Iraqi

corporation wholly owned by the Iraqi government.  Southern Oil, as an agency of

the Iraqi government, maintains a presence in the United States through the

Permanent Representative of Iraq to the United Nations, 14 East 79th Street, New

York, NY  10021, or through the Iraqi Interest Section c/o the Algerian Embassy,

1801 P. Street, NW, Washington, DC  20036.  Southern Oil funnels funds to the

Iraqi government with knowledge that the Iraqi government uses those funds to

support its own terrorist activities as well as those of Al Qaeda.

(j)      The State Organization for Oil Marketing ("SOOM"), an Iraqi

corporation wholly owned by the Iraqi government.  The SOOM, an agency of the

Iraqi government, maintains a presence in the United States through the Permanent

Representative of Iraq to the United Nations, 14 East 79th Street, New York, NY

10021, or through the Iraqi Interest Section c/o the Algerian Embassy, 1801 P.

Street, NW, Washington, DC  20036.  The SOOM funnels funds to the Iraqi

government with knowledge that the Iraqi government uses those funds to support

its own terrorist activities as well as those of Al Qaeda.

(k)     The Iraqi Oil Tankers Company ("IOTC"), an Iraqi corporation

wholly owned by the Iraqi government.  The IOTC, an agency of the Iraqi

government, maintains a presence in the United States through the Permanent

Representative of Iraq to the United Nations, 14 East 79th Street, New York, NY

10021, or through the Iraqi Interest Section c/o the Algerian Embassy, 1801 P.

Street, NW, Washington, DC  20036.  The IOTC funnels funds to the Iraqi

government with knowledge that the Iraqi government uses those funds to support

its own terrorist activities as well as those of Al Qaeda.

(l)     Iraqi Intelligence Service ("IIS"), also known as the "Mukhabarat,"

an agency of the Iraqi government.  The IIS, as a government agency, maintains a

presence in the United States through the Permanent Representative of Iraq to the

United Nations, 14 East 79th Street, New York, NY  10021, or through the Iraqi

Interest Section c/o the Algerian Embassy, 1801 P. Street, NW, Washington, DC

20036.  The IIS funnels funds to the Iraqi government with knowledge that the

Iraqi government uses those funds to support its own terrorist activities as well as

those of Al Qaeda.  The IIS also provides training and intelligence support to Al

Qaeda and other terrorist groups.

(m)     The Central Bank of Iraq, is a financial institution wholly owned and

operated by the Iranian government.  The Central Bank of Iraq, as a government

agency, maintains a presence in the United States through the Permanent Representative of Iraq to the United Nations, 14 East 79th Street, New York, NY 10021, or through the Iraqi Interest Section c/o the Algerian Embassy, 1801 P. Street, NW, Washington, DC 20036. The main offices of the Central Bank of Iraq are located at P.O. Box 64, Rashid Street, Baghdad, Iraq. The Central Bank of Iraq keeps accounts for, grants loans to and otherwise funnels funds to the Iraqi government with knowledge that the Iraqi government uses those funds to support its own terrorist activities as well as those of Al Qaeda.

(n)     Qusai Hussein ("Qusai"), the second son of Saddam Hussein, the commander of the Iraqi Republican Guard and the leader of Special Security Operations. As the head of Iraq's security forces, Qusai has provided training and intelligence support to individual members of Al Qaeda and other terrorist groups. As a government agent, Qusai maintains a presence in the United States through the Permanent Representative of Iraq to the United Nations, 14 East 79th Street, New York, NY 10021, or through the Iraqi Interest Section c/o the Algerian Embassy, 1801 P. Street, NW, Washington, DC 20036.

268.     Iraq has used the Iraqi Instrumentalities to actively sponsor terrorist activities against the United States and its citizens. A major component of Iraq's policy of terrorism is its support of Osama Bin Laden and the Al Qaeda network. The background of that support is set forth below.

### Background of Iraqi Support for Al Qaeda

269.    For many years, Iraq has planned and conducted international terrorist attacks, and has supported a variety of groups that use terrorism to pursue their goals. Iraq has provided money, training, safehaven, and weapons for various terrorist groups, including Al Qaeda.

270.    In 1992, a senior leader of al-Qaeda was hosted in Baghdad by Saddam Hussein, according to the director of the intelligence service Patriotic Union of Kurdistan.

271.    Between 1993 and 1996, while Osama Bin Laden was in Sudan, contacts between him and Iraq were maintained by representatives of the Iranian terror group Mujahedin-e Khalq Organization.

272.    Osama Bin Laden began a relationship with Iraqi intelligence in 1993. Osama Bin Laden played a role in the preparation and running of the Islamist operations in Somalia. These operations involved Al Qaeda operatives trained by Iraqi special forces intelligence officers.  On or about June 1994, Osama Bin Laden met Faruq al-Hijazi, then the director of an Iraqi Intelligence Department and later the chief of the entire Iraqi intelligence apparatus, while he was in Khartoum.

273.    A summary of the evidence supporting Iraq's direct involvement in the 1993 World Trade Center bombing is as follows:

    a.    Mohammed Salameh, a terrorist convicted for his role in the 1993 World Trade Center bombing, made forty-six calls to Iraq.  The majority of those calls went to his uncle in Baghdad, a convicted terrorist and an employee of the Iraqi government who spent eighteen years in an Israeli jail.  Most telephone conversations in Iraq are monitored by Iraqi intelligence;

b.      After Mohammed Salameh's telephone calls to his uncle in Iraq, Abdul Rahman Yasin, an Iraqi resident in Baghdad, traveled to Jordan, where he obtained a U.S. passport.  One of the original indicted conspirators, Abdul RahmanYasin returned to Iraq after the Trade Center bombing and has been harbored by Iraq ever since; and,

c.      Ramzi Yousef entered the United States on an Iraqi passport in September 1992 and went directly to the Al Kifah Refugee Centre in Brooklyn, New York.  At the Al Kifah Centre, Ramzi Yousef met Mahmud Abouhalima, a friend he had met in Afghanistan in 1988 while fighting the Soviets.  Mahmud Abouhalima introduced Ramzi Yousef to Sheikh Omar Abdel Rahman, a terrorist convicted in a 1993 plot to blow up the Lincoln and Holland Tunnels.  Mahmud Abouhalima also introduced Ramzi Yousef to Mohammed Salameh.  Ramzi Yousef, assisted by Salameh, subsequently organized a group of Islamic militants who were affiliated with Sheik Rahman and set in motion the plan to blow up the World Trade Center. He escalated the conspiracy from a low-level pipe bombing plot to an attack on the World Trade Center using the largest improvised explosive device in the history of forensic explosives.

274.    Diplomatic overtures in early 1998 between Iran and Iraq were followed by a visit to Tehran by Muhammad Said al-Sahhaf, Iraq's foreign minister.  Iraq proposed that it was ready to commit itself formally to a new relationship with Iran.  To that end, Iraqi and Iranian foreign ministers signed a memorandum of understanding.

275.    The Sunday Times (London) reported on September 30, 2001 that in March 1998, Osama Bin Laden had visited Baghdad for consultations with Iraqi government officials.

276.    In early 1998, senior intelligence and security officials from Iraq and Iran began meetings to discuss the practical aspects of their new alliance against the American military presence in the Middle East.  In early February, Saddam Hussein dispatched his son, Qusay Hussein, who is in charge of a segment of the Iraqi intelligence system, to represent him at a meeting with senior Iranian officials.  On February 5, Qusay Hussein and Rafia Daham al-Takriti, the chief of Iraqi general intelligence, arrived in al-Shalamja on the Iraqi side of the Iran-Iraq border.  There they met the Iranian intelligence minister, Qorban Ali Dari Najafabadi, and senior Iranian officials.

277.    In or about April 25 to May 1, 1998, two of Osama Bin Laden's senior military commanders, Muhammad Abu-Islam and Abdullah Qassim, visited Baghdad for discussions with Iraqi intelligence.  They met with Saddam Hussein's son, Qusay Hussein.

278.    In or about mid-July 1998, one of the leaders of Al Qaeda, defendant Ayman al-Zawahiri, traveled to Iraq.  He met senior Iraqi officials, including Taha Yassin Ramadan, to discuss practical modalities for the establishment of an Al Qaeda base in Iraq, the expansion of training for his mujahideen, and a joint strategy for an anti-United States jihad throughout the Arab world and North America.

279.    In the mid-July 1998 trip, defendant Ayman al-Zawahiri assumed responsibility for a training camp in the al-Nasiriyah desert established by Iraqi intelligence in or about 1997 for terrorists from Saudi Arabia and the Gulf States.

280.    In or about December of 1998, a senior Iraqi intelligence officer newly-appointed as ambassador to Turkey, Faruq al-Hijazi, met with Osama Bin Laden in

Kandahar to discuss future terrorist strikes against the United States and the United

Kingdom.  Faruq al-Hijazi offered shelter and hospitality for Osama Bin Laden and Al

Qaeda.  He also suggested targets to Osama Bin Laden for terrorist attacks.  Osama Bin

Laden agreed to spearhead the revenge campaign against the West in accordance with the

recent agreement on operational plans and proposed terrorist operations.

281.   To demonstrate Baghdad's commitment to cooperating with Osama Bin

Laden, Faruq al-Hijazi gave Osama Bin Laden a pack of blank Yemeni diplomatic

passports supplied to Iraqi intelligence by their Yemeni counterparts.

282.   Iraqi military-intelligence officers arrived in Afghanistan via Pakistan to

assist in advanced training and preparation of the Islamist terrorists.  The most important

were military personnel from "Unit 999" of Iraqi intelligence.  They selected four teams

in early January 1999, each consisting of twelve veteran terrorists, for advanced and

intense training in sabotage and infiltration techniques for operations in the West.

