# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------:

IN RE TERRORIST ATTACKS ON            Civil Action No.

SEPTEMBER 11, 2001                  03 MDL 1570 (GBD)

------------------------------------------------------------:

| | |
|---|---|
| FIONA HAVLISH, in her own right and as Executrix of the ESTATE OF DONALD G. HAVLISH, JR., Deceased, et al., | : : : : |
| Plaintiffs, v. | : : : |
| USAMA BIN LADEN, | : |
| AL QAEDA/ISLAMIC ARMY, an unincorporated association, *et al* | : CIVIL ACTION NO. 03-CV-9848 -RCC : Case Transferred from the United : States District Court for the |
| FOREIGN STATE DEFENDANTS, | : District of Columbia : Case Number   1:02CV00305 : |
| THE ISLAMIC REPUBLIC OF IRAN, ALI AKBAR HASHEMI RAFSANJANI Previously Identified and Served as Unidentified Terrorist 1, | : : : : : |
| IRANIAN MINISTRY OF INFORMATION AND SECURITY, | : : |
| THE ISLAMIC REVOLUTIONARY GUARD CORPS, | : : : |
| HIZBALLAH, an unincorporated association, | : : : |
| THE IRANIAN MINISTRY OF PETROLEUM, | : : |
| THE NATIONAL IRANIAN TANKER CORPORATION Previously identified as Unidentified Terrorist 2, | : : : |
| THE NATIONAL IRANIAN OIL CORPORATION, | : : |

**SECOND AFFIDAVIT OF
KENNETH R. TIMMERMAN
*re*: EXPERT TESTIMONY**

| | |
|---|---|
| | : |
| THE NATIONAL IRANIAN  GAS COMPANY | : |
| Previously Identified as Unidentified Terrorist 4, | : |
| | : |
| IRAN AIRLINES | : |
| Previously Identified as Unidentified Terrorist 5, | : |
| | : |
| THE NATIONAL IRANIAN | : |
| PETROCHEMICAL COMPANY | : |
| Previously Identified as Unidentified Terrorist 6, | : |
| | : |
| IRANIAN MINISTRY OF | : |
| ECONOMIC AFFAIRS AND FINANCE | : |
| IRANIAN MINISTRY OF COMMERCE, | : |
| | : |
| IRANIAN MINISTRY OF DEFENSE | : |
| AND ARMED FORCES LOGISTICS, | : |
| | : |
| THE CENTRAL BANK OF THE | : |
| ISLAMIC REPUBLIC OF IRAN, *et al.* | : |
| Previously Identified as Unidentified Terrorist 7, | : |
| | : |
| Defendants. | : |

_____

## *Second Affidavit of Kenneth R. Timmerman*
## *re: Expert Testimony*

I, **Kenneth R. Timmerman,** being duly sworn, do hereby swear and affirm under

penalty of perjury that the contents of this Affidavit are true and correct to the best of my

knowledge, information, and belief.  Similarly, I have read the allegations contained in the

*Havlish* **Third Amended Complaint**, and I believe they are true and correct to the best of my

knowledge, information and belief.


### Qualifications of the Witness

1.      *See* First Affidavit of Kenneth R. Timmerman *re*: the *Havlish* Investigation *re*: Terrorist

Attacks on September 11, 2001 at ¶¶ 1-30 and 114-129.

### The Iran-Palestinian Connection
### and the Creation of *Hizballah* in Lebanon

2.      It is my <u>expert opinion</u> that **the Islamic Republic of Iran**, a **Shiite** country, has

always considered **terrorism to be a legitimate tool of foreign policy**, and has, for

decades, been **consistently willing to work with Sunni Muslim leaders and militia**

**groups in terrorist operations**.  Since its inception, the Islamic Iranian regime has

consistently used such Sunni organizations as **terrorist proxies** to carry out important

elements of Iran's foreign policy agenda.

3.      Those relationships had roots beginning in the 1970s, became Iranian regime

policy in the 1980s as **Iran** allied with **Palestinian** groups and created the terrorist

organization *Hizballah* in Lebanon, and expanded in the 1990s to include **Egyptian**

**Islamic *Jihad***, a variety of **Afghan *mujahedin* groups**, the **Bosnian Muslims**, the

**Taliban** and **al Qaeda** – and they continue to this day.

4.      As I will show in this affidavit, Iran's leaders are quite capable of supporting a

given group one day, then arming its opponents the next as Iran's tactical goals shift.

5.      The founder of the Islamic Republic of Iran, **Ayatollah Ruhollah Khomeini**, had

a close personal relationship with **Yasser Arafat**, the leader of the Palestine Liberation

Organization (PLO).  During the 1970s, future Iranian revolutionaries, including

Ayatollah Khomeini's son Ahmad, trained with PLO forces in Lebanon.  Arafat was the first foreign "leader" to visit Iran once Khomeini seized power in 1979.

6.      The early ties mentioned above are illustrated by photographs taken by the Iranian photographer "Reza" (a renowned National Geographic master photographer; winner of the Hope Prize with UNICEF; awarded the *Chevalier de l'Ordre National du Mérite*, France's highest civilian honor) in Lebanon in the late 1970s.  They show **Ahmad Khomeini**, the former Supreme Leader's son, training with PLO guerillas and Cuban military trainers in Lebanon before the Iranian revolution of 1978-1979.  Ex. B-1. "Reza" gave me an entire series of these photographs, subtitled in Farsi, and allowed me to use them in my 1987 book, <u>Fanning the Flames: Guns, Greed and Geopolitics in the Gulf War</u>.[1]

7.      During the years immediately preceding the Islamic Revolution in Iran, **Seyed Ali Mousavi-Khamenei** – Iran's current Supreme Leader – served as the liaison between **Ayatollah Khomeini** from his place of exile in Najaf, Iraq, and the revolutionaries receiving training at Palestinian camps in Lebanon.

8.      After the Shah left Iran on January 6, 1979, **Khamenei** coordinated PLO aid to the Iranian revolution. That aid reportedly included the dispatch of PLO guerillas to Tehran to take part in some of the key military battles on February 11 and 12, 1979, the night of the "*putsch*" that toppled the provisional government of Prime Minister Shahpour Bakhtiar.

---

[1] The book was syndicated by *New York Times* Syndication Sales, with chapters appearing in Dutch, French, Norwegian, Portuguese and other languages. However, the only complete edition of the book was published by a small German-language publisher in Switzerland under the title: <u>Öl ins Feuer</u>, (*Orell Füssli*, Zurich, 1988).

9.       On November 4, 1979, the students' group known as the **"Students Following the Line of the Imam"** seized the U.S. Embassy in Tehran and took 52 U.S. diplomats hostage.  Secretary of State Cyrus Vance then wrote to **Arafat**, who the United States shunned as a terrorist at that time, entreating him to use his influence with Khomeini to get the hostages freed.[2]

10.       In 1982, the **leadership of the Islamic Republic of Iran**, including in particular then prime minister **Mir Hossein Mousavi** and **Hojjat-ol eslam Ali Akbar Mohtashemi**, decided to set up a proxy organization in Lebanon called *Hizballah*, or "Party of God."[3]

11.       Among the early leaders of *Hizballah* was a Lebanese Shiite named Abbas Mousavi, a distant cousin of Mir Hossein Mousavi.

12.       Soon after Israel invaded Lebanon on June 6, 1982, Iran dispatched an expeditionary force of its **Islamic Revolution Guards Corps (IRGC)** to Lebanon to train the initial *Hizballah* fighters and to assist the PLO resist the Israeli invasion.  IRGC troops seized control of the Sheikh Abdallah army barracks from the Lebanese Army in the Bekaa Valley and set up camps inside the ancient Roman ruins in nearby Baalbek, including the famous Temple of Jupiter.

13.       At the time of *Hizballah's* founding in 1982, the relationship between the **Shiite** Islamic Republic of Iran and the predominantly **Sunni** Palestine Liberation Organization of Yasser Arafat was still close enough that Ayatollah Khomeini called on Iraqi leader

[2] *See* Alan Hart, Arafat: Terrorist or Peacemaker? (Sidgwick & Jackson, London: 1984) at p. 378.
[3] Mir Hossein Mousavi ran for president in June 2009, and the popular belief that the regime committed massive fraud to steal the election from him led to widespread disturbances across Iran.

Saddam Hussein, a Sunni, to cease the ongoing Iran-Iraq war, which had been raging since September 20, 1980, and join forces with Iran in dispatching troops to Lebanon to fight on the PLO side against the Israeli invasion.  (Saddam, a secular leader without significant religious ties, declined the invitation and continued to fight Iran.)

14.     In keeping with this long-standing relationship, when Iran's newly formed *Hizballah* organization needed experienced terrorist operatives, it turned to **Yasser Arafat** for assistance.  When Arafat was forced by Israel to leave Lebanon in August 1982, *Hizballah* recruited a former member of Arafat's "Force 17" praetorian guard, a young Lebanese Shiite named **Imad Fayez Mughniyah**, to join their ranks.  Mughniyah soon became *Hizballah's* chief of military (*i.e.*, terrorist) operations a position which he continued until his death in February 2008.

15.     On April 18, 1983, working with other *Hizballah* operatives, and most likely with the help of members of Syrian intelligence and the IRGC stationed in the Bekaa Valley, **Mughniyah** directed a terrorist operation in which a truck bomb destroyed the **U.S. Embassy in Beirut**, killing 63 persons, including CIA Assistant Deputy Director for Mideast Operations, Robert Ames, and five other CIA officers who had traveled from around the Middle East to meet with him.  I was in Beirut at the time and I was one of the first Western journalists to arrive on the scene of the attack.  A young U.S. Embassy press officer named Ryan Crocker emerged from the still smoldering ruins and, covered in dust from the blast, briefed me and other reporters on what had just happened.[4]

---

[4] Ryan Crocker became U.S. ambassador to Iraq in 2007.  I have attached my front page story on the U.S. Embassy blast from *USA Today* as Ex. A-1 to the First Affidavit of Kenneth R. Timmerman *re*: the *Havlish* Investigation.

16.     On or about September 26, 1983, the U.S. National Security Agency (NSA) intercepted a message sent from Iranian intelligence headquarters in Tehran to **Hojjat-ol eslam Ali Akbar Mohtashemi**, the Iranian ambassador in Damascus.  The message instructed Mohtashemi to activate the *Hizballah* network to launch "a spectacular action against the United States Marines" then stationed in Beirut, Lebanon.[5]  Iran did not have an ambassador in Lebanon at the time, so Mohtashemi coordinated *Hizballah* operations and finances out of Damascus, Syria.

17.     A few weeks later, on Sunday, October 23, 1983, two truck bombs simultaneously demolished the U.S. Marines barracks at the Beirut airport and the headquarters of the French paratroopers in Beirut, killing 241 Marines and more than 60 French soldiers.  I had been on a reporting assignment with the Marines just one week earlier and returned to Lebanon one week after the bombings to report on the investigation and the aftermath.

18.     For reasons that have never been elucidated fully, the commander of the U.S. Marines in Beirut, Colonel Tim Geraghty, was never briefed on the intercepted Iranian communication before the attack.  Neither was then Deputy Chief of Naval Operations, Rear Admiral James "Ace" Lyons, who learned of the intercept only after the simultaneous truck bombings.

19.     Much later, I learned about the intercept from Rear Admiral Lyons, who, in March 2003, hand-delivered a sealed copy of the intercept to U.S. District Court Judge Royce C. Lamberth, who at that time was hearing the case *Peterson, et al. v. Islamic*

---

[5] *Peterson, et al. v. Islamic Republic of Iran,* CA 1:01-cv-02094-RCL (D.D.C. May 30, 2003), Memorandum Opinion at 12, cited by Kenneth R. Timmerman in Countdown to Crisis: The Coming Nuclear Showdown with Iran (Crown Forum 2005), pp. 22-23.

*Republic of Iran,* CA 1:01-cv-02094-RCL (D.D.C. May 30, 2003), a civil lawsuit against

Iran on behalf of the victims of the Marine barracks bombing. Ex. B-2.

20.     On November 16, 1983, I was in the mountains in northern Lebanon when French

Super-Etendard fighter jets streaked overhead, heading for the Lebanese interior.  I

recognized the fighter jets and knew from news reports that they had been deployed on a

French carrier off the coast in the Mediterranean Sea.  I was surprised to see them, and I

noted that they flew unaccompanied by any U.S. aircraft.

21.     I learned later that day, after returning to Beirut, that I had witnessed a failed

retaliatory mission against the Sheikh Abdallah barracks in Baalbek, the headquarters of

*Hizballah* and their Iranian Revolutionary Guards trainers.  The mission killed only a

shepherd and a few goats.

22.     In 2003, after Rear Admiral Lyons revealed the existence of the intercept from

1983, I interviewed former Secretary of Defense Caspar Weinberger, former Chairman of

the Joint Chiefs of Staff General John W. Vessey, former Navy Secretary John Lehman,

and others, in order to tell the complete story of the botched retaliation raid, which the

U.S. did not join, and of the Iranian involvement in the attack on the U.S. Marines and

French paratroopers in Beirut.  Those interviews corroborated much of the information I

had learned in Lebanon twenty years earlier, and enhanced my understanding of the

extent of U.S. Government knowledge of the direct terrorist threat from Iran at that time.[6]

23.     From Iranian sources of mine, who have proven to be reliable and who I know to

have access to information and access to a top Iranian regime official who was personally

---

[6]  *See* Kenneth R. Timmerman, ""Invitation to September 11," INSIGHT magazine, January 6,
2004; and Countdown to Crisis, pp. 19-26, "The Intercept."

involved in the planning of the 1983 attacks, I learned that Iran's goal in attacking the U.S. Embassy and, especially the U.S. Marines and French paratroopers, was to force the United States and the Multinational Forces then stationed in Lebanon to withdraw, giving Iran and its *Hizballah* proxy free reign to expand and control the territory.

24.     The U.S. did, in fact, withdraw from Lebanon in February 1984, as a direct result of these attacks.

25.     These Iranian sources also told me that the commander of Iran's Revolutionary Guards Corps, Major General Mohsen Rezai, boasted in the mid-1990s that Iran forced the United States to leave Lebanon in February 1984 through these attacks.

26.     I also learned from these Iranian sources, ████████████████████████████ ████████████████████████████ **Imad Mughniyah**, that Mughniyah was personally involved in the planning and operation of all three attacks, which he carried out on direct orders from Iran. ████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ███████████████████

## Mughniyah's Terrorist Record

27.     My on-the-ground experience in Lebanon from 1982 to 1984 motivated me to continue investigating Iranian-backed terrorism beyond the initial news reports that I wrote.  For nearly 30 years since 1982, I have continuously interviewed a wide variety of government and non-governmental sources in Europe, the United States, and the Middle East on the subjects of *Hizballah*, hostage-taking, and Iranian-backed terrorist acts.

28.     My sources have included recent Iranian exiles who had firsthand knowledge of

how the Iranian regime operates, arms dealers in direct contact with Iranian officials,

Western and Middle Eastern diplomats, intelligence case officers, analysts, and law

enforcement personnel.  Among these latter were the two most prominent French

investigative judges dealing with Iranian terrorism, Gilles Boulouques, and Jean-Louis

Bruguière, who provided me with numerous background briefings.  I will summarize

some of what I learned from these sources here.

29.     In December 1983, the end of the same year of the truck bombing of the U.S.

Embassy and the simultaneous truck bombings of the U.S. Marine barracks and the

French paratroopers headquarters in Beirut, *see* ¶¶ 15-17, *supra*, **Imad Mughniyah's**

brother-in-law, Mustapha Badr-el-Din, was involved in a botched attempt to assassinate

the Emir of Kuwait.  The Iranian regime was furious with the Kuwaitis because of their

support for Saddam Hussein in his continuing war against Iran.

30.     On March 24, 1984, the Kuwaiti authorities sentenced Mustapha Badr-el-Din to

death.

31.     In December 1984, **Mughniyah** coordinated the hijacking of a Kuwaiti airliner to

Tehran in an effort to win Mustapha Badr-el-Din's release.  The lead hijacker, a

*Hizballah* operative named Abu Haidar Mousavi, "surrendered" to Iran and was given

refuge by the Iranian authorities.  (Mughniyah himself wasn't on the plane.)

32.     At the same time, also acting on Iran's orders, **Mughniyah** began kidnapping

Western hostages in Lebanon.  Among others, Mughniyah and his cadres kidnapped the

new CIA station chief in Beirut, William Buckley, on March 16, 1984, ultimately

torturing him to death.

33.    Former hostage David Jacobsen has testified that after Mughniyah's men kidnapped him, he shared a room with William Buckley in the Sheikh Abdallah barracks in Baalbek, the headquarters of Iran's Revolutionary Guards Corps contingent in Lebanon.  Jacobsen has written that he later understood that his captor was **Mughniyah**, and that he was "the boss of all bosses in the hostage operations."[7]

34.    On the morning of June 14, 1985, two Lebanese *Hizballah* members stormed the cockpit of TWA flight 847 after its departure from Athens, Greece, bound for Rome, Italy, and hijacked the aircraft.

35.    During a stopover at the Beirut airport, one of the hijackers murdered a passenger, 23-year old U.S. Navy diver Robert Dean Stethem, and dumped his body onto the tarmac as international TV cameras were rolling.

36.    The FBI subsequently discovered fingerprints in the rear lavatory of the aircraft. Lebanese authorities identified the fingerprints as belonging to **Imad Fayez Mughniyah** and supplied the FBI with a copy of the Lebanese passport that had been issued to him on September 7, 1984.  In 1988, an intelligence analyst from a European country gave me a copy of this passport and several other photographs of Mughniyah that I published in my confidential newsletter, MEDNEWS.[8]  *See* Ex. A-2 to First Affidavit of Kenneth R. Timmerman *re*: the *Havlish* Investigation.

37.    Based on the FBI investigation of the TWA flight 847 hijacking, federal prosecutors issued a sealed indictment of **Imad Fayez Mughniyah** for the murder of

---

[7] David Jacobson, Hostage: My Nightmare in Beirut (Donald I. Fine, Inc. 1991), pp. 40-41, 45; 187.
[8] "Imad Mughniyah: the Real Story," Middle East Defense News (MEDNEWS), May 2, 1988.

Robert Dean Stethem that became the basis for the FBI's "MOST WANTED" notice on Mughniyah.  Mughniyah remained on the FBI's "MOST WANTED" list right up until his death in 2008.

38.    In the 1990s, **Mughniyah** shifted focus from Lebanon to launch a series of dramatic international operations on Iran's behalf.

39.    On March 17, 1992, a *Hizballah* strike team under **Mughniyah's** command used a truck bomb to destroy the Israeli Embassy in Buenos Aires, Argentina, killing 29 people and wounding 242 others.

40.    On July 1994, a follow-on attack against the Argentine Israeli Mutual Association (AMIA) building in Buenos Aires killed 86 persons.  U.S. and Israeli intelligence sources believe **Mughniyah** entered Argentina shortly before the AMIA bombing to activate the sleeper networks that carried out the attack.

41.    Argentinean prosecutors Alberto Nisman and Marcelo Martinez Burgos issued eight arrest warrants on October 25, 2006 in relation to the July 1994 attack on the AMIA Jewish Community Center in Buenos Aires that killed 86 persons. The warrants were for former MOIS minister **Ali Fallahian**; former president **Ali Akbar Rafsanjani**; former foreign minister **Ali Akbar Velayati**; former IRGC commander **Mohsen Reza**; former *Qods* Force commander **Ahmad Vahidi**; a former Iran embassy employee, **Ahmad Reza Asghari** (a/k/a Mohsen Randjbaran); **Mohsen Rabbani**, who ran an Iranian cultural

center in Buenos Aires and was later given diplomatic immunity by the Iranian embassy

in Argentina; and **Imad Mughniyah**.[9]

42.     In their 801-page prosecution report, Nisman and Burgos stated that "the attack

against the AMIA center was decided and organized by the highest ranks of the Islamic

Republic of Iran government that was ruling then, who themselves entrusted the

execution of the criminal act to the Lebanese Terrorist organization *Hizballah*."  Ex. B-

14, p. 1.

43.     The decision to bomb the AMIA center was taken by **Khamenei, Rafsanjani,**

**Velayati**, and **Fallahian** – the "*Omur-e Vijeh*" or Special Matters committee – on August

14, 1993 in Mashad, the Argentinian prosecutors explained.  Also called to the meeting

as "consultants" were **Mohzen Rezai** and **Ahmad Vahidi** from the IRGC, as well as

**Mohsen Rabbani** and **Ahmad Reza Asgari**, who were both employees at the time at the

Iranian embassy in Buenos Aires.

44.     "[T]he preliminary plan to attack our country had its origin in the "Intelligence

Office" that depends on the Presidential office and [was] headed by Rafsanjani himself,"

and was then handed to the IRGC *al Qods* force for execution, Nisman and Burgos wrote.

*Id. at p.* 6.[10]

---

[9] In response to intense lobbying by the Iranian government, INTERPOL agreed to remove
Rafsanjani and Velayati from the suspect list, but issued Red Notices for the six others.
[10] ████████████████████████████████████████████

45.     In November 2007, INTERPOL issued "Red Notices" for **Imad Mughniyah** and five top Iranian government officials at the request of the Government of Argentina, for involvement in planning and executing the July 1994 AMIA bombing.

46.     In summary, although Mughniyah was for many years the lead terrorist operative for Iran's terrorist proxy, Hizballah, still, it was the MOIS and the IRGC *Qods* Force that coordinated terrorist operations with the Supreme Leader's office and a small group of top Iranian decision-makers.


### Mughniyah meets Osama bin Laden and Ayman al Zawahiri

47.     In 1991-1992, the Islamic Republic of Iran leadership established a new organization, known *al Majma' al Alami lil-Taqrib bayna al Madhahib al Islamiyyah* (International Institute for Rapprochement Among the Islamic Legal Schools), to promote publicly a reconciliation of the rival Sunni and Shiite Islamic faiths.

48.     In furtherance of this "strategic plan" to create a united Sunni-Shiite front against the United States and Western culture (of which Israel was considered a part),[11] the Islamic Republic of Iran expanded ties with **Hassan al Turabi**, a prominent **Sunni** Islamist leader in Sudan.  As discussed *supra*, such a reconciliation with Sunni groups was consistent with the Islamic Republic of Iran's behavior since its inception in 1979.

---

[11] Iran's work with Sunni terrorist organizations defied the conventional wisdom of Western intelligence agencies and analysts.  Yet, for many years, a special department within the Supreme Leader's office, known as *"Rahman al Rahim,"* was devoted to supporting Sunni and Shiite *jihadi* organizations.  Since at least 1994, Iran has regularly hosted leaders of HAMAS and other Sunni terrorist organizations in Tehran at annual "Jerusalem Day" celebrations and other special events.

49.     One emissary the Iranians sent to Sudan in 1991-1992 was **IRGC Brigadier General Mohammad Baqr Zolqadr**.[12]

50.     As the official representative of the Islamic Republic of Iran, General **Zolqadr** took part in a historic meeting in Khartoum in 1993 with Hassan **al Turabi**, Imad **Mughniyah**, and **Osama bin Laden**.

51.     Osama bin Laden's former bodyguard and an al Qaeda trainer, **Ali Mohamed**, first revealed the existence of this meeting to the public in a plea allocution on October 27, 2000.  Ex. B-3.  Ali Mohamed is a former Egyptian army officer who infiltrated U.S. Army Special Forces command in the mid-1980s, and later, became a confidential informant of the FBI (although he was actually a "double agent" during that time and continued reporting to al Qaeda).  Ali Mohamed handled security for bin Laden for the Khartoum meeting.[13]

52.     The Khartoum meeting laid the groundwork for the extensive cooperation between Iran and al Qaeda, which would eventually include training, intelligence, security, facilitation of travel, and safe haven, and which would ultimately lead to the 9/11 attacks.

53.     At the time of the Khartoum meeting, **Dr. Ayman al Zawahiri** was hailed as a hero within the radical Islamic movements because of his role in the 1981 assassination

---

[12]  By 1996, **Zolqadr** would rise within the IRGC leadership to become a member of the "Special Operations Committee" of top regime leaders who set policy and targets for Iranian-backed terror attacks, former Iranian president Abolhassan Banisadr told me at that time.

[13]  **Ali Mohammad** was ultimately convicted for his role in the 1998 bombings of the U.S. Embassies in Tanzania and Kenya.  In a plea allocution before Judge Leonard B. Sand of the U.S. District Court for the Southern District of New York on October 20, 2000, Ali Mohamed attested to his role in setting up the Khartoum meeting and Osama bin Laden's relationship with Imad Mughniyah.

of Egyptian president Anwar Sadat, the Arab leader who first made peace with Israel. The Islamic Republic of Iran applauded the Sadat murder, naming a Tehran street after the lead assassin, Khalid Eslambouli.

54.     During repeated trips to Sudan in the early 1990s as a *de facto* Iranian government representative, **Mughniyah** developed a close personal relationship with **Zawahiri**.

55.     **Zawahiri**, in turn, regularly visited Iran, where Iran's leaders welcomed him with open arms and an open checkbook. While in Tehran, Zawahiri was the guest of **Ali Fallahian**, Minister of Intelligence and Security, and **Ahmad Vahidi**, the commander of the IRGC's *Qods* force, Iran's foreign terrorist operational group.[14]

### Iran and Hizballah train terrorists for al Qaeda

56.     Shortly after the 1993 Khartoum meeting, **Osama bin Laden** began to send terrorist operatives to *Hizballah* training camps operated by **Mughniyah** in Lebanon, and to Iran, where they were trained directly by the IRGC.[15]

57.     In a criminal complaint unsealed on September 26, 1998, relating to the U.S. Embassy bombings in Africa, prosecutors in the Southern District of New York publicly linked Osama bin Laden to the Government of Iran, and alleged the two had conspired to launch terrorist attacks against the United States and U.S. interests worldwide.  *USA v. Wadih Hage, et al.*, Affidavit of Daniel Coleman.[16]  Much of Coleman's assertion about

---

[14]  The *Qods* Force is the international operations division of the IRGC.  "*Qods*" is the Persian word for "Jerusalem" and refers to the goal of delivering the city of Jerusalem to Islamic rule.
[15]  9/11 COMMISSION REPORT, pp. 61, 68.
[16]  Coleman is a former FBI agent who worked in a unit tracking Osama bin Laden in the 1990's.

Iran's ties to al Qaeda were based on a "Confidential Source" recruited by the FBI in 1996, who was later identified by the 9/11 Commission as **Jamal al Fadl**.  Members of al Qaeda were told as early as 1992 that the organization should "put aside its differences with Shiite Muslim terrorist organizations, including the government of Iran," so they could cooperate "against the perceived common enemy, the United States and its allies," al Fadl told the FBI.  He made similar comments to the 9/11 Commission.

58.     **Jamal Ahmed al Fadl** was a confidant of Osama bin Laden during bin Laden's stay in the Sudan, who defected to the United States in the summer of 1996.  He provided extensive live testimony in the U.S. District Court for the Southern District of New York during the 2001 trial of the defendants accused of the two U.S. Embassy bombings in East Africa.

59.     In that trial testimony, **al Fadl** said that Osama bin Laden dispatched terrorists under his command to *Hizballah* camps in Lebanon that were run by Mughniyah and the IRGC, where they learned "how to explosives [*sic*] big buildings." Among them was **Saif al Adel**, a top al Qaeda commander at the time of the 9/11 attacks.[17]  Testimony of al-Fadl, pp.  290-91.  Ex. B-4.

60.     In November 1999, Turkish authorities announced that they had arrested a number of al Qaeda terrorists who had entered Turkey from Iran.  Some of the arrested men were part of an eight-member team, including four Kurds and two Algerians, all of whom were carrying forged passports that crossed into Turkey from Iran on June 11,

----

[17] ████████████████████████████████████████

*Second Affidavit of Kenneth R. Timmerman re: Expert Testimony, page 17*

1999.  Under interrogation, the detainees told the Turks they had trained at camps in Iran and had been sent by Osama bin Laden to carry out terrorist attacks aimed at disrupting the upcoming summit of the Conference on European Cooperation and Security to be held in Turkey.  "Bin Ladin operatives trained in Iran," *The Iran Brief,* Nov. 8, 1999.

61.     In September 2004, I traveled to a European capital with *Havlish* attorney Timothy B. Fleming to debrief a former IRGC Colonel, whom I call "Colonel B,"[18] who provided us with numerous documents from his 20-year career with the IRGC.  *See* ¶¶ 36, 38-39, 90-101, First Affidavit of Kenneth R. Timmerman re: the *Havlish* Investigation.[19]

62.     One of the documents Colonel B showed us indicated that in 1999-2000 the Colonel had been the superintendant of Shahid Mohammad Beglou camp, a military training camp at Sahel-e rouh, approximately 40 kilometers west of Rasht near the port of Anzali on the Caspian Sea.

