MDL 1570 PLAINTIFFS' EXECUTIVE COMMITTEES
In re: Terrorist Attacks on September 11, 2001 (S.D.N.Y.)

| Plaintiffs' Executive Committee for Personal Injury and Death Claims | Plaintiffs' Executive Committee for Commercial Claims |
|---|---|
| Ronald L. Motley, *Co-Chair* <br> MOTLEY RICE LLC <br> James P. Kreindler, *Co-Chair* <br> KREINDLR & KREINDLER, LLP | Elliot R. Feldman, *Co-Chair* <br> Sean Carter, *Co-Chair* <br> COZEN O'CONNOR |
| Andrew J. Maloney III, *Co-Liaison Counsel* <br> KREINDLER & KREINDLER LLP <br> Paul J, Hanly, Jr., *Co-Liaison Counsel* <br> HANLY CONROY SHERIDAN FISHER & HAYES LLP | J. Scott Tarbutton, *Liaison Counsel* <br> COZEN O'CONNOR |

August 10, 2015

The Honorable Frank Maas
United States District Court
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street, Room 740
New York, NY 10007

  Re: *In Re: Terrorist Attacks on September 11, 2001,* 03 MDL 1570 (GBD) (FM)

Dear Judge Maas:

  The Plaintiffs' Executive Committees, on behalf of all Plaintiffs, submit this letter and the accompanying exhibits and respectfully request that the Court enter an Order, pursuant to F.R.C.P. 37(a)-(b), compelling defendant Wa'el Hamza Jelaidan ("Jelaidan"), a co-founder of al Qaeda and Executive Order 13224 designee, to promptly produce all documents and materials in his possession, custody, or control pertaining to Jelaidan's relationship with the Kingdom of Saudi Arabia (the "Kingdom"); relating to Jelaidan's activities on behalf of Saudi charities; and relating to Jelaidan's corporate activities. Plaintiffs also seek all documents relating to Jelaidan's activities in support of the mujahideen during the Afghan war against the Soviet Union and concerning Jelaidan's relation with the "Golden Chain," a list of names of financial supporters of al Qaeda. The significance of each of these categories of documents is discussed below.[1]

## Background

  Plaintiffs incorporate by reference the procedural history in Plaintiffs' Letter Brief #1, filed this same day.

---

[1] Plaintiffs' proposal concerning a schedule for motions to compel, and the Court's Order endorsing same (ECF No. 2963), contemplates the filing of multiple motions as to any one defendant. Pursuant to that Order, Plaintiffs are filing two separate motions today in support of their request for an order compelling defendant Wa'el Hamza Jelaidan to produce relevant categories of documents. This motion will be referred to as "Plaintiffs' Letter Brief #2."

nydocs1-1053458.2

The Honorable Frank Maas
August 10, 2015
Page 2

### Jelaidan's Relationship with the Kingdom

Plaintiffs' document requests pertaining to Jelaidan's relationship with the Kingdom are Plaintiffs' First Set Part A: numbers 1 and 19, Part B: numbers 22, 23, and 44-48, and Supplemental Request numbers 17 and 18.[2] In response to these requests Jelaidan produced three documents totaling five pages. None of the documents directly address his relationship with the Kingdom. However this material is crucial to Plaintiffs' case.

Documents gathered by Plaintiffs prior to and during the course of the litigation have deepened Plaintiffs' understanding of the relationship between Jelaidan and the Kingdom. The description of this relationship that follows is based on these documents, and in Plaintiffs' view, demonstrates that documents in Jelaidan's control, which he has failed to produce, would further corroborate the long-standing and significant relationship between Jelaidan and the Kingdom.

In 1982, Jelaidan's first job was working for the King Abdul Aziz University, a Saudi government-run facility.[3,4] He then attended the University of Tucson and maintained a position as the U.S.-based representative of King Abdul Aziz University.[5] While in Tucson, Jelaidan became President of the Islamic Center of Tucson, a recruiting and fundraising center for the jihad in Afghanistan.[6]

In 1986, Jelaidan became Director of the Saudi Red Crescent Society's Pakistan branch. The Kingdom sponsors and supervises the Saudi Red Crescent Society ("SRC") and appoints its directors, including Jelaidan.[7] Jelaidan's activities with the SRC will be covered in more detail below.

Concurrent to his appointment as a director of the SRC, Jelaidan was appointed and ran Prince Salman's relief organization for Pakistan and Afghanistan.[8] At the time, Prince Salman, now King Salman, was the Governor of Riyadh (Saudi Arabia's capital city from 1963-2011). According to Usama Bin Laden, Prince Salman's relief organization was a primary entity used to support Bin Laden and the mujahideen in Afghanistan.[9]

---

[2] *See* Plaintiffs Document Requests, attached hereto as **Exhibit A** at 10, 16, 24, 31-32; Plaintiffs Supplemental Document Requests, attached hereto as **Exhibit B** at 5-6.

