# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHN DOES 1 THROUGH 7 | |
|     Plaintiffs, | |
|         v. | No. 20 Misc. 740 (KPF) |
| THE TALIBAN *et al.*, | |
|     Defendants. | |
| IN RE: TERRORIST ATTACKS ON SEPTEMBER 11, 2001 | No. 03 MD 1570 (GBD)(SN) |
| FIONA HAVLISH *et al.*, | |
|     Plaintiffs, | |
|         v. | No. 03 Civ. 9848 (GBD) (SN) |
| SHEIKH USAMAH BIN-MUHAMMED BIN-LADEN, a.k.a. OSAMA BIN-LADEN *et al.*, | |
|     Defendants. | |

**BRIEF OF THE NGO UNFREEZE AFGHANISTAN AS *AMICI CURIAE*
ON BEHALF OF DA AFGHANISTAN BANK AND THE AFGHAN PEOPLE**

TABLE OF CONTENTS

Introduction ..... 1

Argument ..... 3

   1.   The funds at issue belong to the central bank of Afghanistan, and are held for the benefit of the Afghan people. ..... 3

   2.   The assets of the DAB, as a central bank, are entitled to immunity from attachment and execution under the Foreign Sovereign Immunities Act. ..... 4

   3.   The exception to sovereign immunity under the Terrorism Risk Insurance Act of 2002 ("TRIA") does not apply to the DAB's Assets. ..... 5

   4.   Because seizing the Central Bank's assets to pay compensation to the 9/11 victims would violate international law, the Court should be very wary of expanding the scope of the TRIA exception. ..... 7

   5.   Preserving the sovereign immunity of the Central Bank is in the national interest of the United States, as well as of the people of Afghanistan. ..... 8

Conclusion ..... 9

TABLE OF AUTHORITIES

International Court of Justice, *Jurisdictional Immunities of the State (Germany v. Italy; Greece intervening)* (Feb. 3, 2012), avail. at
https://www.icj-cij.org/public/files/case-related/143/143-20120203-JUD-01-00-EN.pdf

Afghanistan Bank Act, Avail. at
https://dab.gov.af/sites/default/files/2018-12/DABLaw1English_2.pdf

Foreign Sovereign Immunities Act of 1976

Terrorism Risk Insurance Act of 2002

U.S. Dep't of State, *State Sponsors of Terrorism,*
https://www.state.gov/state-sponsors-of-terrorism

INTRODUCTION

On behalf of the non-governmental organization Unfreeze Afghanistan, we request that you accept this *amicus* brief in the cases of *Havlish v. Bin Laden* and *John Does 1-7 v. The Taliban*. We submit this brief to urge the Court to preserve the assets of Da Afghanistan Bank, which is Afghanistan's central bank ("**DAB**" or the "**Central Bank**"), for the benefit and welfare of the people of Afghanistan.

We are U.S. women who have been working on matters related to Afghanistan for over 20 years. Our experience and expertise ranges from helping to run some of the largest women's organizations in Afghanistan, advising the Afghan Ministry of Finance, supporting U.S. policy as analysts, raising funds to build girls' schools, successfully lobbying Congress to create a fund to compensate innocent Afghan victims of U.S. bombings, and briefing Congress on Afghanistan policy issues.

In November 2021, we created Unfreeze Afghanistan to address the plight of the millions of Afghans who had not fled the country after the U.S. withdrawal, and were facing poverty and stagnation in light of the country's collapsing economy. It is our belief that, after a peace deal brokered by our own government, and with the war now having ended even if not in the manner the U.S. would have preferred, Afghanistan must now enter a post-conflict period of economic reconstruction. Failure to do so will result in the prolongation of a humanitarian disaster.

We have met with the U.S. Congress, the Biden Administration, the World Bank and the IMF to encourage them to release frozen Afghan funds in a carefully sequenced and overseen manner. We have been advocating for the release of aid funds to pay the salaries of Afghan teachers, health professionals and other employees who serve the public good, as well as for providing water and energy infrastructure, food transport and distribution, and for the purchase

1

of food, medicine, and other essential imports. We believe as well that the country's economy must have a chance to restart, and for commerce, agriculture and trade to recover, to avoid the continuation of the Afghan people's extreme deprivation.