283.   Czech intelligence sources report that Mohamed Atta, the leader of the Al

Qaeda Hijackers, also traveled to Prague and met with Ahmed Khalil Samir Al-Ani, a

consul and second secretary at the Iraqi Embassy, in June 2000.  Mohamed Atta visited

Prague at least three times.  According to Italian security sources, Mohamed Atta met

repeatedly with an Iraqi General , Habib Faris Abdullah al-Mamouri, who was stationed

at the Iraqi Embassy in Rome.  Atta and General al-Mamouri met in Rome, Hamburg, and

Prague.

284.   According to a report broadcast September 28, 2001 by the US-funded

Radio Free Europe/Radio Liberty:

> A group of Bin Laden mercenaries named 'Jund al-Islam'
> recently appeared in Iraqi Kurdistan under the command of a
> self-styled Emir of Islam by the name of Abu Abdullah Al-
> Shafi'i, who is an Afghan Arab, rumored to be of Egyptian or
> Syrian origin. … The group is playing the role of a fifth
> column on behalf of the Iraq regime in its disruptive
> activities.  The group reportedly consists of 400 to 500 armed
> followers led by Al-Shafi'i and a core of Afghan Arabs who
> handle terrorist training, finance, and propaganda behind the
> scenes … The Afghan Arabs mission is to hire, train, and
> control Islamic mercenaries and teach them the terrorist craft
> learned from Usama Bin Laden's camps near Kandahar,
> Afghanistan … According to intercepted intelligence in
> Kurdistan, Bin Laden's surrogate group is operating in
> concert with Iraqi Intelligence Services – Mukhabarat.

285.   On September 12, 2001, Saddam Hussein said, "The United States had only itself to blame for the attacks on the Pentagon and the World Trade Center" and that "the U.S. has been exporting evil, corruption, and crime and now is reaping the thorns sown by its rulers."  A Baghdad television commentary on September 11 said that "the massive explosions in the centers of power in America, notably the Pentagon, are a painful slap in the face of U.S. politicians to stop their illegitimate hegemony and attempts to impose custodianship on people.  It was no coincidence that the World Trade Center was destroyed in suicidal operations involving two planes that broke through all U.S. security barriers to carry out the operation of the century and to express rejection of the reckless U.S. policy."

286.   On February 10, 2002, Uday Saddam Hussein, Saddam's eldest son, praised the September 11 attacks, according to Al-Sharq Al-Awsat.  Uday Hussein described the September 11 attacks as "daring operations which were carried out by 19 Arab Muslim youths, and they have restored respect for Arabs and Muslims."

287.    Former CIA Director James Woolsey, on December 20, 2001, laid out, in part, the evidence of Iraq's involvement with, and support for, Al Qaeda:

>First are the meeting or meetings between Mohammed Atta and (Mohammed) al-Ani [Colonel Muhammad Khalil Ibrahim al-Ani] of Iraqi intelligence in Prague as stated by the Czech government.  Second, press reports in the U.K. say that two of the other principal hijackers of Sept. 11 met with the Iraqi intelligence in the United Arab Emirates.  Third, (there have been) many meetings between Iraqi intelligence and Al Qaeda during the late '90's in Iraq and in Afghanistan, including the visit by Iraqi intelligence chief (Faruq) Hijazi.  Four, (there are) five eyewitnesses - three of them defectors and two of them American United Nations inspectors - to different aspects of the training that has been taking place for years at Salman Pak on the southern edge of Baghdad.  The training is separate for Iraqis and non-Iraqis to hijack an aircraft using knives.  One can see an old Boeing 707 that Iraqi intelligence services used for this training on commercially available satellite reconnaissance.

288.    Charles Duelfer, a former State Department officer who worked as deputy to the head of the United Nation's inspectors in Iraq, reportedly confirms having visited Salman Pak and seeing the Boeing 707 used for this training.

289.    Ansar al-Islam is an Iraqi based terrorist group that has received funds directly from Al Qaeda.  Ansar al-Islam is jointly controlled by the Iraqi intelligence service and Al Qaeda.

290.    The following remarks were made in a  background briefing by United States Department of Defense official on February 19, 2002:

>Question:        … The connection between al-Qaida and Iraq – is there any talks about that?

Answer:      I think, like – al-Qaida has had contacts with numerous groups and states to varying degrees, and Iraq is one of them.  But the extent of it, I can't really go into right now. …

Question:    But again, similar to Jeff's question back here are we talking about Saddam Hussein, are we talking about something in the intelligence service, are you talking about. …

Answer:      When you look at – again, Iraq, just like Iran, just like some of the other state sponsors, the entities that deal with these groups , these intelligence organizations, tend to by their intelligence services, their covert military operational guys, again, the IRGC Qods Force is one.  So it usually tends – the lead tends to be there, it doesn't tend to be at the government, the president-to-president level.  Or, you know, a president is not going to sit down with a senior terrorist and have dinner with them and talk about plans and plots.

Question:    But are you – to ask the question very specifically, are you telling us that you believe al-Qaida leadership had contact with Iraqi intelligence services or military operatives or –

Answer:      Well, again, I think – and the DCI [Director of Central Intelligence] said it in his opening statement.  The al-Qaida has had contact with Iraq entities, just like they've had contact with Iranian entities.

(United States Department of State, International Information Programs)

291.    George J. Tenet testified before the Senate Armed Services Committee on

March 19, 2002 as follows:

As I said earlier, we continued to watch Iraq's involvement in terrorist activities.  Baghdad has a long history of supporting terrorism, altering its targets to reflect changing priorities and

goals.  It has also had contacts with al-Qa'ida.  Their ties may
be limited by divergent ideologies, but the two sides' mutual
antipathy toward the United States and the Saudi royal family
suggests that tactical cooperation between them is possible –
even though Saddam is well aware that such activity would
carry serious consequences.

(*Worldwide Threat – Converging Dangers in a Post 9/11 World*, Testimony of Director

of Central Intelligence, George J. Tenet before the Senate Armed Services Committee,

March 19, 2002).

## The Non-Defendant Terrorist Supporters

292.    At times relevant hereto, Osama Bin Laden and Al Qaeda committed and

threatened to commit acts of violence and terror against the United States and its citizens.

 The Taliban, operating as the Islamic Emirate of Afghanistan, the Foreign State

Defendants and others aided these terrorist schemes by, among other things, allowing

territory under their control to be used as a safe haven and base of operations for Osama

Bin Laden and the Al Qaeda organization.  In 1999, the United States government

recognized that these activities constituted an unusual and extraordinary threat to the

nation□s security and foreign policy.  President Clinton issued Executive Order No.

13129, declaring a national emergency to deal with that threat.  The Order, issued under

the authority of International Emergency Economic Powers Act (50 U.S.C. §§ 1701-

1706) ("IEEPA"), the National Emergencies Act (50 U.S.C. § 1601 *et seq.*) and §301 of

Title 3, United States Code, imposed an asset freeze against the Taliban.  That asset

freeze was subsequently continued by President George W. Bush through a Presidential

Order issued on July 2, 2001.

293.    Defendants Osama Bin Laden, Al Qaeda, the Taliban, Iran and Iraq have been purposely singled out by the President of the United States as entities that commit, threaten to commit, or support terrorism, specifically including those acts which resulted in the September 11, 2001 murders caused by the Terrorist Hijacked Flights.  These defendants conspired among themselves and with all other defendants to plan and commit crimes against United States citizens, including the Decedents and others, and their property across state and national borders.  Accordingly, all defendants are subject to liability to the Plaintiffs.

294.    On September 24, 2001, President George W. Bush issued Executive Order No. 13224, ordering the Secretary of State, in consultation with the Secretary of the Treasury and the Attorney General, to identify all persons or entities which "*assisted in, sponsored, or provided financial, material or technological support for, or financial or other services to or in support of*" acts of terrorism and to freeze the assets of those persons and entities.  Pursuant to that Executive Order, the State Department has identified a number of persons and entities as "Specially Designated Global Terrorists" ("SDGT's).

### The Executive Order Suspects

295.    As a result of their suspected participation in and contribution to the terrorist acts perpetrated on September 11, 2001, the following persons and organizations have been identified by the State Department, the Treasury Department and the Attorney General as Specially Designated Global Terrorists (hereinafter the "Executive Order Terrorists"):

(1)     Abu Sayyaf Group (a.k.a. Al Harakat Al Islamiyya);

(2)     Harakat ul-Mujahidin (HUM), (a.k.a. Harakat Ul-Mujahideen; a.k.a. Harakat Ul-Ansar; a.k.a. HUA; a.k.a. HUM);

(3)     Al-Jihad (a.k.a. Egyptian Al-Jihad; a.k.a. Jihad Group; a.k.a. New Jihad; a.k.a. Egyptian Islamic Jihad;

(4)     Islamic Army of Aden;

(5)     Makhtab Al-Khidamat/Al Kifah;

(6)     Wafa Humanitarian Organization;

(7)     Al Rashid Trust;

(8)     Mamoun Darkazanli Import-Export Company;

(9)     Abdullah Ahmed Abdullah;

(10)    Haji Abdul Manan Agha;

(11)    Al-Hamati Sweets Bakeries;

(12)    Muhammad Al-Hamati;

(13)    Amin Al-Haq;

(14)    Saqar Al-Jadawi;

(15)    Ahmad Sa'id Al-Kadr;

(16)    Anas Al-Liby;

(17)    Al-Nur Honey Press Shops;

(18)    Yasin Al-Qadi;