63.     Shahid Mohammad Beglou camp specialized in training a variety of terrorist groups loosely affiliated with al Qaeda.  Colonel B told us that the Syrians, Lebanese, Azeris, Libyans, Iraqi Arabs, and Iraqi Kurds came to the camp for 60-day training sessions.  All of these individuals were Sunni Muslims.  The trainees from each group came for 60-day training sessions, and they rarely mixed.

---

[18] I describe this IRGC officer in more detail in my Affidavit *re*: the *Havlish* Investigation, and refer to him as "Colonel B."

[19]  For the reasons stated in ¶¶ 38-39 of my First Affidavit, and drawing upon my 30 years of experience and my skills as an investigative journalist in assessing sources' information and credibility, I believe that Colonel B was being truthful with us,  and I think that his information is sound and that the documents he showed us are authentic.  Although Colonel B ultimately decided not to testify directly, I consider his information to be a substantial value to the *Havlish* investigation and in informing my expert opinion in this case.  At the very least, it is valuable background and corroborating information.

64.     The Colonel told us that the IRGC maintained another separate camp in an especially for Saudi nationals because of their distinct cultural habits and religious practices, which differed even from fellow Sunnis.  This separate camp was located in an Iranian-controlled enclave of Iraqi Kurdistan controlled by Iranian intelligence and later, by Abu Musab al Zarqawi.[20]

65.     Another camp, run by Imad Mughniyah for special recruits Mughniyah spotted during his trips to Afghanistan, was set up in the desert just east of Tehran.

66.     ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████

67.     It is my expert opinion that these camps were the active continuation of the military/terrorist-training relationship that was established between Iran and al Qaeda in the Sudan and Lebanon in the early 1990s.


**The idea of using civilian airliners as weapons**



_____

[20] This Iranian-controlled enclave was a sore point with Iraqi Kurdish leaders. The Prime Minister of the Kurdish Regional Government, Barham Saleh, accused Iranian intelligence officers operating out of this enclave of attempting to assassinate him in 2002.  The area was said to be controlled by a group known as *Ansar al Islam*, an al Qaeda affiliate, and was bombed by the United States during the 2003 war.

*Second Affidavit of Kenneth R. Timmerman re: Expert Testimony, page 19*

69. ███████████████████████████████████████

███████████████████████████████████████

70. ███████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

71. ███████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████

72. ███████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

█████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

█████████████████

74.    ██████████████████████████████████████████

██████████████████████████████████████ the 9/11 COMMISSION REPORT

and a plethora of open source material (and consistent with my debriefing of Colonel B,

*see* ¶¶ 56-60, *infra*), already establishes that Mughniyah, *Hizballah*, and Iran worked

together to train terrorists in camps in Lebanon and inside Iran.

75.    The 9/11 COMMISSION REPORT also places Mughniyah, as the "senior Hezballah

operative," on an airplane bound for Iran with one of the "muscle" hijackers in November

2000, and an "associate" of Mughniyah's on another flight from Beirut to Iran with three

of the "muscle" hijackers in mid-November 2000.  Senior Hezballah officials in Beirut

*and* Iran were known to have been expecting an important group traveling at this time.  In

all, eight to ten of the fourteen Saudi "muscle" hijackers traveled into or out of Iran

between October 2000 and February 2001.  9/11 COMMISSION REPORT at p. 240.  In

addition, the 9/11 COMMISSION REPORT states that, in October 2000, Mughniyah, again,

as the "senior operative of Hezbollah," "visited Saudi Arabia to coordinate activities

there.  He also planned to assist individuals in Saudi Arabia in traveling to Iran during

November.  A top Hezbollah commander and Saudi Hezbollah contacts were involved."

9/11 COMMISSION REPORT at p. 240.

76.    ██████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████

77.     Given the close ties already established by this time between Mughniyah and al

Qaeda, and the training of al Qaeda operatives at *Hizballah* camps in Lebanon and in Iran

by Mughniyah and the IRGC, it is clear, at the very least, that Mughniyah had ample

opportunity and means to teach al Qaeda terrorists how to destroy a large building using a

hijacked airliner.  In any event, regardless of exactly where and how al Qaeda learned the

technique, the 9/11 attack was <u>not</u> the first time al Qaeda attempted to use the tactic.

78.     In December 1994, Algerian terrorists from the GIA (in English, the "Armed

Islamic Group,"), which subsequently became part of al Qaeda, *see* Affidavit of Jean-

Louis Bruguière at ¶ 12, hijacked a French airliner on a regular flight from Algiers to

Paris.  The plane landed in the southern French city of Marseilles to refuel.  A French

SWAT team successfully stormed the plane, rescuing the hostages and arresting the

hijackers.  The case was handed over to French counter-terrorism judge Jean-Louis

Bruguière.

79.     Judge Bruguière briefed me on his investigation in late 2001.  From the very start,

he told me, the hijacking was unusual because the Algerian militants then operating in

France were primarily gun-runners fueling a radical Islamic fundamentalist insurrection

in Algeria.  The hijacking was the first time the GIA had struck France itself.

80.     As Judge Bruguière broadened his investigation, he convinced British authorities

to raid a London safe house belonging to another GIA cell.  As a result of that raid, Judge

Bruguière discovered written orders to the hijackers revealing that the real goal of the

mission had been to crash the aircraft into the Eiffel Tower in Paris.  Judge Bruguière

believes this is the first time that al Qaeda terrorists implemented the idea of using civilian airliners as weapons, and he called the attack a "precursor" to 9/11.[21]

**Egypt accuses Iran of training assassins who tried to kill Mubarak**

81.     On July 7, 1995, five men armed with AK-47 assault rifles and rocket-propelled grenades opened fire on the motorcade of Egyptian president Hosni Mubarak in Addis Ababa, Ethiopia, as he was traveling from the airport to attend a conference of the Organization for African Unity.

82.     In July 1996, the Egyptian authorities arrested 44 Islamists loyal to **Dr. Ayman al Zawahiri**, who they accused of being involved in the attack.  One month later, a top advisor to Egyptian president Mubarak, Osama el Baz, accused Iran of having trained the terrorists who were involved in the attack on Mubarak.  *See The Iran Brief,* September 7, 1996.

83.     Mubarak confirmed Iran's involvement in the 1995 attack during an interview with the London-based Arabic newspaper *al Hayat* that appeared in early September 1996.  "There is information, the source for which is the confessions of the terrorists who were arrested.  They confessed that Iran was involved and that it helped Sudan organize this operation," Mubarak said.[22]

---

[21] *See* Kenneth R. Timmerman, "Codes, Clues, and Confessions," READER'S DIGEST, March 2002.
[22] "Mubarak confirms senior adviser's report that Iran backed attack to kill him in Ethiopia," REUTERS, September 17, 1996.

**Iran's responsibility for the Khobar Towers attack**

84.     On June 25, 1996, terrorists exploded a truck bomb outside the walls of the

Khobar Towers housing complex in Dhahran, Saudi Arabia, killing 19 U.S. Air Force

personnel.

85.     In testimony before the U.S. District Court for the District of Columbia in 2003,

former FBI Director Louis Freeh and his former deputy, Dale Watson, identified the

commander of the IRGC *Qods* Force, **General Ahmed Vahidi**, as the man who

coordinated the Dhahran attack.[23]   I personally listened to and took notes on their

testimony in court.  The district court found Iran responsible for the Khobar Towers

bombing.  *See Heiser v. Islamic Republic of Iran,* 466 F. Supp. 2d 229 (D.D.C. 2006).

86.     Later, the 9/11 Commission examined classified CIA documents establishing that

**General Vahidi** planned the attack with Ahmad al Mugassil, a Saudi-born al Qaeda

operative  9/11 COMMISSION REPORT at p. 60, footnote 48.

87.     A former CIA agent who worked inside the IRGC for nearly a decade, Reza

Kahlili, told me recently that **General Vahidi** was a key operator in Iran's relationship to

al Qaeda, and was undoubtedly involved in the planning of the 9/11 attacks. "Ahmad

Vahidi's contacts with al Qaeda went very deep," Kahlili said. "Vahidi met repeatedly

with bin Laden's deputy, Ayman al Zawahiri, and collaborated in joint terrorist activities,

joint ventures, such as Khobar Towers. He was head of the [IRGC] intelligence unit. He

rose to become *Qods* force commander, and last year was appointed minister of defense.

---

[23] In November 2007, INTERPOL issued Red Notices for **Ahmed Vahidi** and four other Iranian government officials at the request of the Government of Argentina, for their involvement in planning and executing the July 1994 attack on the AMIA Jewish Community Center in Buenos Aires, Argentina.  A separate INTERPOL Red Notice was issued for **Imad Mughniyah** in the same case.

He is in charge of the proliferation of arms to these groups, maintaining contact with them, arming them, and directing them."[24]

88.    One of my sources, an Iranian**,** whose family member was among the very highest echelon of the Iranian leadership, told me that top IRGC intelligence officials and others involved in the overseas terror apparatus were gathered in the home of then-president Ali Akbar Hashemi-Rafsanjani on the evening of the Khobar Towers attack.

89.    This Iranian source, who has shown himself, to my satisfaction, to be a credible and reliable source, told me that, shortly after the attack, Rafsanjani received a telephone call confirming the success of the terrorist operation.  When he put the receiver down, "he smiled and handed out chocolates," my Iranian source said, explaining that handing out chocolates is a sign of good fortune in Iran.

90.    

**Iran provides financing to Osama bin Laden**

91.    In February 1996, an Iranian Marxist opposition group known as the Organization of the People's *Fedaii* Guerillas of Iran (OPFGI), through a credible and reliable source of mine known as "Bahram" (see ¶¶ 37, 39, 102-113 of my First Affidavit re: the *Havlish*

---

[24] Interview with former IRGC officer (and CIA double-agent) Reza Kahlili, March 27, 2010. *See also* Kenneth R. Timmerman, "Ex-Agent Chronicles Being CIA's Eyes and Ears in Iran," Newsmax.com, March 30, 2010.  Kahlili's memoir, A Time to Betray, was published on April 6, 2010 by Threshhold Editions in New York.

investigation) provided me with documents relating to illegal purchases of embargoed Iraqi oil by the IRGC.

92.     Top aides to IRGC commander **Major General Mohsen Rezai** negotiated the oil purchases with Iraqi intermediaries in Paris, France.  Under the scheme, Iraqi oil tanker trucks monthly brought 30,000 metric tons of diesel fuel and 50,000 metric tons of gasoline to an Iranian border post controlled by the IRGC.  The IRGC then took possession of the oil products and sold them at a profit on the international market.[25]

93.     One of the documents provided to me by the OPFGI was a performance bond dated April 6, 1994 issued by the ASLK-CGER Bank in Brussels, Belgium, on behalf of the IRGC sellers, in favor of the buyer, the *al Shamal* Islamic Bank in Khartoum, Sudan. Ex. B-6.

94.     Osama bin Laden was a co-founder of the *al Shamal* Islamic Bank, and he capitalized it with $50 million from his own inheritance.[26]

95.     The international oil markets are extremely complex, and a high level of confidence is needed to work with partners on black market transactions of this magnitude.  Thus, assuming the authenticity of the documents provided to me by the OPFGI - and upon careful investigation, I believe they are authentic - these documents provide evidence of the depth of the ties that underlined existed by1994 between Osama bin Laden and the IRGC.

---

[25] "Iran Breaks UN Embargo on Iraq," *The Iran Brief,* April 1, 1996.
[26] *See* "Usama Bin Laden: Islamic Extremist Financier," Department of State Fact Sheet, August 14, 1996.

96.     It is my <u>expert opinion</u> that this document is evidence that the Government of Iran, through the IRGC, was knowingly engaged in financial transactions with al Qaeda long prior to 9/11, and took steps to keep those ties secret.

## 1996-1998: Iran, OBL, the Taliban, and the Hekmatyar connection

97.     I have reviewed previously classified Department of State cables from Pakistan and elsewhere covering the years 1996-2000 that provide extensive detail of Iran's involvement in Afghanistan.  These documents were released under the Freedom Of Information Act (FOIA) to the National Security Archive, a project of George Washington University in Washington, D.C.

98.     Among other subjects, these documents detail Iran's alliance with radical Sunni warlord **Gulbuddin Hekmatyar**, and Iran's on-again, off-again ties to the Taliban.

99.     In 1996, when U.S. pressure on the government of Sudan threatened Osama bin Laden's sanctuary in Khartoum, Iran's ally, **Hekmatyar**, invited **bin Laden** to join him in Afghanistan.

100.    Not long after bin Laden joined Hekmatyar in Afghanistan, U.S. diplomats reported that **Hekmatyar** met with Iranian foreign minister **Ali Akbar Velayati**.

101.    **Taliban** officials were well aware of Osama bin Laden's close ties to Iran. During a December 1997 meeting in Washington, D.C., Assistant Secretary of State Karl Indefurth made an official request to the Taliban to expel bin Laden from Afghanistan. Three Taliban government ministers replied that, if they did so, bin Laden would "go to Iran and cause more trouble."  Ex. B-7 at p. 9.

102.    When tensions between Iran and the Taliban reached their peak in February 1998,
Iran ordered Hekmatyar to do battle against the Taliban as Iran's surrogate, even though
Hekmatyar's friend, bin Laden, was then allied with the Taliban.

103.    I learned additional details of Iran's cooperation with Hekmatyar from senior
Pakistani officials, including the director of Pakistan's Inter-Services Intelligence, (ISI)
during a trip to the region in February-March 1998, in particular, that Iran was flying
arms and equipment to Hekmatyar inside Afghanistan. *See* "The Great Game in
Afghanistan," *The Iran Brief*, April 6, 1998.

104.    In August 1998, Taliban troops massacred Afghani Hazara Shiites and Iranian
diplomats in Mazar-e Sharif, Afghanistan.  In response, Iran massed some 250,000 troops
at its border with Afghanistan and threatened to invade.

105.    Yet, even at the peak of this very public hostility between Iran and the Taliban
regime, the IRGC was laying the groundwork for a new relationship with the Taliban and
especially with al Qaeda. ███████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████[27]

106.    ██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

_____

*Second Affidavit of Kenneth R. Timmerman re: Expert Testimony, page 28*

███████████████████████████████████████

████████████████████████████████

107.    This double-dealing is consistent with Iranian government behavior since the beginning of the Islamic Republic regime in 1979.

### 2000: Iran courts the Taliban; meets Zawahiri in Afghanistan

108.    I have reviewed recently released transcripts of detainee hearings at the U.S. detention facility at Guantanamo Bay that provide additional examples of improving Iran-Taliban relations from 1999-2001.

109.    Former Taliban Interior Minister **Khirrullah Said Wali Khairkhwa** was the commander of Taliban forces that initially took the city of Mazar-e Sharif in Afghanistan in 1996.  The massacre of Afghani Hazara Shiites and Iranian diplomats in Mazar-e Sharif that followed in 1998 should have made Khairkhwa a hated figure in Iran's eyes. Khairkhwa told a U.S. military tribunal in Guantanamo that, despite that background, the Taliban appointed him Governor of Herat Province from 1999-2001 with the specific mission "to improve relations between Iran and the Taliban government."

110.    "On 7 January 2000, the detainee [Khairkhwa] and three other Taliban officials attended a meeting with Iranian and *Hizbi Islami-Gulbuddin Hekmatyar* faction officials. Present at the meeting were Afghan *Hizbi Islami-Gulbuddin* leader, Gulbuddin Hekmatyar, and Ayman al Zawahiri.  Topics of discussion included United States

intervention in the region, restoration of peace in Afghanistan, and strengthening the ties with Iran government."[28]

111.    After 9/11, Khairkhwa continued to meet with Iranian government officials.  "In November 2001, the detainee met with an Iranian diplomatic delegation. The Iranian government was prepared to offer anti-aircraft weapons to the Taliban for use against the United States and coalition forces operating in Afghanistan," according to the same transcript cited above.  Ex. B-8.

112.    The Islamic Republic of Iran, the Taliban, and al Qaeda have gone to great lengths to purvey a public myth that they are ferocious enemies because of their religious differences.  According to the head of Pakistan's Inter-Services Intelligence, who I interviewed in 1998 in Islamabad, the Iranian government periodically attacked Sunni Muslim leaders and institutions in Pakistan, to enflame sectarian hatred.  Similarly, al Qaeda in Iraq became notorious after the U.S. invasion of Iraq for its repeated attacks on Shiite religious shrines and personalities.[29]

113.    However, everything I have learned in my investigations over the past twenty years indicates that the public myth of irreconcilable Sunni-Shiite religious differences is false when it comes to terrorist operations, and that both the Taliban and al Qaeda have cooperated extensively with Iran since the early 1990s, especially against the United States and against Jewish or Israeli targets.

---

[28] "Unclassified Summary of Evidence for Administrative Review Board in the Case of Khairkhwa, Khirullah Said Wali," October 7, 2005, p. 533. (These pages appear to have been misnumbered in the transcript, repeating the 000530 sequence.)

[29] This is one reason why Iran kept its terrorist training camps segregated along sectarian, and even nationality, lines, as described previously at ¶¶ 62-66, *supra*.

114.    In recent written testimony before the Senate Armed Services committee on March 16, 2010, U.S. CENTCOM commander General David Petraeus acknowledged that Iran has been aiding the Taliban in Afghanistan and that such aid continues to the present day.  "[Al Qaeda] continues to use Iran as a key facilitation hub, where facilitators connect al Qaeda's senior leadership to regional affiliates," he said.  "And although Iranian authorities do periodically disrupt this network by detaining select al Qaeda facilitators and operational planners, Tehran's policy in this regard is often unpredictable."

### 2000-2001: Iran becomes the al Qaeda travel facilitator

115.    Iran is known to have provided travel documents and to facilitate travel into and out of Afghanistan for al Qaeda operatives seeking to disguise their travels from Western intelligence agencies.

116.    I heard anecdotal information from U.S. intelligence officers, gathered during their trips to Afghan-Pakistan border region from 1998-2000, indicating that the United States was then aware that al Qaeda was trying to avoid Pakistan as much as possible as an entry and exit point to Afghanistan because they believed the United States had thousands" of CIA and FBI officers on the ground hunting for Osama bin Laden and his colleagues as part of the East African U.S. Embassies bombing investigation.[30]

117.    The head of Pakistan's ISI told me in an interview in March 1998 that the ISI itself was worried that such a U.S. operation was underway, because it might prompt bin Laden to attack American targets in Pakistan, and he had raised the issue with senior U.S.

---

[30]  Such a belief by al Qaeda was, of course, false.  There was no such U.S. task force on the ground in Pakistan at that time.

officials.  The U.S. "asked us to convey to bin Laden via the Taliban that they had no

plans to come after him," the ISI director told me.

118.    A number of lower level Guantanamo Bay detainees describe facilities provided

to them as al Qaeda members by Iran.  Several said that Iran facilitated their travel

between Afghanistan and Europe, so they could bypass Pakistan, where they believed the

United States could detect them.  *See* Ex. B-9.  Among them:

> a.   Detainee **Al Wady, Hamoud Abdullah Hamoud Hassan** "traveled to
>
>      Afghanistan from Yemen via Iran and Syria in early 2001. [Detainee
>
>      hearings, p. 521.]
>
> b.   Detainee **Al Suadi Abdul Aziz Abdullah Ali** "traveled from Damascus,
>
>      Syria, to Tehran Iran, to Mashaad [*sic*], Iran, to Tibatt, Iran and then to
>
>      Kandahar, Afghanistan" when he joined al Qaeda near the end of 2000.
>
>      [Detainee hearings, p. 530.]
>
> c.   Detainee **Muhammed, Abdul Majid**, who served 3 to 4 years in the
>
>      Iranian army before going to Afghanistan, obtained a letter from *Hezbi*
>
>      *Islami* leader Gulbuddin Hekmatiar "allowing the detainee to cross the
>
>      border from Iran to Afghanistan" as a drug courier.  [Detainee hearings, p.
>
>      500.]
>
> d.   Detainee **Peerzai Qari Hasan Ulla**, a deputy to the Taliban intelligence
>
>      chief, "was likely recruited by the Islamic Revolutionary Guards Corp or
>
>      the Iranian Ministry of Intelligence and Security, trained and returned to
>
>      Afghanistan as a collector and for operational use." [Detainee hearings, p.
>
>      509.]  The military prosecutors working on the detainee hearings had

access to U.S. intelligence files on the detainees, which included information in addition to what had been obtained through direct interrogation.  That information prompted the prosecutors in Peerzai's case to make the following critical observation: "Contacts with al Qaeda were said to have been established through the Iranian Ministry of Intelligence and Security (MOIS). All Iranian intelligence chiefs had contact with al Qaeda as of the mid-1990s." [Detainee hearings, p. 509.]

119.    Another case in point is that of **Tarek Charaabi**, a Tunisian who was arrested in Italy as part of a roundup of al Qaeda members in April 2001.  Charaabi was, reportedly, worried when an al Qaeda travel "facilitator" told him to use the "rat line" through Iran. The facilitator reassured him that al Qaeda had "total collaboration with the Iranians" and had its own organization in Iran "that takes care of helping the *mujahedin* brothers cross the border."  The facilitator said that al Qaeda had switched from using Pakistan as a transit point because "in these past years there's [*sic*] too many secret services." Charaabi was instructed to go to the Iranian embassy in London to pick up a visa "because it's very smooth and then everything's well organized all the way to the training camps."  Their March 10, 2001, conversation was wire-tapped by Italian police and presented in a Milan courtroom during the February 2002 trial of Charaabi and three other Tunisians, who were then convicted of having provided logistical support to al Qaeda in Europe.[31]

---

[31] Judge Giovanna Verga sentenced them to up to five years in prison. *See* Timmerman, <u>Countdown to Crisis</u>, p. 271; Sebastian Rotella, "Terrorism Suspects Traced to Iran," *Los Angeles Times*, August 1, 2004; and "Al Qaeda suspect jailed in Italy," CNN, February 22, 2002.

**The 9/11 Commission documents**

120.    The 9/11 Commission discovered evidence of Iran's material support for the al Qaeda 9/11 hijackers just one week before the Commission sent its final report to the printer in July 2004.  The evidence came in the form of 75 highly classified U.S. intelligence documents, which were reviewed by Commission staff on a Sunday morning in a secure facility at the National Security Agency.

121.    These documents detailed assistance the Iranian government and its Lebanese proxy, *Hizballah*, provided to al Qaeda before the September 11, 2001 attacks.

122.    I learned of this discovery in September 2004 from a member of the 9/11 Commission, who introduced me to Commission staff members who had taken part in the last minute document review.[32]  Ex. B-10.

123.    The NSA documents comprised a complete documented record of operational ties between Iran and al Qaeda for the critical months just prior to September 11.

124.    A member of the 9/11 Commision staff team that conducted the review told me the documents showed that Iran had facilitated the travel of al Qaeda operatives and ordered Iranian border inspectors not to put telltale stamps in the operatives' passports, thus keeping their travel documents clean.  This staff member also told me the documents showed that the Iranians were fully aware that they were helping operatives who were part of an organization preparing attacks against the United States.

125.    The NSA documents are summarized on pages 240-241 of the 9/11 COMMISSION REPORT, which states, "There is strong evidence that Iran facilitated the transit of al

---

[32]    See <u>Countdown to Crisis</u>, pp. 268-71. *New York Times* reporter Philip Shenon also reported this episode in his 2008 book, <u>The Commission</u>, at pp. 370-73.

Qaeda members into and out of Afghanistan before 9/11 and that some of these were future 9/11 hijackers."

126.     The 9/11 COMMISSION REPORT also states that a "senior *Hezbollah* operative" and his associate accompanied future hijackers on their travels to Iran.  Ex. B-11.

127.     I learned from 9/11 Commission staff that the "senior *Hezbollah* operative" was clearly identified in the NSA documents as **Imad Fayez Mughniyah**, although the Commission ultimately decided against naming Mughniyah in the printed version of the report.

128.     On behalf of *Havlish,* I have petitioned senior White House officials and members of the House Permanent Select Intelligence Committee to use their influence to get these documents – or relevant portions thereof – declassified, without success.

129.     In addition, at my suggestion, since 2007, *Havlish* attorneys have submitted several requests to the Director, CIA, the Office of the Director of National Intelligence, and the Director, DIA, to get supporting documents cited in the footnotes of these pages of the 9/11 COMMISSION REPORT released under the Freedom of Information Act (FOIA). Those requests have been denied.

130.

131.     *xxx*

*xxx*



[redacted][33] [redacted]

132. [redacted]

133. [redacted] *x*

134. [redacted] *x*

135. [redacted]

---

33 [redacted]

34 [redacted]

136. ███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

137. ███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████ [35]

138. ███████████████████████████████████

███████████████████████████████████████

██████████████████████████████

139. ███████████████████████████████████

███████████████████████████████████████

██████████████████████

---

[35] ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

140. ████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████

141. ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

142. ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████

143. ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████

144. ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

[redacted]

145. [redacted]

146. [redacted]

147. [redacted]

**February 2001: 9/11 Coordinator Ramzi Binalshibh travels to Iran**

148.     Identified by the 9/11 COMMISSION REPORT as the "coordinator" of the 9/11 plot, **Ramzi Binalshibh** met repeatedly with lead hijacker **Mohammad Atta** in various cities in Europe in late 2000 and early 2001, then traveled to Afghanistan to deliver a progress report from the operations team to **Osama bin Laden** and his deputy, **Ayman al Zawahiri**.  En route, Binalshibh stopped over in **Iran**.

149.     The 9/11 COMMISSION REPORT does not mention Binalshibh's trips to Iran, although it references intelligence reports on Binalshibh's activities in Germany that the German BKA provided to the Commission.

150.     *Havlish* attorneys Richard Hailey, J.D. Lee, and Timothy B. Fleming and I met with the German federal prosecutors in September 2004.  Chief prosecutor Walter Hemberger provided to the *Havlish* attorneys one of those intelligence reports showing that Binalshibh traveled to Iran on his own passport after getting a visa from the Iranian embassy in Berlin.

151.     The German federal prosecutors also provided *Havlish* attorneys with a certified copy of a memo the BKA sent to the FBI in November 2001, documenting Binalshibh's travel to Iran in January-February 2001.  In addition, Walter Hemberger gave us copies of several news articles I had written on the subject of Iran's cooperation with al Qaeda. Hemberger stated that he provided these documents to the 9/11 Commission in June 2004.[36]

152.     The BKA memo states that **Binalshibh** obtained a visa from the Iranian embassy in Berlin, traveled via Amsterdam on January 27-28, 2001, and then flew to Iran on

---

[36] The 9/11 COMMISSION REPORT, footnote 81 to Chapter 5, p. 495, states that the German federal prosecutor sent a letter to 9/11 Commission staff on June 24, 2004, providing documents and answering questions from the Commission.

January 31, 2001.  While the BKA states it had no information how long Binalshibh

stayed in Iran, the Germans next picked up his trace on February 28, 2001, when

Binalshibh returned to Hamburg to empty out the apartment used by the 9/11 pilots.  Ex

B-13.[37]  Binalshibh was eventually arrested in Pakistan in September 2002.

153.   ███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████   Binalshibh may also have traveled *through* Iran *to* Afghanistan, as the 9/11

COMMISSION REPORT says that at least eight of the hijackers did, to avoid having

Afghanistan entry and exit stamps in his passport, and as well, to avoid suspected U.S.

surveillance in Pakistan.

154.   By issuing him visas for Iran, the Iranian government clearly facilitated

Binalshibh's travel.  It is my expert opinion that Binalshibh did not travel to Iran as a

tourist, that the Iranian government knew Binalshibh played a key role in the terrorist plot

then being hatched, and that, because of this, provided material assistance to him.


**Iran purchases a Boeing flight simulator**

155.   ███████████████████████████████████████████████

███████████████████████████████████████████████████x

---

[37] BKA Cable number 13423, dated November 23, 2001. Ref: No 177/01. File 14-31.



[redacted]

156. [redacted]

157. [redacted]

158. [redacted]

38 [redacted]

159. [redacted][39]

160. [redacted][40]

161. [redacted]

162. [redacted]

[redacted]

163. [redacted]

---

39 [redacted]

40 [redacted]



164. ████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████

165. *xxxx*████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████

166. ████████████████████████████████████

█████████████████████████████████████████

██████████████

167. ████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████

168.    One of my trusted sources on the 9/11 Commission staff told me that Iran was "definitely aware that something big was going down" and collaborated by providing travel documents, travel assistance, washed documents, training, and other material assistance to the conspiracy.