[3] Resume of Wael Jelaidan (WJpartA022), attached hereto as **Exhibit C**.

[4] Website of King Abdulaziz University, http://www.kau.edu.sa/Pages-Our-History.aspx (last visited July 27, 2015), attached hereto as **Exhibit D**.

[5] Undated Interview of Abdullah Azzam (KADI52040) attached hereto as **Exhibit E**.

[6] Arizona Corporation Commission, April 1984, attached hereto as **Exhibit F**; Website of Islamic Center of Tucson, http://www.ictucson.org/about/ (last visited August 3, 2015), attached hereto as **Exhibit G**.

[7] Exhibit C; Declaration of Abdelrahman al Swailem, MDL Dkt. No. 96-2, dated April 9, 2004.

[8] Exhibit E.

[9] Guide to the Islamic Fundamentalist Audio Recordings Collection, Yale University Library, pg. 171 (ASH031601) attached hereto as **Exhibit H**.

The Honorable Frank Maas
August 10, 2015
Page 3

Jelaidan's relationship with Prince Salman carried beyond Afghanistan to the war in the former Yugoslavia. In the mid-1990s, Jelaidan held an account at a Vienna branch of Bank Austria.[10] The account was used for transactions involving millions of dollars with the Third World Relief Agency ("TWRA"), a Sudanese organization active in Bosnia.[11] TWRA's activities included the surreptitious supply of weaponry as well as assistance in moving al Qaeda personnel from Sudan to Bosnia.[12] In the summer of 1993, Prince Salman transferred millions of dollars to TWRA's accounts in Erste Bank, Vienna. Some of the funds then transited Jelaidan's Bank Austria account and ended up with a Pakistani weapons supplier.[13] Then in 2000, Jelaidan accompanied Prince Salman on a trip to Bosnia to survey "charity" activities in the region.[14]

Prior to this, in 1989, Jelaidan was appointed Director of the Muslim World League ("MWL"), an organization which claims to be an instrumentality of the Kingdom.[15] Jelaidan's activities with the MWL will be covered in more detail below.

In 1999, the King of Saudi Arabia created the Saudi Joint Relief Committee for Kosovo ("SJRC"). The SJRC, like the MWL, also claims to be an instrumentality of the Kingdom.[16] According to SJRC's President, who acts as an official of the Saudi Government, the SJRC is supervised by the Minister of Interior and includes representatives from seven Saudi ministries.[17] The SJRC's daily operations were performed by SJRC direct hires and civil servants of the Kingdom.[18]

In 1999, Jelaidan was appointed Executive Director of the SJRC. According to the U.S. Government, while in this position, Jelaidan was "a close contact of the local Saudi Embassy and may have been an assistant/confidant of the Saudi Minister of the Interior."[19] The Minister of the Interior during this time was Saudi Prince Nayef. The day after the Jelaidan's Executive Order 13224 designation on September 6, 2002, Prince Nayef publicly defended Jelaidan and demanded to see proof of his culpability in supporting al Qaeda.[20]

---

[10] Plaintiffs' Opposition to the Motion to Dismiss of Sulaiman al Rajhi, Kaplan Affirmation, Exhibit 11, MDL Dkt. No. 1048, dated July 12, 2005.
[11] *Id.*
[12] *Id.*; Plaintiffs' Opposition to KSA Motion to Dismiss, Exhibit 224, Declaration of Ali Ahmed Ali Hamad (PEC-KSA003501), attached hereto as **Exhibit I**.
[13] *See* Spreadsheet (KADI96499-96512), attached hereto as **Exhibit J**.
[14] *See* Sharon Premoli, *11 Years and Counting: Part 1*, *The World Post*, September 14, 2012, http://www.huffingtonpost.com/sharon-premoli/11-years-and-counting-par_b_1882284.html.
[15] Exhibit C; Muslim World League Answer and Cross-claim April 09, 2004, pg. 68, attached hereto as **Exhibit K**.
[16] SJRC Motion to Dismiss, Declaration of Abdulrahman al Suwailem, MDL Dkt. No. 631-2, at 2, dated January 17, 2005.
[17] *Id.* at 3.
[18] *Id.* at 4.
[19] OFAC, Status Report of Albanian TDY Team (KADI2911), attached hereto as **Exhibit L**.
[20] Badr Almotawa, *U.S. Urged to Give Sound Proof in Jelaidan's Case*, *Arab News*, September 8, 2002, http://www.arabnews.com/node/224038, attached hereto as **Exhibit M**.