From March 28 through April 2, 2022, Unfreeze Afghanistan sent an 8-person fact-finding women's delegation to Afghanistan, the first such delegation to visit Afghanistan since the overthrow of the previous government and installation of a government formed by the insurgent forces. Our findings from this trip compel us to submit this *amicus* brief.

We are especially committed to advocating for the interests of Afghan women, as they are in particular peril. Large numbers of women have suffered due to the general contraction of the economy, where women are often the first to lose their jobs. The return of DAB assets will enable the banking sector to resume and will stabilize currency and pricing, which will afford women greater opportunities to work and run businesses.

We are also extremely concerned about the implications of a protracted economic crisis in Afghanistan on regional and global stability and on the national security interests of the United States. The continuation of the current economic crisis will increase the outflow of refugees into neighboring countries and ultimately Western Europe, will give fuel to radical extremism including ISIS-K, will encourage ISIS-K's and other extremists' recruitment of young Afghan men, who have no other livelihood or hope of employment, and will turn the country into a permanent welfare state dependent on humanitarian aid instead of attaining sustainable development. And depleting the assets of the DAB under U.S. government control will reduce the ability of the United States to play a constructive role in structuring the release of those funds in a manner that will protect against these threats and best serve the needs of the Afghan people.

We want to make it clear that we are not a political group and we do not have a political message. Our efforts are not in any way aimed at defending, supporting or otherwise endorsing the Taliban. For us, Afghanistan is its people, not its current political regime. Our concern is for the civilian population of Afghanistan, who, after four decades of fighting, deserve a chance to rebuild their lives through paid employment and normal governmental functions that benefit the entire population.

We also want to make clear that in filing this amicus brief we do not wish to minimize in any way the suffering and loss inflicted upon the families of the victims of the coordinated terrorist attacks that occurred on September 11, 2001, in New York City, Arlington, Virginia, and Shanksville, Pennsylvania. This terrible and immoral atrocity, which violated United States law, international law, and Islamic law, shocked the conscience of all reasonable people. We hope the families of the 9/11 victims, and the Court, will understand that our desire to protect the futures of the Afghan people, in line with what we believe to be both U.S. and international law, in no way reflects any lack of respect for and appreciation of the suffering and loss of the victims of 9/11.

## ARGUMENT

**1. The funds at issue belong to the central bank of Afghanistan, and are held for the benefit of the Afghan people.**

Da Afghanistan Bank was established as the central bank of the State of Afghanistan in 1957, and currently exists and operates in accordance with the Afghanistan Bank Law, which was drafted with U.S. government input and published in the Official Gazette of Afghanistan on December 17, 2003. Section 1.2 of the Afghanistan Bank Law provides that:

> Da Afghanistan Bank is a juridical person with full capacity under the law, may conclude relevant contracts, acquire and dispose of movable and immovable property, and issue its relevant securities and otherwise borrow, and be a party to legal proceedings.

3

The Central Bank is governed by a 7-person "Supreme Council," which is established by the Afghanistan Bank Law as its "highest policy and decision making body." The Law further provides that:

> Da Afghanistan Bank shall, in accordance with this law, be entirely independent in the pursuit of its objectives and no person shall seek to exercise improper influence on members of the decision-making bodies of Da Afghanistan Bank in the performance of their tasks or interfere in any other way in the activities of Da Afghanistan Bank.

Among the objectives and basic tasks assigned to the Central Bank is the responsibility "to hold and manage the official foreign exchange reserves of Afghanistan." Because the DAB's Assets represent the foreign exchange reserves of the State of Afghanistan and are held by its central bank, they should not be attributed to, or deemed owned by, any other person or group, including the Taliban.