(19)    Sa'd Al-Sharif;

(20)    Al-Shifa' Honey Press for Industry and Commerce;

(21)   Sa'd al-Sharif;

(22)   Bilal Bin Marwan;

(23)   Ayadi Chafiq Bin Muhammad;

(24)   Mamoun Darkazanli;

(25)   Jaish-I-Mohammed;

(26)   Jam'Yah Ta'Awun Al-Islamia;

(27)   Imad Fa'iz Mughniyah;

(28)   Rabita Trust;

(29)   Omar Mahmoud Uthman;

(30)   Abdul Rahman Yasin;

(31)   Mohammad Zia;

(32)   Aaran Money Wire Service Inc.;

(33)   Abdi Abdulaziz Ali;

(34)   Abdirisak Aden;

(35)   Al Baraka Exchange LLC;

(36)   Al Taqwa Trade, Property and Industry Company Limited (f.k.a. Al

Taqwa Trade, Property and Industry; f.k.a. Al Taqwa Trade, Property and Industry

Establishment; f.k.a. Himmat Establishment);

(37)   Al-Barakaat (Mogadishu);

(38)   Al-Barakaat Bank (Mogadishu);

(39)   Al-Barakaat Bank of Somalia (a.k.a. Barakaat Bank of Somalia;

a.k.a. BBS);

(40)   Al-Barakaat Group of Companies Somalia Limited (a.k.a. Al-Barakat Financial Company);

(41)   Al-Barakat Finance Group;

(42)   Al-Barakat Financial Holding Company;

(43)   Al-Barakat Global Telecommunications (a.k.a. Barakaat Globetel company);

(44)   Al-Barakaat Wiring Service (U.S.A.);

(45)   Al-Barakat International (a.k.a. Baraco Co.);

(46)   Al-Barakat Investments;

(47)   Albert Friedrich Armand Huber (a.k.a. Ahmed Huber);

(48)   Ali Ghaleb Himmat;

(49)   Asat Trust Reg.;

(50)   Bank Al Taqwa Limited (a.k.a. Al Taqwa Bank; a.k.a. Bank Al Taqwa);

(51)   Baraka Trading Company;

(52)   Barakaat Boston (U.S.A.);

(53)   Barakaat Construction Company;

(54)   Barakaat Enterprise (U.S.A.);

(55)   Barakaat Group of Companies;

(56)   Barakaat International (Sweden);

(57)   Barakaat International Companies (BICO);

(58)   Barakaat International Foundation;

(59)   Barakaat International, Inc. (U.S.A.);

(60)   Barakaat North America, Inc. (Canada & U.S.A.);

(61)   Barakaat Red Sea Telecommunications;

(62)   Barakaat Telecommunications Co. Somalia, Ltd.;

(63)   Barakat Telecommunications Company Limited (BTELCO);

(64)   Barakat Bank and Remittances;

(65)   Barakat Computer Consulting (BCC);

(66)   Barakat Consulting Group (BCG);

(67)   Barakat Global Telephone Company;

(68)   Barakat Post Express (BPE);

(69)   Barakat Refreshment Company;

(70)   Barakat Wire Transfer Company (U.S.A.);

(71)   Barako Trading Company LLC;

(72)   Dahir Ubeidullahi Aweys;

(73)   Garad Jama (a.k.a. Garad K. Nor; a.k.a. Fartune Ahmed Wasrsame),

(74)   Global Service International (U.S.A.);

(75)   Heyatul Ulya;

(76)   Hussein Mahamud Abdullkadir;

(77)   Liban Hussein;

(78)   Mohamed Mansour (a.k.a. Dr. Mohamed Al-Mansour);

(79)  Nada Management Organization SA (f.k.a. Al Taqwa Management

Organization SA);

(80)   Parka Trading Company

(81)   Red Sea Barakat Company Limited;

(82)   Somali International Relief Organization (U.S.A.);

(83)   Somali Internet Company

(84)   Somali Network AB (a.k.a. SOM NET AB);

(85)   Youssef M. Nada

(86)   Youssef M. Nada & Co. Gesellschaft M.B.H;

(87)   Youssef Nada (a.k.a. Youssef M. Nada; a.k.a. Youssef Mustafa

Nada);

(88)   Yusaf Ahmed Ali;

(89)   Zeinab Mansour-Fattouh;

(90)   Lashkar E-Tayyiba (a.k.a. Army of the Righteous; a.k.a. Lashkar-

Toiba; a.k.a. Lashkar-I-Taiba);

(91)   Sultan Bashir-Ud-Din Mahmood (a.k.a. Sultan Bashiruddin

Mahmood; a.k.a. Dr. Bashir Uddin Mehmood; a.k.a. Sultan Baishiruddin

Mekmud);

(92)   Abdul Majeed (a.k.a. Chaudhry Abdul Majeed; a.k.a. Abdul Majid);

(93)   Mohammed Tufail (a.k.a. S.M. Tufail; a.k.a. Sheik Mohammed

Tufail);

(94)   Ummah Tameer E-Nau (UTN) (a.k.a. Foundation for Construction;

a.k.a. Nation Building; a.k.a. Reconstruction Foundation; a.k.a. Reconstruction of

the Islamic Community; a.k.a. Reconstruction of the Muslim Ummah; a.k.a.

Ummah Tameer I-Nau; a.k.a. Ummah Tameer E-Nau; a.k.a. Ummah Tamir I-Nau;

a.k.a. Ummat Tamir E-Nau; a.k.a. Ummat Tamir I-Pau);

(95)  Afghan Support Committee (ASC) (a.k.a. Ahya ul Turas; a.k.a. Jamiat

Ayat-ur-Rhas al Islamia; a.k.a. Jamiat Ihya ul Turath al Islamia; a.k.a. Lajnat el

Masa Eidatul Afghania);

(96)  Abu Bakr Al-Jaziri

(97)  Abd al-Mushin Al-Libi (a.k.a. Ibrahim Ali Muhammad Abu Bakr)

(98)   Revival of Islamic Heritage Society (RIHS) (a.k.a. Jamia Ihya ul

Turath; a.k.a. Jamiat Ihia Al-Turath AL-Islamiya; a.k.a. Revival of Islamic Society

Heritage on the African Continent) [Pakistan & Afghanistan] (office in Kuwait is

NOT designated)

296.    Upon information and belief, the United States Government and the

Plaintiffs are continuing to investigate the Executive Order Terrorists and their

connection to the terrorist attacks of September 11, 2001.

### *The Republic of Sudan*

297.    The Republic of Sudan (hereinafter referred to as "Sudan"), is a foreign

state within the meaning of 28 U.S.C. § 1391(f).  Sudan maintains an Embassy within the

United States at 2210 Massachusetts Avenue N.W., Washington, D.C. 20008-2831.

298.    Sudan has for many years been designated as a foreign state that sponsors

terrorism within the meaning of the Export Administration Act of 1979, 50 U.S.C. App.

§2405(j), and the Foreign Assistance Act of 1961, 22 U.S.C. § 2371(b).  Sudan has

110

supported a variety of groups that use terrorism to pursue their goals. Sudan has provided money, training, safehaven, and weapons for terrorist groups.

299.    Osama Bin Laden was expelled by Saudi Arabia in 1991. In or about 1991, Sudan through Hassan al-Turabi, leader of the country's ruling National Islamic Front party (hereinafter "NIF"), allowed Osama Bin Laden entrance into Sudan. During this time period, Sudan abandoned visa requirements for Arabs and actively encouraged Islamic militants to live within its borders. By the end of 1991, there were between 1,000 and 2,000 members of Al Qaeda in Sudan.

300.    Following Al Qaeda's move to the Sudan in or about 1991, Osama Bin Laden established a headquarters in the Riyadh section of Khartoum.

301.    Osama Bin Laden was able to establish a powerful military and political presence in Sudan in the early 1990s, using a variety of business ventures to finance his activities.

302.    Osama Bin Laden forged business alliances during the early 1990s with wealthy Sudanese. He invested with senior members of the NIF in the Al-Shamal Islamic Bank in Khartoum. Osama Bin Laden invested $50 million dollars of his own funds into the Al-Shamal Islamic Bank. Along with other senior members of the NIF, he founded Wadi-al-Aqiq, a trading company that was allowed by the Sudanese government to engage in unrestricted shipping, and Taba Investments Ltd. According to the United States State Department, Taba Investments Ltd., "secured a near monopoly over Sudan's major agricultural exports of gum, corn, sunflower and sesame products." Other enterprises begun by Osama Bin Laden were Ladin International Company and Al-Hijra

Construction.  Gum Arabic Company Ltd. was owned jointly by Osama Bin Laden and the Sudanese government.  Osama Bin Laden had an interest in Al Themar, an agricultural company which employed 4,000 employees working its one-million-acre Al-Damazine farms. Osama Bin Laden also had an interest in the Blessed Fruits Company and Al-Ikhlas, both involved in the production of honey, fruits and vegetables.  Osama Bin Laden also started Al-Qudurat (a trucking company), Khartoum Tannery (a leather company), a bakery, and a furniture company.  These companies provided income and support to Al Qaeda.

303.    During the years of Bin Laden's exile in Sudan, Al Qaeda grew from a largely one–man operation into a sophisticated organization.  Testimony at subsequent trials of its members, including a paymaster, portrayed it as a multinational corporation complete with a finance committee, investments and well-concealed accounts worldwide.

304.    Osama Bin Laden organized Al Qaeda into camps throughout Sudan, the main one being a 20 acre site near Soba, 10 kilometers south of Khartoum.  Iranians previously based in Lebanon's Beka'a Valley were among those training terrorists at the Soba camp.