169.     On September 11, 2001, the day of the attack, I spoke to Ahmad Rezai, the son of

former IRGC commander, Major General **Mohsen Rezai**.  The younger Rezai was then

living in Los Angeles and had been trying to convince his parents to send his younger

sister to the United State*s* to attend a university, something they had always resisted.

After watching the news of the attacks, the father said he was considering sending *all* the

family out of Iran.  He warned his son to take extra security precautions because it was

clear to him that Iran would get blamed for the attacks.  The implication of his father's

comment on sending his family outside of Iran was crystal clear to his son: his father was

afraid the United States would bomb Iran in retaliation for Iran's involvement in the plot.

*See* Countdown to Crisis, pp. 250-51.

170.     Like the son, I infer that the father had knowledge that Iran was involved, and had

advance knowledge of, the 9/11 attack.  While this is merely anecdotal evidence, it comes

from a source connected to the upper echelons of the Iranian regime (the elder Rezai was

a presidential candidate in 2005 and again in 2009).

**Iran evacuates al Qaeda operatives from Afghanistan after 9/11**

171.     In the aftermath of the 9/11 attacks, Iranian security force*s* used the "rat-line" that

they had established earlier (to help al Qaeda operatives reach Europe) to evacuate al

Qaeda fighters and their families from Afghanistan before the U.S.-led coalition attack on

the Taliban regime reached its peak.  Among the high-level al Qaeda officials who came

through the "rat-line" were **Saad Bin Laden, Saef al Adel**, and **Abu Mussab Zarqawi**.

172.     In the weeks after the 9/11 attacks, hundreds of lower level al Qaeda fighters

streamed across the border into Iran, along with their families, in convoys of four-wheel

drive vehicles.  Most were transferred to safe houses to the north of Tehran.  All were

under the protection of the Iranian regime.  The evacuation was handled under the orders of IRGC intelligence chief **Morteza Rezai** (not to be confused with Mohsen Rezai, discussed above).

173.    I learned about the Iranian's evacuation of al Qaeda from Afghanistan from multiple sources, including "Colonel B" (*see* ¶¶ 88-99 of my First Affidavit *re*: the *Havlish* Investigation), whose IRGC colleagues were personally involved in the evacuation; "Bahram" (*id.,* ¶¶ 100-10,), whose OPFGI organization had identified safe houses outside of Tehran where nearly 800 al Qaeda fighters and their families were being housed; and U.S. Government officials, who told me they were aware that Iran was using "helicopters and fixed-wing aircraft" in addition to the convoys of four-wheel drive vehicles to evacuate al Qaeda operatives to the Iranian city of Mashhad and beyond in October 2001.

174.    After denying for eighteen months that any al Qaeda operatives were present in Iran, on February 16, 2003, Iran's Foreign Minister **Kamal Kharrazi** told reporters that the authorities had "arrested" or "deported" more than 500 al Qaeda members.

175.    However, the sources mentioned in ¶ 168, *supra*, told me at the time that none of the high-level al Qaeda operatives or their families was ever arrested by the regime. Instead, they were transferred from safe houses that had been "blown" to *Boostaneh Bostan*, a more secure guesthouse run by IRGC intelligence and known to U.S. intelligence analysts to whom I spoke as the site of a former army depot near Karaj, north of Tehran.

176.    In addition, I have never seen reports of any al Qaeda members "deported" from Iran to any other country.  Even if such an arrangement had been made with, for example,

Saudi Arabia, at some point it would have leaked out.  I am aware of no such information, and, in my profession, I constantly monitor reports from multiple information streams looking for such developments.

177.    According to press reports and my own sources, the United States intercepted communications from **Saif al Adel**, then in Mashhad, to al Qaeda assassination teams in Saudi Arabia just before their May 12, 2003, assault on three housing compounds in Riyadh.  More than 92 people died during the running gun battles that ensued.  The May 12 attacks shocked the Saudi regime and prompted the first serious crackdown on al Qaeda and its supporters in the Kingdom.  The attacks also prompted an immediate cutoff of then ongoing high-level negotiations between the U.S. ambassador to the United Nations, Zalmay Khalilzad, and senior Iranian government officials.

178.    Following these events, the United States Government publicly accused the Iranian government of harboring al Qaeda operatives in Iran, prompting Iranian intelligence minister Ali Yunesi to claim, in August 2003, that his services were detaining "large numbers" of al Qaeda terrorists, purportedly under house arrest.[41]

179.    Based on the above facts, it is my <u>expert opinion</u> that **senior al Qaeda operatives, including their top military planners, sought – and were provided – refuge in Iran after the 9/11 attacks and that they used Iran as a base for additional terrorist attacks after 9/11, with the knowledge, approval, and assistance of the highest levels of the Iranian government.**

---

[41] CNN 8/1/2003.  President George W. Bush also accused Iran of "harboring al Qaeda leadership" when the 9/11 COMMISSION REPORT was released in July 2004.  *See* Joseph Curl, "Bush Hits Iran for Aid to al Qaeda," *Washington Times*, July 20, 2004.

**French counter-terrorism judge finds Iran tie to al Qaeda**

180.    In October 2004, French counter-terrorism judge Jean-Louis Bruguière wrapped

up his investigation into the al Qaeda plot to bomb the Strasbourg Cathedral over the

December 2000 Christmas holidays.  The alleged leader of the plot, a Moroccan named

Mohammad Ben Zakhriah, a/k/a Meliani, had trained in Afghanistan with top al Qaeda

operatives.  Among the documents Bruguière sent to prosecutors were copies of

Zakhriah's passport and his travel records, showing that he traveled back and forth

between Afghanistan and Europe through Iran. Judge Bruguière briefed me on his

findings once he had closed his investigation.

181.    Judge Bruguière found that Iran provided safe haven, travel facilities, financial

support, intelligence, and limited operational assistance to the al Qaeda network run by

Abu Musab Zarqawi, a Jordanian of Palestinian ancestry who went on to become the

leader of "al Qaeda in Iraq" after the 2003 Gulf War.

182.     Iran's close ties to Zarqawi were well known to the French intelligence services

before the 2003 Gulf War.  In the fall of 2002, the French delivered to the United States

classified cables and a detailed organization chart showing **Zarqawi's Iran connection**

and the location of his **Iranian-backed** terror cells inside Iraqi territory.  This was well

before U.S. Secretary of State Colin Powell made his presentation to the United Nations

Security Council, where he claimed that Zarqawi was backed by **Iraqi** dictator Saddam

Hussein, not Iran.  The misrepresentation of the source of support for Zarqawi's *Ansar Al*

*Islam* organization by Secretary Powell added to the well-documented frictions between Paris and Washington at the time.[42]

183.     Judge Bruguière assisted Spanish authorities investigating the al Qaeda cell that carried out the March 11, 2004, commuter train bombings in Madrid, Spain, as many of the suspects were Moroccans who had lived or worked in France.  Judge Bruguière found that key suspects *always* transited through Iran from Afghanistan on their way to Europe because they knew that the route was safe and the Iranian government had approved their travels.

184.     Spanish communications intercepts, cited by the *Los Angeles Times*, showed that a primary suspect in the Madrid attacks, Mustafa Setmariam Nasar, frequently operated from a base in Iran after the 9/11 attacks, and traveled to Europe from Iran to set the Madrid plot in motion.[43]

185.     Judge Bruguière expressed to me his conclusion that the Iranians repeatedly provided safe haven, travel facilities, financial support, intelligence, and some operational assistance to al Qaeda operatives, especially in the post 9/11 period, as part of a larger strategy of increasing the pressure on the United States and Israel. As he explained to me, "Al Qaeda is not a threat to Iran because the Iranians see no opposition between Sunnis and Shiites."  *See* <u>Countdown to Crisis</u>, p. 279.

---

[42] Judge Bruguière makes a point of this in the sworn statement he provided to *Havlish* attorneys for this case.
[43] *See* Sebastian Rotella, "Terrorism Suspects Traced to Iran," *Los Angeles Times*, August 1, 2004; and Sharon Chadha, "What is al Qaeda Management Doing in Iran?" RADIO FREE EUROPE/RADIO LIBERTY, December 4, 2004.

**Reports that Osama bin Laden is in Iran**

186.    I have received several overlapping reports since 2005 that Osama bin Laden himself has been in Iran at various times since the 9/11 attacks.  These reports came from the three distinct, unconnected sources.

a.    ████████████████████████████████████████
      ████████████████████████████████████████
      ████████████████████████████████████████
      ████████████████████████████████████████
      ████████████████████████████████████████
      ████████████████████████████████████████
      ██████████████████████████

b.    In March 2008, Alan Parrot, the CEO of a U.S-based non-profit naturalist organization, the *Union for the Conservation of Raptors*, traveled to Tajikistan and Afghanistan with a film crew to interview a smuggler who claimed he met regularly with Osama bin Laden during falcon hunting season in the vast rolling steppes of northeastern Iran.  ████████████████████████████████
      ████████████████████████████  I reviewed the entire fifty-five minute interview with the smuggler, who was not identified by name.  In addition, Mr. Parrot provided me with taped conversations, interview notes, and other materials, to support his view that Osama bin Laden regularly hunted falcons in Iran, since at least November 2004, with the approval, assistance and cover of the Iranian government, which closed the entire provincial region where bin Laden

was hunting to other foreigners, including to other wealthy Arabs.[44] Mr. Parrot

has incorporated excerpts from the interview with the smuggler mentioned above

in a documentary film, "Feathered Cocaine," which premiered on April 27, 2010

at the Tribeca Film Festival in New York.

c.  ██████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████

187.    While I have been unable to corroborate independently any of these "sightings" of Osama

bin Laden in Iran, they fit a longstanding pattern of Iranian cooperation with the al Qaeda

leadership that began in 1991-1992 in the Sudan. ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████

188.    Leaders of the U.S. intelligence community have stated repeatedly that they believe

Osama bin Laden has been hiding out in the mountains along the Afghan-Pakistan border.  While

this is a very wild area, it is also arguably the most watched piece

---

[44] *See* Kenneth R. Timmerman, "Did Bin Laden Find Safe Haven in Iraq?" *Newsmax.com*, April 3, 2009.

of real estate on Earth.  In addition to more than 100,000 Pakistan army troops patrolling the region, as well as numerous Pakistani intelligence officers and their agents, the United States conducts extensive surveillance of the region by satellite and by Predator drone and through other means.

189.    In my <u>expert opinion</u>, all the sources' information and the evidence referenced in this affidavit substantially increase the possibility that Osama bin Laden currently is being sheltered by the government of the Islamic Republic of Iran in a part of Iran far from U.S. or foreign surveillance.  Furthermore, it is my <u>expert opinion</u> that Osama bin Laden and al Qaeda <u>certainly</u> have been **sheltered, aided, and given various forms of material assistance by the Iranian government at various times before and since the 9/11 attacks**.


### Usage of all Iranian state instrumentalities in support of terrorism

190.    It is my <u>expert opinion</u> that the Iranian regime uses the entire state apparatus in support of its terrorist operations.  I base this on the many cases of Iranian government terrorist operations I have investigated personally.  Notably, the first elected president of the Islamic Republic of Iran, Abolhassan Banisadr, testifies in *Havlish* that this is true, xxxxxxxxxxxxxxxxxxxxxxx  The following are just a few examples and sources to illustrate the scope of this broad-based and far-reaching use of the state apparatus in support of terror.

191.    **The Bakhtiar murder.** To carry out the murder of former Prime Minister Shahpour Bakhtiar, who was gruesomely murdered by Iranian regime agents at his home

outside of Paris on August 6, 1991, the Iranian government used multiple government ministries and organizations to provide logistics and operational support to the assassins.

192.     According to the 177-page prosecutor's report, to which I had access while reporting for TIME magazine on the case in 1994, the assassination was orchestrated by MOIS, then headed by **Ali Fallahian**.

193.     The French authorities found visa application forms for the killers that were endorsed by a French electronics company called Syfax, whose owners told the French they had sponsored the visas at the request of Massoud Hendi, the former Paris bureau chief for IRIB, Iranian state television.

194.     At the time, IRIB was headed by Mohammed Hashemi, brother of Ali Akbar Hashemi-Rafsanjani.  Hendi told prosecutors he had sought the visas at the request of Hossein Sheikhattar, a senior aide to the minister of telecommunications.

195.     Helping the assassination team escape through Switzerland was Zeinolabedine Sarhadi, a nephew of Hashemi-Rafsanjani.

196.     Sarhadi's mission order was signed by foreign minister **Ali Akbar Velayati**.

197.     Judge Jean-Louis Bruguière, the investigative magistrate for the case, told me at the time, "The whole Iranian state apparatus is at the service of these operations."[45]

198.     **Reza Kahlili.** Former IRGC officer and CIA double-agent Reza Kahlili describes, in his recent memoir, A Time To Betray, *supra,* several examples of the usage of state instrumentalities to support terrorism that he personally witnessed.

---

[45] "The Tehran Connection," TIME, March 21, 1994, by Thomas Sancton, with reporting by Nomi Morris/Berlin, Elaine Shannon/Washington, and Kenneth R. Timmerman / Geneva, Istanbul, Paris, and Vienna.

199.     At one point, he told his CIA handler that Iran's ruling clerics "fund terrorist groups through charitable organizations."  *See* p. 130.

200.     Kahlili also described how the IRGC used stretch limousines in Dubai "displaying Iranian flags and consulate license plates" to transfer of arms and money to terrorist groups.  *See* p. 174.

201.     "The Ministry of Foreign Affairs became the center for intelligence and terror, with intelligence officers posted as ambassadors and consuls around the world," Kahlili told me in a recent interview.  The regime also used Iran Air, and the Islamic Republic of Iran Shipping Lines in support of terrorist operations, he said. "Basically, every entity of the Iranian government is connected to terrorism, working under the umbrella of the *Qods* Force of the Revolutionary Guards."  Kenneth R. Timmerman, "Ex-Agent Chronicles Being CIA's Eyes and Ears in Iran," Newsmax.com, March 30, 2010.

202.     **Jahangir Amouzegar**.  Over the past few years, the IRGC has been expanding its involvement in, indeed, its ownership stake in the Iranian economy.  According to well-respected Iranian economist Jahangir Amuzegar, a former Iranian Minister of Finance and the Iranian representative to the Board of the International Monetary Fund (IMF), "the government and state-affiliated entities continue to own, manage or control some seventy percent of the economy, with the *Pasdaran* (Revolutionary Guards) making increasing inroads into such strategic areas as oil and gas, infrastructure, telecommunications, missile development, nuclear energy and even some unsavory operations."  Javangir Amuzegar, "Bad structure + bad management = lousy economy," *International Iran Times,* April 2, 2010, p. 5.

203. ███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████[46] ███████████████████

███████████████████████████████████████████████

████████████████████████████████

204. ██████████████████████████████   ███████████████

███████████████████████████████████████████████

████████████████████████████████████

205. ███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████

206. ███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████

207. ███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████

---

46
███████████████████████████████████████████████
███████

208.    U.S. security officials in northern Iraq told me, while I was on a reporting trip to the region in April 2008, that Iran also provided truckloads of commercial goods, such as electric space heaters, for free to its agents inside Iraq, which they could sell on local markets to fund their intelligence gathering or terrorist networks.

209.    The Iranian government derives the funds for many of these operations from the income of the National Iranian Oil Company and the state-owned gas companies.

210.    

211.    

212.    

**January 2009 Statement from the U.S. Treasury**

213.    On January 16, 2009, the U.S. Department of the Treasury designated **Saad bin Laden** and three other top al Qaeda officials as international terrorists under Executive Order 13224. The three-page background paper released in support of the designation provides important new details of the relationship between the four men and the Islamic

Republic of Iran.  This information corroborates significant elements of the testimony I have provided in this affidavit.  Ex. B-15.

214.    In particular, the January 16, 2009 Treasury report states: In "late 2001, **Sa'ad bin Laden** facilitated the travel of Usama bin Laden's family members from Afghanistan to Iran. Sa'ad made key decisions for al Qaida and was part of a small group of al Qaida members that was involved in managing the terrorist organization from Iran."

215.    The January 16, 2009 Treasury report further states:  **Mustafa Hamid,** a senior al Qaeda member, "served as a prima*ry* interlocutor between al Qaida and the Government of Iran…. While living in Iran, Hamid was harbored by the Islamic Revolutionary Guards Corps (IRGC), which served as Hamid's point of contact for communications between al Qaida and Iran."

216.    The January 16, 2009 Treasury report further states:  "In the mid-1990s, Mustafa Hamid reportedly negotiated a secret relationship between Osama bin Laden and Iran, allowing many al Qaeda members safe transit through Iran to Afghanistan…. In the late 1990s, Mustafa Hamid passed communications between Osama bin Laden and the Government of Iran.  When tensions were high between Iran and Afghanistan, Mustafa Hamid traveled multiple times from Kandahar to Tehran as an intermediary for the Taliban.  In late 2001, Mustafa Hamid was in Tehran delivering messages from the Taliban to the Government of Iran. Hamid also negotiated on behalf of al Qaida in an attempt to relocate al Qaida families to Iran" after the 9/11 attacks.

217.     The January 16, 2009 Treasury report further states:  **Muhammad Rab'a** al **Sayid** al **Bahtiyti,** an Egyptian-born al Qaeda operative, "has served as a trusted aid to

his father-in-law, Ayman al Zawahiri.... After September 11, 2001, Ayman al Zawahiri instructed Bahtiyti to take al Zawahiri's family to Iran. Bahtiyti reportedly traveled to Iran with al Zawahiri's daughters, where he was subsequently responsible for them. In January 2003, while working from Iran, Bahtiyti arranged housing on behalf of al Qaeda" operatives who came to Iran seeking refuge from U.S. trackers.

218.    The January 16, 2009 Treasury report further states:  **Ali Saleh Husain**, a/k/a Abu Dahhak, was a Yemeni al Qaeda operative who "had close relations" with bin Laden himself. In April 2002, while living in Iran, he was given "responsibility for operation meetings for attacks against Israel," and was a chief al Qaeda contact in Iran for acquiring fresh travel documents for al Qaeda operatives. "In 2001 after the fall of the Taliban, Husain facilitated the movement of al Qaida associated fighters, including an al Qaida military commander, from Afghanistan to Iran. After leaving Afghanistan, Husain was responsible for smuggling al Qaida members and associates via networks in Zahedan, Iran."

219.    The four al Qaeda members referenced in the Treasury report, one of which was the eldest son of Osama bin Laden, were among a larger group of al Qaeda operatives allegedly "detained" by the Iranian regime in mid-2003, after Saudi Arabia complained that Iran had allowed al Qaeda to plot the May 2003 terrorist attacks in Riyadh from Iranian soil.[47]

        *Further the Affiant sayeth not.*

---

[47] During those attacks, al Qaeda operatives shot their way into three housing compounds and set off multiple car bombs, killing 91 people. The Saudis called the May 2003 attacks "our 9/11" and launched a crackdown on homegrown Islamic extremists in the weeks that followed.

This Affidavit is comprised of 219 separately numbered paragraphs, and has

Exhibits B-1 through B-15.


I, **KENNETH R. TIMMERMAN,** being duly sworn, do hereby swear and affirm

under penalty of perjury that the contents of this Affidavit are true and correct to the best

of my knowledge, information, and belief.


_Kenneth R. Timmerman_ (signature)

Kenneth R. Timmerman


Subscribed and sworn before me this _10th_ day of May, 2010, in ~~Washington D.C.~~ _KENSINGTON MARYLAND_


_Denise G. Willsey_ (signature)

Notary Public


**Denise G. Willsey**
**NOTARY PUBLIC**
**Montgomery County, Maryland**
**My Commission Expires 9/12/2013**



Exhibit B-1



1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| D. PETERSON, et al, | . | Docket No. CA 01-2094 |
| | . | |
| Plaintiffs, | . | Washington, D. C. |
| | . | March 17, 2003 |
| vs. | . | 10:00 a.m. |
| | . | |
| THE ISLAMIC REPUBLIC OF IRAN, | . | |
| MINISTRY OF FOREIGN AFFAIRS AND | . | |
| THE MINISTRY OF INFORMATION AND | . | |
| SECURITY, | . | |
| | . | |
| Defendants | . | |
| | . | |

. . . . . . . . . . . . . . . . .

| | | |
|---|---|---|
| J. BOULOS, et al, | . | Docket No. CA 01-2684 |
| | . | |
| Plaintiffs, | . | |
| | . | |
| vs. | . | |
| | . | |
| THE ISLAMIC REPUBLIC OF IRAN, | . | |
| THE IRANIAN MINISTRY OF | . | |
| INFORMATION AND SECURITY, | . | |
| | . | |
| Defendants | . | |

. . . . . . . . . . . . . . . .

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE ROYCE C. LAMBERTH
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiffs:        THOMAS FORTUNE FAY, ESQUIRE
                           DAN GASKILL, ESQUIRE
                           601 Pennsylvania Avenue, N.W.
                           #900 - South Building
                           Washington, D.C. 20004
                           202 589 1300

                           STEVEN R. PERLES, ESQUIRE
                           1615 New Hampshire Avenue, N.W.
                           Washington, D.C. 20009
                           202 745 1300

Exhibit B-2

48

1          THE COURT:  All right.

2          MR. FAY:  Your Honor, while we're waiting I spied

3    another distinguished member of our bar who has been working

4    with us on this case, Mr. Feeney.  Robert Feeney.

5          MR. FEENEY:  Good morning, Your Honor.

6          THE COURT:  Mr. Feeney.

7          MR. FAY:  I guess we need a little work on the lights.

8          There.

9          (Videotape deposition of Joseph Salam played)

10         (Mr. Fay requested on the videotape deposition that

11   Mr. Salam be qualified as an expert)

12         THE COURT:  The witness is well qualified, and the

13   request is granted.

14         (Videotape deposition of Joseph Salam continued,

15   followed by videotape deposition of Mahmoud)

16         MR. FAY:  Your Honor, may I approach the bench?

17         (Off the record)

18         THE COURT:  The Court will recess at this time.  We

19   will resume at two o'clock with the testimony of Admiral Lyons.

20         (Lunch recess, 12:10 p.m. to 2:00 p.m.)

21                        AFTERNOON SESSION 2:10 P.M.

22         MR. FAY:  Good afternoon, Your Honor.  At this time we

23   would call James Lyons as a witness.

24   (JAMES LYONS, WITNESS FOR THE PLAINTIFFS, SWORN)

25                        DIRECT EXAMINATION

53

1    July of 1983 to September, 1985, did you have occasion to

2    receive intelligence information with respect to areas where

3    American military forces were involved?

4    A    I did.  Numerous ones.

5    Q    Was it in the normal course of your work as Deputy Chief of

6    Naval Operations?

7    A    Correct.

8    Q    Admiral, in your position as Deputy Chief of Naval

9    Operations, did you have occasion to become aware of an

10   intercept of a message to the Iranian Ambassador in Damascus

11   from the Iranian Government in Tehran in the fall, late

12   September of 1983?

13   A    You know, we -- that message came -- I got to see that

14   message on the 25th of October, two days after the event of the

15   Marine Barracks blowup.  And that message was formulated in the

16   latter part of September, approximately four weeks before the

17   Marine Barracks blowup.

18   Q    When you say formulated, would that be the same as

19   intercepted in some way?

20   A    Well, you can say that we know with certainty that the

21   Iranian Ambassador called in the leader of the terrorist group,

22   Islamic Amal, (spelled phonetically) Hussein Moussaoui, and

23   gave him instructions to carry out attacks on the forces in

24   Lebanon and to take a spectacular action against the United

25   States Marines.

54

1   Q   Were you ever able to determine why this intercept of late

2   September, 1983 did not reach you until two days after the

3   attack on the Marine Barracks at Beirut?

4   A   I've asked that question a thousand times.   I don't know.

5   I first saw it when the Director of Naval Intelligence walked

6   into my office and said this is something you'd better take a

7   look at.

8   Q   Have you brought a copy of that record with you today?

9   A   Well, I'm not authorized to do that, but I have here an

10  envelope which I will hand the Court which will provide

11  sufficient information for the Court to request that document

12  through appropriate channels.

13  Q   Is that still classified information?

14  A   As far as I know.

15  Q   And that is in an envelope marked Plaintiffs' Exhibit

16  Number Five?

17          THE COURT:   Seven.

18          MR. FAY:   Seven, I'm sorry.   Seven.   Your Honor, we

19  would ask that this exhibit be admitted into evidence but kept

20  under seal of the Court and not published.

21  BY MR. FAY:

22  Q   Admiral, without disclosure of intercept methods with

23  appropriate consideration of national security factors, can you

24  describe essentially the information, the type of information

25  you received?

55

1  A    Well, as I said, we know with certainty that the Iranian

2  Ambassador directed Hussein Moussaoui, the terrorist leader of

3  the Islamic Amal, to conduct attacks against the military

4  forces in Lebanon and to take a spectacular action against the

5  U.S. Marines.  Beyond that, I can't go.

6  Q    Admiral, over your years as a naval officer, was part of

7  your profession the evaluation of intelligence information?

8  A    Well, I would say if there was ever a 24-karat gold

9  document, this was it.  This is not something from the third

10 cousin of the fourth wife of Muhammad the taxicab driver.

11 Q    You don't have any doubt, I take it, as to the authenticity

12 of that message?

13 A    No.

14 Q    And you don't have any doubt that it was sent by somebody

15 in a position in Tehran to give such an order to the

16 Ambassador?

17 A    Correct.

18 Q    Could you express your opinion, you've already said

19 24-Karat, but -- Your Honor, we would ask that the Admiral be

20 qualified as an expert permitted to express an opinion with

21 regard to the reliability of the exhibit which we've placed in

22 evidence?

23        THE COURT:  Your request is granted.

24 BY MR. FAY:

25 Q    Could you -- you already mentioned 24-Carat, so to some

56

1    extent you've answered it but perhaps before I ask that

2    question, could you perhaps tell us a little bit about the type

3    of information that the military gets in intelligence and how

4    much of it is good, how much of it is okay?

5    A    Well, at that particular period of time there were

6    thousands of messages from every source you can imagine.

7    However, not like this message, which should have set off all

8    the bells and whistles.

9    Q    How often would a message of this type of importance, of

10   this type of reliability come across your desk, come to your

11   attention as Deputy Chief of Naval Operations?

12   A    That's the only one I've seen of that quality.

13   Q    One last question, Admiral, are you being compensated in

14   any way for your time either in the traffic jam trying to get

15   here or for your testimony, more importantly.

16   A    No, not at all.

17            MR. FAY:  Your Honor, I have no other questions of

18   this witness.

19            THE COURT:  At the time the intercept was brought to

20   you by the Chief of Naval Intelligence, you evaluated it in the

21   same way you have here today that this was an intelligence --

22            THE WITNESS:  I took it immediately to the Secretary

23   of the Navy and to the Chief of Naval Operations.

24            THE COURT:  No question this was the real Mc Coy in

25   your view.

97

```
 1              THE WITNESS:  No question.

 2              THE COURT:  And it was treated that way by those

 3     officials as well.

 4              THE WITNESS:  Correct.

 5              MR. FAY:  Your Honor, I don't have any other

 6     questions.

 7              MR. PERLES:  May I have a moment with Mr. Fay, please?

 8              THE COURT:  Yes.

 9     BY MR. FAY:

10     Q   Admiral, you mentioned Amal.  Was this the precursor

11     organization to Hezbollah?

12     A   Correct.

13              THE COURT:  Thank you very much, Admiral.

14              MR. FAY:  Thank you, Admiral.

15              THE COURT:  You can step down.

16              Let me say one thing to the ladies and gentlemen who

17     are here.  I want to try to accommodate as many plaintiffs who

18     can observe some part of these proceedings as I can.  I've

19     indicated to the Marshals that about every 30 minutes the last

20     row on each side of the audience I'm going to ask to step out

21     and let other plaintiffs step in so that they'll have an

22     opportunity to observe these proceedings as well.  If there are

23     others who want to rotate in and out, you may do so when we do

24     that rotation but I think that will allow some of the people

25     who are waiting out in the hall to try to get into the
```

See related court docket: http://cryptome.sabotage.org/qaeda102000.htm

This transcript is from an appearance by Ali Mohamed before Judge Sand on October 20, 2000. Mr.
Mohamed is one of 17 defendants in the bombing of US Embassies in Kenya and Sudan. And now the only
one to plead guilty.