The Honorable Frank Maas
August 10, 2015
Page 4

---

As reflected by the brief summary above, Jelaidan was appointed to his positions in various charities, closely affiliated with al Qaeda, by the Saudi Government, and maintained close dealings with Saudi officials in those roles. For these and other reasons, Plaintiffs' document requests pertaining to the relationship between the Kingdom and Jelaidan, are highly relevant to Plaintiffs' case. Relatedly, Plaintiffs have a legitimate concern that the interests of the Saudi Government have influenced the manner in which Jelaidan (and other defendants) have approached discovery in these proceedings, and likely explains why many categories of highly relevant materials have not been produced.

### Jelaidan's Activities on Behalf of Saudi Charities

Plaintiffs' document requests pertaining to Jelaidan's activities on behalf of Saudi charities are Plaintiffs' First Set Part A: numbers 1, 11, 15, 19, 21, 23, Part B: numbers 1, 2, 3, 4, 6, 12-26, 35-43 and Supplemental Request numbers 2, 3, 4, 5, 6, 8, 9, 17, 18, 21, 35, and 43-49.[21]

Jelaidan was involved with the following Saudi-based non-profit organizations: al Haramain wal Masjid al Aqsa ("AHAMA"), the International Islamic Relief Organization ("IIRO"), Lajnat al Bir/WAMY, Maktab al Khidmat ("MAK"), the MWL, the Muwafaq Foundation, Rabita Trust, the SRC, and the SJRC. Four of these entities are Executive Order 13224 designees, and all nine of the entities have been cited in U.S. Government documents as having supported al Qaeda, or having employed al Qaeda operatives as detailed below.

Documents gathered by Plaintiffs prior to and during the course of the litigation demonstrate that Jelaidan's activities on behalf of each of these charities went to further the growth and operations of al Qaeda, enabling it to carry out the September 11th Attacks. The following description of these relationships, in Plaintiffs' view, demonstrates that documents in Jelaidan's control, which he has failed to produce, would further corroborate that he and these so-called charities actively contributed to the growth and operations of al Qaeda leading up to the September 11th Attacks.

1) MAK

Jelaidan's first role in Pakistan and Afghanistan in 1986 was with MAK, an Executive Order 13224 designee, that was founded by Usama Bin Laden and Abullah Azzam as a vehicle to recruit, organize, and support Arab mujahideen for jihad in Afghanistan.[22] Jelaidan was on MAK's "Conveyance Committee," helping to move fighters in and out of the Afghan war zone.[23]

---

[21] Exhibit A at 10, 13-14, 16-19, 21-25, 28-30; Exhibit B at 2-6, 9-11.
[22] National Commission on Terrorist Attacks (9/11 Commission) Monograph on Terrorist Financing (ASH005025), attached hereto as **Exhibit N**.
[23] The Arab Volunteers in Afghanistan by Basil Muhammad, pg. 22 (BUR-PEC063191), attached hereto as **Exhibit O**.

The Honorable Frank Maas
August 10, 2015
Page 5

2) SRC

Following his work with MAK, Jelaidan was appointed Director of the Pakistan branch of the SRC.[24] In this position, Jelaidan, operating under the nom du guerre Abu Hasan al Madani, continued to support Usama Bin Laden, the mujahideen, and al Qaeda in a variety of roles. The SRC, under Jelaidan's leadership, provided warehousing and transport support for weaponry.[25] Jelaidan acted as a funnel to divert SRC donations to al Qaeda and supplied ID cards to Usama Bin Laden and al Qaeda.[26] SRC was tasked with receiving donations for a new jihad group to be based in Sudan.[27]

As the Director of SRC, Jelaidan used his high profile position to encourage the Pakistani Government to register other Saudi radical organizations.[28] For example, the SRC in Pakistan hosted Aqeel al Aqeel and the al Haramain Islamic Foundation.[29] Both of these entities later became Executive Order 13224 designees. The SRC also recommended to the authorities that Lajnat al Bir/WAMY be registered.[30] This was the predecessor to the Benevolence International Foundation, a Saudi and U.S.-based entity which supported al Qaeda activities in Afghanistan, Sudan, Bosnia, and Chechnya.[31]