2. **The assets of the DAB, as a central bank, are entitled to immunity from attachment and execution under the Foreign Sovereign Immunities Act.**

Approximately $7 billion of Afghanistan's foreign exchange reserves were put in the United States for the sole purpose of safeguarding them. We would expect US authorities, including the courts, to protect the assets of the Central Bank. as the source of liquidity supporting international trade and the nation's lender of last resort, undergirding the country's entire banking system.

We understand that the Foreign Sovereign Immunities Act of 1976 ("**FSIA**") establishes a comprehensive and exclusive framework for obtaining and enforcing judgments against a foreign state in civil suits in U.S. courts. There are only a limited number of exceptions provided in the FSIA, in particular as applied to central banks. None of them apply to the DAB's assets.

We understand that the FSIA contains a "terrorism exception," which provides a private right of action for U.S. citizens injured by state sponsors of terrorism, and abrogates foreign

4

states' sovereign immunity from damages suits arising from certain terrorist acts, so long as the foreign state was designated a state sponsor of terrorism. But this provision is inapplicable to the Central Bank, both because Afghanistan is not (and has never been) designated by the United States as a state sponsor of terrorism,[1] and because this provision does not apply to the assets of a central bank. 28 U.S.C. § 1611.

3. **The exception to sovereign immunity under the Terrorism Risk Insurance Act of 2002 ("TRIA") does not apply to the DAB's Assets.**

We understand that there is only one other exception to the sovereign immunity of central bank assets, which is to be found in Section 201(a) of TRIA. But that provision, which we understand was crafted by the U.S. Congress primarily to deal with a specific set of circumstances relating to Iranian governmental assets, only applies if a narrow set of conditions are satisfied. For the conditions to be satisfied, the person against whom attachment or execution is sought must be a terrorist party or an agency or instrumentality of a terrorist party. *The Central Bank is not a terrorist party or an agency or instrumentality of a terrorist party*.

We understand that TRIA defines "terrorist party" to include "a terrorist, a terrorist organization . . . or a foreign state designated as a state sponsor of terrorism." The DAB is certainly not a terrorist or a terrorist organization. It is a central bank. As already noted, neither it nor Afghanistan has been designated as a state sponsor of terrorism.

Because it seems to be the only argument that they can make, we assume that the plaintiffs will argue that the Central Bank is an agency or instrumentality of a terrorist organization, namely of the Taliban (against whom the plaintiffs have a default judgment). It is not. The Central Bank is an agency or instrumentality of the State of Afghanistan, not of the current regime in Kabul, or of any private party, including the Taliban.

---

[1] U.S. Dep't of State, *State Sponsors of Terrorism,* https://www.state.gov/state-sponsors-of-terrorism .

We agree with the U.S. government's Statement of Interest (the "**Statement of Interest**") that there is a distinction between a foreign government and a foreign state, and that a state can "recognize or treat an entity as a state while denying that a particular regime is its government." This means that there is a distinction between property owned by the state, and property owned by a regime that comprises the government of that state. The assets of a central bank should be considered those of the foreign state itself, not its government.

The Taliban's *de facto* current control of the Islamic Emirate of Afghanistan does not give the Taliban, which is a private group based in Kandahar not a governmental entity, ownership or control over the Central Bank's assets or make the Central Bank its agency or instrumentality. We understand from the Statement of Interest that, for that to be true, the DAB would have to have been "a means through which a material function of the [Taliban] is accomplished," to have "provided material services to, on behalf of, or in support of the [Taliban]," or to be "owned, controlled, or directed by the [Taliban]." None of these things is true. And none can be true, because the Central Bank is an agency or instrumentality of the State, and as explained at the outset has a separate legal existence, and is controlled by an independent governing body, which is statutorily protected from improper influence by third parties.[2]

This is moreover particularly true given that the United States has not recognized the regime in Afghanistan, or any other entity or group, as the government of Afghanistan or as part of such a government (and seems unlikely to do so for the foreseeable future). As explained in the Statement of Interest, "a regime not recognized as the government of a state is not entitled to property belonging to that state located in the United States." So for multiple reasons we cannot

---

[2] We understand that over 20 years ago OFAC determined DAB to be controlled by, or to act on behalf of, the Taliban, for the purpose of imposing sanctions on Afghanistan at that time. But the DAB was removed from the Specially Designated Nationals and Blocked Persons List – i.e. those sanctions ended – and the OFAC has not made a similar, more recent determination.

see how the Central Bank's assets can be attributed to the Taliban organization,[3] or even to the current political regime in Kabul.