305.    Osama Bin Laden was allowed to operate freely in the Sudan.  Al Qaeda purchased communications equipment, radios, and rifles for the NIF, while the Sudanese government returned the favor by providing 200 passports to the group so that its members could travel with new identities.

306.    In or about the early 1990's, Jamal al-Fadl went to Hilat Koko, a suburb of Khartoum, where he met with representatives of Al Qaeda and the Sudanese army to

discuss the joint manufacture of chemical weapons.  Al Qaeda and the Sudanese army

cooperated in efforts to mount chemical agents on artillary shells.  Al Qaeda at this time

also began to conduct experiments on dogs that were injected or gassed with cyanide.

307.    Between 1990 and 1993, members of Al Qaeda in Sudan undertook the task

of writing the *Encyclopedia of the Afghan Jihad*.  Additionally, a book on terrorism was

written, *Military Studies in the Jihad against the Tyrants.*

308.    At various times between 1992 and 1996, Osama Bin Laden and Mamdouh

Mahamud Salim met with Iranian officials in Khartoum as part of an overall effort to

arrange a tripartite agreement between Al Qaeda, the NIF of Sudan, and elements of the

government of Iran to work together against the United States, Israel and other western

countries.

309.    At various times between in or about 1992 and 1996, Osama Bin Laden and

Mamdouh Mahamud Salim worked together with a ranking official in the NIF to obtain

communications equipment on behalf of the Sudanese intelligence service.

310.    On at least two occasions in the period from in or about 1992 until 1995,

members of Al Qaeda transported weapons and explosives from Khartoum to the coastal

city of Port Sudan for trans-shipment to the Saudi Arabian peninsula, using vehicles

associated with Osama Bin Laden's businesses.

311.    In 1993, Al Qaeda paid $210,000 for an airplane in Tucson, Arizona, that

was then flown to Khartoum.  This plane was intended to transport American Stinger

anti-aircraft missiles from Pakistan to Sudan, but the missile transport did not take place.

312.    Osama Bin Laden told CNN that one of his proudest achievements during

the period of time Al Qaeda was based in Sudan was Al Qaeda's role in the 1993 killing of more than a dozen American soldiers stationed in Somalia. Al Qaeda and its allies launched operations in Somalia to foment, and even participate in, attacks on British and American forces taking part in Operation Restore Hope in Somalia.

313.    The United States Department of State first put Sudan on the list of state sponsors of terrorism in 1993, largely because of Osama Bin Laden's residency and activities.

314.    In 1995, Hassan al-Turabi organized an Islamic Peoples Congress where Osama Bin Laden was able to meet with militant groups from Pakistan, Algeria and Tunisia, as well as Palestinian Islamic Jihad and HAMAS. During the time that Al Qaeda was based in Sudan, it forged alliances with Egyptian Islamic Groups and Jihad Groups.

315.    In 1994, Saudi Arabia revoked Osama Bin Laden's citizenship. By 1996, Saudi emissaries flew to Khartoum and warned Hassan al-Turabi that unless Sudan withdrew its support for Osama Bin Laden, Saudi Arabia would take action.

316.    Kenneth Katzman, a former analyst for the CIA who is now a terrorist expert for the Congressional Research Service, stated:

> Osama Bin Laden is inspired by Turabi's expansive vision; he
> sees eye to eye with him. Turabi has Islamic credentials
> Osama Bin Laden could never have. They are close
> associates. They are business partners. Osama Bin Laden is
> Turabi's alter ego, his field commander, his operations chief.

317.   Hassan al-Turabi, however, had no choice in the face of mounting American, Egyptian and Saudi pressure.  Sudan expelled Osama Bin Laden in 1996, but allowed him to move to Afghanistan.

318.   Sudan continues to be one of the seven governments that the United States Secretary of State has designated as a state sponsor of international terrorism.  According to *United States Department of State, Patterns of Global Terrorism 2000,* "Sudan continued to serve as a safehaven for members of Al Qaeda, the Lebanese Hezbollah, al-Gama'a al-Islamiyya, Egyptian Islamic Jihad, the Palestine Islamic Jihad, and HAMAS, but it has been engaged in a counterterrorism dialogue with the United States since mid-2000. … Khartoum also still had not complied fully with U.N. Security Council Resolutions 1044, 1054, and 1070, passed in 1996 – which demand that Sudan end all support to terrorists.  They also require Khartoum to hand over three Egyptian Gama'a fugitives linked to the assassination attempt in 1995 against Egyptian President Hosni Mubarak in Ethiopia.  Sudanese officials continued to deny that they had a role in the attack."

### Unidentified Terrorist Defendants

319.   The Unidentified Terrorist Defendants 1-500 (the "Unidentified Terrorists") are other persons, organizations and/or entities that supported, aided, abetted and contributed to Osama Bin Laden, Al Qaeda and other defendants in furtherance of their goal to murder American citizens and perform other acts of terrorism.

320.   In particular, the Unidentified Terrorists performed acts that financially and logistically assisted the named defendants in their terrorist activities that included the use

of the September 11, 2001 Terrorist Hijacked Flights to commit the murder of the

Decedents. These Unidentified Terrorists are liable to the Plaintiffs for damages resulting

from those terrorist activities.

321.   The Unidentified Terrorists include agencies and instrumentalities of the

Foreign State Defendants and their officials, employees and agents whose full identities

are presently unknown to the Plaintiffs.

322.   Upon further investigation by the United States Government, the

Unidentified Terrorists may include those Executive Order Suspects found to have

participated in or contributed to the terrorist activities of the named defendants.

323.   Upon information and belief, the Unidentified Terrorists may also include

certain citizens of Saudi Arabia that supplied material, logistical and financial support to

Osama Bin Laden, Al Qaeda and other defendants, thereby providing the means for those

defendants to carry out the September 11, 2001 attack on America that resulted in the

murder of the Decedents.[1]

## FACTS

### All Defendants

324.   All defendants instructed, trained, directed, financed or otherwise

supported, or assisted or conspired in the instruction, training, direction, financing, or

support of Al Qaeda in connection with their terrorist plans.  In furtherance of those

plans, the Hijackers deliberately hijacked the Terrorist Hijacked Flights and caused those

---

1 Plaintiffs intend to petition the Court for permission to add these Unidentified Terrorists as Named Defendants in
this action as their identities and/or the extent of their involvement in the September 11 attacks become known.

planes to crash into the World Trade Center Towers, the Pentagon building, and a field in Shanksville, Pennsylvania.  At all relevant times, the Hijackers were acting within the course and scope of their authority on behalf of all defendants and in conspiracy with all defendants.  Therefore, all defendants are liable to the Plaintiffs for the actions of the Hijackers.

325.    The assets of certain defendants have been frozen by virtue of the aforementioned Executive Orders or pursuant to section 106 of the U.S.A. Patriot Act of 2001, 107 Pub.L. 56 (Oct. 26, 2001).  Plaintiffs seek recovery of these frozen assets and other sources of compensation for their losses and damages caused by the September 11, 2001 terrorist murders.

### *The September 11 Terrorist Attacks*

326.    On September 11, 2001, five of the Hijackers, Mohammed Atta, Abdul Alomari, Wail al-Shehri, Waleed al-Shehri, and Satam al-Suqami, hijacked American Airlines Flight 11 carrying 92 persons, bound from Boston to Los Angeles, and crashed it into the North Tower of the World Trade Center in New York at approximately 8:46 a.m. (In this Amended Complaint, each hijacker will be identified with the flight number of the plane he hijacked.)

327.    On September 11, 2001, five of the Hijackers,  Marwan al-Shehhi, Fayez Ahmed, a.k.a. "Banihammad Fayez," Ahmed al-Ghamdi, Hamza al-Ghamdi, and Mohand al-Shehri, hijacked United Airlines Flight 175 carrying 65 persons, bound from Boston to Los Angeles, and crashed it into the South Tower of the World Trade Center in New

York at approximately 9:02 a.m..

328.   On September 11, 2001, five of the Hijackers, Khalid al-Midhar, Nawaf al-Hazmi, Hani Hanjour, Salem al-Hamzi, and Majed Moqed, hijacked American Airlines Flight 77 carrying 64 persons, bound from Virginia to Los Angeles, and crashed it into the Pentagon Building in Arlington County, Virginia at approximately 9:37 a.m.

329.   On September 11, 2001, four of the Hijackers,  Ziad Jarrah, Ahmed al-Haznawi, Saaed al-Ghamdi, and Ahmed al-Nami, hijacked United Airlines Flight 93 carrying 45 persons, bound from Newark to San Francisco, and caused it to crash in a field near the town of Shanksville, Pennsylvania at approximately 10:10 a.m..

330.   At approximately 9:50 a.m., the South Tower of the World Trade Center collapsed; at approximately 10:29 a.m., the North Tower of the World Trade Center collapsed; the deaths of thousands of innocent persons were caused by the vicious actions of the terrorists and the subsequent collapse of the World Trade Center towers.

331.   The September 11 terrorist hijackings and attacks referenced above resulted in the murder of the 3,029 Decedents.

332.   The September 11 terrorist hijackings and attacks referenced above were the culmination of a conspiracy among all defendants to murder citizens of the United States.  The background of that conspiracy is set forth below.

### The Conspiracy

333.   From about 1989 until the present, all Named Defendants and Unidentified Terrorist Defendants unlawfully, willfully and knowingly combined, conspired, confederated and agreed to kill and maim persons within the United States, and to create a

118

substantial risk of serious bodily injury to other persons by destroying and damaging structures and other real and personal property within the United States.  In furtherance of this conspiracy, defendants utilized facilities of interstate and foreign commerce, often through illegal means. The intended victims of this conspiracy were United States citizens, the United States Government, and the property of the United States and its citizens.  The conspiracy resulted in the deaths of the Decedents on September 11, 2001.