---

```
                                                              1
        Oakimohp
                              PLEA

   1    UNITED STATES DISTRICT COURT
        SOUTHERN DISTRICT OF NEW YORK
   2
        ------------------------------x
   3
        UNITED STATES OF AMERICA,
   4
                    v.                        S(7) 98 Cr. 1023 (LBS)
   5
        ALI MOHAMED,
   6
                        Defendants.
   7
        ------------------------------x
   8
                                        New York, N.Y.
   9                                    October 20, 2000

  10

  11
        Before:
  12
                    HON. LEONARD B. SAND,
  13
                                        District Judge
  14

  15

  16                            APPEARANCES

  17    MARY JO WHITE
              United States Attorney for the
  18          Southern District of New York
        BY:   PATRICK J. FITZGERALD,
  19          KENNETH M. KARAS,
              MICHAEL GARCIA,
  20          ANDREW C. McCARTHY,
              PAUL BUTLER,
  21          Assistant United States Attorneys

  22
```

Exhibit B-3

PLEA

1   involvement with the Egyptian Islamic Jihad.

2          In 1992, I conducted military and basic explosives

3   training for al Qaeda in Afghanistan.  Among the people I

4   trained were Harun Fadhl and Abu Jihad.  I also conducted

5   intelligence training for al Qaeda.  I taught my trainees how

6   to create cell structures that could be used for operations.

7          In 1991, I helped transport Usama bin Laden from

8   Afghanistan to the Sudan.

9          When I engaged in these activities, and the others

10  that I am about to describe, I understood that I was working

11  with al Qaeda, Bin Laden, Abu Hafs, Abu Ubaidah, and that al

12  Qaeda had a shura council, which included Abu Hajer al Iraqui.

13         In the early 1990s, I assisted al Qaeda in creating a

14  presence in Nairobi, Kenya, and worked with several others on

15  this project.  Abu Ubaidah was in charge of al Qaeda in

16  Nairobi until he drowned.  Khalid al Fawwaz set up al Qaeda's

17  office in Nairobi.  A car business was set up to create

18  income.  Wadih el Hage created a charity organization that

19  would help provide al Qaeda members with identity documents.

20  I personally helped el Hage by making labels in his home in

21  Nairobi.  I personally met Abu Ubaidah and Abu Hafs at Wadih's

22  house in Nairobi.

23         We used various code names to conceal our identities.

24  I used the name "Jeff"; el Hage used the name "Norman"; Ihab

25  used the name "Nawai."

24      I used the name "Jeff"; el Hage used the name "Norman"; Ihab
25      used the name "Nawawi."


SOUTHERN DISTRICT REPORTERS, P.C.
212-805-0300
                                                                27
Oaklmohp
                                PLEA

1           In late 1993, I was asked by bin Laden to conduct

2       surveillance of American, British, French, and Israeli targets

3       in Nairobi.  Among the targets I did surveillance for was the

4       American Embassy in Nairobi, the United States AID Building in

5       Nairobi, the United States Agricultural Office in Nairobi, the

6       French Cultural Center, and French Embassy in Nairobi.  These

7       targets were selected to retaliate against the United States

8       for its involvement in Somalia.  I took pictures, drew

9       diagrams, and wrote a report.  Khalid al Fawwaz paid for my

10      expenses and the photo enlarging equipment.  He was in Nairobi

11      at this time.

12          I later went to Khartoum, where my surveillance files

13      and photographs were reviewed by Usama bin Laden, Abu Hafs,

14      Abu Ubaidah, and others.  Bin Laden looked at the picture of

15      the American Embassy and pointed to where a truck could go as

16      a suicide bomber.

17          In 1994, Bin Laden sent me to Djibouti to do

18      surveillance on several facilities, including French military

19      bases and the American Embassy.

20          In 1994, after an attempt to assassinate Bin Laden, I

21      went to the Sudan in 1994 to train Bin Laden's bodyguards,

22      security detail.  I trained those conducting the security of

23      the interior of his compound, and coordinated with the

24      Sudanese intelligence agents who were responsible for the

25      exterior security.

Oaklmohp

                              PLEA

1          In 1994, while I was in Sudan, I did surveillance
2    training for al Qaeda.  Ihab Ali, also known as Nawawi, was
3    one of the people I trained.  Nawai was supposed to train
4    others.
5          In early 1990s, Zawihiri made two visits to the
6    United States, and he came to United States to help raise
7    funds for the Egyptian Islamic Jihad.  I helped him to do
8    this.
9          I was aware of certain contacts between al Qaeda and/
10   al Jihad organization, on one side, and Iran and Hezbollah on
11   the other side.  I arranged security for a meeting in the
12   Sudan between Mughaniyah, Hezbollah's chief, and Bin Laden.
13         Hezbollah provided explosives training for al Qaeda
14   and al Jihad.  Iran supplied Egyptian Jihad with weapons.
15   Iran also used Hezbolla to supply explosives that were
16   disguised to look like rocks.
17         In late 1994, I was in Nairobi.  Abu Hafs met another
18   man and me in the back of Wadih el Hage's house.  Abu Hafs
19   told me, along with someone else, to do surveillance for the
20   American, British, French and Israeli targets in Senegal in
21   West Africa.
22         At about this time, late 1994, I received a call from
23   an FBI agent who wanted to speak to me about the upcoming
24   trial of United States v. Abdel Rahman.  I flew back to the
25   United States, spoke to the FBI, but didn't disclose

6 February 2001
Source: Digital file from the Court Reporters Office, Southern District of New York.

This is the transcript for Day 2 of the trial.

See other transcripts: http://cryptome.org/usa-v-ubl-dt.htm

The main witness today has been termed the US's Confidential Source No. 1, and has not heretofore been publicly identified.

Cryptome's two top investigators attended the trial today for an hour, observed the jury of 18 persons (6 alternates) predominately minorities, the prosecutors also predominately minorities though the lead was Cauc, the three or four defendants and their legal teams, the main witness and interpretation apparatus, the filled courtroom (an overflow space received video of the proceedings), and the most impressive trial information systems with large flat panel computer screens for each jury member, for the prosecution and defense teams and plasma displays for the audience. Heavy security inside the courtroom, the courthouse and surrounding area: bountiful US Marshals, two metal detectors and checkpoints to pass through, single bank of elevators for access to the 3rd Floor courtroom, a metal and glass security bunker within the courtroom, surveillance cameras galore.

---

158

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA

4              v.                        S(7) 98 Cr. 1023

5    USAMA BIN LADEN, et al.,

6              Defendants.

7    ------------------------------x

8                                        Exhibit B-4
```

```
                                        New York, N.Y.
 9                                      February 6, 2001
                                        10:00 a.m.

10


11


12    Before:

13                        HON. LEONARD B. SAND,

14                                        District Judge

15


16


17


18


19


20


21


22


23


24


25
```

                                                        159


```
 1                        APPEARANCES
```

```
 2   MARY JO WHITE
          United States Attorney for the
 3        Southern District of New York
     BY:  PATRICK FITZGERALD
 4        KENNETH KARAS
          PAUL BUTLER
 5        Assistant United States Attorneys


 6
     SAM A. SCHMIDT
 7   JOSHUA DRATEL
     KRISTIAN K. LARSEN
 8        Attorneys for defendant Wadih El Hage

 9   ANTHONY L. RICCO
     EDWARD D. WILFORD
10   CARL J. HERMAN
     SANDRA A. BABCOCK
11        Attorneys for defendant Mohamed Sadeek Odeh

12   FREDRICK H. COHN
     DAVID P. BAUGH
13        Attorneys for defendant Mohamed Rashed Daoud Al-'Owhali

14   JEREMY SCHNEIDER
     DAVID STERN
15   DAVID RUHNKE
          Attorneys for defendant Khalfan Khamis Mohamed
16

17

18

19

20

21

22

23
```

160

 1                (In open court)

 2                THE COURT:  Thursday, do we need interpreters?  Are

 3     the defendants going to be present on Thursday?

 4                MR. HERMAN:  Mr. Odeh waives his presence, Judge.

 5                MR. SCHMIDT:  Mr. El Hage waives his presence as

 6     well.

 7                MR. STERN:  Mr. Mohamed is going to waive his

 8     presence.

 9                THE COURT:  The sketch artists, I take it, have been

10     instructed not to sketch any juror and not to sketch the next

11     witness.

12                MR. COHN:  Mr. Al-'Owhali waives his presence, your

13     Honor.

14                THE COURT:  Who have we not heard from?

15                MR. COHN:  You've heard from everybody.

16                THE COURT:  We've heard from everybody.  All right,

17    then I will advise the marshals.  And will you advise Nancy

18    Festinger that we will not need an interpreter on Thursday?

19              I think the jurors are just about ready.

20              (Jury present)

21              THE COURT:  Good morning, ladies and gentlemen.

22              THE JURY:  Good morning.

23              THE COURT:  There is a blank looseleaf and a pen on

24    your seats, should you wish to take notes.  Don't feel that

25    you are compelled to do so.  And if you would like to not,

                                                            161

1     just put them down on the floor.  That's fine, too.  It's

2     simply whatever you think will be of greatest assistance to

3     you.

4               We're now in the government's case.  Government may

5     call its first witness.

6               MR. FITZGERALD:  Yes, your Honor.  The government

7     calls as its first witness, Jamal Ahmed al-Fadl.

8               THE COURT:  All right.

9       JAMAL AHMED AL-FADL,

10              called as a witness by the government,

11          having been duly sworn, testified as follows:

12          DEPUTY CLERK:  Please state your full name.

13          THE WITNESS:  My name is Jamal Ahmed Mohamed al-Fadl.

14    DIRECT EXAMINATION

15    BY MR. FITZGERALD:

16    Q.  Sir, if you could spell your first name and your last name

17    in the English language for the record.

18    A.  The first name is J-A-M-A-L.  The last name is

19    A-L-F-A-D-L.

20    Q.  If you could try to talk as you are doing now into the

21    microphone directly in front of you, if you could also speak

22    slowly, because of your accent, to make sure that everyone

23    understands what you say, and if you could try to pause if you

24    use an Arabic word or name so that we can clarify how that is

25    spelled.

                                                        162


 1          Could you tell the jury where you were born and what

 2    year?

 3    A.  I born in Ruffa City in Sudan.

21    A.   If you want me explain that, like what I say before here,

22    we have something called delegation office, and if I want to

23    travel to country, I don't want them to see I come from Sudan,

24    one of the delegation officers, he go to the immigration

25    airport, and he took me through other way, that's means

286

1     immigration not going to stamp my passport.

2     Q.   Are you familiar with the difference between a Sunni

3     Muslim and a Shia Muslim?

4     A.   Yes.

5     Q.   Which faith are you?

6     A.   I am Sunni.

7     Q.   Can you briefly explain your understanding of what the

8     difference is between a Sunni Muslim and a Shia Muslim.

9     A.   Yes, I understand.   Some scholars from Sunni and some

10    scholars from Shia, they say the difference is 16 points, 16

11    things make the difference between Sunni and Shia.

12    Q.   Can you give us the example of one or two.

13    A.   Like in Sunni, when somebody want to married, he need two

14    witnesses, and the lady, she have to bring somebody from her

15   family, like her dad or brother or uncle.  He should be

16   present when they make the license for marriage.

17        In Shia, they don't use that.  If the husband and the

18   lady, they agree, they can do it without witness, and they can

19   say we want a marriage for five years, and after five years

20   we're going to see.  This is in Shia, they call it Zawaj al

21   Muhda.

22        And also the other difference, the Shia, they believe

23   they don't want to make jihad until they wait for imam.

24   Q.  I-M-A-M?

25   A.  Yes.


                                                        287



1   Q.  Can you explain to the jury your understanding of what an

2   imam is.

3   A.  Imam means leader of the whole Muslim.  In Sunni, the

4   Sunni people, they can make jihad without imam.

5   Q.  During the time that you were in the Sudan with al Qaeda,

6   did you have any conversations with other members of al Qaeda

7   about the relationship between Sunni Muslims and Shia Muslims?

8    A.   Yes.

9    Q.   Can you tell us who spoke about that?

10   A.   I remember Abu Fadhl al Makkee and Abu Hajer al Iraqi and

11   Abu Fadhl al Iraqi.

12   Q.   If we can focus on what Abu Hajer al Iraqi said first.

13   A.   Abu Hajer, he believe, now we got one enemy, the westerns,

14   and if we all the Muslims come together and unite together,

15   they forget the problems and the differences between them,

16   it's better for them to fight one enemy.  And he says the Shia

17   and the Sunnis, they should come together for focusing in one

18   enemy.

19   Q.   In the Sudan, are most of the Muslims there Sunni or Shia?

20   A.   Most of the Muslims Sunni.

21   Q.   Is there a particular country where most of the Shia

22   Muslims are?

23   A.   In Iran, most of the Muslims Shia.

24   Q.   You mentioned that Abu Fadhl al Iraqi also spoke about the

25   difference between Sunni and Shia.

288

1    A.   Yes.

2    Q.  Do you recall what he said?

3    A.  I remember he say in Saudi Arabia they got a little Shia,

4    and he say if the Sunni and Shia come together and fight one

5    enemy, it's better than they fight each other, and he say what

6    happened between Iraq and Iran, is there is no reason for

7    that.

8    Q.  Did there ever come a time when a person representing Shia

9    Muslims came to Khartoum to meet with al Qaeda members?

10   A.  Yes.

11   Q.  Were you present for that?

12   A.  Yes.

13   Q.  Can you tell us where that meeting occurred?

14   A.  I remember that meeting in guesthouse in Riyadh.

15   Q.  Can you describe how the meeting came about and who was

16   present.

17   A.  I remember one guy, his name Ahmed Abdel Rahman Hamadabi.

18   He is a Sudani guy.

19   Q.  What was his last name?

20   A.  Hamadabi.  And he Sudani guy, and he is big scholar over

21   there.  He bring with him other guy, his name Sheikh Nomani.

22   Sheikh Nomani got office in Khartoum belong to Iran government

23   for Shia Muslims to recruit other people to Shia.

24   Q.  What happened when Sheikh Nomani came to the guesthouse in

25   Riyadh City?

289

1    A.  In front there they sit down and some of the higher

2    membership, they got meeting and talking with the Sheikh

3    Nomani and Hamadabi.

4    Q.  Was Bin Laden there?

5    A.  Yes.

6    Q.  Can you tell us what was discussed at that meeting.

7    A.  They talk about we have to come together and we have to

8    forget the problem between each other and each one he should

9    respect the other because our enemy is one and because there

10   is no reason to fight each other.

11   Q.  Who did they describe the enemy as being?

12   A.  They say westerns.

13   Q.  After that meeting, did there come a time when the Sunni

14   and Shia Muslims began to work together with al Qaeda in

15   Sudan?

16   A.  Yes.

17  Q.  Can you tell us what happened?

18  A.  I remember --

19         MR. SCHMIDT:  Objection, your Honor, unless we can

20  show a source of information.

21  Q.  We will rephrase the question.

22         How did you learn what happened after the meeting --

23  strike that.

24         Did you ever speak to anyone who received any

25  training from anyone who was a Shia Muslim?

290

1   A.  Yes.

2   Q.  Who did you speak to?

3   A.  Abu Talha al Sudani and Saif al Islam el Masry.

4   Q.  Is that the person whose picture you identified after

5   lunch?

6   A.  Yes.

7   Q.  What did Saif al Islam El Masry tell you?

8   A.  He say they go to south Lebanon to got training with the

9   Shiites over there.

10    Q.  Did he indicate what Shia group in south Lebanon provided

11    the training?

12    A.  I remember he told me it's called Hezbollah.

13    Q.  What did Abu Talha tell you?

14    A.  Abu Talha, he tell me the training is very good, and he

15    bring some tapes with him.

16    Q.  Did Abu Talha tell you what was on the tapes he brought

17    back?

18    A.  I saw one of the tapes, and he tell me they train about

19    how to explosives big buildings.

20    Q.  Did Abu Talha tell you if anyone else went with him for

21    this training besides Saif el Masry?

22    A.  Yes.

23    Q.  Who was that?

24    A.  Abu Jaffer el Masry.

25    Q.  Is that the same Abu Jaffer el Masry that you told us this

291

1    morning was an explosives trainer at the Khalid Ibn Walid camp

2    that you attended in Afghanistan?

3    A.  No, the area that I say he runs Jihad Wal camp.

4   Q.   Is that the same person who was involved in the Jihad Wal

5   camp?

6   A.   Yes.

7   Q.   Do you know if anybody else from al Qaeda went --

8   A.   Also Salem el Masry.

9   Q.   Was he also a trainer at the Jihad Wal calm?

10  A.   Yes.

11  Q.   Anyone else that you recall went to the training?

12  A.   I remember also he told me Saif al Adel, he went with

13  them.

14  Q.   Do you recall if anyone else went?

15  A.   No, I don't remember.

16  Q.   Are you familiar with a section in Khartoum called Hilat

17  Koko?

18  A.   Yes.

19  Q.   Did you ever travel to the section of Khartoum called

20  Hilat Koko with any member of al Qaeda?

21  A.   Yes, I did.

22  Q.   Who did you go with?

23  A.   I remember one time I went with Abu Rida al Suri, and one

24  time I went with Abu Hajer al Iraqi.

25   Q.   Anyone else?

1   A.   And one time I went with --

2   Q.   We will go through that name.  M-U-Q-A-D-E-M.  Is that a

3   name or a title?

4   A.   No, a title.  He got one eagle and one star.

5   Q.   Does that mean he is an officer?

6   A.   Yes, he is in the army.

7   Q.   In which army?

8   A.   Sudanese army.

9   Q.   His name?

10   A.   Yes.  Abdul Baset Hamza.

11   Q.   Tell us about the time you went to Hilat Koko with Abu

12   Hajer al Iraqi, what you discussed.

13   A.   I learn that in this building they try to make chemical

14   weapons with regular weapons.

15   Q.   Can you explain what you mean by chemical weapons with

16   regular weapons.

17   A.   I remember another guy, he explain more to me about this.

18   Q.   Who was that?

News Photographs showing the destruction of El Al Flight 1862 on October 4, 1992 outside of Amsterdam, Holland





```
94APR06  14:49:54                                    Logical Terminal P006
MT 8760                            Guarantee                    Page 00001
                                                               Func 80CRE
MSGACK  (1:F21CGAKBEBBAXXX2990137355)(4:(177:9404061453)(451:0))
Basic Header       F   01  CGAKBEBBAXXX 2990 137355
Application Header  I 760 UBAFFRPPXXXX N
                          *UNION DE BANQUES ARABES ET
                          *FRANCAISES
                          *PARIS
User Header        Bank. Priority  113:
                   Msg User Ref.   108:
Sequence of Total  *27   : 1 / 2
TRN                *20   : CRE/219/320853
Further Ident.     *23   : ISSUE
Date               30    : 940406
Details of Guarant.*77 C :
          ATTN MME CHRISTINE JEAN (GARANTIES BANCAIRES ETRANGERES).
          BENEFICIAIRE : AL SHAMAL ISLAMIC BANK
                         KHARTOUM - SOUDAN
                         COMPTE CHEZ VOUS : 960-79-9