3) MWL and IIRO

Jelaidan was also intimately involved with the IIRO and MWL. The IIRO is a Saudi-based charity affiliated with and an integral part of the MWL. The IIRO and the MWL are widely considered to have been active supporters of al Qaeda and took part in the early meetings in Pakistan which led to the formation of al Qaeda.[32] Jamal al Fadl is an al Qaeda insider who defected to the U.S. and has testified against his former colleagues.[33] According to al Fadl, Jelaidan funneled funds, which originated from the headquarters of IIRO and MWL, to Peshawar, Pakistan, that were then turned over to al Qaeda.[34]

---

[24] Exhibit C.
[25] Tareekh, Almusadat 41 (ASH001006), attached hereto as **Exhibit P**.
[26] FBI Written Response to Swiss Authorities, dated April 26, 2005 (KADI27094), attached hereto as **Exhibit Q**.
[27] TareekhOsama/29/Tareekh Osama.91 (ASH000970-971), attached hereto as **Exhibit R**.
[28] Corporate entities have to register with the local government in the jurisdiction in which they plan to operate.
[29] Letter to Chief Secretary and Related Court Filings, dated February 21, 1989 (BURPEC75116-125), attached hereto as **Exhibit S**.
[30] Request for Registration, dated May 25, 1989 (WAMYSA63930), attached hereto as **Exhibit T**.
[31] U.S. v. Arnaout, No. 02 CR 892, Government's Evidentiary Proffer at 47 (ASH1314), attached hereto as **Exhibit U**; Exhibit N at 94 (ASH5031).
[32] TareekhOsama/49/Tareekh Osama.121 (ASH925), attached hereto as **Exhibit V**.
[33] National Commission on Terrorist Attacks (9/11 Commission) Report pg. 62, (ASH1491) attached hereto as **Exhibit W**.
[34] Exhibit Q (KADI27094-27099); Exhibit U at 19 (ASH1286).

The Honorable Frank Maas
August 10, 2015
Page 6

4) Muwafaq Foundation

As the Director of the MWL in Pakistan and Afghanistan in the early 1990s, Jelaidan employed Chafiq Ayadi, a Tunisian mujahideen who was wounded in battle in Afghanistan, and is another Executive Order 13224 designee.[35] Jelaidan and Ayadi held a joint bank account in Europe.[36] Jelaidan later recommended Ayadi for a position as head of the Muwafaq Foundation, run by Jelaidan's close confidante, Yasin Kadi.[37] Jelaidan also helped establish Muwafaq in Pakistan.[38] Muwafaq, Jelaidan, and Mohamed Jamal Khalifa were involved in a suspicious financial transaction where funds were diverted to support the IIRO's Filipino office.[39] That office was run by Khalifa, Usama Bin Laden's brother-in-law, and was deeply involved in numerous terror plots.[40]

5) Rabita Trust

From 1992 until after the September 11th Attacks, Jelaidan worked for the Rabita Trust (another Executive Order 13224 designee), first as a Project Director and later as Secretary General.[41] Rabita Trust was founded by Saudi and Pakistani authorities and placed under the control of the MWL. For some period of time, Rabita Trust operated out of Jelaidan's Jeddah, Saudi Arabia office.[42]

6) AHAMA

Starting in the 1990s Jelaidan was on the board of directors of AHAMA along with Executive Order 13224 designee Yasin Kadi and Kadi's uncle (who lived in Saudi Arabia).[43] Jelaidan was the signator of at least three bank accounts belonging to AHAMA.[44] AHAMA's Bosnian branch financially supported another Executive Order 13224 designee al Furqan.[45] AHAMA had an operational branch in Pakistan and was active in al Qaeda supporting

---

[35] Kadi v. Paulson, U.S. Government's Administrative Record, File 4 (KADI3623), attached hereto as **Exhibit X**; Treasury Department Letter to Swiss Prosecutor, dated November 29, 2001 (ASH6011), attached hereto as **Exhibit Y**; Article from Al-Sharq al-Awsat, dated November 12, 2002 (KADI89821), attached hereto as **Exhibit Z**.
[36] Wikileaks Release, State Department Cable 06ZAGREB1304, attached hereto as **Exhibit AA**.
[37] Exhibit X (KADI3623).
[38] Introductory Letter (KADI86533), attached hereto as **Exhibit BB**.
[39] Muwafaq Foundation Accounts (KADI51069), attached hereto as **Exhibit CC**; FOIA Response, pg. 489, attached hereto as **Exhibit DD**.
[40] Philippines Report to the United Nations, dated October 23, 2003 (ASH582-591), attached hereto as **Exhibit EE**.
[41] Exhibit C.
[42] Letter to Faisal Finance, dated May 19, 1998 (KADI0004402), attached hereto as **Exhibit FF**; *see also* Letter to the Governor of the State Bank of Pakistan from Jelaidan, dated August, 21, 2002 (RT PTA 12), attached hereto as **Exhibit GG**.
[43] Kadi Submission to OFAC (KADI39601-39614), attached hereto as **Exhibit HH**.
[44] U.S. Treasury Department Treasury Designates Bosnian Charities Funneling Dollars to Al Qaida, May 6, 2004 (ASH000407-410), attached hereto as **Exhibit II**; U.S. Treasury Department Protecting Charitable Organizations (BUR-PEC10851-854), attached hereto as **Exhibit JJ**.
[45] *Id.*