   **4. Because seizing the Central Bank's assets to pay compensation to the 9/11 victims would violate international law, the Court should be very wary of expanding the scope of the TRIA exception.**

While in the United States the rules of sovereign immunity have, since 1976, been codified in the FSIA, the doctrine is a facet of international law respected by all countries. In 2012 the International Court of Justice ("**ICJ**") was asked to resolve a dispute between Italy and Germany, involving a suit by Italians who during the Second World War were deported to Germany and forced to work in German armaments factories in grave violation of the laws of war. Notwithstanding the nature of the crime that gave rise to the suit for damages, which Germany did not contest, the ICJ held that "the action of the Italian courts in denying Germany the immunity to which the Court has held it was entitled under customary international law constitutes a breach of the obligations owed by the Italian State to Germany."[4] In coming to that conclusion, the ICJ surveyed the law in numerous countries, and noted that the "terrorism exception" in the FSIA "has no counterpart in the legislation of other States."

We understand that in the U.S. courts U.S. legislation will always take precedence over conflicting international legal norms. But in the current case, where only a very aggressive and broad reading of the TRIA exception, combined with factual determinations that we feel are not

---

[3]   The plaintiffs' argument presumes that the Taliban is a terrorist organization, as defined in U.S. law. We are not sure that this is the case. While we are highly critical of many aspects of Taliban ideology, including particularly their systematic repression of the rights of women, recent terrorist attacks in Afghanistan have taken place against the Taliban regime, or in spite of its efforts to curb ISIS-K. We understand that the definition of "terrorist organization" in the law usually refers to organizations that have been designated as such by the Secretary of State. We do not believe that the Afghan Taliban has been so designated. There is another group, called the *Tehrik-e Taliban Pakistan*, which has been so designated, but that terrorist organization is primarily active in Pakistan, and should not be confused with the Afghan Taliban. We understand that there are other ways in which the plaintiffs may argue that Taliban in Afghanistan are a terrorist organization, but we believe that among the Taliban's many faults this is not one of them, at least at present.

[4]   *Jurisdictional Immunities of the State (Germany v. Italy; Greece intervening)* (Feb. 3, 2012), *avail. at* https://www.icj-cij.org/public/files/case-related/143/143-20120203-JUD-01-00-EN.pdf .

7

justified, would allow the assets of the Central Bank to be used to pay damages to the 9/11 plaintiffs, we would urge the Court to be mindful of the international legal principles that underlie the FSIA and to construe the TRIA exception narrowly, as we believe was intended given its history.

5. **Preserving the sovereign immunity of the Central Bank is in the national interest of the United States, as well as of the people of Afghanistan.**

In August 2021, President Joe Biden remarked that the United States' "only vital national interest in Afghanistan remains today what it has always been: preventing a terrorist attack on [the] American homeland." But a collapsing economy gives terrorist groups room in which to operate in Afghanistan and provides a pool of potential recruits. Both al-Qaeda and the anti-Taliban Islamic State in Khorasan (ISIS-K) could pose a significant threat inside Afghanistan and in the region, according to recent U.S. government estimates. While they may be unlikely to successfully orchestrate an attack in the United States, they could conduct attacks against U.S. and Allied targets in other countries. As the commander of U.S. Central Command noted, "ISIS-K may gain strength and be emboldened to expand its operations and target neighboring countries" absent sustained U.S. pressure. To be clear, the threat that is posed does not come from the current regime in Kabul, or from the Taliban organization. It comes from the continued meltdown of the economy of Afghanistan.