334.    In furtherance of the conspiracy, and to effect its objects, the Named Defendants and the Unidentified Terrorist Defendants committed the following acts:

a.    At various times from at least as early as 1989, the Taliban/Islamic Emirate of Afghanistan, Osama Bin Laden and others known and unknown, provided training camps and guesthouses in Islamic Emirate of Afghanistan, including camps known as Khalden, Derunta, Khost, Siddiq, and Jihad Wal, for the use of Al Qaeda and its affiliated groups.

b.    At various times from at least as early as 1990, defendants and their unknown co-conspirators provided military and intelligence training in various areas, including Islamic Emirate of Afghanistan, Iraq, Iran, Pakistan, and the Sudan, for the use of Al Qaeda and its affiliated groups.

c.    At various times from at least as early as 1989, defendants and others known and unknown, engaged in financial and business transactions on behalf of Al Qaeda, including, but not limited to: purchasing land for training camps; purchasing warehouses for storage of items, including explosives; purchasing

communications and electronics equipment; transferring funds between corporate accounts; and transporting currency and weapons to members of Al Qaeda and its associated terrorist organizations in various countries throughout the world.

d.    At various times from at least 1990, Iran has provided material support to Bin Laden and Al Qaeda, often through its state-sponsored terrorist organization, Hizballah.  As described above, that support included advice and assistance in planning attacks against American targets.  Information was often shared and exchanged between Al Qaeda and Iran, as evidenced by the following:

i.    For many years, the Department of State has included Iran among the "*state sponsors of terrorism.*"  Indeed, more than once in recent years, the Department of State has described Iran as "*the most active*" among state sponsors of terrorism.  Iran's role in establishing, maintaining and supporting Hizballah, the Lebanese Shiite organization with a well-documented history of terrorism, is well documented.

ii.    In October 2001, a Bin Laden operative, Ali Mohamed, confessed in Federal District Court in New York that he and senior Bin Laden operatives had met with Hizballah security chief Imad Mughniyah who is believed to have carried out the bombings of the U.S. Embassy in Beirut and the Marine barracks in 1983.

iii.    In June 1996, Iran's Ministry of Information and Security hosted a meeting of terrorist leaders in Tehran that included Mugniyah and senior aides to Bin Laden.  Senior aides to Bin Laden subsequently met with Mugniyah on several occasions.

iv.    Mugniyah is believed to have made several trips to Germany for the purpose of meeting with some of the Hijackers who lived in Germany prior to traveling to the United States.

v.    Based on evidence developed in connection with the war in Afghanistan, senior officials in the U.S. Government, including Secretary of Defense Donald Rumsfeld, believe that Al Qaeda and Taliban members have now taken refuge in Iran.

vi.      Secretary of Defense Donald Rumsfeld has stated that there is a direct nexus between the terrorist states of Iran and Iraq and terrorist organizations including Al Qaeda; the President of the United States, George W. Bush, has declared both Iran and Iraq to be an "*axis of evil*" supporting terrorist groups including Al Qaeda.

vii.     On February 13, 2002, Vice President Dick Cheney stated, while addressing the Council on Foreign Relations, that Iraq and Iran were dangerous adversaries of the American people.  Vice President Cheney stated: "*we've seen all too many examples of their* [Iran and Iraq] *active support of terrorism."*

e.      At various times, defendant Iraq has also provided material support to Bin Laden and Al Qaeda, often through its state-run intelligence agency.  That support included advice and assistance in planning attacks against American targets, and training and instruction in the execution of such attacks.  Information was often shared and exchanged between Al Qaeda and Iraq, as evidenced by the following:

i.       The relationship between Al Qaeda and Iraq developed in the early 1990s.  After the Gulf War, Iraqi agents traveled to the Sudan to participate in training exercises with Bin Laden□s forces.  From 1991 to 1996, there was extensive interaction between Al Qaeda and Iraqi intelligence officers.

ii.      In the Spring of 1998, two of Bin Laden□s senior military commanders met in Baghdad with Qusay Hussein, chief of Iraqi intelligence and son of Saddam Hussein.   As a result of these meetings, Iraq reportedly agreed to supply Al Qaeda with training, intelligence, weapons and other support.

iii.     According to intelligence officials of the Czech Republic, lead Hijacker Mohammed Atta and Iraqi intelligence officer Mohammed al-Ani met in Prague in June 2000.  Former CIA Director James Woolsey cites this meeting as indicative of Iraqi support of and involvement in the September 11 terrorist attacks.

iv.     In addition to Mohammed Atta, two other Hijackers met with Iraqi intelligence in the United Arab Emirates prior to traveling to the United States.

v.     Director Woolsey and other former and current intelligence officials have reported many meetings between Iraqi intelligence officers and Al Qaeda during the late 1990's in Iraq and Islamic Emirate of Afghanistan.  According to these reports, elite Iraqi intelligence officers provided advanced sabotage and infiltration training to Al Qaeda operatives.

vi.     Director Woolsey has further pointed to the training that was reported by several witnesses to have taken place in Iraq.  The training centered on methods to hijack an aircraft using knives.  The location of the training was an old Boeing 707 at an airfield outside of Baghdad.

vii.     Secretary of State Colin Powell publicly stated on February 13, 2002 that the Bush administration "*is committed to regime change*" because of its complicity with terrorist organizations. On February 14, 2002, President Bush publicly stated he would consider a wide range of options to oust Saddam Hussein because of his terrorist activities including the support of Al Qaeda.  The President ordered the government to review all options involving Iraq, including military action, because the Iraqi leaders "*need to understand I am serious*".  Addressing the Council for Foreign Relations on February 15, 2002, Vice President Dick Cheney stated that Iraq has been a sponsor of terrorism: "*clearly that's got to be one* [Iraq] *we focus on . . .  he* [Saddam Hussein] *has in the past had some dealings with terrorists, clearly.*"

### *The Hijackers' Preparation*

335.    Beginning in and about 1998, Ramzi Bin al-Shibh, Mohammed Atta (#11), Marwan al-Shehhi (#175), and Ziad Jarrah (#93), and others, formed and maintained an Al Qaeda terrorist cell in Germany.  It was during this period that meetings were held with representatives of Iran and Iraq.

336.    On or about January 15, 2000, Khalid Almihdhar (#77) and Nawaf Alhazmi (#77) traveled from Bangkok, Thailand, to Los Angeles, California.

337.    On or about June 3, 2000, Mohammed Atta (#11) traveled to the United States from Prague, Czech Republic.  On or about early July 2000, Mohammed Atta (#11) and Marwan al-Shehhi (#175) visited the Airman Flight School in Norman, Oklahoma. They ultimately attended flight training classes at Huffman Aviation in Venice, Florida between July and December 2000.

338.    On or about September 29, 2000, Zacarias Moussaoui contacted Airman Flight School in Norman, Oklahoma using an e-mail account he set up on September 6, 2000, with an internet service provider in Malaysia.

339.    On or about November 5, 2000, Mohammed Atta (#11) purchased flight deck videos for the Boeing 747 Model 200, Boeing 757 Model 200, and other items from a pilot store in Ohio ("Ohio Pilot Store").  One month later, he purchased flight deck videos for the Boeing 767 Model 300ER and the Airbus A320 Model 200 from the Ohio Pilot Store.

340.    Between on or about January 2001 and March 2001, Hani Hanjour (#77)

attended pilot training courses in Phoenix, Arizona, including at Pan Am International
Flight Academy.

341.    Between on or about February 1, 2001, and on or about February 15, 2001,
Mohammed Atta (#11) and Marwan al-Shehhi (#175) took a flight check ride from
Briscoe Field, Lawrenceville, Georgia.

342.    Between on or about February 26, 2001, and on or about May 29, 2001,
Zacarias Moussaoui attended the Airman Flight School in Norman, Oklahoma.

343.    On or about March 19, 2001, Nawaf Alhazmi (#77) purchased flight deck
videos for the Boeing 747 Model 400, the Boeing 747 Model 200 and the Boeing 777
Model 200, and another video from the Ohio Pilot Store.

344.    Between on or about April 23, 2001, and on or about June 29, 2001, Satam
Al Suqami (#11), Waleed Alshehri (#11), Ahmed Alghamdi (#175), Majed Moqed (#77),
Marwan al-Shehhi (#175), Mohammed Atta (#11), Ahmed Alnami (#93), Hamza
Alghamdi (#175), Mohand Alshehri (#175), Wail Alshehri (#11), Ahmed Al Haznawi
(#93), Fayez Banihammad (#175), and Salem Alhazmi (#77) traveled from various points
in the world to the United States.

345.    On or about May 23, 2001, Zacarias Moussaoui contacted an office of the
Pan Am International Flight Academy in Miami, Florida via e-mail.

346.    On or about June 20, 2001, Zacarias Moussaoui purchased flight deck
videos for the Boeing 747 Model 400 and the Boeing 747 Model 200 from the Ohio Pilot
Store.

347.    On or about July 8, 2001, Mohammed Atta (#11) purchased a knife in

Zurich, Switzerland.

348.    On or about July 10 and July 11, 2001, Zacarias Moussaoui made credit card payments to the Pan Am International Flight Academy for a simulator course in commercial flight training.

349.    On or about July 25, 2001, Ziad Jarrah (#93) traveled from the United States to Germany. On August 4, 2001, Ziad Jarrah (#93) traveled from Germany to the United States.