          MADAME,
          VEUILLEZ TROUVER PAR APRES TEXTE DE NOTRE GARANTIE DE BONNE
          EXECUTION CRE/219/320853 EN FAVEUR DE LA AL SHAMAL ISLAMIC BANK,
          SOUDAN TITULAIRE DU COMPTE 960-79-9 CHEZ VOUS.
          PERFORMANCE BOND CRE/219/320853
          WE REFER TO THE CONTRACT BETWEEN
          UNIPACK
          190 RUE DE TOLBIAC
          75013 PARIS
          FRANCE
          HEREAFTER CALLED THE SELLER
          AND
          AGUACEIRO SERVICOS LTD
          AVENIDA ARRIAGA 75
          9000 FUNCHAL MADEIRA
          PORTUGAL
          HEREAFTER CALLED THE BUYER
          CONCERNING THE DELIVERY OF PRODUCT D2 GAZ OIL 65,000 MT MONTHLY
          AS REQUESTED IN THE ABOVE MENTIONED CONTRACT, WE,ASLK-CGER BANK
          VERZEKERINGEN, HEREAFTER CALLED ASLK-CGER BANK, ISSUE OUR
          PERFORMANCE BOND CRE/219/320853 BY ORDER OF THE SELLER, IN
          FAVOUR OF THE BUYER FOR AN AMOUNT OF MAXIMUM USD 160.875,-
          (ONE HUNDRED AND SIXTY THOUSAND EIGHT HUNDRED AND SEVENTY FIVE
          UNITED STATES DOLLAR),
Trailer                : MAC:CEF1E35F
```



Exhibit B-6

UNCLASSIFIED                                        E16

Current Class: CONFIDENTIAL                         Page: 1
Current Handling: n/a
Document Number: 1997STATE231842                    Channel: n/a

Case Number: 200104094

<<<<.>>>>
PTQ6254

RELEASED IN PART
B6

CONFIDENTIAL       PTQ6254

PAGE 01       STATE    231842   111715Z
ORIGIN SA-01

INFO   LOG-00    ACDA-08   ACDE-00   INLB-01   AID-00    AMAD-01   SMEC-00
       INL-01    OASY-00   DINT-00   DOEE-00   SRPP-00   DS-00     EAP-01
       EB-00     EUR-01    OIGO-01   HHS-01    H-01      IM-01     TEDE-00
       INR-00    IO-00     JUSE-00   L-01      ADS-00    M-00      NEA-01
       NSAE-00   OES-01    OIC-02    OMB-01    OPIC-01   PA-00     PM-00
       PPT-01    PRS-00    P-00      CIO-00    SP-00     STR-00    T-00
       SNIS-00   NISC-00   PMB-00    DSCC-00   PRM-10    PRME-01   DRL-04
       G-00      MR-00     /041R

231842
SOURCE:  KODAKC.110047
DRAFTED BY: SA/PAB:SRAPOPORT -- 12/08/97 202 647-9552 SAPAB/AFGHAN/L20
APPROVED BY: SA:KFINDERFURTH
SA/PAB:MEMALINOWSKI/THUSHEK
                -----------------04DC0F  111719Z /38
P 111713Z DEC 97
FM SECSTATE WASHDC
TO AMEMBASSY ISLAMABAD PRIORITY
INFO AMCONSUL PESHAWAR PRIORITY
AMEMBASSY NEW DELHI PRIORITY
AMEMBASSY ANKARA PRIORITY
AMEMBASSY LONDON PRIORITY
AMEMBASSY PARIS PRIORITY
AMEMBASSY ROME PRIORITY
USMISSION USUN NEW YORK PRIORITY
AMEMBASSY BEIJING PRIORITY
AMEMBASSY TASHKENT PRIORITY
AMEMBASSY ASHGABAT PRIORITY
                CONFIDENTIAL

Current Class: CONFIDENTIAL                          Page: 1
  UNITED STATES DEPARTMENT OF STATE
  REVIEW AUTHORITY: SHARON E AHMAD
  DATE/CASE ID: 27 JUN 2003  200104094

UNCLASSIFIED     Exhibit B-7

UNCLASSIFIED

Current Class: CONFIDENTIAL                                    Page: 2
Current Handling: n/a
 Document Number: 1997STATE231842                          Channel: n/a

                         Case Number: 200104094

                            CONFIDENTIAL

PAGE 02         STATE    231842    111715Z
AMEMBASSY DUSHANBE PRIORITY
AMEMBASSY MOSCOW PRIORITY
AMEMBASSY BONN PRIORITY
AMEMBASSY BISHKEK PRIORITY
AMEMBASSY ALMATY PRIORITY
AMEMBASSY CAIRO PRIORITY
AMEMBASSY RIYADH PRIORITY
AMEMBASSY TOKYO PRIORITY
NSC WASHDC 0000
CIA WASHDC 0000
SECDEF WASHDC 0000
USIA WASHDC 0000
TREASURY DEPT WASHDC 0000
DEA WASHDC 0000

C O N F I D E N T I A L STATE 231842


LONDON FOR TUELLER, PARIS FOR RAVELING

E.O. 12958: DECL: L2/08/07
TAGS: PGOV, PREL, KWMN, PHUM, SNAR, AF
SUBJECT: AFGHANISTAN:  MEETING WITH THE TALIBAN

REF: ISLAMABAD 10486

1.  (U) CLASSIFIED BY KARL F. INDERFURTH, SA A/S. REASON:
1.5(D).

2.  (C)  SUAAARY: A/S INDERFURTH MET DECEMBER 8 WITH THREE
TALIBAN "ACTING MINISTERS," PLUS THE UN "PERMREP
DESIGNATE." WE UNDERSTAND THE TALIBAN RECEIVED
                         CONFIDENTIAL




                         CONFIDENTIAL

PAGE 03         STATE    231842    111715Z
INSTRUCTIONS FROM MULLAH OMAR, THEIR SUPREME LEADER, TO
SEEK THIS MEETING. THEY WANTED IMPROVED RELATIONS WITH THE

Current Class: CONFIDENTIAL                                    Page: 2

UNCLASSIFIED

Current Class: CONFIDENTIAL                                           Page: 3
Current Handling: n/a
Document Number: 1997STATE231842                                Channel: n/a

Case Number: 200104094

U.S. AND URGED US TO REOPEN OUR EMBASSY IN KABUL. THEY
DESCRIBED THEIR EFFORTS TO COOPERATE ON NARCOTICS ISSUES
AND ASKED FOR U.S. ASSISTANCE IN FUNDING CROP SUBSTITUTION
PROGRAMS.  A/S INDERFURTH HOPED THEIR COOPERATION WOULD
YIELD VISIBLE RESULTS BUT DESCRIBED THE DRUG ISSUE IN MORAL
AS WELL AS ECONOMIC TERMS. A/S INDERFURTH STRONGLY STATED
U.S. CONCERNS REGARDING GENDER ISSUES. THE TALIBAN
RESPONDED THAT THEIR POLICY WAS POPULAR, REFLECTED AFGHAN
TRADITION, AND THAT MUCH OF OUR INFORMATION REGARDING THEIR
POLICIES TOWARD WOMEN WAS WRONG. A/S INDERFURTH SAID THEY
SHOULD INVITE AN INTERNATIONAL TEAM TO VISIT IF THIS WAS

THE CASE; THE TALIBAN AGREED. THE TALIBAN ALSO INDICATED
WILLINGNESS TO NEGOTIATE WITH THE OPPOSITION AND AGREED ON
THE NEED FOR A BROAD-BASED GOVERNMENT,  THOUGH NOT ONE BASED
UPON DIVIDING UP MINISTRIES BETWEEN THE FACTIONS.
RESPONDING TO TALIBAN CRITICISM ALLEGING A LACK OF CONCERN
OVER THE REPORTED SLAUGHTER OF TALIBAN PRISONERS, A/S
INDERFURTH READ THEM A VOA EDITORIAL OPPOSING HUMAN RIGHTS
VIOLATIONS BY EITHER SIDE AND SPECIFICALLY CITING THE
REPORTED MASSACRES. ALTHOUGH THE TALIBAN CRITICIZED
RABBANI'S HOLD ON THE UN SEAT, THEY AGREED ON THE
IMPORTANCE OF WORKING WITH BRAHIMI AND THE UN BUT WARNED
THAT TIME WAS SHORT. THE TALIBAN WAS NOT RECEPTIVE TO
JOINING IN THE INTRA-AFGHAN DIALOGUE PROCESS.  THEY
REPEATED THEIR PLEDGE TO PREVENT TERRORISTS FROM USING
AFGHANISTAN TO LAUNCH ATTACKS ON OTHERS.  THEY STRESSED
THEIR EAGERNESS TO SEE THE PIPELINE GO AHEAD BUT WERE
WARNED THAT FINANCING WOULD NOT BE POSSIBLE WITHOUT PEACE.
CONFIDENTIAL


CONFIDENTIAL

PAGE 04       STATE   231842   111715Z
THE DELEGATION REPORTEDLY WAS PLEASED WITH THE MEETING AND
FRANK DISCUSSION.  THEY PROVIDED US WITH A NON-PAPER. (SEE
PAPA 18.) END SUMMARY.

3. (C)   A/S INDERFURTH, ACCOMPANIED BY PAR DIRECTOR
MALINOWSKI AND AFGHAN DESKOFFS RAPOPORT AND HUSHEK, MET
WITH THREE SENIOR MEMBERS OF THE TALIBAN DELEGATION
VISITING THE U.S. UNDER THE AUSPICES OF UNOCAL (REFTEL),

UNCLASSIFIED

Current Class: CONFIDENTIAL                                    Page: 4
Current Handling: n/a
Document Number: 1997STATE231842                               Channel: n/a

Case Number: 200104094

"ACTING MINISTER OF MINES AND INDUSTRY" ARMAD JAN, ACTING
MINISTER OF INFORMATION AND CULTURE" AMIR KHAN MOTTAQI, AND
"ACTING MINISTER OF PLANNING" DIN MOHAMMED (AN ETHNIC
TAJIK).   (INNER SHURA MEMBER MULLAH MOHAMMED GHAUS IS IN
OMAHA [                                                    ]        B6
[      ] DID NOT ACCOMPANY THE GROUP TO WASHINGTON.)  TALIBAN "UN
PERMREP DESIGNATE" MUJAHID (WHO IS ARMAD JAN'S BROTHER-IN-
LAW) ACCOMPANIED THE THREE AND SERVED AS TRANSLATOR.  THE
GROUP DISTRIBUTED A POSITION PAPER (SEE PAPA 18 FOR TEXT).
WE UNDERSTAND THE TALIBAN'S SUPREME AUTHORITY, MULLAH OMAR,
ORDERED THE DELEGATION TO SEEK THIS MEETING WITH A/S
INDERFURTH.

LET'S BE FRIENDS

4. (C) MOTTAQI, WHO DID MOST OF THE TALKING, EXPRESSED THE
TALIBANVS WISH FOR GOOD RELATIONS WITH US. HE THANKED US
FOR OUR SUPPORT DURING THE FIGHT AGAINST THE COMMUNISTS BUT
WARNED THAT RUSSIAN-TRAINED AGENTS WERE STILL WORKING IN
AFGHANISTAN. HE WENT ON TO DESCRIBE ATROCITIES COMMITTED
BY RESISTANCE COMMANDERS AFTER THE RUSSIAN WITHDRAWAL AND

CONFIDENTIAL

CONFIDENTIAL

PAGE 05      STATE   231842   111715Z
CLAIMED THAT ONLY THE TALIBAN HAD BROUGHT PEACE TO THE
PORTIONS OF THE COUNTRY UNDER THEIR CONTROL.

DRUGS

5. (C)   MOTTAQI DETAILED TALIBAN EFFORTS TO DATE TO COMBAT
NARCOTICS: ARIANA AIRLINES IS NO LONGER USED FOR
TRAFFICKING; HEROIN LABS HAVE BEEN DESTROYED; THERE ARE NO
ADDICTS IN TALIBAN AREAS; AND CANNABIS AND HASHISH
CULTIVATION HAS BEEN ELIMINATED.   IN CONTRAST, HE NOTED
THAT NORTHERN AREAS ARE STILL PERMITTING LABORATORIES TO
PROCESS OPIUM. HE WENT ON TO DESCRIBE THE PROPOSED
COOPERATION BETWEEN THE TALIBAN AND THE UN DRUG CONTROL

Current Class: CONFIDENTIAL                                    Page: 4

Current Class: CONFIDENTIAL                                     Page: 5
Current Handling: n/a
 Document Number: 1997STATE231842                           Channel: n/a

Case Number: 200104094

PROGRAM (UNDCP), NOTING IRANIAN INVOLVEMENT IN THE AFGHAN
DRUG TRADE AND ASKING FOR U.S.  AND INTERNATIONAL
ASSISTANCE TO PROMOTE CROP SUBSTITUTION PROGRAMS AND END
POPPY CULTIVATION. A/S INDERFURTH WELCOMED THESE STEPS AND
THEIR PLEDGE TO WORK WITH UNDCP.  HE HOPED TO SEE VISIBLE
RESULTS AND MADE THE POINT THAT THIS WAS A MORAL ISSUE AS
MUCH AS AN ECONOMIC ONE.

GENDER

6. (C)   TURNING TO GENDER AND EDUCATION ISSUES, MOTTAQI
SAID THAT THERE WERE NOW 1,200,000 AFGHANS IN SCHOOLS
INCLUDING 3000 GIRLS IN KABUL.  HE ADDED THAT THE
REQUIREMENT THAT WOMEN BE VEILED WAS A DEMAND OF THE AFGHAN
PEOPLE AND THAT THE TALIBAN REGIME WOULD BE OVERTHROWN IF
THEY ALTERED IT.  HE REPEATED, HOWEVER, THAT THE TALIBAN
                   CONFIDENTIAL



                   CONFIDENTIAL

PAGE 06        STATE   231842   111715Z
DID NOT WISH TO STOP FEMALE EDUCATION. A/S INDERFURTH
RESPONDED THAT WE WERE EXTREMELY CONCERNED ABOUT THIS POINT
AND DECLARED THAT MEN AND WOMEN SHOULD HAVE EQUAL
OPPORTUNITIES IN LIFE, INCLUDING IN EDUCATION AND
EMPLOYMENT. MOTTAQI AGREED, BUT ARGUED THAT THERE WERE
DIFFERENCES BETWEEN THE SEXES, NOTING THAT "HARD WORK WAS
DONE BY MEN IN YOUR COUNTRY" AND THAT THERE HAD NOT BEEN A
WOMAN PRESIDENT AND THERE WAS ONLY ONE WOMAN IN THE CABINET
(SIC). A/S INDERFURTH CORRECTED HIM AND NOTED THAT A
SOCIETY NEEDED THE CONTRIBUTIONS OF ALL OF ITS MEMBERS TO
GO FORWARD. FURTHER, HE SAID OUR ATTITUDE TOWARD THE
TALIBAN WOULD BE INFLUENCED BY ITS BEHAVIOR RELATING TO
MEDICAL CARE, EDUCATION, AND OPPORTUNITIES MADE AVAILABLE
TO WOMEN.  THIS WAS NOT THE U.S. VIEW ALONE BUT WAS HELD BY
THE ENTIRE INTERNATIONAL COMMUNITY. THE TALIBAN, HE
ARGUED, SHOULD RESPOND TO THIS IN A POSITIVE WAY.

7. (C) MOTTAQI RESPONDED THAT MUCH OF THE INTERNATIONAL
COMMUNITY'S INFORMATION ON THE CIRCUMSTANCES OF AFGHAN
WOMEN WAS WRONG. A/S INDERFURTH RESPONDED THAT THEY SHOULD

Current Class: CONFIDENTIAL                                    Page: 6
Current Handling: n/a
 Document Number: 1997STATE231842                        Channel: n/a

Case Number: 200104094

INVITE AN INTERNATIONAL TEAM TO SEE FOR ITSELF. THE U.S.
WOULD BE PART OF SUCH A GROUP AND WOULD LIKE TO BE PROVEN
WRONG. AHMAD JAN SAID THE TALIBAN WOULD INVITE SUCH A
DELEGATION BUT ASKED THAT, BECAUSE OF THE VAST DESTRUCTION
IT HAS SUFFERED, WE NOT CONSIDER AFGHANISTAN "A NORMAL
COUNTRY." HE WARNED AGAINST APPLYING U.S. STANDARDS. HE
NOTED THAT THERE HAD NOT BEEN MUCH FEMALE EDUCATION IN THE
PAST BUT SAID THAT THE TALIBAN WOULD MOVE "GRADUALLY AND
STEADILY" AND EDUCATE THE PEOPLE ABOUT THE IMPORTANCE OF
EDUCATION IN ACCORD WITH ISLAMIC TEACHINGS.

CONFIDENTIAL


CONFIDENTIAL

PAGE 07        STATE    231842   111715Z
NEGOTIATIONS


8. (C) A/S INDEREURTH ASKED ABOUT THE TALIBANWS ATTITUDE
TOWARD NEGOTIATING WITH THE OPPOSITION, NOTING THAT THERE
HAD BEEN REPORTS OF TALKS WITH NIMA HEAD GENERAL DOS TAM.
MOTTAQI ANSWERED THAT THE TALIBAN FAVORED TALKS AND HAD
SENT IMPORTANT PEOPLE TO SUCH MEETINGS WHILE THE NORTH HAD
RESPONDED WITH "LOW-LEVEL PEOPLE WITHOUT AUTHORITY OR
CREATIVE IDEAS." HE ADMITTED THAT A "KIND OF NEGOTIATIONS"
WAS GOING ON WITH DOS TAM BUT THERE WAS A GENERAL LACK OF
CONFIDENCE AND TRUST BETWEEN THE TALIBAN AND THEIR
OPPONENTS.  HE CITED MALIK'S SEIZURE OF A NEGOTIATING TEAM
IN MAY IN MAZAR-I-SHARIF.  (NOTE: THE NORTH ARGUES, WITH
CONSIDERABLE JUSTIFICATION, THAT THEY WERE PART OF AN
OCCUPYING FORCE RATHER THAN NEGOTIATORS.)

THE MASS KILLINGS


9. (C) MOTTAQI THEN TURNED TO THE REPORTED 3,000 TALIBAN
PRISONERS SLAIN NEAR MAZAR, BLAMING THEIR DEATHS IN PART
UPON WORLD COMMUNITY SUPPORT FOR THE OPPOSITION.   A/S
INDERFURTH RESPONDED, CITING RECENT VOA EDITORIALS, THAT
THE U.S. OPPOSED HUMAN RIGHTS VIOLATIONS BY ANY SIDE. THE
U.S., HE STRESSED, WAS NEUTRAL BETWEEN THE FACTIONS AND

UNCLASSIFIED

Current Class: CONFIDENTIAL                                    Page: 7
Current Handling: n/a
 Document Number: 1997STATE231842                    Channel: n/a

Case Number: 200104094

SUPPORTED A PROCESS LEADING TO A CEASE-FIRE AND
NEGOTIATIONS FOR A BROAD-BASED GOVERNMENT. THE TALIBAN
REPRESENTATIVES WERE PLEASED THAT THE U.S. HAD SPOKEN OUT
AGAINST THE MASSACRE.

CONFIDENTIAL

CONFIDENTIAL

PAGE 08        STATE   231842   111715Z
QUESTIONING NEUTRALITY/MORE ON NEGOTIATIONS

10. (C)    MOTTAQI AGAIN QUESTIONED THE NEUTRALITY OF THE
INTERNATIONAL COMMUNITY BY CITING THE FACT THAT RABBANI
RETAINS THE AFGHAN SEAT IN THE UNGA, ADDING THAT THE
INTERNATIONAL COMMUNITY HAD ALSO FAILED TO CONDEMN RUSSIAN
INTERFERENCE IN AFGHANISTAN.  A/S INDERFURTH SAID HE WOULD
BE CONSULTING WITH THE RUSSIANS NEXT WEEK, ADDING THAT THEY
HAD EXPRESSED THE DESIRE TO WORK CONSTRUCTIVELY TO END THE
FIGHTING. HE CITED BRAHIMI'S GROUP AND NOTED THAT THE
TALIBAN HAD BEEN GIVEN THE COMMON TALKING POINTS.   HE URGED
THEM TO WORK CLOSELY WITH BRAHIMI. MOTTAQI SAID THEY WERE
READY TO COOPERATE WITH THE UN ON AFGHANISTAN BUT THAT TIME
WAS SHORT.   THEY WERE ALSO READY TO NEGOTIATE WITH THE
OPPOSITION, EVEN THOUGH THE RABBANI REGIME HAD CHEATED AND
LIED TO THEN. A/S INDERFURTH URGED THEM TO THINK OF THE
FUTURE RATHER THAN DWELL ON THE PAST. ON THE UN SEAT, HE
SAID IT COULD BE RESOLVED QUICKLY IF THERE WERE A CEASE-
FIRE, NEGOTIATIONS, AND A BROAD-BASED GOVERNMENT.   THE
TALIBAN, HE ADDED, WOULD HAVE A MAJOR ROLE IN ANY SUCH
GOVERNMENT, BUT IT COULDN1T HAVE THE ONLY ROLE AND RECEIVE
U.S. RECOGNITION.

DEMINING/RECONSTRUCTION

11. (C)    A/S INDERFURTH BRIEFLY DESCRIBED HIS NEW
POSITION AS SPECIAL REPRESENTATIVE OF THE PRESIDENT AND
SECRETARY OF STATE FOR GLOBAL HUMANITARIAN DEMINING. HE
NOTED THAT THE USG HAD GIVEN USD LV MILLION FOR DEMINING IN
AFGHANISTAN BUT ADDED THAT FOR AFGHANISTAN TO GET MORE
CONFIDENTIAL

Current Class: CONFIDENTIAL                                    Page: 7

UNCLASSIFIED

Current Class: CONFIDENTIAL                                         Page: 8
Current Handling: n/a
  Document Number: 1997STATE231842                               Channel: n/a

Case Number: 200104094

CONFIDENTIAL

PAGE 09       STATE   231842   111715Z
ECONOMIC ASSISTANCE FOR REHABILITATION FROM THE
INTERNATIONAL COMMUNITY, THE WAR MUST COME TO AN END. MANY
NATIONS WOULD LIKE TO DO MORE, BUT CANNOT BECAUSE OF THE
CONTINUED FIGHTING. THIS MUST STOP AND A BROAD-BASED
GOVERNMENT BE ESTABLISHED.

12.  (C)    MOTTAQI RESPONDED THAT THE TALIBAN WANTS PEACE
AND IS WILLING TO WORK WITH ANYONE THAT WANTS PEACE. IN A
FUTURE GOVERNMENT, ALL GROUPS MUST BE REPRESENTED.  (ANMAD
JAN LATER ADDED THAT SUCH A GOVERNMENT SHOULD AVOID
PARCELING MINISTRIES OUT AMONG THE PARTIES AS IN THE PAST
BECAUSE THIS TYPE OF COALITION GOVERNMENT HAD NOT AND WOULD
NOT WORK. THE U.S. SIDE AGREED.) HE URGED, HOWEVER, THAT
THE U.S. WORK TO END FOREIGN INTERFERENCE IN AFGHANISTAN.
HE ASKEDUS TO REOPEN OUR EMBASSY IN KABUL SO WE COULD
OBTAIN INFORMATION FIRST HAND. THE U.S., HE SAID,    SHOULD
STAND WITH AFGHANISTAN, AS WE DID DURING THE RUSSIAN
INVASION, OR ELSE THE AFGHAN PEOPLE WILL THINK WE ARE
ABANDONING THEM.

TERRORISM

13.   (C)    FOLLOWING A/S INDERFURTH'S DEPARTURE FOR ANOTHER
MEETING, PAB DIRECTOR MALINOWSKI RAISED THE ISSUE OF
TERRORISM, NOTING THE ACTIVITIES UNDERTAKEN BY SOME
INDIVIDUALS WHO HAD RECEIVED TRAINING IN AFGHANISTAN, AND
SPECIFICALLY THE CASE OF SAUDI TERRORIST FINANCIER OSAMA
BIN LAD IN, NOTING THAT THE TALIBAN HAD PREVIOUSLY PLEDGED
THAT THEIR SOIL WOULD NOT BE USED AS A BASE FOR ATTACKS ON
OTHERS. HE ASKED FOR A RENEWAL OF THIS COMMITMENT, NOTING
                    CONFIDENTIAL

UNCLASSIFIED

UNCLASSIFIED

Current Class: CONFIDENTIAL                                          Page: 9
Current Handling: n/a
Document Number: 1997STATE231842                              Channel: n/a

Case Number: 200104094

CONFIDENTIAL

PAGE 10        STATE    231842   111715Z
THAT BIN LADIN AND OTHERS HAD DAMAGED THE IMAGE OF
AFGHANISTAN IN THE WORLD. MOTTAQI RESPONDED THAT THEY WILL
KEEP THEIR COMMITMENT AND NOT ALLOW AFGHANISTAN TO USE
AFGHANISTAN AS A BASE FOR TERRORISM. DIN MOHAMMED ADDED
THAT IF BIN LADEN WERE EXPELLED, HE WOULD GO TO IRAN AND
CAUSE MORE TROUBLE. AHMAD JAN NOTED THAT THE TALIBAN DID
NOT INVITE BIN LADIN INTO AFGHANISTAN; HE WAS ALREADY IN
NANGARHAR AS A GUEST OF THE PREVIOUS REGIME WHEN THEY TOOK
OVER.  THE TALIBAN, HE CLAIMED, HAD STOPPED ALLOWING HIM TO
GIVE PUBLIC INTERVIEWS AND HAD FRUSTRATED IRANIAN AND IRAQI
ATTEMPTS TO GET IN CONTACT WITH HIM.

INTRA-AFGHAN DIALOGUE PROCESS


14.   (C)   MALINOWSKI RAISED THE INTRA-AFGHAN DIALOGUE
PROCESS, ASKING IF THERE WERE ANY CHANCE OF OBTAINING
TALIBAN REPRESENTATION. DIN MUHAMMAD RESPONDED THAT THE
INDIVIDUALS INVOLVED DID NOT HAVE THE TRUST OF THE AFGHAN
PEOPLE AND LACKED AUTHORITY, THEREFORE THE TALIBAN COULD
NOT BE INVOLVED. MALINOWSKI REPLIED THAT THE PROCESS
NEEDED THE TALIBANTS PARTICIPATION TO MOVE AHEAD AND IT DID
OFFER SOME PROMISE.

CONSULAR PROBLEMS


15.   (C)   MUJAHID RAISED THE PROBLEMS CREATED BY THE AFGHAN
CONSULATE IN NEW YORK ISSUING PASSPORTS THAT WERE NOT
REGISTERED WITH THE (TALIBAN) FOREIGN MINISTRY IN KABUL AND
THE FACT THAT BOTH PAKISTAN AND THE TALIBAN DID NOT
                        CONFIDENTIAL




CONFIDENTIAL

PAGE 11        STATE    231842   111715Z
CONSIDER THESE DOCUMENTS VALID FOR ONWARD TRAVEL. HE ASKED
ABOUT ISSUING PASSPORTS THROUGH HIS OFFICE. THE U.S. SIDE
RESPONDED THAT, PER PREVIOUS GUIDANCE, ONLY ACCREDITED

Current Class: CONFIDENTIAL                                          Page: 9

UNCLASSIFIED

Current Class: CONFIDENTIAL                                         Page: 10
Current Handling: n/a
Document Number: 1997STATE231842                                   Channel: n/a

Case Number: 200104094

CONSULAR OFFICERS COULD ISSUE PASSPORTS TO FOREIGN CITIZENS
IN THE U.S. WE AGREED TO INVESTIGATE OTHER APPROACHES,

SUCH AS THE POSSIBILITY OF HAVING THE DOCUMENTS ISSUED BY
THE AFGHAN EMBASSY IN ISLAMABAD AND TRANSPORTED TO NEW
YORK.

PIPELINE

16. (C) ANMAD JAN RAISED THE PIPELINE ISSUE AND SAID THE
TALIBAN AND PAKISTAN WERE BOTH EAGER FOR THE OIL AND GAS
PIPELINE PROJECT TO GO AHEAD. MALINOWSKI SAID THAT WE ALSO
WANTED THE PROJECT TO PROCEED AND DESCRIBED THE BENEFITS IT
WOULD PROVIDE AFGHANISTAN AND THE REGION, BUT HE NOTED THAT
IT WAS UNLIKELY TO BE FINANCED UNLESS THERE WAS PEACE IN
AFGHANISTAN. ABMAD JAN SAID THE COMMENCEMENT OF THE
PROJECT WOULD GIVE AN INCENTIVE TO THE PEACE PROCESS. HE
EXPRESSED CONCERN ABOUT IRANIAN MOTIVATION AND DESIRE TO
OBTAIN THE PIPELINE FOR THEMSELVES. HE ADDED THAT THE
AFGHAN CENTRAL BANK COULD GUARANTEE THE INVESTMENT.
MALINOWSKI REPEATED THAT THE PROJECT NEEDED PEACE IN THE
COUNTRY, WARNING THAT AFGHANISTAN HAD LOST A MAJOR
OPPORTUNITY IN 1991 FOR ECONOMIC RECONSTRUCTION BECAUSE OF
THE CONTINUED FIGHTING AND HE HOPED IT WOULD NOT LOSE THE
ECONOMIC BENEFITS THAT THE PIPELINE WOULD PRODUCE TOO.

17. (C) COMMENT: THE "ACTING MINISTERS" REPORTEDLY WERE
                CONFIDENTIAL

CONFIDENTIAL

PAGE 12        STATE   231842   111715Z
PLEASED WITH THE MEETING AND APPRECIATED THE OPPORTUNITY TO
ENGAGE IN DISCUSSION WITH A/S INDERFURTH. THEIR CONCERN
OVER THEIR IMAGE IN THE U.S. CAME THROUGH. WE BELIEVE OUR
MESSAGE ON GENDER ISSUES, NARCOTICS, COOPERATION WITH THE
UN, AND THE NEED FOR A NEGOTIATED SETTLEMENT ALSO CAME
THROUGH LOUD AND CLEAR. WE UNDERSTAND THAT THIS WAS THE
"ACTING MINISTERS" FIRST TRIP OUTSIDE THE ISLAMIC WORLD AND
THAT THEY REPORTEDLY WERE SURPRISED WITH THE DEPTH OF ANTI
TALIBAN FEELING IN THE WEST AND UNDERSTAND THAT THIS MUST

Current Class: CONFIDENTIAL                                         Page: 10

UNCLASSIFIED

Current Class: CONFIDENTIAL                                    Page: 11
Current Handling: n/a
 Document Number: 1997STATE231842                           Channel: n/a

Case Number: 200104094

BE ADDRESSED. END COMMENT.

18. (U) TEXT OF TALIBAN NON-PAPER (LIGHTLY EDITED FOR STYLE)

VIEWPOINTS:

A) THE ISLAMIC STATE OF AFGHANISTAN WANTS FRIENDLY RELATIONS WITH THE U.S. AND ALL COUNTRIES OF THE WORLD BASED ON MUTUAL RESPECT AND NON-INTERFERENCE. WE ARE GRATEFUL FOR THE MATERIAL AND MORAL SUPPORT OF THE U.S. TO THE PEOPLE OF AFGHANISTAN DURING THE RUSSIAN INVASION OF OUR COUNTRY. THE SUPPORT CAN BE A GOOD FOUNDATION FOR FRIENDSHIP BETWEEN THE PEOPLE AND GOVERNMENT OF AFGHANISTAN

AND THE PEOPLE AND GOVERNMENT OF THE UNITED STATES OF AMERICA.  THE AFGHANS DO NOT FORGET A HAND EXTENDED TO THEM IN TIME OF NEED.  WE HOPE THAT, EASED ON GOOD WILL, MULTI-FACETED COOPERATION MAY CONTINUE BETWEEN THE TWO COUNTRIES IN THE FUTURE.

B) THE ISLAMIC STATE OF AFGHANISTAN HAS EMBARKED ON THE
CONFIDENTIAL


CONFIDENTIAL

PAGE 13       STATE   231842   111715Z
ROAD OF UPROOTING THE EVIL OF TRAFFICKING AND POPPY CULTIVATION FROM AFGHANISTAN. WE WANT THIS PLAGUE TO BE EXTERMINATED FOR GOOD. HOWEVER, TO ACCOMPLISH THIS TASK, WE NEED CROP SUBSTITUTES AND ALTERNATIVE PROJECTS FOR THE FARMERS.  IF THE FARMERS DO NOT HAVE SOUND ALTERNATIVE MEANS OF OBTAINING INCOME, THEY WILL ONCE AGAIN RETURN TO POPPY CULTIVATION. THE ISLAMIC STATE SEEKS U.S. FINANCIAL AND MATERIAL AID TO SOLVE THIS PROBLEM.

C) MALE AND FEMALE EDUCATION IS ALSO A KEY ISSUE FACING US. WE ARE NOT ABLE TO SOLVE THE ISSUE BY OURSELVES UNLESS HELPED BY THE U.S. AND THE INTERNATIONAL COMMUNITY FINANCIALLY AND MATERIALLY.  OUR ECONOMY IS IN SHAMBLES. THE INFRASTRUCTURE IS DESTROYED. BUILDINGS FOR GIRLS AND BOYS SCHOOLS NEED RECONSTRUCTION. A BUDGET   (AID) IS ALSO

UNCLASSIFIED

UNCLASSIFIED

Current Class: CONFIDENTIAL                                    Page: 12
Current Handling: n/a
 Document Number: 1997STATE231842                              Channel: n/a

Case Number: 200104094

REQUIRED FOR EDUCATIONAL EXPENDITURES.

D) THE STATE DEPARTMENT MAY WELL BE AWARE OF 3,000 MEMBERS
OF THE TALIBAN ISLAMIC MOVEMENT MASSACRED BY THE SO-CALLED
NORTHERN ALLIANCE MILITIA IN LAILY DESERT, NEAR THE TOWN OF
SHIBARGHAN IN JOZJAN PROVINCE, NORTH AFGHANISTAN.

ACCORDING TO MAWLAVI TURKESTANI, DOSTAM REPRESENTATIVE IN
ISLAMABAD, 1632 TALEBAN IMPRISONED IN SHIBARGHAN WERE TAKEN
TO THE LAILY DESERT, WEST OF SHIBARGHAN CITY, AND
MASSACRED.  ABOUT V00 MEN IMPRISONED IN MAZAR-I-SHARIF AND
372 IMPRISONED IN FARYAB WERE ALSO EXECUTED.  THE MEN WHO
SURVIVED THE MASSACRES ARE ALIVE IN KABUL.   FOR MONTHS NOW,
THEY HAVE BEEN THERE TO PROVIDE EVIDENCE OF THE MASSACRES.
SOME PRISONERS REPORTEDLY DIED UNDER TORTURE. WITNESSES
SAY THAT MANY MORE PRISONERS WERE SAVAGELY MAIMED AND THEIR
                        CONFIDENTIAL

                        CONFIDENTIAL

PAGE 14        STATE   231842   111715Z
LIMBS AMPUTATED BEFORE THEY WERE KILLED.   OTHER PRISONERS
HAD THEIR BODIES CRUSHED BY TANKS AND BULLDOZERS.

THE MASSACRE HAPPENED UNDER THE AUSPICES OF THE RABBANI
REGIME. AT THE TIME OF THE ATROCITIES, RABBANI CLAIMED TO
BE PRESIDENT OF THE COUNTRY. HIS GOVERNMENT WAS BASED IN
MAZAR-I-SHARIF. GENERAL MALIK, WHO IS NOW IN IRAN, WAS
RABBANIWS FOREIGN MINISTER AND CHIEF OF THE JUMBESH PARTY.

WHEN THE HAIR OF A PERSON IS CUT IN KABUL, THE WHOLE MEDIA
IS TALKING ABOUT IT. NOW 3000 PEOPLE HAVE BEEN KILLED BY
THE OPPOSITION MILITIA AND THERE IS NO SERIOUS INTEREST.

THE U.S. ADVOCATES HUMAN RIGHTS THROUGHOUT THE WORLD. BUT
STILL, IT HAS NOT CONDEMNED THE TRAGIC HUMAN HOLOCAUST IN
THE LAILY DESERT. THE PEOPLE OF AFGHANISTAN NEVER EXPECTED
THE U.S. GOVERNMENT TO BE A SILENT SPECTATOR WHILE
THOUSANDS OF AFGHAN MEN AND WOMEN FROM ALL RACIAL
BACKGROUNDS ARE MOURNING THE MASSACRE OF THEIR RELATIVES IN
AFGHANISTAN. WE WANT YOU FOR HUMANITARIAN REASONS TO HELP
US BRING THE CULPRITS TO TRIAL AND PROSECUTE THEM ACCORDING

UNCLASSIFIED

UNCLASSIFIED

Case Number: 200104094

TO INTERNATIONAL NORMS AND PRINCIPLES.

E) THE ISLAMIC STATE OF AFGHANISTAN WANTS A BROAD-BASED
GOVERNMENT REPRESENTING ALL OF THE PEOPLE OF AFGHANISTAN.
UNFORTUNATELY, COALITION GOVERNMENTS HAVE NEVER WORKED IN
AFGHANISTAN. THE ISLAMIC STATE RESPECTS THE RIGHTS OF ALL
ETHNIC GROUPS IN AFGHANISTAN AND IS WILLING TO HAVE THEM IN
THE GOVERNMENT.

F) MOSCOW AND TEHRAN ARE PROVIDING MULTI-FACETED AID TO
                    CONFIDENTIAL

CONFIDENTIAL

PAGE 15        STATE   231842   111715Z
THE OPPOSITION.  ARMS WITH INSTRUCTIONS IN THE PERSIAN
LANGUAGE HAVE BEEN SEEN IN MAZAR-I-SHARIF AND BAMIYAN.
TEHRAN HAS SENT AMMUNITION AND ARMS TO THE OPPOSITION BY
MAKING HUNDREDS OF FLIGHTS TO BAMIYAN AND MAZAR-I-SHARIF
AIRPORTS. OTHER LOGISTICAL AIDS HAVE ALSO BEEN GIVEN TO
THE OPPOSITION MILITIA BY IRAN AND RUSSIA. WE WANT A
PRACTICAL U.S. ROLE IN ENDING THE FOREIGN INTERVENTION IN
AFGHANISTAN.

G) THE ISLAMIC STATE BELIEVES THE OPPONENTS ARE CREATING
MISUNDERSTANDING BETWEEN THE ISLAMIC STATE AND THE USA AS
WELL AS OTHER FRIENDLY COUNTRIES. THEREFORE, THE ISLAMIC
STATE WANTS THE U.S. GOVERNMENT TO RESTART ITS EMBASSY IN
KABUL IN ORDER TO HAVE FIRST HAND INFORMATION ABOUT THE
SITUATION.  THIS WILL ALSO HELP OPEN UP A VISTA OF
COOPERATION ON WIDE-RANGING MATTERS BETWEEN THE TWO
FRIENDLY COUNTRIES AND PEOPLES.

END TEXT.
TALBOTT

UNCLASSIFIED

# UNCLASSIFIED

**Department of Defense**
**Office for the Administrative Review of the Detention of Enemy**
**Combatants at US Naval Base Guantanamo Bay, Cuba**

4 November 2005

TO:        AL SUADI, ABDUL AZIZ ABDULLAH ALI

SUBJECT:   UNCLASSIFIED SUMMARY OF EVIDENCE FOR ADMINISTRATIVE
           REVIEW BOARD IN THE CASE OF
           AL SUADI, ABDUL AZIZ ABDULLAH ALI

1. An Administrative Review Board will be convened to review your case to determine if your continued detention is necessary.

2. The Administrative Review Board will conduct a comprehensive review of all reasonably available and relevant information regarding your case. At the conclusion of this review the Board will make a recommendation to: (1) release you to your home state; (2) transfer you to your home state, with conditions agreed upon by the United States and your home state; or (3) continue your detention under United States control.

3. The following primary factors favor continued detention:

   a. Commitment

      1. The detainee attended a mosque in Yemen where he heard about jihad from a Sheikh. An individual urged him to go to Afghanistan to participate in a jihad against the Russians.

      2. The detainee was urged to help with the jihad and he traveled to Afghanistan near the end of 2000.

      3. The detainee traveled from Damascus, Syria, to Tehran, Iran to Mashaad, Iran to Tibatt, Iran and then to Kandahar, Afghanistan.

   b. Training

      1. In 1990-1991, the detainee completed basic training and served as a volunteer National Guardsman in the Yemen National Guard.

      2. The detainee received training with the Rocket Propelled Grenade, AK-47, Pulemyot Kalashnikov and a weapon similar to the .50 caliber machine gun. The training took place between 1991-1992.

      3. The detainee attended the explosives course at the al Farouq training camp in Afghanistan. After graduation, the detainee was chosen as an assistant to teach an explosives course at Tarnak farms.

# UNCLASSIFIED

# UNCLASSIFIED

**SUBJECT:    UNCLASSIFIED SUMMARY OF EVIDENCE FOR ADMINISTRATIVE
REVIEW BOARD IN THE CASE OF
AL SUADI, ABDUL AZIZ ABDULLAH ALI**

   c. Other Relevant Data

     1. The detainee was seen at a guest house in Kandahar during August 2001.

     2. The detainee and the others were awaiting training while in Afghanistan. An operative stated that he assumed the detainee was traveling to Chechnya for jihad.

     3. An operative saw the detainee in January 2002 at a guesthouse in Karachi, Pakistan where the detainee was eventually captured. The operative did not know exactly how the detainee traveled there from Afghanistan, but stated typically, a network of Pakistanis would bring them.

     4. The detainee was in a Karachi guesthouse for approximately one month before his arrest. During that time, the Yemenis were waiting to travel home to Yemen. All the men had turned their cash, passports and identification over to al Qaida facilitators upon their arrival in Afghanistan, for safekeeping.

4. The following primary factors favor release or transfer:

   a. The detainee denied having any knowledge of the attacks prior their execution on 11 September 2001.

   b. The detainee denied having any knowledge of any rumors or plans of future attacks on the United States.

   c. The detainee denied any knowledge of bomb making or explosives instructors. The detainee claimed the entire notion of building a bomb out of homemade materials seemed very strange and foreign to him.

5. You will be afforded a meaningful opportunity to be heard and to present information to the Board; this includes an opportunity to be physically present at the proceeding. The Assisting Military Officer (AMO) will assist you in reviewing all relevant and reasonably available unclassified information regarding your case. The AMO is not an advocate for or against continued detention, nor may the AMO form a confidential relationship with you or represent you in any other matter.

# UNCLASSIFIED

# UNCLASSIFIED

**Department of Defense**
**Office for the Administrative Review of the Detention of Enemy**
**Combatants at US Naval Base Guantanamo Bay, Cuba**

7 October 2005

TO:       KHAIRKHWA, KHIRULLAH SAID WALI

SUBJECT:   UNCLASSIFIED SUMMARY OF EVIDENCE FOR ADMINISTRATIVE
          REVIEW BOARD IN THE CASE OF KHAIRKHWA, KHIRULLAH SAID
          WALI

1. An Administrative Review Board will be convened to review your case to determine if your continued detention is necessary.

2. The Administrative Review Board will conduct a comprehensive review of all reasonably available and relevant information regarding your case. At the conclusion of this review the Board will make a recommendation to: (1) release you to your home state; (2) transfer you to your home state, with conditions agreed upon by the United States and your home state; or (3) continue your detention under United States control.

3. The following primary factors favor continued detention:

    a. Commitment

        1. The detainee acted as the Pashto spokesman for the Taliban from 1994 to 1999.

        2. The Taliban chose the detainee to become their spokesperson for BBC and Voice of America. As Taliban spokesperson, the detainee traveled to Chaman, Pakistan, Kandahar, Charasia County of Kabul, and Mazar-e-Sharif.

        3. While serving as the Taliban spokesperson in Spin Buldak, Afghanistan, the detainee also served as county supervisor in that area.

        4. The detainee is a former Taliban Interior Minister and was the commander of Taliban forces that took Mazar-e-Sharif in 1996.

        5. The detainee worked as a Deputy Sheriff in Spin Buldak and knew of shipments of Taliban seized weapons from Mazar-e-Sharif to Khandahar.

        6. The detainee was trusted by the Taliban to keep order in Herat and to send taxes collected back to Mullah Omar.

    b. Training

        The detainee received military training for a short period of time at Camp Marof, near Kandahar, when the detainee was in his teens.

# UNCLASSIFIED

DMO Exhibit  1
Page 1 of 4

000552

# UNCLASSIFIED

**SUBJECT:   UNCLASSIFIED SUMMARY OF EVIDENCE FOR ADMINISTRATIVE REVIEW BOARD IN THE CASE OF KHAIRKHWA, KHIRULLAH SAID WALI**

c. Connections/Associations

1. As Taliban spokesperson, the detainee met many influential Taliban leaders, such as Mullah Omar.

2. The detainee was known to have close ties to Usama Bin Laden.

3. In 1996, the detainee attended a meeting in Kandahar. Jihad fighters, Usama Bin Laden and his guest attended the meeting.

4. The detainee was appointed by the Taliban as Governor of Herat Province for a two-year period from about 1999 to 2001. The detainee's job was to improve relations between Iran and the Taliban government.