The Honorable Frank Maas
August 10, 2015
Page 7

---

the Islamic Coordination Council, a group of non-governmental organizations providing emergency relief assistance to Pakistan and Afghanistan.[46]

### 7) SJRC

In 1999, the Kingdom established the SJRC and appointed Jelaidan as the Executive Director.[47] According to U.S. authorities, Jelaidan proceeded to use the SJRC as a front to "move money and men into and from the Balkans" for Usama bin Laden.[48] SJRC publicly discussed its involvement with terrorist attacks in Albania, Kosovo, Egypt, Tanzania and Kenya. And between 1998 and 2001, the SJRC channeled more than $74 million to al Qaida members and loyalists affiliated with SJRC bureaus.

In sum, Jelaidan's activities with these Saudi charities span over two decades during a key period of growth for the radical Islamic movement, ultimately culminating in the September 11th Attacks. Accordingly, documents in Jelaidan's possession, custody, or control pertaining to these charities are crucial to Plaintiffs' case and must be produced.

### Jelaidan's Corporate Activities

Plaintiffs' document requests pertaining to Jelaidan's corporate activities are Plaintiffs First Set Part A: numbers 1 & 23, Part B: numbers 1, 2, 3, 4, 6, 12-26, and 35-43, and Supplemental Request numbers 7, 10, 23, 24, 31, 51, 53, and 54.[49]

Jelaidan was involved with the following seven corporate entities: Abrar, Caravan Development Group, Cavallo Ltd, Euro Invest Ltd, KA Stan, Maram Travel, and Trading Services.[50]

All of the above corporate entities with the exception of Trading Services had beneficial owners that, along with Jelaidan are Executive Order 13224 designees. The limited documents available to Plaintiffs indicate that funds were regularly transferred among the entities with no apparent business reason for doing so.

---

[46] Brief Information on ICC Member Organizations Health Services in Afghanistan (IIRO112762) dated October 16, 2001, attached hereto as **Exhibit KK**; Les Resaux d'Allah (excerpt) (KADI92397), attached hereto as **Exhibit LL**.
[47] Affirmation of Sean P. Carter in Opposition to Motion to Dismiss, MDL Dkt. No. 1257, Exhibit 3, at 17; Plaintiffs Opposition to Sulaiman Al Rajhi Motion to Dismiss, Declaration of Justin B. Kaplan, MDL Dkt. No. 1031 Exhibit 8, at 15.
[48] Nick Wood, *US fears terrorist attack in Kosovo*, BBC News, April 3, 2000, http://news.bbc.co.uk/2/hi/europe/700435.stm, attached hereto as **Exhibit MM**.
[49] Exhibit A at 10, 17-19, 21-25, 28-30; Exhibit B at 4, 7-8, 12-13.
[50] Exhibit HH; Decision of French Tribunal (KADI103302), dated November 16, 2012, attached hereto as **Exhibit NN**; Plaintiffs Opposition to Yasin Kadi Motion to Dismiss, MDL Dkt. No. 1763, Exhibit 12, Meeting to Transfer Shares, dated August 1, 1997 (KADI73784), attached hereto as **Exhibit OO**; Exhibit FF; Notification of Suspicious Act (KADI40079), dated October 11, 2002, attached hereto as **Exhibit PP**; Faisal Finance Application Form (KADI39955), attached hereto as **Exhibit QQ**.

The Honorable Frank Maas
August 10, 2015
Page 8

For instance al Qaeda founder and international procurement specialist Mahmoud Salim founded Maram in Turkey in the mid-1990s. Shortly afterwards he sold the company to two other long-time al Qaeda supporters, Mohamed Louay Bayazid and Jelaidan. Jelaidan then recruited Yasin Kadi to provide the financing for a Maram-run project to build student housing for a Yemen-based university founded and run by another long-time al Qaeda supporter, Abdel Majid Zindani. All of the above were Executive Order 13224 designees. From late 1997 until early 1999, Kadi sent Jelaidan $1.25 million for the project. The money was transferred via a series of accounts in Swiss and Turkish banks owned by Saudi businessmen. Some of the funds ended up in Jelaidan's personal account, though the bulk simply went missing.[51]

There were similar financial transactions directed from these corporate entities to the Saudi charities affiliated with Jelaidan. Similar to the inter-corporate transactions, the transactions between the Jelaidan affiliated corporations and Saudi charities do not demonstrate charitable activities. On the contrary, money seems to disappear amidst a set of complex financial transactions.