We understand the concern that, notwithstanding the legal independence of the DAB, the Taliban might find a way to appropriate Central Bank funds for inappropriate and undesirable purposes. Dr. Shah Mohammad Mehrabi, who has spent 20 years on the governing Supreme Council of the Central Bank and is the current chair of its Audit Committee, has proposed releasing funds in a limited, monitored, and conditional way. He has suggested sending $200 million per month, and verifying that these funds are used for the purpose of stabilizing the

currency and restoring liquidity in the economy. The use of funds would be audited by an international auditing firm, something that has continued through the changes of August 15, 2021. If there is any misappropriation, the funds could be cut off immediately.

Any such arrangements will need to be discussed and agreed between the U.S. government – including the White House, the Treasury Department and the State Department – and the members of the DAB's Supreme Council, particularly those who are resident in the United States such as Dr. Mehrabi. The point we are making is that the assets of the Central Bank now held at the Federal Reserve Bank of New York are not and will not be under the control, or even accessible by, the Taliban. They are and will remain assets of the Central Bank, and will be used solely for the benefit of the people of Afghanistan.

CONCLUSION

As stated at the outset, in making this submission Unfreeze Afghanistan does not mean to deny or minimize the suffering and loss of the 9/11 plaintiffs, and the many other families whose spouses, parents, children and friends died or were grievously injured by terrorist atrocities on September 11, 2001, or to disrespect their memory. Compensation for their losses is fair and just, but not if it comes from assets that do not belong to the Taliban, and instead are the foreign exchange reserves of the State of Afghanistan held by its Central Bank.

The complete freezing of Afghan's Central Bank assets is a major factor that has pushed a fragile economy over the edge. Without access to its reserves, the Central Bank can't hold the dollar auctions that previously stabilized the local currency. Due to the cash shortage, banks have been forced to restrict the amount of money people can withdraw from their savings. Merchants, from small shopkeepers to mid-size and large businesses, cannot order the inventory they need, and even if they could people have little cash with which to buy it. Inflation has risen

astronomically, with price increases for basic food staples sometimes increasing several times in just one day.

The most recent projections place 23 million people — 55% of the country's population — at a high level of acute food insecurity. As we witnessed on our recent trip, many Afghans must choose between buying food and paying their rent. Save the Children is estimating that 5.5 million children will face crisis levels of hunger in the second half of this year. Reportedly some parents are making the even more excruciating choices of selling a child so that their other children may survive.

Humanitarian aid groups are trying to fill the gap, but they, too, face enormous difficulties transferring funds into the country. Even when funds are successfully transferred, they often can't be withdrawn because of limited cash in the banks. Moreover, humanitarian aid, while critical, cannot replace private enterprise.

The U.S. invested two decades in constructing and strengthening a modern, efficient and independent central bank, which can issue banknotes and currency, be the lender of last resort, and provide liquidity to the commercial banks. We do not wish to minimize the challenges associated with returning the Central Bank to full functionality, in a step-by-step manner consistent with the safeguards alluded to above. The blocking order imposed by the Executive Order will remain in place, and will not be lifted or relaxed until the President, the U.S. Department of the Treasury, the U.S. Department of State, and other relevant authorities are convinced that protections are in place to ensure that whatever funds are made available out of these assets will be appropriately ring-fenced, and will be deployed solely for the benefit of the Afghan people, and for no other purpose. We understand that the DAB looks forward to having constructive discussions with that shared objective in mind. But for there to be funds available for the Central Bank to achieve that objective, its assets must be preserved.

For the multiple reasons set forth above, we urge the Court to reject the judgment plaintiffs' efforts to execute against the Central Bank's assets. The DAB's Assets belong to the Central Bank, not the Taliban, and the Central Bank is an agency or instrumentality of the State of Afghanistan, not of the Taliban. The DAB's Assets are therefore entitled to immunity under the FSIA and international law and, as importantly, are simply not the property of any defendant in these cases.

Respectfully submitted,

UNFREEZE AFGHANISTAN

Medea Benjamin, 666 G St. NE, Washington DC 20002, 415-235-6517, medea.benjamin@gmail.com

Cheryl Benard, Washington DC

Masuda Sultan, New York City

Sunita Viswanath, New York City

Ann Wright, Honolulu, Hawaii

12