350.    On or about August 3, 2001, Zacarias Moussaoui purchased two knives in Oklahoma City, Oklahoma.

351.    Between August 13 and August 15, 2001, Zacarias Moussaoui attended the Pan Am International Flight Academy in Minneapolis, Minnesota, for simulator training on the Boeing 747 Model 400.

352.    On or about August 17, 2001, Zacarias Moussaoui, while being interviewed by federal agents in Minneapolis, attempted to explain his presence in the United States by falsely stating that he was simply interested in learning to fly.

353.    On or about August 17, 2001, Ziad Jarrah (#93) undertook a ☐check ride☐ at a flight school in Fort Lauderdale, Florida.

354.    During this period leading up to the September 11 attacks, the Hijackers were receiving money and support from other known and unknown defendants.  Specific evidence of that financial support includes the following:

        a.     On or about June 29, 2000, $4,790 was wired from the United Arab

Emirates ("UAE") to Marwan al-Shehhi (#175) in Manhattan.

      b.      On or about July 19, 2000, $9,985 was wired from UAE into a Florida SunTrust bank account in the names of Mohammed Atta (#11) and Marwan al-Shehhi (#175).

      c.      On or about July 26, 2000, in Germany, Ramzi Bin al-Shibh wired money to Marwan al-Shehhi (#175) in Florida.

      d.      On or about August 7, 2000, $9,485 was wired from UAE into a Florida SunTrust bank account in the names of Mohammed Atta (#11) and Marwan al-Shehhi (#175).

      e.      On or about August 30, 2000, $19,985 was wired from UAE into a Florida SunTrust bank account in the names of Mohammed Atta (#11) and Marwan al-Shehhi (#175).

      f.      On or about September 18, 2000, $69,985 was wired from UAE into a Florida SunTrust bank account in the names of Mohamed Atta (#11) and Marwan al-Shehhi (#175).

      g.      On or about February 23, 2001, Zacarias Moussaoui flew from London, England to Chicago, Illinois, declaring at least $35,000 cash on his Customs declaration, and then from Chicago to Oklahoma City, Oklahoma.

      h.      On or about February 26, 2001, Zacarias Moussaoui opened a bank account in Norman, Oklahoma, depositing approximately $32,000 cash.

      i.      On or about August 14, 2000, in Yemen, Ramzi Bin al-Shibh

arranged to wire money from his account in Germany to the account of a flight training school in Florida.

j.     On or about September 25, 2000, in Hamburg, Germany, Ramzi Bin al-Shibh sent money via wire transfer to Marwan al-Shehhi (#175) in Florida.

k.     In Summer 2001, Fayez Banihammad (#175), Saeed Alghamdi (#93), Hamza Alghamdi (#175), Waleed Alshehri (#11), Ziad Jarrah (#93), Satam Al Suqami (#11), Mohand Alshehri (#175), Ahmed Alghamdi (#93), and Ahmed Al Haznawi (#93) each opened a Florida SunTrust bank account with a cash deposit.

l.     On June 25, 2001, Mustafa Ahmed al-Hawsawi used a cash deposit to open a checking account at a Standard Chartered Bank branch in Dubai, UAE.

m.    On June 25, 2001, at the same Standard Chartered Bank branch in Dubai, UAE, Fayez Banihammad (#175) used a cash deposit to open a savings account and also opened a checking account.

n.     On July 18, 2001, Fayez Ahmed (#175) gave power of attorney to Mustafa Ahmed al-Hawsawi for Fayez Banihammad Standard Chartered Bank accounts in UAE.  On July 18, 2001, using his power of attorney, al-Hawsawi picked up Fayez Banihammad's VISA and ATM cards in UAE.

o.     Between July 18 and August 1, 2001, Mustafa Ahmed Al-Hawsawi caused Fayez Banihammad's VISA and ATM cards to be shipped from UAE to Fayez Banihammad in Florida. (The VISA card was then used for the first time on

August 1, 2001, in Florida.)

p.      On or about July 30 and 31, 2001, in Hamburg, Germany, Ramzi Bin al-Shibh, using the name "Ahad Sabet," received two wire transfers, totaling approximately $15,000, from "Hashim Abdulrahman" in UAE.

q.      On or about August 1 and 3, 2001, Ramzi Bin al-Shibh, using the name "Ahad Sabet," wired approximately $14,000 in money orders to Zacarias Moussaoui in Oklahoma from train stations in Dusseldorf and Hamburg, Germany.

355.    On or about August 22, 2001, Fayez Ahmed (#175) used his VISA card in Florida to obtain approximately $4,900 cash, which had been deposited into his Standard Chartered Bank account in UAE the day before.

356.    On or about August 22, 2001, in Miami, Florida, Ziad Jarrah (#93) purchased an antenna for a Global Positioning System ("GPS"), other GPS related equipment, and schematics for 757 cockpit instrument diagrams. (GPS allows an individual to navigate to a position using coordinates pre-programmed into the GPS unit.)

357.    On or about August 25, 2001, Khalid Almihdhar and Majed Moqed purchased with cash tickets for American Airlines Flight 77, from Virginia to Los Angeles, California, scheduled for September 11, 2001.

358.    On or about August 26, 2001, Waleed Alshehri and Wail Alshehri made reservations on American Airlines Flight 11, from Boston, Massachusetts, to Los Angeles, California, scheduled for September 11, 2001.

359.    On or about August 27, 2001, reservations for electronic, one-way tickets

were made for Fayez Banihammad and Mohand Alshehri, for United Airlines Flight 175, from Boston, Massachusetts, to Los Angeles, California, scheduled for September 11, 2001.

360.   On or about August 27, 2001, Nawaf Alhazmi and Salem Alhazmi booked flights on American Airlines Flight 77.

361.   On or about August 28, 2001, Satam Al Suqami purchased a ticket with cash for American Airlines Flight 11.

362.   On or about August 28, 2001, Mohammed Atta and Abdulaziz Alomari reserved two seats on American Airlines Flight 11.

363.   On or about August 29, 2001, Ahmed Alghamdi and Hamza Alghamdi reserved electronic, one-way tickets for United Airlines Flight 175.

364.   On or about August 29, 2001, Ahmed Al Haznawi purchased a ticket on United Airlines Flight 93 from Newark, New Jersey, to San Francisco, California, scheduled for September 11, 2001.

365.   On or about August 30, 2001, Mohammed Atta (#11) purchased a utility tool that contained a knife.

366.   On or about September 6, 2001, Satam Al Suqami (#11) and Abdulaziz Alomari (#11) flew from Florida to Boston.

### *Executing the September 11, 2001 Terrorist Attacks*

367.   On September 11, 2001, Mohammed Atta, Abdul Aziz Alomari, Satam Al Suqami, Waleed M. Alshehri, and Wail Alshehri hijacked American Airlines Flight 11, a

Boeing 767, which had departed Boston at approximately 7:59 a.m. They flew Flight 11

into the North Tower of the World Trade Center in Manhattan at approximately 8:45 a.m.,

causing the collapse of the tower and the deaths of thousands of Decedents [as of April

15, 2002, there were 2,614 dead or missing persons at the World Trade Center Towers.]

368.   On September 11, 2001, Hamza Alghamdi, Fayez Banihammad, Mohand

Alshehri, Ahmed Alghamdi, and Marwan al-Shehhi hijacked United Airlines Flight 175,

a Boeing 767, which had departed from Boston at approximately 8:14 a.m. Upon

hijacking the United Flight 175, the terrorists murdered the pilot, **Victor J. Saracini**, and

thereafter flew Flight 175 into the South Tower of the World Trade Center in Manhattan

at approximately 9:03 a.m., causing the collapse of the tower and the death of thousands

of Decedents.

369.   On September 11, 2001, Khalid Almihdhar, Majed Moqed, Nawaf Alhazmi,

Salem Alhazmi, and Hani Hanjour hijacked American Airlines Flight 77, a Boeing 757,

which had departed from Virginia bound for Los Angeles, at approximately 8:10 a.m.

They flew Flight 77 into the Pentagon in Virginia at approximately 9:37 a.m., causing the

deaths of 184 Decedents.

370.   On or about September 11, 2001, Saeed Alghamdi, Ahmed Alnami, Ahmed

Al Haznawi, and Ziad Jarrah hijacked United Airlines Flight 93, a Boeing 757, which left

Gate 17 at 8:01 a.m.and departed from Newark, New Jersey bound for San Francisco at

approximately 8:42 a.m. After resistance by the passengers, Flight 93 crashed in

Shanksville, Somerset County, Pennsylvania at approximately 10:06 a.m., killing 40

Decedents.  Having been given the information from loved ones concerning the terrorist

attacks in New York, the passengers and crew of Flight 93 acted on that information and averted further disaster at the expense of their own lives.  Decedent **Mark K. Bingham** was one of the leaders of this heroic counter-attack against the hijackers.

371.    As set forth above, the Hijackers used box cutters and knives to commit air piracy and murder on behalf of Osama Bin Laden, the Taliban, Muhammad Omar, Al Qaeda, the Islamic Republic of Iran, the Republic of Iraq and all other defendants.

372.    The September 11, 2001 attacks were the culmination of a conspiracy among all defendants to plan, finance, support and execute terrorist murder.  A detailed factual description of the planning and execution of these terrorist attacks is set forth in the Federal Indictment of Zacarias Moussaoui.