5. On 7 January 2000, the detainee and three other Taliban officials attended a meeting with Iranian and Hizbi Islami-Gulbuddin Hikmatyar faction officials. Present at the meeting were Afghan Hizbi Islami-Gulbuddin leader, Gulbuddin Hikmatyar and Ayman Al-Zawahiri. Topics of discussion included United States intervention in the region, restoration of peace in Afghanistan and strengthening the Taliban's ties with Iran government.

6. The detainee visited Mullah Omar for the funeral of Omar's brother, which was sometime in November 2000.

7. Mullah Omar approached the detainee prior to the 9/11/2001 attacks and voiced his distrust of Hamid Karzai and Omar's concerns over the detainee's relationship with Karzai.

8. In the fall of 2001, the detainee met with Mullah Omar for about 10 minutes, outside of Omar's house, across from the Kharq-e-Sharif shrine.

9. In November 2001, the detainee met with an Iranian diplomatic delegation. The Iranian government was prepared to offer anti-aircraft weapons to the Taliban for use against the United States and coalition forces operating in Afghanistan.

10. On 20 December 2001, the detainee met with Taliban leader Mullah Omar in the Rais-Baghra House in Baghran, Helmand Province.

11. When the Taliban lost control of the government, the detainee called Hamid Karzai for advice. The detainee met with one of Karzai's representatives and discussed the new government and the detainee's future safety.

# UNCLASSIFIED

# UNCLASSIFIED

**Department of Defense**
**Office for the Administrative Review of the Detention of Enemy**
**Combatants at US Naval Base Guantanamo Bay, Cuba**

7 November 2005

TO:     AL DAYI, OMAR SAID SALIM

SUBJECT:    UNCLASSIFIED SUMMARY OF EVIDENCE FOR ADMINISTRATIVE
REVIEW BOARD IN THE CASE OF AL DAYI, OMAR SAID SALIM

1. An Administrative Review Board will be convened to review your case to determine if your
continued detention is necessary.

2. The Administrative Review Board will conduct a comprehensive review of all reasonably
available and relevant information regarding your case. At the conclusion of this review the
Board will make a recommendation to: (1) release you to your home state; (2) transfer you to
your home state, with conditions agreed upon by the United States and your home state; or (3)
continue your detention under United States control.

3. The following primary factors favor continued detention:

  a. Connections/Associations

     1. The detainee was given airline tickets and $500 USD to travel from Yemen to
Afghanistan.

     2. The detainee stayed in the "Daftar Taliban" in Quetta, Pakistan.

     3. The detainee stayed in safehouses in Kandahar and Jalalabad, Afghanistan.

     4. The detainee relocated from the Jalalabad, Afghanistan safehouse to one of the rear
echelon camps in the Tora Bora region. The detainee was shown to his position by Abdul
Quduz.

     5. The detainee was in the Tora Bora region for about a month before he was wounded in
the leg by a missile fired at the caves.

     6. The detainee's name was included in a list of 324 Arabic names, aliases and
nationalities recovered from raids on safehouses associated with suspected al Qaida in Karachi,
Pakistan.

  b. Detainee Actions and Statements

     The detainee gave his $500 USD to two others before he was taken to the hospital for
treatment of his leg wound. He wanted to prevent the Afghan people from taking his money.

# UNCLASSIFIED

DMO Exhibit _1_
Page 1 of 2

000495

# UNCLASSIFIED

**Department of Defense**
**Office for the Administrative Review of the Detention of Enemy**
**Combatants at US Naval Base Guantanamo Bay, Cuba**

12 August 2005

TO:   .  MUHAMMED, ABDUL MAJID

SUBJECT:   UNCLASSIFIED SUMMARY OF EVIDENCE FOR ADMINISTRATIVE
REVIEW BOARD IN THE CASE OF MUHAMMED, ABDUL MAJID

1. An Administrative Review Board will be convened to review your case to determine if your continued detention is necessary.

2. The Administrative Review Board will conduct a comprehensive review of all reasonably available and relevant information regarding your case. At the conclusion of this review the Board will make a recommendation to: (1) release you to your home state; (2) transfer you to your home state, with conditions agreed upon by the United States and your home state; or (3) continue your detention under United States control.

3. The following primary factors favor continued detention:

   a. Commitment

      1. The detainee worked for a time as a drug courier between Afghanistan and Iran.

      2. The detainee had an Afghani person obtain a letter from the Hezb-e Islami Gulbuddin allowing the detainee to cross the border from Iran to Afghanistan. The detainee paid 5,000 in Iranian money (NFI).

      3. Hizb-e Islami Gulbuddin (HIG) has long-established ties with Usama Bin Ladin. HIG founder Gulbuddin Hikmatyar offered to shelter Bin Ladin after the latter fled Sudan in 1996. HIG has staged small attacks in its attempt to force U.S. troops to withdraw from Afghanistan, overthrow the Afghan Transitional Administration (ATA), and establish a fundamentalist state.

   b. Training

      The detainee was in the Iranian army in the 3-4 years before he went to Afghanistan. While in the military he was trained in basic drill and the AK-47.

4. The following primary factors favor release or transfer:

   a. The detainee has been diagnosed with severe borderline personality disorder.

   b. The detainee answered no to questions about belonging to anti U.S. groups, attacking coalition forces, or plans to attack coalition forces if released.

# UNCLASSIFIED

DMO Exhibit __1__
Page 1 of 2
060360

# UNCLASSIFIED

SUBJECT:   UNCLASSIFIED SUMMARY OF EVIDENCE FOR ADMINISTRATIVE
REVIEW BOARD IN THE CASE OF PEERZAI, QARI HASAN ULLA

3. Haji Sharif Adin worked for Taliban Intelligence Chief, Qari Hamid Ghul, during the
Taliban rule.

4. Haji Sharif Adin was expected to attend a meeting at the home of Haji Ghul Agha.
Agha is responsible for an explosion in front of the Kandahar Mayor's office in May 2002.

5. Agha and the Hezb-e Islami Gulbuddin are suspected of planning several of the recent
bombings in Kandahar and are planning to target U.S. personnel in the near future.

6. Hizb-I Islami Gulbuddin (HIG) has long established ties with bin Laden. HIG has
staged small attacks in its attempt to force U.S. troops to withdraw from Afghanistan, overthrow
the Afghan Transitional Administration, and establish a fundamentalist state.

7. The detainee had a working relationship with persons known by him to be associated
with the Taliban.

c. Other Relevant Data

1. The detainee spent 9 years and 4 months in various Iranian prisons for possession of
hashish, which he had been trafficking.

2. The detainee is extremely evasive and uses multiple resistance techniques.  He was
likely recruited by the Islamic Revolutionary Guards Corps (IRGC) or the Iranian Ministry of
Intelligence and Security (MOIS), trained and returned to Afghanistan as a collector and for
operational use.

3. Contacts with al Qaida were said to have been established through the Iranian Ministry
Intelligence and Security (MOIS). All Iranian Intelligence Chiefs had contact with al Qaida as of
the mid 1990's.

4. The following primary factors favor release or transfer:

a. The detainee denies having any knowledge of the attacks in the U.S. prior to their
execution and denies having any knowledge of any rumors or plans of future attacks on the U.S.
or U.S. interests.

b. The detainee states that Usama bin Laden is responsible for his current incarceration and
he would like to kill him if he could get his hands on him.

c. The detainee stated that the current idea of jihad is wrong. He believes that jihad is the
spreading of Islam or preaching. Jihad is not brutality and killing.

5. You will be afforded a meaningful opportunity to be heard and to present information to the
Board; this includes an opportunity to be physically present at the proceeding. The Assisting

# UNCLASSIFIED

# UNCLASSIFIED

**Department of Defense**
**Office for the Administrative Review of the Detention of Enemy**
**Combatants at US Naval Base Guantanamo Bay, Cuba**

24 June 2005

TO:  AL WADY, HAMOUD ABDULLAH HAMOUD HASSAN

SUBJECT:  UNCLASSIFIED SUMMARY OF EVIDENCE FOR ADMINISTRATIVE
REVIEW BOARD IN THE CASE OF
AL WADY, HAMOUD ABDULLAH HAMOUD HASSAN

1. An Administrative Review Board will be convened to review your case to determine if your continued detention is necessary.

2. The Administrative Review Board will conduct a comprehensive review of all reasonably available and relevant information regarding your case. At the conclusion of this review the Board will make a recommendation to: (1) release you to your home state; (2) transfer you to your home state, with conditions agreed upon by the United States and your home state; or (3) continue your detention under United States control.

3. The following primary factors favor continued detention:

    a. Commitment

        1. The detainee traveled to Afghanistan for jihad.

        2. The detainee was recruited and his travel instructions to Afghanistan were facilitated by Abu Abdul Rahman at the Hayel Said Mosque in Adan, Yemen.

        3. The detainee also had 2,000 USD of his own money saved for the trip.

        4. The detainee traveled to Afghanistan from Yemen via Iran and Syria in early 2001.

        5. The detainee served as an assistant officer at Kho Ajagir, the Northern Afghanistan Front.

        6. The detainee has been identified as being part of a group of Yemenis that a foreign government service considered dangerous extremists that was still active in Sana'a in April 2002.

    b. Training

        1. The detainee stayed at the Said Center, a military post in the Bagram area, for 25 days.

        2. The Said Center Training Camp was a Taliban-run training camp for Arab recruits in route to fight General Dotsam's soldiers to the north of Khonduz, Afghanistan. Training consisted of small arms familiarization and range qualification.

# UNCLASSIFIED

DMO Exhibit ___
Page 1 of 3

000531

# UNCLASSIFIED

**Department of Defense**
**Office for the Administrative Review of the Detention of Enemy**
**Combatants at US Naval Base Guantanamo Bay, Cuba**

4 November 2005

TO:          AL SUADI, ABDUL AZIZ ABDULLAH ALI

SUBJECT:   UNCLASSIFIED SUMMARY OF EVIDENCE FOR ADMINISTRATIVE
           REVIEW BOARD IN THE CASE OF
           AL SUADI, ABDUL AZIZ ABDULLAH ALI

1. An Administrative Review Board will be convened to review your case to determine if your
continued detention is necessary.

2. The Administrative Review Board will conduct a comprehensive review of all reasonably
available and relevant information regarding your case. At the conclusion of this review the
Board will make a recommendation to: (1) release you to your home state; (2) transfer you to
your home state, with conditions agreed upon by the United States and your home state; or (3)
continue your detention under United States control.

3. The following primary factors favor continued detention:

   a. Commitment

      1. The detainee attended a mosque in Yemen where he heard about jihad from a Sheikh.
An individual urged him to go to Afghanistan to participate in a jihad against the Russians.

      2. The detainee was urged to help with the jihad and he traveled to Afghanistan near the
end of 2000.

      3. The detainee traveled from Damascus, Syria, to Tehran, Iran to Mashaad, Iran to Tibatt,
Iran and then to Kandahar, Afghanistan.

   b. Training

      1. In 1990-1991, the detainee completed basic training and served as a volunteer National
Guardsman in the Yemen National Guard.

      2. The detainee received training with the Rocket Propelled Grenade, AK-47, Pulemyot
Kalashnikov and a weapon similar to the .50 caliber machine gun. The training took place
between 1991-1992.

      3. The detainee attended the explosives course at the al Farouq training camp in
Afghanistan. After graduation, the detainee was chosen as an assistant to teach an explosives
course at Tarnak farms.

# UNCLASSIFIED

DMO Exhibit 1
Page 1 of 2
000530

**24**

# THE EVIDENCE

One week before the 9/11 Commission was scheduled to send its final report to the printers in July 2004, Philip D. Zelikow, the Commission's staff director, gathered members together for an unusual briefing.

Commission staff members had discovered a document from a U.S. intelligence agency that described in detail Iran's ties to al-Qaeda, he said. It had been buried at the bottom of a huge stack of highly classified documents on other subjects that had been delivered to a special high-security reading room in an undisclosed location in Washington, D.C.

The document was a summary of raw intelligence reports gathered through intercepts and other means, and was uncovered when staff readers—on detail from different intelligence agencies—were turning over rocks before the report went to the printer, just to make sure no worm crawled out. When the chief analyst scanned through the references at the end, he whistled quietly. "There's trouble in River City," he recalls thinking. It footnoted seventy-five distinct source documents, labeled from Capital *A* to *sss*.

The commissioners realized that if their report was published and word of the missing documents leaked out later, it would discredit their entire investigation, so they ordered staff to make a last-minute panic run. Zelikow phoned the director of the intelligence agency that had prepared the summary and asked him to dig out all seventy-five source documents. He wanted to send his people over to read them in person the following morning at seven-thirty. He didn't care that it was Sunday. They had to see the documents immediately.

The team leader was a former CIA analyst who had spent decades reading highly classified SIGINT intercepts; he had been chosen for the commission staff because of his cosmic clearances and the breadth of his knowledge of how the vast U.S. intelligence community gathered, sifted, and analyzed raw data.

Exhibit B-10

The problem was the Concept. Everything the CIA had been telling the commission up until that point was absolutely cut and dried: there was no connection between al-Qaeda and Iran. None, no way. Nada. "We found perplexing the settled CIA position as expressed by Paul Pillar in his book that there was no meaningful connection at all between al-Qaeda and Iran," one commissioner told me when I asked him about this incident.

The documents the team began reading that Sunday morning told a whole different story. After intense negotiations, commissioners agreed to a considerably scaled-back summary of what the staff had found, which appeared on pages 240–241 of the final report (and which is reproduced in this book's appendix).

But that brief summary gives no idea of the scope of the material the CIA had been sitting on, or the sheer number of intelligence reports. That story has never been told until now.

What the team leader found that Sunday morning was nothing less than a complete documented record of operational ties between Iran and al-Qaeda for the critical months just prior to September 11. "The documents showed Iran was facilitating the travel of al-Qaeda operatives, ordering Iranian border inspectors not to put telltale stamps on their passports, thus keeping their travel documents clean" the team leader told me. "The Iranians were fully aware that they were helping operatives who were part of an organization preparing attacks against the United States."

The U.S. intelligence community was also aware of the help Iran was providing bin Laden's men. But because the analysts were driven by the Concept, they consistently downplayed that relationship.

"Old School Ties" was the dismissive title of one post-9/11 analytical report issued by the CIA's Counter Terrorism Center that summarized the early days of bin Laden's cooperation with Iran. It included an account of his meetings in Sudan with Iranian officials in late 1991–1992, and the organizational meetings between bin Laden's Islamic Army Shura (Counsel) and the PLO, Hamas, and Hezbollah, meetings that were brokered by Sudan's Islamist leader Hassan Turabi. Other reports, from January 1997, detailed top bin Laden operatives' travels to Iran and to Hezbollah camps in Lebanon for terrorist training, where bin Laden tasked them to learn the secrets of Hezbollah's speciality: how to set off large, simultaneous truck bombs. (The Iranians obliged and provided that training, the CIA concluded.) "By late 1993, early 1994 there had been a handshake between bin Laden and Iran," the team leader said. A handshake and operational cooperation.

The commission also reviewed CIA documentation on al-Qaeda's connection to Vahidi, Sherafi, and Ahmed al-Mughassil in preparing the

Khobar Towers bombing. Apparently, the information was too sensitive to have been shared with FBI director Louis Freeh, who told reporters after testifying in U.S. District court on the case that al-Qaeda played no role in the attack.[1]

Most troubling among the seventy-five documents the team read that Sunday morning in July were masses of reports on Iranian intelligence operative Imad Mugniyeh, who is described in the 9/11 Commission Report as "a senior Hezbollah operative." The raw reporting showed that well before 9/11, the United States had hard intelligence that the Tehran regime had appointed Mugniyeh as the point man for operational contacts with bin Laden's men. That coincided with the information Zakeri brought to the CIA in Baku four months before the attack.

If anyone had been on the radar screen of U.S. intelligence collectors it was Imad Mugniyeh. Before 9/11, he had killed more Americans than any other terrorist. Putting Mugniyeh together with bin Laden was like throwing a match onto a pile of oil-soaked rags. And yet no alarm bells seemed to have gone off. Mugniyeh is not even named in the final commission report.

The source reports showed that Mugniyeh coordinated the travel of eight to ten of the "muscle hijackers" between Saudi Arabia, Beirut, and Iran in October and November 2000. They revealed that Mugniyeh personally traveled to Saudi Arabia that November and then accompanied muscle hijacker Ahmed al Ghamdi on the plane to Beirut for his trip on to Iran. After that successful dry run, three more muscle hijackers came to Beirut and then flew as a group to Iran, accompanied by one of Mugniyeh's men.

Frustrated by their late discovery of the documents, which prevented them from investigating further, the authors of the 9/11 Commission Report's chapter 7 resorted to irony. It was always possible that so much coordination was simply a "remarkable coincidence" and that "Hezbollah was actually focusing on some other group of individuals traveling from Saudi Arabia during this same time frame, rather than the future hijackers."

Even in its post-9/11 reporting, which Tenet tried unsuccessfully to prevent the commission from reviewing, the CIA simply assumed that the hijackers were traveling *through* Iran, not *to* Iran, my sources on the commission said. It was the Concept again.* The fact that Mugniyeh had become al-Qaeda's travel agent never hit home. "Every time they came up with a

---

*The CIA spin on those trips to Iran is evident in *9/11 and Terrorist Travel*, a staff monograph released by the commission at the same time as its main report. It speaks of "lax immigration and border security" in Iran and claims that al-Qaeda resorted to "human smugglers" to arrange travel to and from Afghanistan "through Iran." See *inter alia* "Exploring the Link between Human Smugglers and Terrorists," p. 61.

smoking gun, the analysts came back and said, yes, that's interesting, but it's not actionable," one commissioner told me. It was the supreme putdown.

Despite a personal pledge from CIA director George Tenet to provide every assistance and to scour every file, the Agency never briefed the commission on Zakeri's walk-in warning before 9/11. My sources believe Tenet simply didn't know—because no one had ever thought to brief him.

The FBI appears to have been less affected by the Concept, at least during their post-9/11 investigation. They sent teams of Special Agents to the Middle East and Europe and acquired the original passenger manifests that documented the hijackers' travels with Mugniyeh.

U.S. interrogators learned firsthand about Iran's help in facilitating travel of al-Qaeda operatives involved in the 9/11 plot from al-Qaeda planner Khaled Sheikh Mohammad, liaison officer Ramzi Binalshibh, and, more generally, from "Khallad" (Tawfiq Bin Attash). All three were captured by the U.S. after the September 11 attacks. Khallad initially tried to get a U.S. visa so he could take part in the "airplanes" plot but was rejected by U.S. immigration authorities. He helped bomb the USS *Cole* in Yemen in October 2000 instead.

## "TOTAL COLLABORATION WITH THE IRANIANS"

Tarek Charaabi was worried when an al-Qaeda travel "facilitator" told him to use the rat line through Iran. "Isn't there a danger in Iran?" he asked. The facilitator reassured him that al-Qaeda had "total collaboration with the Iranians" and had its own organization in Iran "that takes care of helping the Mujahedin brothers cross the border." Their March 10, 2001, conversation was wire-tapped by Italian police and presented in a Milan court the following year. It helped convict Charaabi and three other Tunisians of having provided logistical support to al-Qaeda in Europe.

Al-Qaeda had switched from using Pakistan as a transit point, the facilitator said, because "in these past years there's too many secret services." Charaabi was instructed to go to the Iranian embassy in London to pick up a visa "because it's very smooth and then everything's well organized all the way to the training camps."[2]

In Hamburg, Germany, a Syrian Muslim brother named Mohammad Haydar Zammar boasted of having recruited 9/11 pilots Mohammad Atta and Ziad Jarrah and encouraging them to join bin Laden's jihad in Afghanistan. When the three-hundred-pound Zammar boasted, people around him took notice.

his intended address as the Marriott Hotel, New York City, but instead spent one night at another New York hotel. He then joined the group of hijackers in Paterson, reuniting with Nawaf al Hazmi after more than a year. With two months remaining, all 19 hijackers were in the United States and ready to take the final steps toward carrying out the attacks.[119]

### Assistance from Hezbollah and Iran to al Qaeda

As we mentioned in chapter 2, while in Sudan, senior managers in al Qaeda maintained contacts with Iran and the Iranian-supported worldwide terrorist organization Hezbollah, which is based mainly in southern Lebanon and Beirut. Al Qaeda members received advice and training from Hezbollah.

Intelligence indicates the persistence of contacts between Iranian security officials and senior al Qaeda figures after Bin Ladin's return to Afghanistan. Khallad has said that Iran made a concerted effort to strengthen relations with al Qaeda after the October 2000 attack on the USS *Cole*, but was rebuffed because Bin Ladin did not want to alienate his supporters in Saudi Arabia. Khallad and other detainees have described the willingness of Iranian officials to facilitate the travel of al Qaeda members through Iran, on their way to and from Afghanistan. For example, Iranian border inspectors would be told not to place telltale stamps in the passports of these travelers. Such arrangements were particularly beneficial to Saudi members of al Qaeda.[120]

Our knowledge of the international travels of the al Qaeda operatives selected for the 9/11 operation remains fragmentary. But we now have evidence suggesting that 8 to 10 of the 14 Saudi "muscle" operatives traveled into or out of Iran between October 2000 and February 2001.[121]

In October 2000, a senior operative of Hezbollah visited Saudi Arabia to coordinate activities there. He also planned to assist individuals in Saudi Arabia in traveling to Iran during November. A top Hezbollah commander and Saudi Hezbollah contacts were involved.[122]

Also in October 2000, two future muscle hijackers, Mohand al Shehri and Hamza al Ghamdi, flew from Iran to Kuwait. In November, Ahmed al Ghamdi apparently flew to Beirut, traveling—perhaps by coincidence—on the same flight as a senior Hezbollah operative. Also in November, Salem al Hazmi apparently flew from Saudi Arabia to Beirut.[123]

In mid-November, we believe, three of the future muscle hijackers, Wail al Shehri, Waleed al Shehri, and Ahmed al Nami, all of whom had obtained their U.S. visas in late October, traveled in a group from Saudi Arabia to Beirut and then onward to Iran. An associate of a senior Hezbollah operative was on the same flight that took the future hijackers to Iran. Hezbollah officials in Beirut and Iran were expecting the arrival of a group during the same time period. The travel of this group was important enough to merit the attention of senior figures in Hezbollah.[124]

Later in November, two future muscle hijackers, Satam al Suqami and Majed

Moqed, flew into Iran from Bahrain. In February 2001, Khalid al Mihdhar may have taken a flight from Syria to Iran, and then traveled further within Iran to a point near the Afghan border.[125]

KSM and Binalshibh have confirmed that several of the 9/11 hijackers (at least eight, according to Binalshibh) transited Iran on their way to or from Afghanistan, taking advantage of the Iranian practice of not stamping Saudi passports. They deny any other reason for the hijackers' travel to Iran. They also deny any relationship between the hijackers and Hezbollah.[126]

In sum, there is strong evidence that Iran facilitated the transit of al Qaeda members into and out of Afghanistan before 9/11, and that some of these were future 9/11 hijackers. There also is circumstantial evidence that senior Hezbollah operatives were closely tracking the travel of some of these future muscle hijackers into Iran in November 2000.  However, we cannot rule out the possibility of a remarkable coincidence—that is, that Hezbollah was actually focusing on some other group of individuals traveling from Saudi Arabia during this same time frame, rather than the future hijackers.[127]

We have found no evidence that Iran or Hezbollah was aware of the planning for what later became  the 9/11 attack. At the time of their travel through Iran, the al Qaeda operatives themselves were probably not aware of the specific details of their future operation.

After 9/11, Iran and Hezbollah wished to conceal any past evidence of cooperation with Sunni terrorists associated with al Qaeda. A senior Hezbollah official disclaimed any Hezbollah involvement in 9/11.[128]

We believe this topic requires further investigation by the U.S. government.

## 7.4 FINAL STRATEGIES AND TACTICS

### Final Preparations in the United States

During the early summer of 2001, Atta, assisted by Shehhi, was busy coordinating the arrival of most of the muscle hijackers in southern Florida—picking them up at the airport, finding them places to stay, and helping them settle in the United States.[129]

The majority settled in Florida. Some opened bank accounts, acquired mailboxes, and rented cars. Several also joined local gyms, presumably to stay fit for the operation. Upon first arriving, most stayed in hotels and motels; but by mid-June, they settled in shared apartments relatively close to one another and Atta.[130] Though these muscle hijackers did not travel much after arriving in the United States, two of them, Waleed al Shehri and Satam al Suqami, took unusual trips.

On May 19, Shehri and Suqami flew from Fort Lauderdale to Freeport, the Bahamas, where they had reservations at the Bahamas Princess Resort. The two were turned away by Bahamian officials on arrival, however, because they

**EXHIBIT B-12 REDACTED IN FULL**

000050

ZD 14 - 31
Tgb.-Nr. 177/01
BAO - USA

Wiesbaden, den 23.11.2001
# 13423

Betreff
Internationale Fahndung nach Ramzi BINALSHIBH, geb. 01.05.1972 im Jemen, wegen
Verdachts der Mitgliedschaft in einer terroristischen Vereinigung in Tateinheit mit Mord und
Angriff auf den Luftverkehr

hier : Iran


V e r m e r k

Anhand der vorliegenden Kontounterlagen konnte festgestellt werden, dass Ramzi
BINALSHIBH im Dezember 2000 40 .- DM an das Generalkonsulat der "Islamischen
Republik ( Iran ) " überwies.
Ermittlungen ergaben, dass BINALSHIBH am 14.12.2000 ein entsprechendes Visum für eine
4 wöchige Reise in den Iran zu "Pilgerzwecken" stellte.

Wie nun von der politische Abteilung der Iranischen Botschaft Berlin über das Auswärtige
Amt fernmündlich mitgeteilt wurde, reiste BINALSHIBH am 31.01.2001 über den
internationalen Flughafen Teheran ein.
Eine Ausreise unter diesen Personalien sei jedoch nicht festzustellen, was eventuell für
einen illegalen Grenzübertritt möglicherweise nach Afghanistan sprechen könnte.
Weitere Informationen konnten nicht erhoben werden.

Es wird in diesem Zusammenhang darauf hingewiesen, dass der polizeiliche Dienstverkehr (
Übermittlungen von personenbezogenen Daten etc. ) mit dem Iran derzeit seitens des BMJ
untersagt ist. Weitere Informationen können auf polizeilichem Weg nicht erhoben werden.

Da laut Kontounterlagen am 27 / 28.01.2001 Geldabhebungen des BINALSHIBH in
Amsterdam nachvollziehbar sind, kann davon ausgegangen werden, dass er von dort in den
Iran geflogen ist.
Entsprechende Flugabklärungen werden von hier initiiert.

Leon, KHK

Exhibit B-13

000050

ZD 14-31                                    Wiesbaden, 11/23/2001
Ref. No. 177/01                             # 13423
BAO – USA


Subject
International manhunt for Ramzi BINALSHIBH, born on 05/01/1972 in Yemen, on suspicion of
affiliation with a terrorist organization in conjunction with murder and attack on air traffic

Here: Iran


Notation


Based on the available account files, it was established that in December 2000 Ramzi
BINALSHIBH remitted DM 40.00 to the Consulate General of the "Islamic Republic (of
Iran)".

The investigation showed that on 12/14/2000 BINALSHIBH applied for a visa for a 4-week trip to
Iran for "pilgrimage purposes".


As the Political Section of the Iranian Embassy in Berlin has now informed by telephone via
the Federal Foreign Office, BINALSHIBH entered the country on 01/31/2001 through the
International Airport of Tehran.

However, no departure can be found for this personal data, which could indicate an illegal
border crossing, possibly to Afghanistan. No further information was available.


In this context, it should be pointed out that police dealings (transfer of personal data etc.) with
Iran are presently prohibited by the Federal Ministry of Justice (BMJ). It was not possible to
obtain additional information through police channels.


Because account files indicate monetary withdrawals by BINALSHIBH on 01/27 and
01/28/2001 in Amsterdam, it can be assumed that he flew to Iran from there.

The appropriate flight-related clarifications will be initiated from here.

(signed)

Leon, Police Superintendent (KHK)

On the 25th October, we, the Public prosecutors in charge of the Prosecutor's Investigation Unit of the AMIA Case, Drs. Alberto Nisman and Marcelo Martinez Burgos, requested the Judge who leads the case, Dr. Rodolfo Canicoba Corral, the issue of national and international arrest warrants of seven Iranian citizens and a Lebanese citizen accused of having different degrees of participation in the terrorist attack perpetrated against the Israeli mutual Central in Buenos Aires on July18[th] 1994.

In our over 800 page presentation – which in some way reflects most of recollection and analysis work done in this Unit since we were designated by the judge in February 2005 to investigate the case – we also expose, amongst other facts, our conviction sustained with plural elements of evidence, that the brutal attack, which caused the death of 85 people, 150 injured at least and numerous material damage, was decided and organized by the highest ranks of the Islamic Republic of Iran government that was ruling then, who themselves entrusted the execution of the operation to the Lebanese Terrorist organization Hezbollah (God's Party), historically subordinated -both politically and economically- to the interests of the Tehran's regime