In 1996, for example, in post war Bosnia, Yasin Kadi bought Depozitna Bank. Kadi installed Chafiq Ayadi as the head of the bank, at Jelaidan's recommendation, even though Ayadi had no prior banking experience. The above individuals were all Executive Order 13224 designees. Shortly after Kadi bought Depozitna Bank, the bank made loans of approximately $1 million to Muwafaq, a charity run by Kadi and Ayadi. Muwafaq in turn transferred approximately $200,000 to Ayadi's personal account and the remaining $800,000 to an account owned by the head of IIRO Sarajevo. Depozitna also loaned approximately $600,000 to Euro Invest, a company owned by Jelaidan, Kadi, and Ayadi. Neither Muwafaq, IIRO, Euro Invest or any of the individuals involved could demonstrate any legitimate humanitarian or commercial use for the funds. In 1999, the Bosnians indicted Ayadi and another Muwafaq officer for fraud. The charges were dropped in February 2001, after the loans were repaid by a $1.6 million donation to Muwafaq by Kadi.[52]

In light of Jelaidan's association with these corporate entities, the suspicious transactions involving these entities, and the importance of tracing terrorist funding to its source, especially in the years leading up to the September 11th Attacks, documents in Jelaidan's possession, custody, or control pertaining to these corporate entities are crucial to Plaintiffs' case and must be produced.

### Jelaidan's Failure to Respond to Two Other Requests

Part B of Plaintiffs' first set of document requests, numbers 1, 2, and 3 concern Jelaidan's activities in support of the mujahideen during the Afghan war against the Soviet

---

[51] The Maram example is based upon Plaintiffs reading of documents produced in this litigation as well as other documents gathered by the Plaintiffs. Plaintiffs can more fully brief this issue at the Court's request.

[52] The Euro Invest example is based upon Plaintiffs reading of documents produced in this litigation as well as other documents gathered by the Plaintiffs. Plaintiffs can more fully brief this issue at the Court's request.

Union.[53] Jelaidan produced no documents in response to these requests. Jelaidan was active in the Afghan conflict as a fighter and as a logistician.[54] At first he worked under the banner of the MAK, the organization set up to recruit, provision and train foreign Arab mujahideen. Jelaidan then supported the war effort as well as Usama Bin Laden under cover of the SRC and the MWL.[55] Jelaidan must produce all documents in his possession, custody, or control relating to his support of the mujahideen, as these documents provide a key link between the SRC and MWL on the one hand and al Qaeda on the other, in the years leading up to the September 11th Attacks.[56]

Plaintiffs' document request numbers 28-32 in Part B concern Jelaidan's relations with the "Golden Chain," a list of names of financial supporters of al Qaeda.[57] Jelaidan produced no records in response to these requests. The Golden Chain is a part of an archive found in a raid of the Benevolence International Foundation. It was authenticated by an al Qaeda defector who said that within al Qaeda the document was known as the Golden Chain.[58] It is a list of names, consisting largely of well-known wealthy Saudi businessman.[59] It also contains three names of those that received the funds which were transmitted to al Qaeda. One of these names is Wa'el, widely considered to refer to Wa'el Jelaidan. The Golden Chain supported al Qaeda at its founding in the late 1980s and years later in helping al Qaeda solidify itself after its move from Sudan to Afghanistan.[60] Jelaidan must produce all documents in his possession, custody, or control relating to the Golden Chain as this list provides key information about the funding network that was necessary to carry out the September 11th Attacks.

### Jelaidan has "Control" Over Documents Concerning His Relationship to the Kingdom, the Saudi Charities He Ran, His Corporate Activities, His Support of the Mujahideen, and the "Golden Chain," and Must Produce Them in Accordance with Rule 34.

Rule 34(a) of the Federal Rules of Civil Procedure requires production of all responsive, non-privileged documents within a party's "possession, custody or control" that are responsive to another party's document request. *See United States v. Stein*, 488 F. Supp. 2d 350, 361 (S.D.N.Y. 2007) ("Legal ownership of the requested documents or things is not determinative, nor is actual possession necessary if the party has control of the items. Control has been defined to include the legal right to obtain the documents requested upon demand. The term 'control' is broadly construed."); *Florentia Contracting Corp. v. The Resolution Trust Corp.*, No.