373.    As a direct and proximate result of the intentional, willful, reckless, and careless actions of the defendants, all Plaintiffs have suffered severe and permanent personal injuries, damages, and losses, including the following:

(a)    Decedents' fear of death prior to the crash into and collapse of the World Trade Center Towers, the crash into the Pentagon and the crash of United Airlines flight 93;

(b)    the severe mental anguish suffered by all Plaintiffs;

(c)    the severe pain and suffering suffered by Plaintiffs;

(d)    the inability of all Decedents to perform the usual household and personal activities that they normally would have performed through the remainder of their natural life expectancies;

(e)    loss of Decedents' earnings and future earning potential;

(f)    loss of Decedents' life and life□s pleasures;

(g)    loss of consortium and/or companionship;

(h)     costs relating to managing the estates of all Decedents; and

(i)     death of the Decedents by way of murder as a result of the defendants'
conduct and that of their co-conspirators.

374.    The aforementioned deaths, personal injuries and losses experienced by the

Plaintiffs were caused by the intentional outrageous acts, recklessness, and carelessness

of all defendants, acting individually and in concert, as well as other co-conspirators not

yet identified, and of their agents, servants, employees, agencies and instrumentalities,

acting within and during the course and scope of their employment, authority, or apparent

authority.

## CLAIMS

### COUNT ONE
*CLAIM BY U.S. NATIONAL PLAINTIFFS AGAINST*
*SOVERIGN STATE DEFENDANTS UNDER SECTION 1605A*
*FOREIGN SOVEREIGN IMMUNITIES ACT*

375.    Plaintiffs incorporate herein by reference the averments contained in the

preceding paragraphs as though fully set forth at length.

376.    This suit was initially brought pursuant to 28 U.S.C. §1605(a)(7) and Pub.L.

104-208, Div. A, Title I, §101(c), 110 Stat. 3009-172 (reprinted at 28 U.S.C. § 1605 note

(West Supp.)).

377.    Congress in the National Defense Authorization Act for Fiscal Year 2008

(P.L. 110-181, §1083), which was enacted January 29, 2008 (the "NDAA") amended the

FSIA by adding a new §1605A to Chapter 97 of Title 28 of the U. S. Code.  The new

Section 1605A unequivocally creates a federal private right of action against the foreign

state sponsors of terrorism:

>**(c) Private right of action.**--A foreign state that is or was a state sponsor of terrorism as described in subsection(a)(2)(A)(i), and any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency, shall be liable to--
>
>**(1)** a national of the United States,
>
>**(2)** a member of the armed forces,
>
>**(3)** an employee of the Government of the United States, or of an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment, or
>
>**(4)** the legal representative of a person described in paragraph (1), (2), or (3),
>
>for personal injury or death caused by acts described in subsection (a) (1) of that foreign state, or of an official, employee, or agent of that foreign state, for which the courts of the United States may maintain jurisdiction under this section for money damages. In any such action, damages may include economic damages, solatium, pain and suffering, and punitive damages. In any such action, a foreign state shall be vicariously liable for the acts of its officials, employees, or agents.

Section 1605A applies to this pending action pursuant to Pub.L. 110-181, Div. A, Title X,

§ 1083(c), Jan. 28, 2008, 122 Stat. 342, which provides that:

>**(1) In general.**--The amendments made by this section [enacting this section and amending 28 U.S.C.A. §§1605, 1607, 1610, and 42 U.S.C.A. § 10603c] shall apply to any claim arising under section 1605A of title 28, United States Code [this section].
>
>**(2) Prior actions.**--
>
>**(A) In general.**--With respect to any action that—
>
>**(i)** was brought under section 1605(a)(7) of title 28, United States Code, or section 589 of the Foreign Operations, Export

Financing, and Related Programs Appropriations Act, 1997 (as contained in section 101(c) of division A of Public Law 104-208) [not classified to the Code], before the date of the enactment of this Act [Jan. 28, 2008],

**(ii)** relied upon either such provision as creating a cause of action,

**(iii)** has been adversely affected on the grounds that either or both of these provisions fail to create a cause of action against the state, and

**(iv)** as of such date of enactment [Jan. 28, 2008], is before the courts in any form, including on appeal or motion under rule 60(b) of the Federal Rules of Civil Procedure,

that action, and any judgment in the action shall, on motion made by plaintiffs to the United States district court where the action was initially brought, or judgment in the action was initially entered, be given effect as if the action had originally been filed under section 1605A(c) of title 28, United States Code [subsec. (c) of this section].

. . .

**(3) Related actions.**--If an action arising out of an act or incident has been timely commenced under section 1605(a)(7) of title 28, United States Code, or section 589 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1997 (as contained in section 101(c) of division A of Public Law 104-208), any other action arising out of the same act or incident may be brought under section 1605A of title 28, United States Code [this section], if the action is commenced not later than the latter of 60 days after--

**(A)** the date of the entry of judgment in the original action; or

**(B)** the date of the enactment of this Act [Jan. 28, 2008].

378.  As a result of the conduct of the Foreign State Defendants and their agencies, instrumentalities, officials, employees and agents that violated the federal laws cited above, all Plaintiffs suffered damages as fully set forth in the paragraphs above

which are incorporated herein by reference.

379.   Decedents are survived by family members entitled to recover damages from all defendants for wrongful death.  These family members are among the Plaintiffs who are entitled to damages deemed as a fair and just compensation for the injuries resulting from the deaths of the Decedents.

380.   The injuries and damages suffered by the Plaintiffs by virtue of the death the Decedents, and the consequences resulting there from, were proximately caused by the intentional and reckless acts, omissions, and other tortuous conduct of all defendants as described herein.

381.   As a direct and proximate result of the deaths of the Decedents, their heirs have been deprived of future aid, assistance, services, comfort, and financial support.

382.   As a direct and proximate result of the defendants' cowardly, barbaric and outrageous acts of murder, the heirs of the Decedents will forever grieve their deaths.

383.   As a further result of intentional and reckless acts, omissions, and other tortuous conduct of the defendants, the Plaintiffs have been caused to expend various sums to administer the estates of Decedents and have incurred other expenses for which they are entitled to recover.

384.   As a result of the defendants' murderous conduct, the Decedents suffered damages including pain and suffering, trauma, emotional distress, loss of life and life's pleasures, loss of earnings and earning capacity, loss of accretion to their estates and other items of damages as fully set forth in the paragraphs above which are incorporated herein by reference.

135

385.    Plaintiffs also bring this action for damages suffered by the Decedents and caused by the defendants' conduct.  As a result of the intentional and negligent acts of the defendants as described above, the Decedents were placed in apprehension of harmful and offensive bodily contact (assault), suffered offensive and harmful bodily contact (battery), suffered extreme fear, anxiety, emotional and psychological distress (intentional/negligent infliction of emotional distress), and were mentally and physically harmed, trapped, and falsely imprisoned (false imprisonment) prior to their deaths.

386.   The actions of all defendants, acting in concert to carry out their unlawful objectives, were malicious, outrageous and in willful, wanton, and reckless disregard of the rights of all the Plaintiffs.  The defendants, acting individually and jointly, intended to carry out actions that would end the lives of the Decedents.

387.   As a result of their intentional, malicious, outrageous, willful and wanton conduct, all defendants are jointly and severally liable to all Plaintiffs for punitive damages.

**WHEREFORE**, Plaintiffs demand judgment in their favor against the Foreign State Defendants, the Iranian Instrumentalities and the Iraqi Instrumentalities, and each of their officials, employees and agents, jointly, severally, and/or individually, in an amount in excess of One Billion Dollars ($1,000,000,000) for compensatory and punitive damages, plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent the these defendants from ever again committing the terrorist acts of September 11, 2001 or similar acts.

## COUNT TWO
### *CLAIM BY NON-U.S. NATIONAL PLAINTIFFS AGAINST SOVERIGN STATE DEFENDANTS UNDER ALIEN TORT CLAIMS ACT*

388.    Plaintiffs incorporate herein by reference the averments contained in the preceding paragraphs as though fully set forth at length.

389.    As set forth above, the defendants, jointly and severally, caused the deaths of each of the Decedents through and by reason of acts of international terrorism.  These terrorist activities constitute violations of the law of nations, including those international legal norms prohibiting torture, genocide, air piracy, terrorism and mass murder.

390.    As a result of the defendants' violation of the law of nations, all Plaintiffs suffered damages as fully set forth in the paragraphs above which are incorporated herein by reference.

391.    Pursuant to 28 U.S.C. §1350, the estates, survivors and heirs of Decedents who were aliens at the time of their death are entitled to recover damages they have sustained by reason of the defendants' actions.

392.    Decedents are survived by family members entitled to recover damages from all defendants for wrongful death.  These family members are among the Plaintiffs who are entitled to damages deemed as a fair and just compensation for the injuries resulting from the deaths of the Decedents.

393.    The injuries and damages suffered by the Plaintiffs by virtue of the death the Decedents, and the consequences resulting there from, were proximately caused by the intentional and reckless acts, omissions, and other tortuous conduct of all defendants as described herein.

394.    As a direct and proximate result of the deaths of the Decedents, their heirs have been deprived of future aid, assistance, services, comfort, and financial support.

395.    As a direct and proximate result of the defendants' cowardly, barbaric and outrageous acts of murder, the heirs of the Decedents will forever grieve their deaths.

396.    As a further result of intentional and reckless acts, omissions, and other tortuous conduct of the defendants, the Plaintiffs have been caused to expend various sums to administer the estates of Decedents and have incurred other expenses for which they are entitled to recover.

397.    As a result of the defendants' murderous conduct, the Decedents suffered damages including pain and suffering, trauma, emotional distress, loss of life and life□s pleasures, loss of earnings and earning capacity, loss of accretion to their estates and other items of damages as fully set forth in the paragraphs above which are incorporated herein by reference.