The people whose arrest warrants we require are: Alí Akbar Rafsanjani, who in 1994 was President of the Islamic Republic of Iran; the then Iranian Minister of Information and Security, Alí Fallahijan; the former Foreign Minister of Iran, Ali Velayati; former Commander of the Revolutionary Guards (Pasdaran) Mohsen Rezai; Ahmad Vahidi, Commander of the "Qods" Force at that time; Mohsen Rabbani, the former cultural attache at the Iranian Embassy in Buenos Aires; Ahmad Reza Asghari or Mohsen Randjbaran, the Iranian embassy's former third secretary, and finally Imad Fayez Moughnieh, the former head of Hizballah's External Service Department.

As regards the Spiritual Leader of the Islamic Nation, taking into account the different instruments of International Law and the unanimous doctrine and judicial precedents on immunity *ratione personae* that gives statutory protection to the Chiefs of State or government that holds office, we have not included him in our indictment.

Due to the extreme solemnity and public importance of the facts that we have been investigating, plus the unusual extension of our report and the technical language used, we have considered convenient to present this document, written in a more accessible language and in which we tried to condense all the most important elements that we have taken into account to ground and well found our accusation. We believe this is necessary not only because of what we have just said, but as a way of satisfying the right of the whole society (which we believe goes hand in hand with a republican and democratic government) to know the most relevant conclusions that arouse from the investigation of an event that has deeply affected the whole society, without a doubt.

On the other hand, presenting an indictment like the one we gave to Your Honour, was for different reasons, urgent. First of all, we must recall that the judge Juan José Galeano, later formally removed from his post as a federal judge for serious irregularities in the process of the case, had already issued national and international warrants for the arrests of twelve Iranian citizens and one Lebanese citizen suspected of having different degrees of involvement in the perpetration of the attack against AMIA.

However, the arrest warrants required by Galeano, except for the one on Imad Moughnieh (on whom already weighted arrest orders from US judicial authorities and Argentina's Supreme Court

executive board, in the framework of the General Assembly of the Agency celebrated in the city of Berlin, Federal Republic of Germany, during September, 2005.

The decision, in which 115 countries participated, was adopted by 91 votes in favor of the Executive Committee's proposal, 9 votes against it and 15 abstentions. In both occasions - the temporary suspension and the subsequent final cessation– the main reason that INTERPOL authorities alleged to stop searching for the suspects was related to the irregularities committed by the former judge Galeano during the investigation. . In the case of the suspension - transformed into a virtual cancellation from October 29, 2004-, the note of the Office of Legal Matters that reported it, dated October 3, 2004, remits to the sentence dictated by the Oral Federal and Criminal Court nº 3 of this city in the case 437/00 of its registration, named "Telleldín, Carlos Alberto and others s/homicide… (AMIA bombing)", where those accused of conforming the so called "local connection" were judged. The above mentioned note not only stands out the absolution of the twenty-two people that were accused, but transcribes splits of the press release emitted by the cited Oral Court in relation to the pronouncement fallen in the case September 2, 2004, particularly as soon as consigned that "the test produced in the debate permitted to verify a substantial violation to the rules of the Duty of Defense in judgment, when shown the lack of impartiality of the examining magistrate", as well as the fact that "it was established, because of the numerous irregularities verified, that the examining magistrate oriented his action to 'build' an incriminating hypotheses, intending to attend, that way, the requests the society was making and, at the same time, satisfying the interests of unscrupulous rulers".

Without the relevance of such arguments and the ones claimed by the performing officials, it is obvious that what prevailed among INTERPOL authorities was not the Court's resolution but, rather, the distrust generated by the irregular performance of former Judge Galeano that spread through all the legal process. In other words, the reasoning was, more or less, the following: having proved that Dr. Galeano committed irregularities in the case, all his judgings are presumably irregular as well. Thus, it arises clearly from the opinion raised by the executive board to the General Assembly of INTERPOL, proposing the cancellation of the red notices in the following terms: "The executive board notes, particularly, that the halting orders were signed by a magistrate whose intervention in the case was declared irregular by the competent Argentine judicial authorities ".

So the decision of canceling the search of the suspects (called "cease of the red notices" in the technical slang) made by the authorities of INTERPOL is practically the same as if the arrest warrants were not effective.

Considering this "virtual non-moving situation", INTERPOL's central authorities have ventured to suggest, through its Legal Office chief, that only new orders of detention signed by a different judge and based on a reexamination of the supporting evidence that support the charges, would be able to justify the re-establishment of the red notice". Until then, the cease of the search of the twelve suspects, that the General Secretary had determined, applies.

What we have just exposed helps to understand better the reasons that motivated the confection of our indictment. Basically, it exposes thoroughly and in detail the conclusions to which we have arrived in this Unit, after more than one year and a half in charge of the case. With the picture left by the resolution of INTERPOL, we did not just build a make up version of the previous requirements, but we did a complete re-examination of the so called "international connection".

This does not mean, of course, that there are no common issues in both requests, because bearing in mind the great amount of information that has been accumulated during the years; it would be nonsense to expect the contrary. However, and ever since the last judge was

vice versa, as it is worth saying there are people whose capture opportunely was requested without, in some cases, in our opinion, with the sufficient evidence.

The above-mentioned differences are also shown in the accusation performed, so much to the maximum authorities of the former government of the Islamic Republic of Iran, as to the Lebanese organization Hezbollah. In fact, while Galeano had limited his resolution to declaring the responsibility of some " radicalized elements of the Iranian State", we, on the other hand, consider proven that the decision to execute the attack was adopted not by a cut off-minority group of partisan officials linked to a more radical Islam, but, on the contrary, it was a decision extensively debated and finally resolved arrived at by consensus by top leaders of the former Iranian government, in a general context of a foreign policy that did not reject the resource of terrorist violence as a tool for achieving the objectives established in the Islamic country starting on the February of 1979 revolution.

In the same direction, corresponds to emphasize the contrast that itself evidences both views in relation to the organization called Hezbollah. Beyond the fact that former Judge Galeano's resolution does not evacuate properly the nature and reaches of the relationship between that group and the Islamic Republic of Iran (relation that we qualify as without hesitation, as of subordination on the part of the Lebanese group to the strategic and political objectives of the Islamic country), the truth is that while Galeano has emphasized the fact that the distinguish if Hezbollah was a "terrorist or resistance movement against the Israeli illegitimate occupation of Lebanon" was not necessary, for us it is evident that the first characterization is the correct one, and so we took special care in clarifying it along the opinion, because that is, exactly, what the great amount of evidence collected in the case reveals.

But beyond these circumstances, that can be considered different appreciations, the relevant thing is that Galeano, unlike us, neither did he attribute direct responsibility of the bombing to Hezbollah, but, rather, some passages of his resolution shows with clarity the doubts that the former judge sheltered in that sense. Thus, for example, when he argued that the referred group that awarded the attack (Ansar Allah) "had a fantasy name, under which shielded itself an Islamic fundamentalist group, presumably linked to the Lebanese Hezbollah", or when, further on, when speaking about the public declarations formulated by Hezbollah leaders before de attack, he argued that even though "they constitute a demonstration of the political speech, guidelines of a political purpose, that do not necessarily evidence a certain way of action (…), in no way these statements imply that Hezbollah as political party have itself been involved, taking initiatives that imply their responsibility", to finalize concluding that "there is not evidence, up to now, that they should have been in knowledge of the plans and, after the attack, have participated of the consequences…"

In another order of ideas, should not be believed -and so is to point out- that the conclusions that will be exposed in the present opinion imply the finalization of the investigation process. There are still many that have been ordered in the various files (for example, an exhaustive telephone-cross over that, together with the Intelligence Bureau is under way, and that comprises an analysis on national and international calls from 1991 on) that is not yet finished, fact that impedes us to go forward with different aspects of the investigation, at the risk of unduly fragmenting the analysis and, thus, to induce to erroneous interpretations.

A last comment, perhaps unnecessary, so as to put an end to this already long preamble. Just as we have advanced, along the present opinion we will show that bombing against the AMIA/DAIA center has been decided and organized by the highest leaders of the former government of the Islamic Republic of Iran, whom at the same time, entrusted its execution to the Lebanese terrorist

organized by the highest ranks of the Islamic Republic of Iran government that was ruling then, who themselves entrusted the execution of the criminal act to the Lebanese Terrorist organization Hezbollah.

Necessarily therefore, along these pages we will see us obliged to graze, when not to undertake directly, questions that have to do with the religious elements, in concrete, with the Islamic religion; or, more properly, with an radicalized interpretation of the Islam. It relates to, without doubts, a sensitive and especially complex matter, that in truth we would prefer to put aside if was not because, by virtue of the reasons that we have just exposed, we are absolutely persuaded that it is not alone is necessary but, what is more, turns out to be inevitable.

What we have just said will be me more easily understood when we head for to describe the special characteristics that gather the theocratic states as the one that reigned in the Islamic Republic of Iran at the time of the attack. In those types of governments, politics and religion are found indissolubly tied, up to the point where the first is conceived in function of the second one.

In the concrete case that today occupies us, and though the actual actions of decision, planning and execution of the attack will be put in head of specific individuals, should not loose sight of the fact that many of those were high representatives of a state whose force rests in religious principles, and such circumstance, that constitutes an objective data (can be simply verify in the country's denomination, as well as in specific norms of its constitution), perhaps explains better than no other, the symbiosis between politics and religion that is now intended to be emphasized.

Nevertheless, should not be incurred in the banal simplification of supposing that every theocracy, by the sole fact to be it, validates necessarily the use of the terrorism for the attainment of its political objectives, or that the devotion to a specific worship, which ever one it is, carries implicitly the appeal to the violence as a legitimate resource for the propagation of its faith. Nothing further than our intention is to hold that generalization, that besides is notoriously unjust toward millions who cultivate their faith in a peaceful and well deliberate way.

It should remain in clear from the beginning about our strict compliance to unrestricted freedom of worship that our constitution consecrates in its articles 14, 19, 20, and in international treaties incorporated in article 75, clause 22. It should remain clear also that the consideration of the religious thing in itself, like demonstration of a spiritual dimension of the individual, is, as already said, a sensitive and deeply complex matter and, in all cases, absolutely beyond the object of this opinion. And it should also remain clear, finally, our absolute conviction that the Muslim faith encourages and promotes peace and coexistence among all the men, and far away is to promote hatred and barbarism.

Unfortunately, those guidelines have not impeded the fact that, along all times, fanatic and unscrupulous individuals, with the pretext of complying with the duties their faith imposes, appeal to religious excuses to promote the annihilation of their equal. The religious issue returns, then, as a facade, a disguise, a mere alleged reason to disguise facts that, well looked at, do not pass from being, smooth and clear, atrocious crimes.

-II-

It has been proven that the responsibility of the attack against the AMIA center falls on whom, then, exercised the authority of the Islamic Republic of Iran. It will be shown, in that sense, that its maximum authorities of former Administration were the ones who decided to carry out, plan its implementation and entrusted its execution to the Lebanese terrorist organization Hezbollah, group this last that, acting in the case as a mere appendix of the will of Teheran's government,

Republic of Iran, but, and on the contrary, the study of the antecedents collected in the case samples, state, beyond any doubt that the execution of acts of terrorism out of the borders Islamic country was not an unusual methodology of its foreign policy, guided by the postulates emanated from the revolution occurred February 1979 and directed, at last, to expand its individual and extremist vision of the Islam around the world.

With that purpose, and just as occurred in the case under study, Teheran's Administration frequently recurred to the operating structure of the Lebanese militia Hezbollah, gestated after the ideals of the Jomeini's revolution, and that with the years has erected as a fundamental instrument for the concreteness of the objectives of the preceding above-mentioned Iranian foreign policy previously evoked. On this particular issue, we will try to stand out the tight subordination relationship existing among the leaders of it cited terrorist group and the government with headquarters in Teheran, to the point that its rise and consolidation cannot be explained without strict attention to the convenience that this represented to the Iranian interests in the region. Such extreme is seen reflected not only in the political-religious plan, with the pointing out of a common enemy, but also, in the regular and never dissembled aid that the Iranian officials offered Hezbollah, so much financial as militarily.

Collecting the evidence in the case, we have managed to say the terrorist attack against the AMIA was framed in the Middle East conflict that has been going on for decades, especially in the ups and downs of the Peace process initiated by the Madrid Peace Conference (1991) and Oslo Peace Accords (1993).

In that context of belligerence, and apart from the evidence that the intention of the attack was to make an accurate strike onto a specific target within in the breast of the Jewish community, as for the particular reasons that Argentina was a favorable place to extend the conflict, there exist, to our judgment, sufficient elements that indicate that it obeyed to the unilateral decision of Argentina's Government to end contracts on the provision of nuclear technology that, previously, had been subscribed with the Islamic Republic of Iran.

We have also proved that the decision was made, based on a one hundred and eighty degrees turn operated in the foreign policy of former president Carlos Menem. Argentina was in a neutral position, member of the Non-Aligned Movement (NAM), and this turn caused the abandonment of this position, and enlisted Argentina next to the interests of the maximum enemies of the Iranian clerical regime, that is to say, the United States and Israel.

That was, according to our judgment, the determinant factor for the decision to carry out the ahead the attack against the AMIA center, a decision that was carried out within the so called Special Matters Committee ("Omure Vijeh" Committee, in Farsi), conformed - at the time the attack had been decided -, by Alí Khamenei - Spiritual Guide -, Alí Akbar Rafsanjani -President of the Nation -, Alí Akbar Velayati - Foreign Minister - and Alí Fallahijan - Minister of Information -, in the framework of a meeting celebrated on August 14th, 1993 in the Iranian city of Mashad. To the meeting were summoned, as consultants, two Iranian representatives that were holding office in Buenos Aires: the chiite clerigy Mohsen Rabbani, sheik of "At-Tauhíd" mosque and later designated cultural attaché of the Islamic Republic in Argentina, and Ahmad Reza Asghari (also known as Mohsen Randjabaran), ex member of the Revolutionary Guards Corps and third Secretary of the Embassy of Iran in Buenos Aires.

The existence of the meeting was recreated by what has been said by some qualified people that in some way, direct or indirectly, have been involved with the Iranian Regime.

 Whether they have been part of the government (as former president Abolghassem Bani Sadr, during Khomeini´s time), or been in charge of directing the intelligence service (such is the case

in different times and with different political orientations - interesting fact -, but they all agree in the substantial aspects of the meeting, thing that constitutes strong circumstantial evidence, that has led us to infer, both with other evidences, that the meeting actually took place.

Regarding the proposal approved in the meeting of the 14th August 1993, as the evidence in the case shows and so we have exposed in our indictment, the preliminary plan to attack our country had its origin in the "Intelligence Office" that depends on the Presidential office, and headed by Rafsanjani himself. We have determined that its integration was completed with Alì Fallahijan, Alí Velayati and the chief of the "Al Qods" force, Ahmad Vahidi and the chief of the Revolutionary Guards Corps (Pasdaran), Mohsen Rezai.

The indictment we elevated also explains the intelligence structure that the Iranian government had in this city at the time of the attack. Without this structure the carrying out of an attack, of the importance of the AMIA center, would have been impossible. It is in this context that we demonstrated that the carrying out and the maintenance of this type of structures in the "infiltrated" countries, was a functional practice and necessary as to fulfill the objectives of the Iranian Exterior policy of that time.

As it will be stated, our country was infiltrated by the Iranian intelligence service, which from mid 80's began forming a vast network of espionage, that was transformed into a complete station of intelligence for whose conformation, its ideologues made use of, on one hand, of the Embassy and the Iranian Cultural Office in Buenos Aires, and of the extremist elements that frequented the shiite mosques of "At-Tauhíd" in the Floresta area , "Al Imán" in the city of Cañuelas and "El Mártir" in the city of San Miguel de Tucumán in the province of the same name; of the undercover business called "G.T.C." and "Imanco", and by radicalized members of the Muslim community, whose action in our country derived in the obtaining of the necessary information and the development of the local logistic operations that supplied the way to executing the attack to the AMIA center on the morning of July 18th, 1994.

 It has been demonstrated, in the indictment, it was the sheik Mohsen Rabbani, (who then became Cultural Attachee in the Iranian Embassy in Argentina) the main creator of this work ever since, in 1983, he arrived to the country and settled the foundation for the espionage structure we have recently mentioned.

All the pieces that conformed this scaffolding have functioned in a cross over way and they have constituted the installation of the intelligence service in our country, with sufficient capacity to organize with success the phase that corresponded to his duty the attack. The explosion of the bomb in the AMIA center verifies this empirical aspect.

In the following paragraphs, it will also be appreciated in detail, in which way, once having adopted the decision to the carry out the attack, the amount of information that flowed between Iran and its Argentinean delegation -basically through officials and diplomatic mail-, currently to significant transfers of money that were made from abroad to a banking account under the name of Rabbani, undisputed leader of the "Mullah" regime in our country, -and perhaps also its more faithful representative, from an ideological perspective- maintained in a private banking entity, involving substantially greater sums compare to those arisen in similar periods analyzed.

When he came back from the meeting where the decision to attack our country was made, and just four months before the criminal act occurred U$S 150.812 were received there, and a slice of that money U$S 94.000 was withdrawn before the attack, the rest was withdrawn on the following two months.

Compromising even more a Rabbani with the logistic phase of the attack, indisputable documents exist that, at that time, show him cruising around through diverse car agencies within the capital

to do with the different reasons Rabbani exposed.

The analyzed evidence demonstrates it was Rabbani the one in charge of the local logistics of the attack. The evidence points, likewise, that the one responsible for coordinating the different aspects of the operation from Iran was not another that the former Minister of Information, Alí Fallahijan; and that an identical task, although tight to the strictly operating aspect of the attack, fits to be attributed Imad Moughnieh, former leader of the Exterior Service of Hezbollah. In this sense, reports enclosed in the case allow us to infer that he was responsible for conforming the operating group that had to execute the hit, and whose entrance income to our territory is suitable to be situated in the first days July, 1994, just as the analysis done within this Unit of international phone calls reveals.

In fact, such constancies consent us to infer that the entrance into our country of the operating group, or at least part of it, occurred on July 1st, 1994 through the international airport of Ezeiza, and that their exit went was produced by the metropolitan airport Jorge Newbery on the same day of the attack, fact that arises after having accredited the existence of diverse phone calls made from public telephones in there installed, and the ones around the AMIA area towards a cell phone number registered in the city of Foz do Iguaçu, Federative Republic of Brazil, at the so called "Tri Border Area", belonging to whom could have got at its charge the coordination process of the members of the terrorist cell that was operating in Buenos Aires at that time.

The produced evidence in the case helped us to show that the mentioned cell phone was used by the person in charge of coordination the performance of the members of the cell in Buenos Aires.

In this order of idea, it is to show the fact that calls flow toward that cell phone ceased, gaudy and finally, the same day that the attack occurred

Actually, that July 1st, 1994 at 10.30 from public telephone located at the Ezeiza international airport, the first communication towards the cell phone that belonged to the coordinator of the operating group was carried out. A second call was produced at 12.18, from the same airport, although from a different telephone line.

And a third communication to the cell phone indicated was carried out on July 1st, at 17.21, this time from a phone booth located at 707 Corrientes Avenue of this city. From the same place, only 6 minutes later, though from another line, a call produced to a member of a clan located in Foz do Iguazu linked -according to the agency of national intelligence- to the group Hezbollah was registered. 9 minutes went by and from the same issuing line a call was produced to an identified Hezbollah office in Beirut -Lebanon-.

A week later, that is to say July 8th, 1994 and once again from the public telephone located at 707 Corrientes Avenue a call was verified to the cell phone of the one coordinating the operating group. The communication begun at 9.28 of that day, and from there on, and till 9.47 more than 20 new calls to credited Hezbollah office in Beirut, according to the Intelligence Bureau. It was a matter of an intense exchange of information that coincides exactly with the day in which the third secretary of Iran's Embassy in Argentina, Ahmad Asghari, left the country all of sudden. Ahmad Asghari was one of the people responsible for the attack and was in charge of activating the clandestine nets in the country.

On the 10th of that same month, Carlos Alberto Telleldín published in a national newspaper a classified notice offering for sale a Trafic SUV of the same characteristics that the one that was later used to perform the attack and that carried out engine nº 2831467, which a few days later, was found among the debris of the AMIA building.

July 15th, 1994 (five days after the publication of the SUV and only three days before the execution of the operation), at approximately 18.00, the car bomb was entered, by a subject

importance given by two insuperable circumstances: the first one, is that the company that provided the service informed that the call was made around the area of the parking lot, attending to the fact that it activated the cell in that quarter when the call was initiated; and the second one, that the communication only took 26 seconds, barely enough time to confirm the success of a fundamental phase of the operation.

The chain of confirmations continues due to the fact that it has been confirmed that around an hour later -exactly at 19.18- a new call was made to the coordinator of the operation in Foz do Iguaçu. The communication was carried out from a public phone booth located at 1744 Nazca Avenue, only twelve blocks away from the referred mosque, "At-Tauhíd", place to where Rabbani had communicated previously. So, it does not result ventured to outline that the information finally was transmitted to the coordinator of the operating group.

Having described briefly the necessary triangulation that, for security reasons local Iranian agents complimented to report that the car bomb had been successfully parked, results clearly, that that has been the SUV vehicle used against the Israeli mutual, likewise, the fact that at all times, the maneuver has been scrupulously looked after by Terrorist members, among them Mohsen Rabbani.

Finally, on July 18th, the day of the attack, the last phone call to the coordinator of the operation's cell phone was verified. It is the one performed from the Jorge Newbery Metropolitan Airport at 7.41. It arises with clarity that the task of this part of the group executor had concluded satisfactorily.

Thus, the operation had entered in its final phase. Anticipating the consequences that the commission of the attack would lead to, Teheran's regimen had adopted a series of measures in order to preserve itself and its officials against the eventual accusations that could be set foreseeable. In fact, during March 1994, only four month before the attack, the already several mentioned Rabbani, and despite the fact that he had been working in the country since 1983, he was invested with diplomatic status, acquiring the consequent immunity. In this was, the Iranian authorities showed, thus, to have learned the lesson: on October 1992, Kazem Darabi, whose functions turned out to be analogous to then developed by the Cultural Counselor Mohsen Rabbani in Argentina, was captured in the German city of Berlin for his participation in the attack perpetrated within the bar called "Mykonos" on September 17th, 1992. As opposed to Rabbani, Darabi then lacked of immunity of arrest, for which nothing could be done to avoid its capture and subsequent condemn.

In that same tonic, June 30th, 1994, only eighteen days before the attack, Ambassador Hadi Soleimanpour exited the country from the international airport of Ezeiza; a few days later, on July 8th, the same would do his personal collaborator in the embassy, Ahmad Reza Asghari. The same would later do, a day before the attack, the Ambassadors of the Islamic Republic of Iran in Chile and in Uruguay, who embarked upon the same flight bounded for the German city of Frankfurt.

By then, everything was ready to execute the operation.

July 18, 1994, at 9.53 the Lebanese citizen and active member of the Lebanese organization Hezbollah, Ibrahim Hussein Berro, driving a Renault Trafic loaded with a quantity reckoned between 300 and 400 kilograms of explosives, rose the sidewalk of 633 Pasteur st. and, set against the doors of the AMIA building, detonated that load, producing the total collapse of the building's front part and damages of diverse kind in the adjoining real estate. The attack produced the death of 85 people and wounds of different magnitude in, at least, 151 individuals.

In comparison to the modus operandi carried out in the attack, two years before, directed against another Jewish objective -the Israeli Embassy in Buenos Aires-, in which the participation of the

allotted themselves the attack here investigated as well as the so the explosion occurred at that same, in an Panamanian airline called "Alas Chiricanas"?

As we have demonstrated on our indictment the denomination "Ansar Allah" resulted to be one of the so many fantasy manes with which Hezbollah claimed its attacks. The experience showed, besides, that this modality was habitually utilized by the group with the clear purpose to elude its responsibility in the different actions carried out, fundamentally, outside southern Lebanon, where the conflict met the characteristics of a conventional war.

From there on, the judicial investigation went through, as we have already explained a series of ups and downs, referred mainly to the investigation of the so called "local connection" of the attack. However, at early stages of the investigation, cirmustantial evidence that pointed out to the government of the Islamic republic of Iran and to the Lebanese Hezbollah as the people responsible for the attack begun to appear