---

[53] Exhibit A at 18.
[54] U.S. Treasury Department Statement on the Designation of Wa'el Hamza Julidan (ASH006003-6005), attached hereto as **Exhibit RR**.
[55] *See supra*, footnotes 24-33.
[56] While the Court sustained an objection to broad discovery requests as to the Afghan jihad generally, it allowed Plaintiffs to pursue more focused inquiries as to how these individuals and entities became affiliated with one another.
[57] Exhibit A at 26-27.
[58] Affidavit of David K. Draper in Opposition to Motion to Dismiss, MDL Dkt. No. 1030, Exhibit 13, at 24, filed July 7, 2005.
[59] Exhibit W at 55 (ASH001484).
[60] *Id.* at 55, 66 (ASH001484, ASH001495).

The Honorable Frank Maas
August 10, 2015
Page 10

---

92 Civ. 1188, 1993 U.S. Dist. LEXIS 5275, at *7 (S.D.N.Y. Apr. 22, 1993) ("Control is defined as the legal right, authority, or ability to obtain upon demand documents in the possession of another.").

If the producing party has the legal right or the practical ability to obtain the documents, then it is deemed to have 'control,' even if the documents are actually in the possession of a non-party." *Scovin v. Great W. Life & Annuity Ins. Co.*, No. 3:02CV1161, 2006 U.S. Dist. LEXIS 71386, at *8-9 (D. Conn. Sept. 29, 2006) (citing *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 236 F.R.D. 177, 180 (S.D.N.Y. 2006)). The federal courts have been clear that a party may not forego his duty to produce responsive documents by asserting that they are "not in my possession," and must produce documents where the party has the legal right to obtain such documents on demand. *See e.g.*, *Scott v. Arex, Inc.*, 124 F.R.D. 39, 41 (D. Conn. 1989).

Courts have held that "control" "does not require that a party have actual managerial power over the foreign corporation, but rather that there be close coordination between them." *DeSmeth v. Samsung Am.*, No. 92 Civ. 3710, 1998 U.S. Dist. LEXIS 1907, at *32 (S.D.N.Y. Feb. 19, 1998); *see also Afros S.P.A. v. Krauss-Maffei Corp.*, 113 F.R.D. 127, 129-132 (D. Del. 1986) (examining totality of relationship between two entities to determine "control").

Courts have consistently held that corporate officers and directors have "control" over corporate documents. *A.F.L. Falck, S.p.A. v. E.A. Karay Co.*, 131 F.R.D. 46, 49 (S.D.N.Y. 1990); *Scott*, 124 F.R.D. at 41; *Riddell Sports v. Brooks*, 158 F.R.D. 555, 558 (S.D.N.Y. 1994) ("It is well-established that an individual party to a lawsuit can be compelled to produce relevant information and documents relating to a non-party corporation of which it is an officer, director or shareholder."); *Hardin v. Belmont Textile Mach. Co.*, No. 3:05CV492, 2007 U.S. Dist. LEXIS 57937, at *8 (W.D.N.C. Aug. 7, 2007) (holding that home computers used for work benefitting corporations owned by individual and located on a property owned by the individual were under the control of the individual); *Kamatani v. BenQ Corp.*, No. 2:03-CV-437, 2005 U.S. Dist. LEXIS 42762, at *16-19, *29-30 (E.D. Tex. Oct. 6, 2005) (deeming 49% owner of joint venture to have control over joint venture's documents and sanctioning individual for misrepresenting that he lacked control over documents, and for, among other things, not diligently searching his records).

Documents pertaining to a company have been deemed to be in the possession, custody or control of *former* directors and officers as well. *Scovin*, 2006 U.S. Dist. LEXIS 71386, at *8-9 (rejecting a company's argument that it did not have "control" over documents believed to be in possession of the company's former secretary, even though the secretary had not worked at the company for 5 years); *U & I Corp. v. Advanced Med. Design, Inc.*, 251 F.R.D. 667, 675 (M.D. Fla. 2008) (finding it "highly unlikely" that a business could find no responsive email correspondence between "past and present" employees when business allegedly checked these former employees' personal computers, especially because the business "fail[ed] to submit an affidavit from a knowledgeable individual verifying the scope of the search, the efforts taken to locate documents, the inability to identify and produce such documents and the date when

The Honorable Frank Maas
August 10, 2015
Page 11

---

these documents were deleted or removed from the personal computers."); *In re Triton Energy Ltd.*, No. 5:98CV256, 2002 U.S. Dist. LEXIS 4326, at *19 (E.D. Tex. Mar. 7, 2002) (requiring current and former directors to submit their hard drives to computer specialist for review of email correspondence); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 236 F.R.D. at 182 (rejecting argument that former executive did not have control of corporate documents and requiring former executive to produce documents, noting that he "overs[aw] the very operations that gave rise to the Complaint").