398.    Plaintiffs also bring this action for damages suffered by the Decedents and caused by the defendants' conduct.  As a result of the intentional and negligent acts of the defendants as described above, the Decedents were placed in apprehension of harmful and offensive bodily contact (assault), suffered offensive and harmful bodily contact (battery), suffered extreme fear, anxiety, emotional and psychological distress (intentional/negligent infliction of emotional distress), and were mentally and physically harmed, trapped, and falsely imprisoned (false imprisonment) prior to their deaths.

399.    The actions of all defendants, acting in concert to carry out their unlawful objectives, were malicious, outrageous and in willful, wanton, and reckless disregard of

the rights of all the Plaintiffs.  The defendants, acting individually and jointly, intended to carry out actions that would end the lives of the Decedents.

400.    As a result of their intentional, malicious, outrageous, willful and wanton conduct, all defendants are jointly and severally liable to all Plaintiffs for punitive damages.

WHEREFORE, Plaintiffs who are estates, survivors and heirs of alien Decedents demand judgment in their favor against all defendants, jointly, severally, and/or individually, in excess of One Billion Dollars ($1,000,000,000) for compensatory and punitive damages, plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent the defendants from ever again committing the terrorist acts of September 11, 2001 or similar acts.

## COUNT THREE
### CLAIM BY ALL PLAINTIFFS AGAINST
### NON-SOVERIGN STATE DEFENDANTS
### FOR WRONGFUL DEATH

401.    Plaintiffs incorporate by reference the averments in the preceding paragraphs as though fully set forth at length.

402.    Decedents are survived by family members entitled to recover damages from all defendants for wrongful death.  These family members are among the Plaintiffs who are entitled to damages deemed as a fair and just compensation for the injuries resulting from the deaths of the Decedents.

403.    The injuries and damages suffered by the Plaintiffs by virtue of the death

the Decedents, and the consequences resulting therefrom, were proximately caused by the intentional and reckless acts, omissions, and other tortuous conduct of all defendants as described herein.

404.   As a direct and proximate result of the deaths of the Decedents, their heirs have been deprived of future aid, assistance, services, comfort, and financial support.

405.   As a direct and proximate result of the defendants' cowardly, barbaric and outrageous acts of murder, the heirs of the Decedents will forever grieve their deaths.

406.   As a further result of intentional and reckless acts, omissions, and other tortuous conduct of the defendants, the Plaintiffs have been caused to expend various sums to administer the estates of Decedents and have incurred other expenses for which they are entitled to recover.

**WHEREFORE**, Plaintiffs demand judgment in their favor against all defendants, jointly, severally, and/or individually, in an amount in excess of One Billion Dollars ($1,000,000,000) for compensatory and punitive damages, plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent the defendants from ever again committing the terrorist acts of September 11, 2001 or similar acts.

**COUNT FOUR**
***CLAIM BY ALL PLAINTIFFS AGAINST***
***NON-SOVERIGN STATE DEFENDANTS***
***FOR SURVIVAL***

407.   Plaintiffs incorporate herein by reference the averments contained in the

preceding paragraphs as though fully set forth at length.

408.   Plaintiffs bring this action for damages suffered by the Decedents and caused by the defendants' conduct.  As a result of the intentional and negligent acts of the defendants as described above, the Decedents were placed in apprehension of harmful and offensive bodily contact (assault), suffered offensive and harmful bodily contact (battery), suffered extreme fear, anxiety, emotional and psychological distress (intentional/negligent infliction of emotional distress), and were mentally and physically harmed, trapped, and falsely imprisoned (false imprisonment) prior to their deaths.

409.   As a result of the defendants' murderous conduct, the Decedents suffered damages including pain and suffering, trauma, emotional distress, loss of life and life□s pleasures, loss of earnings and earning capacity, loss of accretion to their estates and other items of damages as fully set forth in the paragraphs above which are incorporated herein by reference.

**WHEREFORE**, Plaintiffs demand judgment in their favor against all defendants, jointly, severally, and/or individually, in an amount in excess of One Billion Dollars ($1,000,000,000) for compensatory and punitive damages, plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent the defendants from ever again committing the terrorist acts of September 11, 2001 or similar acts.

**COUNT FIVE**
*CLAIM BY ALL PLAINTIFFS AGAINST NON-SOVERIGN STATE*
*DEFENDANTS FOR NEGLIGENT AND/OR INTENTIONAL*

### *INFLICTION OF EMOTIONAL DISTRESS*

410.    Plaintiffs incorporate herein by reference the averments contained in the preceding paragraphs as though fully set forth at length.

411.    All defendants knew that the September 11, 2001 intentional hijacking and suicide flights would injure innocent United States citizens at their place of work, leaving family members to grieve for their losses.

412.    The actions of the defendants in using the September 11, 2001 intentional hijacking and suicide flights to murder the Decedents were done with a willful disregard for the rights and lives of the Plaintiffs.

413.    As a direct and proximate result of defendants' conduct, Plaintiffs have suffered and will forever in the future suffer severe and permanent psychiatric disorders, emotional distress and anxiety, permanent psychological distress and permanent mental impairment causing expenses for medical care and counseling.

414.    The conduct of the defendants was undertaken in an intentional manner to kill American citizens.  Their efforts culminated in the murder of the Decedents and caused the contemporaneous and permanent emotional suffering of the families and heirs of the Decedents.

415.    The defendants, by engaging in this unlawful conduct, negligently and/or intentionally inflicted emotional distress upon the Plaintiffs.

**WHEREFORE**, Plaintiffs demand judgment in their favor against all defendants, jointly, severally, and/or individually, in an amount in excess of One Billion Dollars ($1,000,000,000) for compensatory and punitive damages, plus interest, costs,

and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent the defendants from ever again committing the terrorist acts of September 11, 2001 or similar acts.

## COUNT SIX
### CLAIM BY ALL PLAINTIFFS AGAINST NON-SOVERIGN STATE DEFENDANTS FOR CONSPIRACY

416.   Plaintiffs incorporate herein by reference the averments contained in the preceding paragraphs as though fully set forth at length.

417.   As set forth more fully above, all defendants, known and unknown, unlawfully, willfully and knowingly combined, conspired, confederated and agreed, tacitly and/or expressly, to kill the Decedents and other persons within the United States.

418.   As set forth above, all defendants conspired and agreed to provide material support and resources to Al Qaeda, Bin Laden and the Hijackers in furtherance of defendants' overall goal to kill American citizens and other persons residing in the United States.

419.   As set forth above, all defendants engaged in concerted efforts and activities designed to attack the United States and inflict harm on U.S. citizens and property.

420.   The defendants' conspiracy resulted in the September 11 terrorist attacks that killed the Decedents.

421.   As a result of the defendants' conspiracy, Plaintiffs have suffered damages

as fully set forth in the paragraphs above which are incorporated herein by reference.

   **WHEREFORE**, Plaintiffs demand judgment in their favor against all defendants, jointly, severally, and/or individually, in an amount in excess of One Billion Dollars ($1,000,000,000) for compensatory and punitive damages, plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent the defendants from ever again committing the terrorist acts of September 11, 2001 or similar acts.

           Respectfully submitted,

            /s/ Thomas E. Mellon, Jr.
           Thomas E. Mellon, Jr., (Pa. Bar No. 16767)
           John A. Corr, (Pa. Bar No. 52820)
           Stephen A. Corr, (Pa. Bar No. 65266)
           MELLON, WEBSTER & SHELLY
           87 North Broad Street
           Doylestown, PA  18901
           Telephone:  (215) 348-7700

           R. Douglas Hailey (IN Bar No. 7375-49)
           Mary Beth Ramey (IN Bar No. 5876-49)
           RAMEY &HAILEY
           9333 North Meridian Street
           Suite 105
           Indianapolis, Indiana 46260
           (317) 582-0000

           Dennis G. Pantazis, Esquire
           WIGGINS CHILDS QUINN
            & PANTAZIS, LLC
           The Kress Building
           301 19th Street North
           Birmingham, AL 35203
           205-314-0500

Timothy B. Fleming, Esq. (DC Bar No. 351114)
WIGGINS CHILDS QUINN
   & PANTAZIS, PLLC
2031 Florida Avenue, NW, Suite 300
Washington, DC  20009
(202) 467-4123


J.D. Lee (TN Bar No. 2030)
David C. Lee (TN Bar No. 015217)
LAW OFFICE OF J.D. LEE
422 South Gay Street, 3rd Floor
Knoxville, TN 37902
(865) 544-0101

Evan J. Yegelwel, Esquire
TERRELL HOGAN ELLIS
   YEGELWEL. P.A.
233 East Bay Street
Blackstone Building, 8th Floor
Jacksonville, FL 32202
Telephone: 904-632-2424

Edward H. Rubenstone (Pa. Bar No. 16542)
LAMM RUBENSTONE LLC
3600 Horizon Boulevard, Suite 200
Trevose, PA 19053
Telephone: 215-638-9330

Donald J. Winder, (Utah Bar No. 3519)
WINDER & COUNSEL, PC
175 West 200 South, Suite 4000
P.O. BOX 2668
Salt Lake City, UT 84110-2668
Telephone: 801-322-2222

Richard D. Burbidge, (Utah Bar No. 0492)
Stephen B. Mitchell, (Utah Bar No. 2278)
Jefferson W. Gross, (Utah Bar No. 8339)
BURBIDGE MITCHELL & GROSS
215 South State Street, Suite 920
Salt Lake City, UT 84111
Telephone: 801-355-6677

**Attorneys for Plaintiffs**

Robert M. Foote, Esquire
Craig S. Meilke, Esquire
FOOTE, MEYERS, MIELKE
  & FLOWERS, LLC
3 North Second Street, Suite 300
St. Charles, Illinois  60174