-III-

Regarding the responsibility of those who governed Iran by that time, we have demonstrated in our presentation that at least during the first half of the nineties (decade when also two attacks took place in Buenos Aires) terrorist attacks in other countries were not, for the mullahs' regime, a new practice. We have even proved that the regime had an operative methodology implemented with resources from the Iranian burocratic state, what contribute to assure its proven effectiveness. We will come back to this later.

This bureaucracy servile to terror, such as the one Teheran sustained at the time of the attack to the AMIA center, might be hard to understand by a non-specialized reader. However, this is perfectly comprehensible from the logic of the so-called "revolution export".

This concept (that is expressed in more detail in our indictment) is related to one of the fundamental principles that inspired the Iranian revolution that, under the shadow of Ayatollah Khomenei, came to power in Iran on February 1979 and has to do with the never concealed objective of expanding the revolutionary postulates to the rest of the globe. This purpose of universalizing the Islamic chiite doctrine, stated in the Iranian constitutional text, did not only promoted and supported the development of other Islamic groups in the rest of the Middle East countries (Hezbollah among them), but also encouraged in a rather veiled way, the development of terrorist operations against objectives related to the regime traditional enemies, meaning occidental countries in general, and United States and Israel in particular. Both countries were considered by the Islamic fanatics as the incarnation of everything considered vile and despicable by the more radicalized chii doctrine.

The objective of exporting the revolution is stated in the preamble of the Iranian constitution as: "…the Constitution paves the way for the perpetuation of this Revolution in and outside the country, particularly in the area of expansion of international relations with other Islamic and peoples' movements; it tries to prepare the ground for the creation of a single world Ommat (worldwide community), and the perpetuation of the struggle for delivering all the deprived and oppressed nations of the world"

All the available means (economic and infrastructural) are directed towards this objective, including official institutions abroad. The General Secretary of the opposition group "Flag of the Freedom", Manoucher Ganji, expressed during his statement that " it is important the fact that the Islamic Revolution has always maintained that it will carry our terrorist operations abroad, this has never been a secret and that their objective would be Israel and United States."

attitude towards the world is dictated by our religious convictions.

It should not be considered that the export of the revolution doctrine worked as a direct and only cause for the terrorist attacks. Generally, as results from the different records, each one of these events answered the need of satisfying political objectives such as weakening the attempt of opposition forces, resisting the occidental countries in the Middle East zone, or just answering by the use of violent means to measures or actions that are considered by the regime itself as aggressive or threatening to their interests. The export of the revolution doctrine does not support the indiscriminate violence itself, but provides a theoretical and doctrinal justification for the use in any case to fulfill the regime strategic objectives.

In the written work we have presented the 25th October 2006 to Dr. Canicoba Corral there is a special item to the analysis of several terrorism acts attributed to the Islamic Republic of Iran. From the judicial resolutions emitted as a consequence of these precedents, there is something in common: all of them make the government of the officials of the Islamic Republic of Iran responsible as organizers or sponsors of the terrorist acts. This evidence represents the most complete proof that the mullahs regime resorts to violence to achieve the exportation of the revolution. This means the oral excesses and veiled threats that the Iranian leaders utter now and then against opposition of the regime and against the government of Israel are not only sayings but translated into particular criminal actions.

Three acts deserve a special reference. The facts are known as "Mykonos", "Radjavi" and "Bakthiar".

The first one happened on September 17th, 1992: Dr. Sadegh Sharafkandi, General Secretary of the Democratic party of Kurdistan of Iran, and three collaborators Fattah Abdoli, Homayoun Ardalan and Nouri Dekhordi were machined-gunned in the restaurant Mykonos in the city of Berlin, where they have gathered after participating in a Congress of the International Socialist. In the sentence of the Berlin Superior Regional Court of Justice the steps followed by the government of Iran to carry out the attack are described in detail: from the activation of sleeping cells, gathering of information, the decision-making process of the attack and, finally, the execution of the operation. Plus it exposed the relationship between Iran and Hezbollah, considering Hezbollah "an extension of Iran's policy. Not only that, but says Hezbollah was created, financed and supplied with arms, troops and training by Iran. This is not a selfless act performed by Iran, but it is done with the objective of expanding the Islamic revolution throughout Lebanon and to fight the opposition of Iran's Islamic regime." In conclusion, the German Court arrived to the conclusion that the authorities of Iran's government were responsible for the attack.

On April 24th 1990 Kazem Radjavi was killed. As he was driving along the Tannay route of the Coppet Commune in Switzerland, he was forced, by two other vehicles, to leave the highway causing him to collide into the entrance of a house located on the 68 of the route. Radjavi was an Iranian former diplomat, former ambassador of United Nations and a mission leader in an Iranian diplomatic operation in Dakar who quitted on April 1981. Radjavi´s brother was Massoud Radjavi, leader of the National Council of Resistance of Iran and chief of the "Moudjahidin" organization, opposition to Khomeini's regime.

The judicial cause of the revealed an important involvement of Iran's government. The Swiss investigators exposed that "taking into account the facts revealed previously (…) we are convinced that one or some of the Iranian official services are directly involved in the murder of Mr. Kazem Radjavi". Following the same line, Junod and Cottier, both inspectors of the Security Police of Geneva, addressed a report to Judge Dr. Chatelain on July 3rd 1990, stating "… we are convinced that an Iranian official service is involved in the murders".

established that there were 13 people involved in the preparation and execution of the murder. These people had passports that had been issued by the Iranian service and a mention of "chief of mission". Some of their documents had been established on the same days. Most of the suspects went to Switzerland together, in a direct Teheran-Geneva flight of the Iran-air airline. They had plane tickets that had been issued altogether, one after the other (correlative serial numbers). (…) It was Minister Ali Fallahian the one in charge of commanding all orders and missions, and directing the preciously planned actions.

On August 8th 1991 at 11:50 in the residence situated on 37th rue Cluseret de Suresnes near Paris, the dead bodies of Chapour Bakthiar (General Secretary of National Resistance Movement of Iran) and his private secretary, Soroush Katibeh. The autopsies revealed the murders took place on August 6th 1991. Bakthiar was mechanically asphyxiated by the crushing and multiple fractures of the larynx, and an external hemorrhage produced by a cutting weapon, whereas Katibeth died by facial suppression and deep wounds the right dorsal region, caused by a cutting weapon.

Bakhtiar had been designated Prime Minister of the imperial government of Iran on January 4th 1979. The Islamic Revolution overthrew Sha Pahlavi´s regime on the 1st day of February, and he was forced to go into exhile. He arrived to France, and it was in this country where Bakthiar founded and directed the National Resistance Movement of Iran, an opposition party to Iranian regime.

The detailed analysis of the evidences sent by the French justice shows, not only that the authors that actually carried out the attack were protected by the Iranian state, but that they also used the Iranian state apparatus to fulfill loyally the murder-order given by the governors of that nation. It's the evident benefit that brings the disappearance of one of the main political referents of the opposition of the Islamic regime, the vast resources used in the operation, the easy way in which they gathered false identity cards, the great number of Iranians dedicated to help the suspects to escape and the proven relationship between some of the people involved in the operations and the Iranian government, that clearly demonstrate the responsibility of the higher rank members of the government in the design, planning and execution of a murder so carefully chosen.

-IV-

As we have already said, at the time of the AMIA attack, the execution of a terrorist operation abroad implicated the joint and coordinated activity of different organisms of Iran's government, that acting coordinately each contributed what was needed for the successful execution of the plan. This structure that we have characterized as a "matrix" (word that represents the idea of a pre-fixed mould, model or scheme) worked in a pyramidal way; where the vertex is the Special Affairs Committee, presided by the nation's spiritual guide, then comes (but on the same level) the Intelligence and Security Ministries, Exterior relations, Culture and Islamic Guide and, finally, the Guardians of the Revolution (PASDARAN), where in its sine the feared "Qods force" were in charge of the "special operations" abroad.

Sensible information from intelligence about possible targets, elaboration, deliberation and acceptance of the plan, further specific information on the chosen target, issuing passports; getting visas; assuring diplomatic immunity; getting plane tickets and lodging in the selected country; development of a policy to conceal the criminal act. All this and more was precisely organized, immediately provided and scrupulously monitored by the different offices of the regime that were assigned some kind of responsibility in the attack.

complex apparatus.

The organizational chart of this structure, that has already been explained by qualified witnesses in the case, included:  the consular delegations (Iranian diplomats and the embassies also contribute in the gathering of intelligence information, and the follow up of targets that Teheran's regime planned to attacks), the centers of Islamic cult (some mosques, perfectly legal cult centers, were taken advantage as a way of recruiting people by some fanatics and unscrupulous individuals), commercial enterprises (some of them where registered in the country, and had no significant movements for several years) and finally, some of the members of the Muslims communities in the region, that gathered information without being disturbed, cause they had legitimate activities (some of them were taxi-drivers, some students).

The investigation on this case demonstrated that at the time of the attack a system with these characteristics, was actually running in Argentina. The direct evidences that prove this affirmation are stated in a prolonged chapter of the indictment. It's just because of a space issue that we aren't going to reproduce it here.

Needless to say that without the logistics and operating benefits that emerged from the existence of this structure, it wouldn't have been possible to successfully executed a blast of the magnitude of the one we are investigating. Besides the cumulus of evidence that point out to the then government of the Islamic Republic of Iran as responsible for the attack, the intelligence station emerges as an "indication of opportunity", meaning one of the conditions that makes the attack possible.

-V-

As regards the causes that in our opinion determined the attack, in our presentation we explain that regardless the extremist vision about Islam that lay behind each and every violent attack, at the time of the AMIA attack, by the mullahs regime, there have also been some concrete issues, related to the prevailing geopolitical situation that had been taking place in the Middle East, that in some way "justified", in the integrist perverse logic, the accomplishment of the attack in Buenos Aires.

These motives have to do, basically, with the sudden cancellation of the contracts for transferring nuclear technology that had been signed with the Islamic Republic of Iran. This decision, as we explain in the pertinent paragraph of the report, had as a consequence the interference in the nuclear strategy of the mentioned Islamic country.  We have also showed that the decision of canceling the contracts responded to a 180° turn that took place in the exterior policy of, the former President Carlos Menem, causing the transforming of Argentina into a nation enrolled with the interests of the main enemies of the Iranian clerical regime, as we have already mentioned the United Estates and Israel, and causing the abandonment of the position of a neutral country member of the Non-Aligned Movement.

In synthesis, here we have in the sudden cancellation of the so-called "nuclear contracts" – fact proven with conclusive evidence – the concurrence of a absolutely likely reason or motive that arises as one of the main circumstantial evidence that we think indicate the involvement of the then government of Iran in the attack

Other episodes related the delicate regional conjuncture that was also taking place in the Middle East at the time of the attack, served as an excellent excuse and definitely opportune to give an internal reason to the organization that would take care of the execution it is elevated like one of the main indications that, in our opinion, indicate the participation of the then government of Iran

Both the kidnap of one of Hezbollah's leader Moustapha Dirani on May 1994, (kidnap attributed to Israel) and the bombing, by Israelite forces in the first days of June, of a training camp of Hezbollah in Bekaa Valley in Lebanon, causing an undetermined number of casualties (the records in the case file says between 9 to 40 dead people), were part of the Middle East context at the time of the attack.

## VI

As we have already said other elements that showed the responsibility of the then government of the Islamic Republic of Iran is the fact that in the days proximate to the attack, the Iranian government increased, in a remarkable way and absolutely out of proportion if compared to the historical registers verified in the case, the amount of diplomatic letters and officials (coming from different countries from the globe, such as Germany, Iran, Brazil, Chile and Uruguay) sent to Argentina. This last circumstance is also atypical if compared to previous periods.

It has been demonstrated that by the time the attack happened (as the reports of the Ministry of Foreign Affairs of Argentina have shown) there was no circumstance, motive or official event that could justify the envoy of so many diplomatic mails. When analyzed altogether with the circumstantial evidence recollected in the cause, it leads to infer that the maneuver that was detected, whether it was used to distract the attraction, to transfer information and/or sensible materials or for both, it was directly motivated by the attack we are studying.

No less suggestive was the sudden exit of the influential former Third Secretary of the Iranian Embassy in Argentina and former PASDARAN member, Ahmad Reza Asghari, according to the evidence collected in the case, whom also took part in the meeting of the "Omure Vijeh Committee" celebrated in Mashad on August 14th, 1993.

Considering the whole circumstances listed above, we have no other explanation rather than those ones recently clarified, regarding the fact that Asghari, whose originally departure date was October 1994, abandoned it on July 8th, 1994; better said, exactly ten days before the blast.

In a similar context we can include the simultaneous – and by the way very opportune – departure of the Iranian Ambassadors of the region, in one of the many maneuvers of the Iranian government to move away its officials – and, consequently, themselves – from any possible direct involvement in the attack.

## -VII-

We have already indicated several times in this presentation that in order to carry out the terrorist operation decided on August 14th 1993, the people in charge of the Special Affaires Committee of the government of Iran used the Chiite Lebanese Hezbollah group, historically subordinated to the interests of the regime of Teherán. The most important evidences in the case that demonstrate the involvement of this terrorist organization in the event we investigate are:

*Modus operandi:

Car bombing attack with a suicide-bomber inside is the first factor that suggests the responsibility of Hezbollah. In fact, as one of the experts on international terrorism has testified in the case, this spectacular modality is a truly "registered trade mark" of the above mentioned fundamentalist organization. In fact, the long series of similar operations carried out by Hezbollah in Lebanon during the 80's and 90's - stated in another passage of the present document. - confirms this

March 17th, 1992, was committed by the organization "Islamic Jihad", Hezbollah's armed-wing. Furthermore, the remarkable similarities between both attacks (although more than similarities, we should referring to them as true identities: commission place-identity, attacked target-identity and modus operandi-identity) and nearness period between both events –and all the above mentioned details, is clearly another element that allows us to deduce that both attacks were executed by the same terrorist organization.

*Claiming responsibility for the attack:

Only five days after the attack on the AMIA center, the Lebanese newspaper "Al-Nahar" published a press release from an organization called "Ansar Allah", that allotted themselves the attack here investigated as well as the so the explosion occurred the following day, in an Panamanian airline called "Alas Chiricanas".

It was clear now, the repetition of the proceedings used two years ago by the "Islamic Jihad" in order to claim responsibility for the attack against the Israeli Embassy (identical methodology, even the same newspaper). The documents and testimonies obtained in the case (among them, the press conferences by Hezbollah's Assistant Secretary General and second in the organization, Nahim Kassem), later showed that "Ansar Allah" is an non-existing group, being one of the so many fantasy names used by Hezbollah to claim responsibility in this kinds of attacks without directly compromising itself in the hit.

* The suicide bomber:

 It has been conclusively established that the Lebanese citizen and member of the Hezbollah, Ibrahim Hussein Berro, was the driver of the Renault Trafic that exploded in front of the AMIA building on July 18th 19940, immolating himself in the act. This is not the time to reproduce the great amount of evidences that show what we have just expose, as it has already been deeply developed in a specific part of the indictment.

* Moughnieh:

As it has already been stated, different testimonies indicate former Hezbollah Foreign Security Service responsible, the well known Lebanese terrorist Imad Fayez Moughnieh, as the top person in charge of the planning and coordination of the attack. This clearly gives another element to extend the terrorist group's liability in the blast.

*The public threats of the leaders of Hezbollah:

It would not be reasonable or rational to leave behind the public declarations prompted by Hezbollah leaders, announcing in some way, the operation and its particular way of materialization.

In this order, and in line with what François Gorphe denominates "indication of the previous demonstrations of the crime" two declarations deserve to be emphasized because of the high rank of the author, but -in the second case- for its specific forcefulness.

The first one was attributed to Hezbollah's Spiritual Leader, Muhammad Hussein Fadlallah, and was declared soon after Dirani's kidnap. It just stated that the resistance had a lot of oxygen. The enemy had said they had a very long hand, but the Muslims combatants have proven, after the murder of Abbas Moussawi, that their hands can reach to Argentina. Finally, he said the front has extended all over the world and the battle will develop throughout time.

Less descriptive but with similar prophetic content was the threat that Hassan Nasrallah delivered only a month before the attack: "There are a thousand suicidal bombers prepared to attack Israel around the world".

Considering the dimension of the tragedy that only 32 days later knocked down the AMIA center and the evidence collected in this case, it would be little less than absurd to assume that the

The number of proofs and circumstantial evidence stated – all of them with great entity, precision and concordance– confirms, with concrete elements, the many testimonies of analysts and experts in international terrorism accumulated during the investigation, and that unanimously, and ever since the investigation started agreed in saying, that the Lebanese Hezbollah was in charge of carrying out the attack.

In addition, these are the same testimonies that, with identical forcefulness, all indicate that the terrorist group, created and sustained - both military and economically - by the government of the Islamic Republic of Iran, doesn't carried out in an independent way - or at least didn't at the time of the attack- international terrorist operations, not only that, but their participation in this type of episodes, outside Lebanese frontiers, obeyed to directions emanated directly from Teheran's regime.

And it has been proved, indeed, that this is what has happened in our case, in which the proofs gathered indicate the perfectly coordinated intervention of both actors in the attack, and framed in the subordination relationship described by the experts.


-IX-


To sum up, we are absolutely convinced that the circumstances that we deem proven in the indictment allow many key questions that the investigation on the attack pretended to reveal, to be answered.

        Actually, we have pointed out the people that decided to attack the AMIA center, when and why. Furthermore, who where the ones in charge of the general coordination of the attack, and who were the ones in charge of the operative phase. We have also individualized the local key people needed, in order to carry out the attack, and the outstanding characteristics of the operative infrastructure, which by handling intelligence and logistics, acted as an essential condition for them to be able to perpetrate successfully the attack.

Nevertheless, it's necessary to state clear, once more, that with the requirement we are doing today it should not be believed -and so is to point out- that implies the finalization of the investigation process. There are still several points of the investigation, in which we are now working in collaboration with other state agencies, in an unstoppable way, and though some important advances have been made, the announcement depends on several diligences that are still pending, any premature conclusions risk of unduly fragmenting the analysis and, thus, to induce to erroneous or interpretations.

What we have just said doesn't mean that there aren't other extremes, due to the amount of circumstances that deem them proven, that can't or won't be communicated in this phase of the investigation. And that is, exactly what we have been trying to do along our indictment. On the one hand, expressing the need to call for the arrest of a group of individuals strongly suspected of having some implication in the attack, and on the other hand, the determination of the responsibilities of the highest authorities, at the time of the attack, of the government of the Islamic Republic of Iran, and of the Lebanese Hezbollah in the attack.

Case 1:03-cv-09848-GBD-SN   Document 274-2   Filed 05/19/11   Page 136 of 138   1/16/09 5:23 PM

**PRESS ROOM**
U.S. DEPARTMENT OF THE TREASURY

January 16, 2009
hp-1360

### Treasury Targets Al Qaida Operatives in Iran

**Washington, D.C. -** The U.S. Department of the Treasury today designated four al Qaida associates under Executive Order 13224, which targets terrorists and those providing support to terrorists or acts of terrorism.

"It is important that Iran give a public accounting of how it is meeting its international obligations to constrain al Qaida," said Stuart Levey, Under Secretary for Terrorism and Financial Intelligence.  "Global efforts to financially isolate al Qaida have made it difficult for the core leadership to raise funds and sustain itself.  Nevertheless, al Qaida remains a very dangerous threat, and it is crucial to keep targeting the support lines of al Qaida and its affiliates."

Under E.O. 13224, any assets held by these individuals under U.S. jurisdiction are frozen and U.S. persons are prohibited from engaging in any transactions with the designees.

"Even though individual terrorist attacks are relatively inexpensive to carry out, it costs a great deal of money for al Qaida to operate globally.  These realities demand that we keep up the financial pressure against al Qaida and like-minded terrorist organizations," Levey continued. "Designations have a far reaching impact, deterring would-be donors from providing financial support to terrorism and leaving al Qaida leadership struggling to identify much-needed funding resources."

*MUSTAFA HAMID*
AKAs:        Mustafa Muhammad `Atiya Hamid
              Mustafa Atiya
              Abu Walid al-Misri
              Abu al-Walid al-Masri
              Abu al-Walid
              Hashim al-Makki
POB:         Alexandria, Egypt
DOB:         March 1945
Nationality:  Egyptian
              Pakistani

Mustafa Hamid is a senior al Qaida associate who served as a primary interlocutor between al Qaida and the Government of Iran. Before the fall of the Taliban, Hamid served as an instructor at a terrorist camp near Jalalabad that trained in the use of explosives. Hamid is the father-in-law of senior al Qaida military commander Sayf al-Adl. He formerly served as a correspondent for a satellite television station, at the request of senior al Qaida leadership. While living in Iran, Hamid was harbored by the Islamic Revolutionary Guard Corps (IRGC), which served as Hamid's point of contact for communications between al Qaida and Iran.

In the mid-1990s, Mustafa Hamid reportedly negotiated a secret relationship between Usama Bin Laden and Iran, allowing many al Qaida members safe transit through Iran to Afghanistan.

In the late 1990s, Mustafa Hamid passed communications between Usama bin Laden and the Government of Iran.  When tensions were high between Iran and Afghanistan, Mustafa Hamid traveled multiple times from Kandahar to Tehran as

Exhibit B-15

an intermediary for the Taliban.

In late 2001, Mustafa Hamid was in Tehran delivering messages from the Taliban to the Government of Iran. Hamid also negotiated on behalf of al Qaida in an attempt to relocate al Qaida families to Iran. As part of this effort, senior al Qaida member Abu Hafs the Mauritanian traveled with Hamid and two IRGC members to Tehran for meetings. Beginning in late 2001, the family of a senior al Qaida military commander lived with Mustafa Hamid's family in Iran. Separately, in 2002 Mustafa Hamid facilitated contacts between the IRGC and another senior al Qaida military commander.  In mid-2003, Mustafa Hamid was arrested in Iran along with other al Qaida members and associates.

### MUHAMMAD RAB'A AL-SA YID AL-BAHTIYTI

| | |
|---|---|
| AKAs: | Muhammad Mahmud Rabi' al-Zayd al-Bahtiti |
| | Muhammad Mahmud al-Bahtiti |
| | Muhammad Rabi' al-Sa'id al-Hatiti |
| | Muhammad Rabi' al-Bahtiti |
| | Abu Dujana al-Masri |
| DOB: | 1971 |
| P013 | Al-Sharqiyyah, Egypt |
| Nationality: | Egyptian |
| | Pakistani |

Muhammad Rab'a al-Sayid al-Bahtiyti is a senior member of the Egyptian Islamic Jihad (EIJ) and an al Qaida operative. Bahtiyti has served as a trusted aide to his father- in-law Ayman al-Zawahiri.

In the mid-1990s, Bahtiyti served on an al Qaida military committee and provided military training that included urban warfare tactics for al Qaida members. Bahtiyti drafted training manuals for al Qaida as well as a book on security that was used as a template for al Qaida's surveillance operations.

In 1995, Bahtiyti reportedly was involved in the bombing of the Egyptian Embassy in Islamabad, Pakistan.

After September 11, 2001, Ayman al-Zawahiri instructed Bahtiyti to take al-Zawahiri's family to Iran. Bahtiyti reportedly traveled to Iran with al-Zawahiri's daughters, where he was subsequently responsible for them. In January 2003, while working from Iran, Bahtiyti arranged housing on behalf of al Qaida. Bahtiyti reportedly was arrested by Iranian authorities in mid-2003.

### ALI SALEH HUSAIN

| | |
|---|---|
| AKAs: | Abu Dahhak |
| | 'Ali Salih Husayn al-Dhahak al-Tabuki |
| | Ali Saleh Husain al-Tabuki |
| | 'Ali Salih Husayn 'Ula'lah |
| | 'Ali Salih Husayn |
| | 'Ala'lah Dhahhak al-Tabuki |
| | Abu Dhahak al-Yemeni |
| DOB: | Circa 1970 |
| POB: | al-Hudaydah, Yemen |
| Nationality: | Yemeni |
| Height | 5'9" |

Ali Saleh Husain is a senior al Qaida associate who had close relations with Usama bin Laden. Husain was responsible for logistics pertaining to al Qaida-affiliated fighters and acted as an interlocutor between al Qaida and its Chechnya-based affiliates. Husain coordinated with Usama bin Laden on the training of fighters in terrorist camps in Afghanistan who were preparing to travel to Chechnya.

Circa early 2001, Husain reportedly arranged a meeting that included a senior al

Qaida operations chief to discuss operations planned against Israel. In April 2002, al Qaida senior official Abu Zubaydah indicated that the responsibility for operational meetings for attacks against Israel had been handed over to Husain. Husain also was reportedly Abu Zubaydah's secondary point of contact for obtaining fraudulent passports.

In 2001 after the fall of the Taliban, Husain facilitated the move of al Qaida-associated fighters, including an al Qaida military commander, from Afghanistan to Iran. After leaving Afghanistan, Husain was responsible for smuggling al Qaida members and associates via networks in Zahedan, Iran. In early 2002, Husain sent $20,000 to a senior al Qaida lieutenant who had requested financial assistance. Husain was detained by the Government of Iran in early 2003.

### SA'AD BIN LADEN

| | |
|---|---|
| AKAs: | Sad Bin Laden |
| | Sa'ad Muhammad Awad Abud |
| | Muhammad Awad |
| | Muhammad 'Awad Adbud |
| | Sa'ad Muhammad Baabood |
| | Abdul Rahman Al-Kahtane |
| | Bin Muhammad Awad Abbud |
| DOB: | 1982 |
| POB: | Saudi Arabia |
| Nationality: | Saudi Araibian |
| Passport No. | 520951 (Sudan) |
| | 530951 (Sudan) |

Sa'ad bin Laden, one of Usama bin Laden's sons, has been involved in al Qaida activities. For example, in late 2001, Sa'ad facilitated the travel of Usama bin Laden's family members from Afghanistan to Iran. Sa'ad made key decisions for al Qaida and was part of a small group of al Qaeda members that was involved in managing the terrorist organization from Iran. He was arrested by Iranian authorities in early 2003.

As of September 2008, it was possible that Sa'ad bin Laden was no longer in Iranian custody.

**-30-**