Here, Jelaidan has had close relations with Saudi leadership for more than 25 years. He has been an officer, director, founding member, employee, and account manager for numerous Saudi charities. In many cases, he was appointed to these positions by members of the Saudi royal family. He also associated with, and was an active member of, at least seven corporate entities that, like the Saudi charities, were involved in the growth and funding of radical Islam and designated terrorist organizations in the years leading up to the September 11th Attacks. The headquarters for some of these organizations, where they received mail and other correspondence, was Jelaidan's business address in Jeddah, Saudi Arabia.[61] For instance, Trading Services, a Jelaidan company, operated from Jelaidan's business address, PO Box 1436, Jeddah, Saudi Arabia. Rabita Trust also operated from the same address, and Jelaidan used the address to open a Citibank account in Geneva. Jelaidan certainly has control of records kept at his own address.

Jelaidan has devoted the past 25 years of his life to the growth of the Wahabi Islamic movement as a close confidant, employee, director, officer, and/or agent of the Saudi charities, the Kingdom, and the corporate entities noted above. It defies reason that he has just three documents in his possession, custody, or control that capture the totality of these relationships between him and the Kingdom, between him and the Saudi charities, and between him and nine corporate entities. *See Cooper Industries, Inc. v. British Aerospace, Inc.*, 102 F.R.D. 918, 920 n.2 (S.D.N.Y. 1984) (documents used in ordinary course of business presumed to be in control of business); Ari M. Berman and Lyndsey R. Cholak, *So Simple to State, So Hard to Apply; Interpreting 'Possession, Custody and Control' in Today's Complex Corporate World*, New York Law Journal (May 16, 2011) ("Merely stating that one does not have control is not sufficient if the requested documents are of the type that would be used in a company's ordinary course of business.").

Further, Plaintiffs were not just requesting random documents from Jelaidan relating to the activities of the Kingdom, the Saudi charities, or the corporate entities. Rather, Plaintiffs seek documents that relate or pertain to *Jelaidan's activities* with and within these entities and instrumentalities. Therefore, even more so than in *Slovin*, which involved document requests related to a corporate entity generally, Jelaidan has no reasonable excuse for not producing documents about his own activities. This case closely parallels *In re Flag Telecom Holdings, Ltd. Sec. Litig.* where a former executive was required to produce corporate documents when he "overs[aw] the very operations that gave rise to the Complaint." Here, likewise,

---

[61] *See* Exhibit FF; Exhibit GG; Exhibit PP; Exhibit QQ.

The Honorable Frank Maas
August 10, 2015
Page 12

---

Plaintiffs seek documents explaining Jelaidan's relation to the Kingdom, the Saudi charities, and his corporate entities concerning the very operations that gave rise to this MDL.

Finally, the inference that a defendant has failed to comply with discovery obligations grows stronger when defendant previously committed discovery violations. *See, e.g., Zervos v. S.S. Sam Houston*, 79 F.R.D. 593, 595 (S.D.N.Y. 1978) (requiring party to produce banking documents despite party's statement that no documents were in his possession when he had already committed discovery violations). Here, Your Honor has already sanctioned Jelaidan for "fail[ing] to meet even the most basic discovery obligations" and noted that his "misconduct spans a history of seven years and *persists to this day*."[62] Accordingly, Your Honor should disregard out of hand Jelaidan's pretextual excuses for his ongoing discovery violations and compel him to produce the categories of documents discussed above.

### Conclusion

By reason of the foregoing, Plaintiffs' respectfully request that the Court order Jelaidan to immediately produce all documents and materials pertaining to his relationship with the Kingdom; all documents and materials relating to his activities on behalf of Saudi charities; all documents and materials relating to his corporate activities; all documents and materials relating to Jelaidan's support of the mujahideen, and all documents and materials concerning the "Golden Chain." Given the history of Jelaidan's non-compliance in these proceedings, as detailed by the Court in its October 28, 2013 Memorandum Decision and Report and Recommendation, severe sanctions are warranted if Jelaidan cannot promptly produce the requested documents.

Respectfully submitted,

For

Jerry S. Goldman, Esq.
THE MDL 1570 PLAINTIFFS' EXECUTIVE COMMITTEES

JSG

cc:   The Honorable George B. Daniels (via Fed-Ex)
      MDL-1570 Counsel of Record (via ECF)

---

[62] Memorandum Decision and Report and Recommendation, at 9, attached hereto as **Exhibit SS** (emphasis added).